**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

| | |
|---|---|
| **EOLAS TECHNOLOGIES INCORPORATED,** | |
| **Plaintiff,** | **Civil Action No. 6:15-cv-01038-RWS** |
| **v.** | **LEAD CASE** |
| **AMAZON.COM, INC.,** | **JURY TRIAL DEMANDED** |
| **Defendant.** | |

## JOINT REVISED MOTION FOR ENTRY OF A PROTECTIVE ORDER WITH SEVERAL POINTS OF DISAGREEMENT

Pursuant to the Court's Order (Dkt. 44) and the Court's oral guidance and orders at the April 7, 2016 scheduling conference, Plaintiff Eolas Technologies Incorporated ("Eolas" or "Plaintiff") and Defendants Amazon.com, Inc. ("Amazon"); Google Inc. ("Google"); and Wal-Mart Stores, Inc. and Wal-Mart Stores Texas, LLC ("Walmart") (collectively "Defendants") jointly submit a revised proposed Protective Order, attached hereto. The parties agree on the vast majority of issues, but disagree as to several specific issues. The parties' proposals are outlined below and highlighted in the attached proposed order (Eolas in green and Defendants in yellow).

### Issue #1 (Source code printouts)

*Eolas's Proposal*:

Just as in the prior protective order between Eolas, Amazon, and Google (attached as Exhibit 1 to this filing), the receiving Party should be able to print a reasonable number of pages. As shown by Exhibit 2 attached to this filing (the joint motion for a protective order in the prior case), an allowance for printing a reasonable number of pages was not even disputed in the last case. As a compromise, and as provided in Eolas's prior proposal submitted to the Court (Dkt.

71-3 at 14) and discussed at the April 7, 2016 hearing (but with slightly modified language here to ease Defendants' concerns), Eolas has further agreed to state that certain continuous blocks of printed code requests are presumptively objectionable (*e.g.*, more than 30 consecutive pages not from the same routine or function). This affords significant protections to producing Parties. This proposal provides Defendants the primary protection they requested at the April 7, 2016 hearing (*i.e.*, limits on consecutive pages), but provides reasonable allowances for a receiving Party given that code has yet to be made available and the parties are unsure as to the scope of productions and number of code versions they will be dealing with.

Contrary to Defendants' argument, Eolas's proposal is consistent with what Eolas proposed in its prior proposal and at the April 7, 2016 hearing. Eolas has not changed its position. Eolas noted its proposed exception at the hearing, and pointed its proposal out to counsel for Defendants at the hearing. Moreover, Eolas's proposal does not present unnecessary copying risks. Eolas and its experts do not control how long a routine or function to perform an operation may be in terms of lines of code. In Eolas's counsel's experience, routines and functions do not often exceed thirty pages, but at times they do. And when they do, it can be necessary to print that code consecutively so as to capture the operations being done in sequence. Just as it can be necessary to have an entire email string for context, it can also be necessary to have an entire routine or function to provide necessary context. Pointing to words or operations out of context is not always reasonable or helpful.

Moreover, Defendants' proposal goes too far. It seeks to shift the burden to object to the receiving Party (*i.e.*, by noting that "[t]he receiving Party shall not" instead of following the operation of the protective order, which requires that the producing Party object). Such a shift in burdens is unnecessary here. Eolas's "presumptively objectionable" language deals with

2

Defendants' concerns. Eolas understands that each receiving Party's source code is important, but vast protections are already in place (including limiting who sees it, the format of what can be seen, logging, and more) are sufficient.

*Defendants' Proposal*:[1]

There really should be no remaining dispute on source code printouts. As Plaintiff has requested, Defendants have removed a specific cap to aggregate amount of source code printouts. Instead, Defendants have agreed to Plaintiff's reasonable standard, merely providing that, should Plaintiff go beyond a reasonable number of printouts, that Defendants may seek relief from the Court, including telephonically.

As Defendants have demonstrated, the longer the length of consecutive page printouts, the increase in the risk of copying an entire program, whether it by unintentional violation of the Protective Order or otherwise. Plaintiff has never disputed this. Rather, at the April 7, 2016 hearing, after raising its own proposal, Plaintiff subsequently – and unequivocally -- agreed to a limit of 30 consecutive pages of source code printouts, and the parties ceased argument on this point based on this representation. Yet, Plaintiff's current proposal does not provide for this limit. Instead, it specifically allows for more than thirty (30) pages "where the requested Source Code Printout is a routine or function that is longer in length than thirty pages." Plaintiff provides no explanation for changing its position now, or why this "routine or function" language, which presents the exact copying risks that Defendants seek to avoid, is even necessary. Plaintiff should be held to its word and agreement at the April 7 Hearing and the agreed 30 consecutive pages, reflected in Defendants' proposal, should be adopted.

---

[1]  Defendants have not repeated, but instead incorporate by reference, their explanations of the importance of source code in the parties' prior submission concerning this dispute.  (Dkt. 71-3).

**Issue #2 (Transporting source code)**

*Eolas's Proposal*:

Consistent with the Court's sample protective order (paragraph 10(k)), Eolas believes that persons authorized to have the Source Code Printouts should be authorized to transmit or receive them to others that are so authorized via Federal express or similar. Defendants' proposal that only hand carry be permitted will unreasonably limit the receiving Party's ability to get copies of code to those authorized to have them. Forcing someone to get on a plane (or drive) and travel for a day or more, when Federal Express and other couriers are reliable and available, is unwarranted. Defendants' proposal also increases the chances of gamesmanship—a producing Party may decide to deliver printouts to an office of a receiving Party's counsel that is not substantively involved in the case, thereby hindering the receiving Party's ability to litigate efficiently. Moreover, Defendants point to no evidence that their proposal is likely to be safer, especially in light of their desire to drive up costs in a significant manner.

If the Court is inclined to agree with Defendants that Federal Express and other couriers should not be used to transport physical copies of code, then Eolas believes that procedures similar to the Court's sample protective order should be followed in terms of source code printing. That is, the producing Party should make encrypted electronic copies of printed code and provide that code to the receiving Party on CDs or DVDs. The information required to decrypt can be sent separately (such as via email) to prevent unauthorized access. Then, when the receiving Party needs to provide the code to consultants or those otherwise allowed to see it (pursuant to the protective order), encrypted electronic copies could be shared with those individuals via "hand carry, Federal Express or other similarly reliable courier," with the information required to decrypt sent separately (such as via email). This sort of procedure would ensure that the producing Party's code is encrypted during transport, but would allow for the

4

parties to go about litigating this case without unnecessary hurdles and costs. Defendants' professed concerns with Eolas's alternative proposal ignore that Eolas's alternative proposal is similar to what the Court's sample protective order calls for, though Eolas's proposal is even more restrictive. Thus, Eolas continues to believe that its original proposal—that printed source code be transported between permitted persons via "hand carry, Federal Express or other similarly reliable courier"—be adopted.

*Defendants' Proposal*:

The parties agree that materials designated "RESTRICTED CONFIDENTIAL SOURCE CODE" shall be stored or viewed at a limited set of locations, and the parties also agree that the secure locations shall be under the direct control of an approved expert or consultant, or counsel at all times. Eolas, however, proposes that the receiving party may use "Federal Express or other similarly reliable courier" to transport Defendants' source code. It now, after the conference with the Court, newly proposes an alternative, that Defendants should provide encrypted electronic copies of printed code in lieu of transporting code via Fedex. Both of these suggestions would undermine the other provisions of this Protective Order that the parties have already agreed to, including those carefully crafted to ensure that source code remain in the direct control of approved experts or consultants, or counsel at all times.

Eolas's proposal would allow it to put printed copies of Defendants' highly sensitive source code into the hands of Federal Express or another similar carrier. However, Federal Express is not under the direct control of anyone associated with this case or under the Protective Order. Indeed, if the printed source code is lost in the mail, there will be no one who can answer for where it went, who obtained access to it, or where it ended up, etc. Even if Federal Express or other similar carriers offer tracking services, there is not a single person responsible for the

5

constant security of the code.  Eolas has not identified a single security precaution it would take in handing over its code to these third parties, including the very services offered by Federal Express to protect more valuable or confidential shipments.  That Federal Express offers such enhanced services ("On-Board Courier service available for 'hand-carry' shipments requiring more assurance of security and control." and "Secure Transportation Solutions") reflects that such additional protections are needed and commercially common.  *See http://customcritical.fedex.com/us/services/air-expedite/.*

Eolas argues that this provision should be included because "[f]orcing someone to get on a plane (or drive) and travel for a day or more, when Federal Express and other couriers are reliable and available, is unwarranted."  Contrary to Eolas's assertion, nothing in Defendants' proposal would prevent Eolas from hiring a courier to hand-deliver printed source code; the proposed terms specifically provide that anyone cleared under Paragraphs 10(e) or 10(i) may carry the code, along with anyone working "***at the direction of***" a person cleared under Paragraphs 10(e) or 10(i).  Having a courier deliver printed source code, rather than standard Federal Express shipping, ensures that the printed source code is delivered to the right person and that Defendants' most sensitive materials are adequately protected for the entirety of the trip. And, that person can answer any questions that may arise if something unexpected occurs in transit.  This does not impose an onerous burden on Eolas, and any burden is greatly outweighed by the importance of maintaining the security of Defendants' source code. Moreover, nothing precludes Eolas's approved experts and consultants from reviewing printed pages of source code in counsel's offices, altogether eliminating the need to transport them.

Defendants also note that Eolas' position regarding the burden of travel contradicts its positions taken in its opposition to transfer motions.  Specifically, in its oppositions, Eolas argues

6

that its consultants, the inventors of the patent-in-suit located in California, and its Chief Technology Officer in Illinois, would not find it inconvenient to travel to the Eastern District; it is not clear why the travel to this district or the offices of Eolas' outside counsel by expert witnesses, chosen and paid by Eolas for the purposes of assisting in this litigation, now present an enhanced burden. Eolas accuses Defendants of attempting to "drive up costs," but it is Eolas that is attempting to avoid taking reasonable measures to protect Defendants' confidential information, and, in order to reduce the burden on Eolas, Defendants have already agreed to take responsibility for getting the source code printouts to the offices of Eolas' outside counsel in the first place.

Eolas's new proposal (not raised during the meet-and-confer process) that Defendants provide encrypted electronic copies of printed code is also not feasible.  Defendants would prefer transport via Federal Express to permitting electronic transport, but believe that neither is warranted.  This late proposal creates a number of security risks, for which Eolas has identified no plan to address.  Each new electronic copy and each new electronic environment increases the risk of both advertent and inadvertent disclosure.  Eolas suggests that it would ensure that the code is "encrypted during transport," but Eolas does not identify the forms of encryption and other electronic security measures that it would use during transfer to protect its information— many forms of encryption do not provide much, if any, security.

Nothing in Eolas's proposal addresses the problems that could arise due after transport and unencryption, when unencrypted electronic copies of Defendants' source code are in Plaintiff's hands.  In fact, Eolas identifies no limits on how the source code would be handled once unencrypted and no security measures protecting the machines storing the unencrypted data, which present a significant, and unwarranted, risk to Defendants' data.  As a result, Plaintiff

7

could copy Defendants' unencrypted code innumerable times without limitation, and without any ability to trace its whereabouts.  This risk, alone, makes the risk associated with Plaintiff's proposal untenable.  The parties agree that electronic copies of Defendants' source code on the Source Code Computer – even more so than printed copies – should be strictly controlled.  The only electronic version of Defendants' source code should be on the Source Code Computer.

To reassure Eolas that Defendants will not produce source code printouts at the office of an attorney who is not substantively involved in the case, Defendants are willing to deliver source code printouts to an attorney office of Eolas's choosing.

8

**Issue #3 (Treatment of notes about source code)**

*Eolas's Proposal*:

Any notes taken by those reviewing Source Code Material cannot include source code, as the parties have agreed. Therefore, any notes taken should not be treated the same as source code. The proper level of protection for such notes should be the same as technical documents describing the operation of the producing Party's products and systems—RESTRICTED – ATTORNEYS' EYES ONLY. Treating such notes—which are work product—as source code may allow the producing Party unreasonable access into the receiving Party's mental state and strategy. Moreover, treating such notes as source code may create arguments that such notes need to be produced to the other side, which would be inappropriate. Contrary to Defendants' suggestion below, notes ***within source code***, made by the persons who wrote the source code, are not the same thing as a reviewer's notes.

However, in the spirit of compromise, Eolas agrees to treat such notes as RESTRICTED – CONFIDENTIAL SOURCE CODE with two caveats: (1) no logging of notes is required; and (2) copies of notes need not be produced to any other party. Defendants now appear to agree to (2), but still disagree as to (1). Requiring logging of notes taken by source code reviewers is unnecessary. The notes are not source code. And attempts by a producing Party to obtain a log regarding such notes would provide unnecessary insight into work product—including when and where individuals may have discussed such notes, how often, and more. Thus, logging of such notes should not be required.

Defendants' cited cases (*Synopsys* and *Superspeed*) are unhelpful. Each involved the copying of code into notes. That is forbidden under the parties' agreed protective order provisions (paragraph 10(r)).

*Defendants' Proposal*:

The parties are largely in agreement concerning the treatment of notes concerning source code. The only dispute is whether a receiving party must log such notes as it would need to for source code. Eolas' only stated concern in this regard has been it does not want to have to produce a log to the receiving party because it would reveal work product—i.e. who has seen the notes. While it is unclear that an identification of who accessed the material and when could constitute work product, Defendants have addressed Eolas' stated concern with a provision that the log of source code notes need not be produced absent a Court Order (e.g. in connection with a Protective Order violation). Eolas has expressed no basis as to how this fails to address its concern. Instead, it would appear that Eolas simply does not want to go through the effort to log this material. However, given the paramount importance of source code to Defendants, there is no reason why notes concerning the source code should not have the same critical safeguards as the source code itself. In fact, Defendants' concerns regarding the protection of its source code should that source code be copied into notes in any form by a reviewing party are well-founded. *See Synopsys Inc., v. Mentor Graphics Corp.*, C-12-06467-MMC(DMR), 2015 WL 3491272, at *1-5 (N.D. Cal. June 2, 2015) (granting sanctions where party reviewing source code copied source code into notes, in violation of the protective order); *Superspeed, LLC v. Google Inc.*, No. H-12-1688, D.I. 196 (S.D. Tex. Nov. 18, 2014) (awarding fees and costs where reviewing party copied lines of source code into notes).

Although Eolas offers a "compromise" position where copies of notes would not be produced to any other party, Defendants have never suggested that source code notes should be produced. Defendants only suggested that the logs themselves should be produced *if* there is an alleged protective violation and pursuant to Court order. Eolas's "compromise" position is a red herring.

11

**Issue #4 (Scope of prosecution bar beyond sample protective order)**

*Eolas's Proposal*:

Eolas proposes using the prosecution bar from the Court's sample protective order (paragraph 11) with two small additions at the end of the paragraph: (1) to make clear that post-grant proceedings initiated by a party other than Eolas are not prosecution of an application (which is what is covered by the Court's standard bar); and (2) to make clear that Eolas will not amend its claims during any post-grant proceedings. These deviations are an attempt by Eolas to provide Defendants with additional protections. They are to Eolas's detriment. Eolas's proposed bar is also similar to what was included in the last case, as shown in paragraph 5 of Exhibit 1.

Defendants now appear to agree that such additional provisions are adequate in some regards, but continue to propose modifications to the prosecution bar that are meant to hinder Eolas and its counsel. First, Defendants unreasonably define "Field of Invention" to go beyond the patent and its claims, and extend into undefined and unnecessary areas like "(a) methods or systems for embedding interactive content in web pages, (b) any products, services, or systems accused by Eolas in this Action." Such a broad definition is unnecessary and is likely to fuel disputes in the future, especially because Eolas has already agreed not to amend claims (thereby preventing any chance at amendments meant to encompass other things). And the gist of Defendants' Field of Invention subsection (c) is arguably covered by what is already in the Court's sample protective order, but adds ambiguity by listing a number of different relationships and patents not at issue here. The Court's sample protective order handles this issue already and should be adopted.

Second, Defendants seek to increase the duration of the bar from one year to two. This is also unnecessary and will only act as an unreasonable restraint on counsel and others signed onto

this protective order. This is particularly true here where the patent-in-suit here expires next year and where Eolas has agreed not to amend the claims of that patent in post-grant proceedings.

Just as the Court's sample protective order provides, the prosecution bar in this case should only cover prosecution of applications, cover the field of the patent-in-suit, and last for one year after conclusion of this Action. Defendants fail to adequately explain why the facts of this case necessitate deviating from the Court's sample protective order. Defendants' proposed additions should be rejected.

_Defendants' Proposal_:

Defendants request a prosecution bar requiring any person who receives their technical confidential information in this action to be restricted, for a limited time, from engaging in related patent prosecution and acquisition activities for others.  This is necessary to prevent the inadvertent misuse of Defendants' confidential information in connection with the competitive affairs of another.  The parties dispute only two points: (1) whether the bar should be limited to only the subject matter of the patent-in-suit, as Eolas contends, or whether the bar should protect defendants based on the subject matter of the documents Eolas requests and reviews during the litigation, and (2) the length of the bar.  Defendants' proposal strikes the right balance between the risk of inadvertent disclosure and the potential harm to Eolas.  _In re Deutsche Bank Trust Co. Americas_, 605 F.3d 1373, 1381 (Fed. Cir. 2010).

The parties' compromise prosecution bar would restrict activities related "directly or indirectly drafting, amending, advising on, or otherwise affecting the scope or maintenance of patent claims."  Because Eolas has agreed to not amend claims during _inter partes_ review or other post-grant proceedings, Defendants have agreed that there is sufficient protection of their information, if the scope and length of the bar are sufficient.  _See Deutsche Bank_, 605 F.3d at

1380 (finding attorneys involved in "making strategic decisions on the type and scope of patent protection," and "strategically amending or surrendering claim scope" create a "much greater" risk of inadvertently disclosing competitive information, regardless of the type of proceedings).

Eolas's proposal regarding the subject matter of the bar is too narrow in that it is limited to the field of invention of the patents-in-suit, and is not limited to the field of invention of Defendants' accused features. Eolas has asserted its patent claims against 13 Google products (including dozens of features within those products), 12 Amazon features, and 7 Walmart features. These products have numerous technical details that have little to do with the patents-in-suit that are reflected in source code and other highly technical documents. Attorneys representing Eolas will get access to the highly technical documents produced by Defendants in relation to the subject matter of the patent-in-suit, and, thus, the bar should reflect the scope of confidential information to which Eolas' counsel will have access. Narrowing the bar to just the scope of the field of the invention would allow counsel and consultants who have reviewed highly confidential information to prosecute patents in the exact space where they have reviewed Defendants' information, which presents the exact risk that the prosecution bar is intended to address in the first place.

Defendants are subject collectively to dozens of patent litigations per year by patent assertion entities in the business of writing patent claims or acquiring patents, solely to tax the inventive work of Defendants' engineers. Those firms could cause incalculable injury to Defendants were they permitted to be advised by persons having first-hand knowledge of Defendants' trade secrets as reflected in source code and other highly sensitive documents. Eolas provides no support for its limited prosecution bar. The financial motivation of its

14

attorneys cannot be a legitimate reason.  Instead, courts consider the burden on the receiving party and its right to have the benefit of counsel of its choice.  *Deutsche Bank*, 605 F.3d at 1381.

Defendants also seek a prosecution bar extending for two years after the conclusion of litigation, which reasonably reflects the risk to the proprietary competitive information in this litigation, balanced with the relative absence of burden on clients of litigation counsel.  Courts have found two-year bars reasonable in those circumstances.  *See Kelora Sys., LLC v. Target Corp.*, Nos. C 11–01548 CW (LB) *et al.*, 2011 WL 6000759, at *7 (N.D. Cal. Aug. 29, 2011) (citing *Applied Signal Tech., Inc. v. Emerging Mkts. Commc'ns, Inc.*, No. C–09–02180 SBA (DMR), 2011 WL 197811, at *2 (N.D. Cal. Jan. 20, 2011)).

15

**Issue #5 (Necessity of acquisition bar)**

*Eolas's Proposal*:

Defendants' proposal here (which is not in the Court's sample protective order or the protective order from the prior case, Exhibit 1) is unwarranted. Defendants' proposal appears to be a solution in search of a problem. That is particularly true here as Defendants have pointed to no evidence suggesting such a situation may ever arise or that the proposal has any relation to this case or its parties. The patents involved in the cases between Eolas, Google, and Amazon all come from the same family, which Eolas already owns. The protective order already calls for Designated Material from this Action to be used in only this Action (see paragraph 7). Moreover, in-house personnel are not permitted to receive HIGHLY SENSITIVE MATERIAL under the protective order, so presumably Defendants are attempting to include outside counsel, experts, and consultants within the scope of this provision. But this would be overbroad, and an undue restraint on those individuals given the vast protections already put in place by this protective order. Finally, the duration of the proposed bar is unduly long and restrictive.

*Defendants' Proposal*:

Defendants propose an acquisition bar because it would be highly prejudicial to allow Eolas, who has demonstrated a proclivity for filing continuation patents applications and then bringing successive lawsuits against individual defendants, to benefit from having access to Defendant's confidential information and to use that information to acquire patents to assert against Defendants' products and services. *See, e.g., Unwired Planet LLC v. Apple Inc.*, No. 12-0505, 2013 WL 1501489, at *7 (D. Nev. Apr. 11, 2013) (finding that "good cause exists to include in the protective order the bar that Unwired's outside counsel cannot use the confidential information obtained in this lawsuit for the purpose of giving advice on patent acquisitions"); *E-Contact Technologies, LLC v. Apple, Inc.*, Case No. 1:11-cv-00426- LED-KFG, 2012 WL

16

11924448, at *2  (E.D. Tex. June 19, 2012) ("This Court finds that the potential harm of inadvertent disclosure outweighs the restriction imposed on counsel for Plaintiff.  An acquisition bar should be included in the protective order."); *see also PersonalWeb Technologies, LLC v. Google Inc.,* et. al., Case No. 6:11-CV-00656 (E.D. Tex. Aug. 9, 2012), D.I. 89, ¶ 2B (barring both prosecution and acquisition activity).  Further, courts in this district have barred counsel from access to confidential information that could be used in the acquisition of patents, and counseling regarding the same, particularly when a plaintiff has brought repeated litigation against a defendant, like Eolas.  *See Hyundai Motor Am. v. Clear With Computers, LLC,* 6:08-cv-302 (E.D. Tex. May 11, 2009), D.I. 71; *ST Sales Tech Holdings, LLC v. Daimler Chrysler Co.,* 2008 WL 5634214 (E.D. Tex. Mar. 14, 2008); *Bright Response, LLC v. Google, Inc.*, 2:07-cv-371 (E.D. Tex. June 2, 2010), D.I. 349 (all barring plaintiff's attorney from confidential documents because of the risk of inadvertent disclosure during the counseling and acquisition of patents).

Defendant's proposed acquisition bar is narrowly tailored and a reasonable safeguard to ensure that any person reviewing either party's HIGHLY SENSITIVE MATERIAL shall not, for a period of two years following the conclusion of this case, engage in any activity related to the acquisition of patents or patent applications or advising or counseling clients regarding the same. This is not an attempt to escape infringement allegations or to stifle competition; it merely ensures that individuals with access to such information do not inadvertently use it improperly.

**Issue #6 (Export control provision)**

*Eolas's Proposal*:

Eolas agrees that each of the parties should be responsible for complying with all rules and requirements—including the Court's orders, Federal and Local rules, and laws, which include export control laws. This goes without saying, including through Defendants' reference to 15 CFR 734.2(b). But just as Eolas previously proposed (Dkt. 71-3 at 33), and in recognition of the fact that some parties may already know that certain material is subject to export control laws, the producing Party should provide that information to the receiving Party. It is the producing Party that knows its materials best and should therefore inform the receiving Party if it knows that any of its material is subject to such export control laws (and which laws).

Specifically, if Defendants are right that they know that much of their material is subject to export control laws (though Defendants have provided no evidence, other than attorney argument, to that effect), then there is presumably some classification system used by Defendants internally, in the ordinary course of business, to deal with those export control laws. For instance, such a system would ensure that H-1B visa individuals from certain countries employed by Defendants (or similar) are restricted in some way from seeing certain material. If no such internal classifications or knowledge about whether material is subject to export control exists (as Defendants appear to now suggest), then there is nothing additional to do. But if such internal classifications/knowledge exists, the producing Party should share that information (including which export control laws are implicated) with the receiving Party. The burden to do so is minimal at best.

An export control provision should be used as a shield to protect all involved from running afoul of laws and regulations, including specific laws about specific materials that a

producing Party may already know of. Such a provision, and export control laws generally, should not be wielded by a producing Party as a sword to intimidate the other side.

*Defendants' Proposal:*

Eolas continues to seek to avoid having to comply with export control provisions. Eolas first refuses to include a provision noting, as should be uncontroversial, that each Party needs to comply with the applicable laws of the United States.

Next, as Defendants explained in their initial briefing, nearly all non-public information produced is likely subject to at least the following export control designations, including: Export Control Classification Numbers ("ECCNs"): 5D002, 5E002, 5D992, 5E992, and EAR99. (*See* Dkt. 73-1 at 35.) Despite this explanation, after the CMC, Eolas newly seeks to force Defendants to mark, apparently on a document by document basis, the applicable export control provisions. Eolas identifies no authority for such a broad and burdensome request. Indeed, such a process is not possible, given the volume of documents likely to be produced in this litigation-- such review would overwhelm counsel familiar with export control provisions. Defendants have identified export control provisions applicable to the material likely to be produced and can inform Eolas if material likely to be produced may be subject to additional classifications.

It is also unclear why Eolas now insists on the language "e.g., because it maintains the data in a special way due to its employment of non-U.S. citizens and non-U.S. permanent residents." As Defendants explained in their initial briefing, Defendants may comply with export control internally in a number of ways that do not require internal changes in the way material is stored, such as by conducting appropriate screening when employees are hired and obtaining appropriate export licenses when necessary. Although Eolas' clause is exemplary, this language is misleading and should not be included.

Defendants sought to ease the burden on all parties by simply limiting the provision of documents to U.S. citizens and permanent residents, but Eolas rejected this proposal.  The Court should not allow Eolas to impose significant, unwarranted costs on Defendants simply because it wants to hire non-U.S. citizens.

**Issue #7 (Handling service of Protected Material of one Defendant on another Defendant)**

*Eolas's Proposal*:

Eolas believes that, due to pre-trial consolidation of these cases (Dkt. 22) and the close relation of the issues in the three cases, the cases should be treated as one for the purposes of this protective order. This means that materials from one Defendant can be served on outside counsel of other Defendants. Defendants appear to now agree with this. But to ensure that no Defendant is unduly surprised by the inclusion of another Defendant's material in an expert report after close of fact discovery (as Defendants argued was their primary concern at the April 7, 2016 hearing), Eolas proposes a notice provision of fourteen days before expert reports regarding such materials. Although expert reports may not even be finalized by then (particularly because discovery will not yet be over with), Eolas agrees to provide such notice.

On the other hand, Defendants seek to impose additional, and unwarranted, administrative and logistical restrictions on the use of such materials. Notably, Defendants now suggest a 45 day notice provision for use of such Protected Materials in filings, at hearings, and in discovery responses, in addition to in expert reports. Defendants' proposed restrictions bear little resemblance to Defendants' primary concern raised at the April 7, 2016 hearing about being surprised at the inclusion of another Defendants' Protected Material in an expert report after the close of fact discovery. And such a drastic notice requirement would unreasonably restrain Eolas's counsel's ability to litigate this case.

With respect to filings, hearings, and discovery responses, no notice should be needed at all as the issue of post-fact discovery surprise will not be present. And requiring such notice before such events, including so far in advance, is impractical. For instance, the parties are not likely to know in advance that motion practice is necessary on an issue, that a hearing is going to be scheduled or what will be needed at the hearing, or that discovery requests are incoming (as

21

responses to discovery requests are typically due approximately 30 days after service). If issues do arise as to filings, hearings, and discovery response, the parties are more than capable of informally resolving them. Notice of 45 days is entirely unnecessary, impractical, and likely to lead to additional disputes.

And with respect to expert reports, Eolas (and Defendants, presumably) will be unlikely to be close to finalizing expert reports two months before service of them. The parties are unlikely to be in such a position even two weeks before the deadline. This includes knowing for sure what materials will be in reports. Defendants' proposal requests too much in light of the limited concerns that they have expressed.

The parties should certainly strive to provide as much notice as is possible, but Defendants' proposal goes too far. Eolas's two week notice provision is more than adequate to deal with any alleged surprises in expert reports. Defendants' newly raised concerns about filings, hearings, and discovery responses are without merit.

*Defendants' Proposal*:

To address Eolas' concerns regarding the logistical difficulties in treating the cases against each Defendant as separate for the purpose of the Protective Order, Defendants have agreed to remove that restriction from the Protective Order. This, however, results in the potential, as explained at the April 7, 2016 scheduling conference, that one Defendants' materials could be used against another Defendant, even though the other Defendant has never seen such materials. While the risk certainly exists for expert reports, it is not limited to them as Eolas suggests. It could occur at any stage of the case, such as putting a previously unseen document in front of an expert at a deposition, raising the document as evidence at a hearing, or including it in support of a motion. Defendants should not be faced with rebutting the contents of another

Defendants' materials it has not seen without the ability to investigate and take fact discovery, just as it would be able to do in a standard case.  Defendants' proposal seeks to address these risks by requiring 45 days prior notice (but in no event less than 45 days before the close of fact discovery, unless such material was not produced until after that date, in which case Plaintiff must disclose it within 14 days of the material being produced) both to the Defendant that produced the Protected Material and the Other Defendant.  This adopts procedures similar to that of a subpoena, without imposing the burden that Eolas seeks to avoid of having to serve a subpoena.  That way, the Defendant against whom the material will be used will have an opportunity to conduct additional fact discovery regarding those materials.

By contrast, while Eolas' proposal does allow some notice, it is limited to experts, and 14 days simply does not provide enough time to meaningfully investigate or seek discovery in relation to another Defendants' materials, such as through a subpoena or even informally.  Indeed, that would allow Eolas to potentially identify documents it intends to use in a case, for the first time, after the fact discovery period has closed, despite having had those documents in its possession.  While Eolas says it needs this because it will not able to finalize its reports 45 days before it serves them, the provision does not require reports to be finalized and there is nothing to prevent Eolas from being diligent in determining which documents it may use and anticipating this issue which would presumably only concern a small subset of materials, such as it is typically required to do during fact discovery.  This is a fair compromise especially given that, without this cross-sharing provision, Eolas would have to comply with standard discovery procedures (which it apparently views as more burdensome) to use one Defendants' materials against another for any purpose.

Eolas also provides no reason to reject Defendants' reasonable proposals that the notice of this use and disclosure be in good faith (to avoid notice of more materials than Eolas actually intends to use which could make the notice useless) or that the notice does not excuse Eolas from the otherwise responding to or supplementing discovery responses.

Dated: April 15, 2016

Respectfully submitted,

/s/ *Kevin L. Burgess*
Kevin L. Burgess
Lead Attorney
Texas State Bar No. 24006927
kburgess@mckoolsmith.com
John B. Campbell
Texas State Bar No. 24036314
jcampbell@mckoolsmith.com
James Quigley
Texas State Bar No. 24075810
jquigley@mckoolsmith.com
**McKool Smith, P.C.**
300 W. 6th Street, Suite 1700
Austin, TX 78701
Telephone: (512) 692-8700
Facsimile: (512) 692-8744

Mike McKool
Texas State Bar No. 13732100
mmckool@mckoolsmith.com
**McKool Smith, P.C.**
300 Crescent Court, Suite 1500
Dallas, TX 75201
Telephone: (214) 978-4000
Facsimile: (214) 978-4044

Jennifer L. Truelove
Texas State Bar No. 24012906
jtruelove@mckoolsmith.com
McKool Smith, P.C.
104 East Houston Street
Suite 300
Marshall, TX 75670
Telephone: (903) 923-9002
Telecopier: (903) 923-9099

**ATTORNEYS FOR PLAINTIFF EOLAS
TECHNOLOGIES INCORPORATED**

/s/  *Jennifer H. Doan*
Jennifer Haltom Doan
Texas Bar No. 08809050
Joshua R. Thane
Texas Bar No. 24060713
J. Randy Roeser
Texas Bar No. 24089377
Haltom & Doan
6500 Summerhill Road, Suite 100
Texarkana, TX 75503
Telephone:  903.255.1000
Facsimile:  903.255.0800
Email: jdoan@haltomdoan.com
Email: jthane@haltomdoan.com
Email: rroeser@haltomdoan.com

Douglas E. Lumish
California State Bar No. 183863
Richard G. Frenkel
California State Bar No. 204133
Jeffrey G. Homrig
California State Bar No. 215890
Amit Makker
California State Bar No. 280747
LATHAM & WATKINS LLP
140 Scott Drive
Menlo Park, CA 94025
Telephone: 650.328.4600
Facsimile: 650.463.2600
Email: doug.lumish@lw.com
Email:  rick.frenkel@lw.com
Email: jeff.homrig@lw.com
Email:  amit.makker@lw.com

Joseph H. Lee
California State Bar No. 248046
LATHAM & WATKINS LLP
650 Town Center Drive, 20th Floor
Costa Mesa, CA 92626-1925
Telephone:  714.540.1235
Facsimile:  714.755.8290
Email:  joseph.lee@lw.com
Grant E. Kinsel
Washington Bar No. 49576

25

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Telephone:  206-359-3516
Facsimile:  206-359-9000
Email:  Gkinsel@perkinscoie.com
**ATTORNEYS FOR DEFENDANT
AMAZON.COM, INC.**

/s/ *Bijal V. Vakil*
Bijal V. Vakil
CA State Bar No.:  192878
(Admitted to practice in E.D. Texas)
Shamita D. Etienne-Cummings
CA State Bar No.:  202090
(Admitted to practice in E.D. Texas)
Thomas C. Flynn
CA State Bar No.:  257945
 (admitted to practice in E.D. Texas)
Allen W. Wang
CA State Bar No.:  278953
(admitted to practice in E.D. Texas)
WHITE & CASE LLP
3000 El Camino Real
Five Palo Alto Square 9th Floor
Palo Alto, CA 94306
Telephone: (650) 213-0300
Facsimile: (650) 213-8158
Email: bvakil@whitecase.com
Email: setienne@whitecase.com
Email: tflynn@whitecase.com
Email: allen.wang@whitecase.com

J. Thad Heartfield
State Bar No. 09346800
THE HEARTFIELD LAW FIRM
2195 Dowlen Road
Beaumont, TX  77706
Telephone:  (409) 866-3318
Facsimile:   (409) 866-5789
Email: thad@heartfieldlawfirm.com
**ATTORNEYS FOR DEFENDANTS
WAL-MART STORES, INC. AND
WAL-MART STORES TEXAS, LLC**

26

*/s/ David A. Perlson*

Charles K. Verhoeven, CA Bar No. 170151
  charlesverhoeven@quinnemanuel.com
David A. Perlson, CA Bar No. 209502
  davidperlson@quinnemanuel.com
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, California  94111-4788
Tel: 415-875-6600
Fax: 415-875-6700

Michael E. Jones, SBN: 10929400
  mikejones@potterminton.com
Patrick C. Clutter, SBN: 24036374
  patrickclutter@potterminton.com
POTTER MINTON, PC
110 North College, Suite 500
Tyler, Texas 75702
Tel: 903-597-8311
Fax: 903-593-0846
**ATTORNEYS FOR DEFENDANT GOOGLE INC.**

27

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document has been served on all counsel of record via the Court's ECF system on April 15, 2016.

/s/ James Quigley
James Quigley

## CERTIFICATE OF CONFERENCE

The undersigned hereby certifies that Eolas and Defendants have discussed the contemporaneously submitted Revised Joint Protective, Joint Discovery, and Joint Docket Control Orders. After meeting and conferring by email and phone on the issues, the parties agreed they had reached an agreement on the issues, except as to issues discussed above and shown in the attached proposed order(s).

/s/ James Quigley
James Quigley

McKool 1175899v3