[counsel identified on signature page]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

**EOLAS TECHNOLOGIES INCORPORATED,**

**Plaintiff,**

**v.**

**AMAZON.COM, INC.,**

**Defendant.**

**CASE NO. 4:17-CV-03022-JST**

**EOLAS TECHNOLOGIES INCORPORATED'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON OBVIOUSNESS-TYPE DOUBLE PATENTING AND PRECLUSION DOCTRINES**

Judge: Hon. Jon S. Tigar
Date: July 16, 2020
Time: 2:00 P.M.

MCKOOL SMITH, P.C.
AUSTIN, TX

**TABLE OF CONTENTS**

I. Introduction ....................1

II. Summary of the Argument ....................1

III. Statement of Facts ....................4

A. Eolas's Origins, the Parent Patent, and the Microsoft Lawsuit ....................4

1. Scientists at UCSF develop an inventive solution for medical researchers; the PTO issues a patent to UC Regents based on their work ....................4

2. Eolas sues Microsoft for infringement; the case settles after a jury verdict, multiple reexaminations, and a Federal Circuit remand ....................5

B. The First Continuation Patent Issues After an OTDP Rejection ....................5

C. The *Adobe* Lawsuit ....................6

1. Eolas sues Amazon, Google, and others for infringing the '906 and '985 patents; after many settlements, the court sets a validity-only trial ....................6

2. Amazon and Google convince the court to construe the claims to apply to non-Web systems and leverage that construction for an invalidity verdict ....................6

D. The Second and Third Continuation Patents Issue After OTDP Rejections; Google Sues UC Regents and Eolas ....................7

E. The Fourth Continuation Patent Issues; Eolas Sues Amazon, Google and Walmart ....................7

1. The PTO issues the '507 patent without an OTDP rejection after considering the prior patents and *Adobe* Lawsuit alleged prior art ....................7

2. Eolas sues Defendants for infringing the '507 patent and seeks early resolution of the issues now—four years later—before this Court ....................8

IV. Legal Standard ....................9

V. Argument ....................9

A. The Asserted Claims Are New and Nonobvious Compared to the Prior Claims ....................9

1. The prior claims are directed to less secure, less scalable, non-Web-limited embodiments ..... 10

2. The Asserted Claims are directed to specific Web embodiments and provide previously unclaimed advantages of security and scalability ..... 10

3. The PTO confirmed that the Asserted Claims are nonobvious over the prior claims ..... 18

B. OTDP Does Not Apply Here: Considered as a Whole, the Asserted Claims are Distinct from and Nonobvious Over the Prior Claims ..... 20

1. OTDP does not apply here ..... 20

2. Defendants' OTDP arguments are unavailing ..... 22

C. Collateral Estoppel Does Not Apply Here: the Asserted Claims are Materially Different than '985 Patent Claim 42 and Have Never Been Adjudicated ..... 25

1. Collateral estoppel does not apply here ..... 25

2. Defendants' collateral estoppel arguments are unavailing ..... 26

D. The Kessler Doctrine Does Not Apply Here: the Asserted Claims are Not Essentially the Same as Any Prior Claims ..... 27

E. The *Adobe* Lawsuit's General Jury Verdict Prevents Assuming Any Reference is Prior Art ..... 29

VI. Conclusion ..... 30

MCKOOL SMITH, P.C.
AUSTIN, TX

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Abbvie Inc. v. Mathilda & Terence Kennedy Inst. of Rheumatology Tr.*,
764 F.3d 1366 (Fed. Cir. 2014)....23

*Acumed LLC v. Stryker Corp.*,
525 F.3d 1319 (Fed. Cir. 2008 )....28, 29

*Advanced Cardiovascular Sys., Inc. v. SciMed Life Sys., Inc.*,
989 F. Supp. 1237 (N.D. Cal. 1997)....28

*ArcelorMittal Atlantique et Lorraine v. AK Steel Corp.*,
908 F.3d 1267 (Fed. Cir. 2018)....25

*Bourns, Inc. v. United States*,
537 F.2d 486 (Ct. Cl. 1976)....17, 25, 27, 29

*Brain Life, LLC v. Elekta Inc.*,
746 F.3d 1045 (Fed. Cir. 2014)....27

*Brigham & Women's Hosp. Inc. v. Teva Pharms. USA, Inc.*,
761 F. Supp. 210 (D. Del. 2011)....23

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)....9

*Eolas Techs. Inc. v. Microsoft Corp.*,
399 F.3d 1325 (Fed. Cir. 2005)....5

*Foster v. Hallco Mfg. Co., Inc.*,
947 F.2d 469 (Fed. Cir. 1991)....28

*Geneva Pharms., Inc. v. GlaxoSmithKline PLC*,
349 F.3d 1373 (Fed. Cir. 2003)....20

*Graham v. John Deere Co. of K.C*,
383 U.S. 1 (1966)....25

*Kimberly-Clark Worldwide, Inc. v. First Quality Baby Prods. LLC*,
135 F. Supp. 3d 850 (E.D. Wis. 2015)....26

*Magna Elecs., Inc. v. TRW Auto. Holdings Corp.*,
2016 WL 4239187 (W.D. Mich. Jan. 8 2016)....21

*Medtronic, Inv. v. AGA Med. Corp.*, 2009 WL 1163976 (N.D. Cal. Apr. 28, 2009) (Chesney, J.) ....................21

*Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91 (2011)....................9, 22, 26, 28

*Ohio Willow Wood Co. v. Alps South, LLC*, 735 F.3d 1333 (Fed. Cir. 2013)....................25, 26, 27

*Otsuka Pharm. Co., Ltd. v. Sun Pharm. Indus., Ltd.*, 678 F.3d 1280 (Fed. Cir. 2012)....................20, 21, 22

*Procter & Gamble Co. v. Teva Pharms. USA, Inc.*, 566 F.3d 989 (Fed. Cir. 2009)....................21

*Regents of Univ. of Cal. v. Monsanto Co.*, 2005 WL 1513093 (N.D. Cal. June 27, 2005) (Hamilton, J.)....................23

*SimpleAir, Inc. v. Google LLC*, 884 F.3d 1160 (Fed. Cir. 2018)....................17, 28, 29

*SKC Kolon PI, Inc. v. Kaneka Corp.*, 2017 WL 3476995 (C.D. Cal. Mar. 13, 2017)....................28

*Soverain Software LLC v. Victor's Secret Direct Brand Mgmt., LLC*, 778 F.3d 1311 (Fed. Cir. 2015)....................25, 26, 27

*SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107 (Fed. Cir. 1985) (*en banc*) ....................9

*United Access Techs., LLC v. Centurytel Broadband Services LLC*, 778 F.3d 1327 (Fed. Cir. 2015)....................30

**STATUTES**

28 U.S.C. § 1404(a) ....................25

35 U.S.C. § 103....................20

**OTHER AUTHORITIES**

Fed. R. Civ. P. 56(c) ....................9

MCKOOL SMITH, P.C.
AUSTIN, TX

## TABLE OF EXHIBITS

| Exhibit No. | Description |
|---|---|
| 1 | Declaration of David M. Martin, Jr., Ph.D. with accompanying exhibits |
| 2 | Dkt. 1322, Memorandum Opinion and Order, *Eolas Techs. Inc. v. Adobe Sys., Inc.*, No. 6:09-cv-446-LED (E.D. Tex. Feb. 3, 2012) |
| 3 | Excerpts of February 9, 2012 AM Trial Transcript, *Eolas Techs. Inc. v. Adobe Sys., Inc.*, No. 6:09-cv-446-LED (E.D. Tex.) |
| 4 | Excerpts of February 8, 2012 AM Trial Transcript, *Eolas Techs. Inc. v. Adobe Sys., Inc.*, No. 6:09-cv-446-LED (E.D. Tex.) |
| 5 | Excerpts of February 6, 2012 PM Trial Transcript, *Eolas Techs. Inc. v. Adobe Sys., Inc.*, No. 6:09-cv-446-LED (E.D. Tex.) |
| 6 | Non-Confidential Excerpts of Rebuttal Expert Report of Dr. David Martin, *Eolas Techs. Inc. v. Amazon.com, Inc.*, No. 6:15-cv-1038-RWS (served March 30, 2017) |
| 7 | Non-Confidential Excerpts of Opening Expert Report of Dr. David Martin, *Eolas Techs. Inc. v. Amazon.com, Inc.*, No. 6:15-cv-1038-RWS (served February 28, 2017) |
| 8 | U.S. Patent No. 5,838,906 |
| 9 | Declaration and Assignment of Patent Application |
| 10 | Exclusive License Agreement between The Regents of the University of California and Eolas Technologies Incorporated for "Embedded Program Objects in Distributed Hypermedia Systems" |
| 11 | Business Plan: Eolas Technologies Incorporated, September 30, 1995 |
| 12 | Excerpts of February 8, 2012 PM Trial Transcript, *Eolas Techs. Inc. v. Adobe Sys., Inc.*, No. 6:09-cv-446-LED (E.D. Tex.) |
| 13 | Original Complaint and Demand for Jury Trial, *Eolas Techs. Inc. v. Microsoft Corp.*, No. 99C 0626 (N.D. Ill. Feb. 2, 1999) |
| 14 | Special Verdict, *Eolas Techs. Inc. v. Microsoft Corp.*, No. 99C 0626 (N.D. Ill. Aug. 11, 2003) |
| 15 | Judgment Order, *Eolas Techs. Inc. v. Microsoft Corp.*, No. 99C 0626 (N.D. Ill. Jan. 14, 2004) |
| 16 | Stipulation for Dismissal with Prejudice and [Proposed] Order Thereon, *Eolas Techs. Inc. v. Microsoft Corp.*, No. 99C 0626 (N.D. Ill. Sept. 13, 2007) |
| 17 | U.S. Patent No. 7,599,985 |
| 18 | July 20, 2004 Office Action excerpt from prosecution of U.S. Patent No. 7,599,985 |
| 19 | March 7, 2005 Terminal Disclaimer to Obviate a Double Patenting Rejection Over a "Prior" Patent excerpt from prosecution of U.S. Patent No. 7,599,985 |
| 20 | Dkt. 1, Plaintiff's Complaint for Patent Infringement, *Eolas Techs. Inc. v. Adobe Sys. Inc.*, No. 6:09-cv-446 (E.D. Tex. Oct. 6, 2009) |
| 21 | Dkt. 988, Order, *Eolas Techs. Inc. v. Adobe Sys. Inc.*, No. 6:09-cv-446 (E.D. |

| | |
|---|---|
| | Tex. Sept. 22, 2011) |
| 22 | Dkt 1264, Final Trial Plan, *Eolas Techs. Inc. v. Adobe Sys. Inc.*, No. 6:09-cv-446 (E.D. Tex. Jan. 20, 2012) |
| 23 | Collection of dismissal orders from *Eolas Techs. Inc. v. Adobe Sys. Inc.*, No. 6:09-cv-446 (E.D. Tex.) |
| 24 | Dkt. 1301-1, Defendants' Brief Regarding the Term "Browser Application," *Eolas Techs. Inc. v. Adobe Sys. Inc.*, No. 6:09-cv-446 (E.D. Tex. Jan. 27, 2012) |
| 25 | Dkt. 1353, Verdict Form for Invalidity Trial, *Eolas Techs. Inc. v. Adobe Sys. Inc.*, No. 6:09-cv-446 (E.D. Tex. Feb. 9, 2012) |
| 26 | Dkt. 1417, Amended Final Judgment, *Eolas Techs. Inc. v. Adobe Sys. Inc.*, No. 6:09-cv-446 (E.D. Tex. July 19, 2012) |
| 27 | Dkt. 1435, Rule 36 Judgment, *Eolas Techs. Inc. v. Amazon.com Inc.*, No. 2012-1632 (Fed. Cir. July 19, 2013) |
| 28 | U.S. Patent No. 8,086,662 |
| 29 | U.S. Patent No. 8,082,293 |
| 30 | June 22, 2010 Office Action excerpt from prosecution of U.S. Patent No. 8,086,662 |
| 31 | October 22, 2010 Terminal Disclaimers to Obviate a Double Patenting Rejection Over a "Prior" Patent excerpt from prosecution of U.S. Patent No. 8,086,662 |
| 32 | July 21, 2010 Office Action excerpt from prosecution of U.S. Patent No. 8,082,293 |
| 33 | January 20, 2011 Terminal Disclaimers to Obviate a Double Patenting Rejection Over a "Prior" Patent excerpt from prosecution of U.S. Patent No. 8,082,293 |
| 34 | Dkt. 1, Complaint for Declaratory Judgment of Non-Infringement of U.S. Patent Nos. 8,082,293 and 8,086,662, *Google Inc. v. Eolas Techs. Inc.*, No. 3:13-cv-5997-JST (N.D. Cal. Dec. 30, 2013) |
| 35 | Dkt. 70, Order Denying Motions to Dismiss for Lack of Jurisdiction, *Google Inc. v. Eolas Techs. Inc.*, No. 3:13-cv-5997-JST (N.D. Cal. June 24, 2014) |
| 36 | Dkt. 76, Answer to Complaint for Declaratory Judgment of Non-Infringement, *Google Inc. v. Eolas Techs. Inc.*, No. 3:13-cv-5997-JST (N.D. Cal. July 8, 2014) |
| 37 | Dkt. 97, Order Granting in Part Defendants' Motion to Dismiss, *Google Inc. v. Eolas Techs. Inc.*, No. 3:13-cv-5997-JST (N.D. Cal. November 17, 2014) |
| 38 | Dkt. 99, Stipulation and Order to Dismiss Action, *Google Inc. v. Eolas Techs. Inc.*, No. 3:13-cv-5997-JST (N.D. Cal. December 4, 2014) |
| 39 | U.S. Patent No. 9,195,507 |
| 40 | May 7, 2012 Petition Under 37 C.F.R. § 1.181 excerpt from prosecution of U.S. Patent No. 9,195,507 |
| 41 | June 8, 2012 Decision on Petition Under 37 C.F.R. § 1.181 excerpt from prosecution of U.S. Patent No. 9,195,507 |

MCKOOL SMITH, P.C.
AUSTIN, TX

-vi-

Case Nos. 4:17-cv-03022-JST; 4:17-cv-03022-JST; 4:17-cv-03022-JST

EOLAS'S RESPONSE TO DEFENDANTS' MSJ

| | |
|---|---|
| 42 | Screenshot of USPTO Website dated May 16, 2014 |
| 43 | February 3, 2015 Submission Under 37 C.F.R. 1.105 excerpt from prosecution of U.S. Patent No. 9,195,507 |
| 44 | Excerpts of January 31, 2017 Deposition of Charles Krueger |
| 45 | March 27, 2015 Office Action excerpt from prosecution of U.S. Patent No. 9,195,507 |
| 46 | June 25, 2015 Response to Non-Final Office Action excerpt from prosecution of U.S. Patent No. 9,195,507 |
| 47 | July 22, 2015 Notice of Allowability excerpt from prosecution of U.S. Patent No. 9,195,507 |
| 48 | August 20, 2015 Amendment Under 37 CFR 1.312 and Interview Summary excerpt from prosecution of U.S. Patent No. 9,195,507 |
| 49 | September 10, 2015 Corrected Notice of Allowability excerpt from prosecution of U.S. Patent No. 9,195,507 |
| 50 | October 14, 2015 Patent Assignment |
| 51 | Dkt. 1318, Defendants' Reply Brief Regarding the Term "Browser Application," *Eolas Techs. Inc. v. Adobe Sys. Inc.*, No. 6:09-cv-446 (E.D. Tex. Feb. 3, 2012) |
| 52 | Declaration of Michael D. Doyle, Ph.D. with accompanying exhibits |
| 53 | Email string "Re: Standardizing new HTML features" |
| 54 | Email string "Re: launching executable through HTML files" |
| 55 | Email string re "Digital Libraries RFP" |
| 56 | Letter re "Digital Library" |
| 57 | Email string re "HMML" |
| 58 | January 18, 2006 Office communication excerpt from prosecution of U.S. Patent No. 7,599,985 |
| 59 | July 20, 2015 Issue Classification excerpt from prosecution of U.S. Patent No. 9,195,507 |
| 60 | Perkins Coie, "Immunizing Patent Portfolios Against 'Infectious' Estoppel" |

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Defendants' motion for summary judgment turns on their contentions that the Asserted Claims and prior claims are "not patentably distinct," "substantially identical," and "essentially the same." Motion ("Mot.") at 8. Those assertions are meritless. When the Asserted Claims are viewed as a whole, together with the evidence set forth herein, it is clear that they are dispositively different from the prior claims. Because the Asserted Claims are different from the prior claims, the Asserted Claims are not invalid for obviousness-type double patenting ("OTDP") and do not violate principals of collateral estoppel or the *Kessler* doctrine. The Court should deny Defendants' motion.

## II. SUMMARY OF THE ARGUMENT

1. The plain language of the Asserted Claims reflects numerous substantive differences over the prior claims. *See generally* Ex. 1. The evidence shows significant differences between the Asserted Claims and prior claims. For instance, the Asserted Claims: (1) are specific to the Web; (2) provide new security in that context; and (3) provide new scalability and resource allocation in that context. *Id.* ¶ 3. While each of these distinctions is individually meaningful, the significance of these distinctions is exponentially magnified when—as is required by law—they are considered as a combined whole. The Asserted Claims have a priority date of late 1993. At the time, experts in the field struggled with each of these issues and were sufficiently skeptical that satisfactory solutions could be found that they cautioned others against changes to the then-static Web. *Id.* ¶¶ 36-38. Despite this adversity, the inventors from the University of California San Francisco ("UCSF") conceived of and developed the inventions claimed in the '507 patent that resolved these concerns. A person of skill in the art, considering this new combination of security and scalability in the context of the Web, would find these differences nonobvious and patentably distinct. *Id.* ¶¶ 67-77, 95-96.

Defendants bear the burden—by clear and convincing evidence—to prove that the Asserted Claims, when considered as a whole and not as individual elements in isolation, are "not patentably distinct" from the prior claims. They fall short of their burden. Indeed, the controlling analysis requires proof that a person of skill, in the early 1990s, would have had a reason to combine all of

MCKOOL SMITH, P.C. AUSTIN, TX

the new limitations in the context of the then-nascent Web. Defendants offer no such proof, and their expert offers no such testimony. Instead, Defendants resort to misdirection. They suggest that Eolas purportedly "described 'the invention' in this case as covering the same broad scope as 'the invention' in previous cases," Mot. at 10, and argue that discrete concepts such as "coordination" and "distributive systems" were not invented by the '507 patent inventors, *id.* at 17, 19. But Eolas has *never* suggested that the Asserted Claims and prior claims are *not* patentably distinct—they are patentably distinct. And whether the inventors invented every discrete element in the patented combination is irrelevant: virtually every new combination is made up of previously-known elements. The question is whether the new combination, taken as a whole, is obvious. The evidence shows that the new combination is nonobvious; Defendants' evidence fails to show otherwise.

2. Even without the presumption of validity (that applies here but does not apply during prosecution), the PTO's independent review concluded that the Asserted Claims are new and nonobvious. The PTO gained a deep familiarity with these patents, and developed substantial expertise in considering the OTDP issues that their prosecutions raised. In addition to multiple reexaminations, the PTO examined three continuation patent family members prior to the '507 patent—and Examiner Larry Donaghue handled all three of those examinations as well as the examination of the '507 patent. In each continuation before the '507 patent, the PTO considered and rejected proposed claims on OTDP grounds based on one or more earlier family members. During examination of the '507 patent application (led by Examiner Donaghue), the PTO independently raised and considered questions regarding patentable distinctions between the new claims and the prior claims and alleged prior art at issue in the *Adobe* Lawsuit. After the differences were explained, the PTO allowed the '507 patent claims without an OTDP rejection. Defendants thus ask this Court to retread ground that has already been well-worn by the PTO, and to come to the opposite conclusion reached by the agency with substantial experience and expertise analyzing OTDP questions raised by this patent family, all on the basis of legally insufficient evidence.

3. The arguments offered by Amazon and Google in the *Adobe* Lawsuit further call into question the credibility of the arguments they offer here. While Defendants may suggest that new

limitations related to the Web, to security, and to scalability are negligible and insignificant, that was *not* their view during the *Adobe* Lawsuit. At that time, Amazon and Google convinced the court and the jury that the prior patents were not limited to the Web—that argument was critical because their prior art was not Web-based. Understanding that they could not prove invalidity of Web-based patent claims using non-Web-based prior art, Amazon and Google asked for an emergency claim construction from the court on the eve of trial—and received one—holding that the prior claims were not limited to "operating only within the Internet or World Wide Web." Ex. 2 at . They then argued to the jury that the prior claims—unlike the Asserted Claims—contained "no requirement that the browser be a web browser" and that there were "no security issues at all associated with th[ose] claims." Ex. 3 at 64:21-22; Ex. 4 at 69:25-60:7. In other words, Amazon and Google argued in the *Adobe* Lawsuit that the prior claims lacked Web and security elements—elements that are demonstrably in the Asserted Claims. Their past conduct thus confirms that—at least during the *Adobe* Lawsuit—Amazon and Google believed that these Web- and security-related limitations, missing from the prior claims, were highly relevant to their prior patentability arguments.

4. Finally, a note on tone and timing. Defendants' motion at points borders on disparaging, as if they were offended that Eolas would call them to account for their infringement of a (presumed valid) patent issued by the PTO. Defendants even suggest that Eolas is improperly seeking to turn this litigation into some "decades-long ordeal" for the Court and parties. Mot. at 1. To the contrary, Eolas filed this suit at the earliest possible moment—the day the PTO issued the '507 patent. And Eolas has long desired to see its '507 patent claims resolved efficiently and expeditiously.

Had Defendants viewed their own arguments related to the prior claims and prior litigations between the parties as meritorious, they could have presented these defenses four years ago: their motion relies on no new discovery and no new claim construction. In fact, more than four years ago, Eolas proposed that these defenses be resolved at the outset of the litigation. Dkt. 70 at 9. Defendants objected to an early resolution, wanting to wait, as they later suggested, for a "Court [that] may be more receptive" to their arguments. Dkt. 371 at 16 n.1; Dkt. 70 at 9. But even after transfer, Defendants delayed seeking resolution on the merits, choosing instead to derail the case with a

multi-year, meritless sideshow contradicting their prior pleadings that resulted in scores of unnecessary pleadings, thousands of hours of unnecessary attorney time, and millions of dollars in unnecessary legal expenses, and unfairly called into question the integrity and reputation of a score of Eolas's lawyers. In any event, whatever the reasons for Defendants' delay, Eolas welcomes the chance to finally resolve and put to rest the legal defenses in Defendants' motion.

## III. STATEMENT OF FACTS

### A. Eolas's Origins, the Parent Patent, and the *Microsoft* Lawsuit

#### 1. Scientists at UCSF develop an inventive solution for medical researchers; the PTO issues a patent to UC Regents based on their work.

In 1993, Dr. Michael Doyle, David C. Martin, and Cheong Ang worked at the Center for Knowledge Management at UCSF. Ex. 5 at 93:6-8. Their task: "com[ing] up with new technologies to disseminate the results of [human embryo biomedical research] activities to the outside world" for use in detecting and treating birth defects in infants. *Id.* at 93:11-18, 93:25-94:20. To accomplish this task, the scientists sought to make 3D image reconstructions of the embryo research available over a network for interactive exploration. *Id.* at 94:21-95:13. But the Web at the time was in its infancy and did not permit interactivity, much less interactivity by multiple medical professionals with large, complex 3D images that a server would struggle with storing and processing. Rather, "the web at the time was very primitive" and "designed for working with documents that didn't change." *Id.* at 96:24-97:10. Indeed, early Web designers like Marc Andreessen—the co-creator of the Netscape Web browser released in late 1994—wanted to keep the Web static and avoid interactivity with "generic inclusions," such as audio or video (MPEG). Ex. 6 ¶¶ 448-49. The preferred route at the time was to save such files on a local computer and work with the files using a local application. *Id*; Ex. 7 ¶ 40.

Undeterred, Doyle, Martin, and Ang developed a solution where "the user's PC could actually tap into powerful remote computational research, powerful remote supercomputers" and "the user could interact with that [3D image] within the documents as if they had a control panel to the supercomputer." Ex. 5 at 100:2-16. The inventive solution enabled non-technical researchers to

MCKOOL SMITH, P.C.
AUSTIN, TX

use Web browsers to access and interact with 3D images stored and processed on multiple servers. *Id.* at 101:10-19. Based on this work, the inventors filed a first patent application, assigned to UC Regents, which the PTO issued as the '906 patent. Ex. 8 at Cover; Ex. 9.

By 1995, Doyle formed Eolas Technologies Incorporated and UC Regents granted Eolas an exclusive license to the invention. Ex. 10. Eolas's plan was to "creat[e] and licens[e] innovative technologies and related products which will enable the World Wide Web to become the preferred environment for all interactive computing applications by the year 2000." Ex. 11 at EOLAS0311595. This arrangement was commonplace for UC Regents as part of its effort aimed at "creating public benefit from [discovering] new knowledge." Ex. 12 at 105:22-107:9. UC Regents encouraged inventors' entrepreneurial efforts and "allow[ed] companies to take [patents] out into the world." *Id.* UC Regents "has been doing this ... probably since the '60s" and is "one of the universities with the longest history of working in patenting and licensing technology." *Id.* at 107:10-17.

**2. Eolas sues Microsoft for infringement; the case settles after a jury verdict, multiple reexaminations, and a Federal Circuit remand.**

In 1999, Eolas sued Microsoft for infringing the '906 patent. Ex. 13. A jury found for Eolas and the district court entered a final appealable judgment. Ex. 14; Ex. 15. On appeal, the Federal Circuit affirmed the judgment as to claim construction and infringement, but vacated and remanded on Microsoft's invalidity claims for consideration of excluded evidence. *Eolas Techs. Inc. v. Microsoft Corp.*, 399 F.3d 1325, 1328, 1335, 1341 (Fed. Cir. 2005). Before a retrial, Eolas and Microsoft settled, and the district court dismissed the case. Ex. 16.

While the Microsoft Lawsuit was pending, the PTO initiated two *ex parte* reexaminations of the '906 patent. The PTO confirmed the patentability of the '906 patent claims in both reexaminations. Ex. 8 at Reexam C1 Cover, Claims; Ex. 8 at Reexam C2 Cover, Claims.

**B. The First Continuation Patent Issues After an OTDP Rejection**

During the pendency of the Microsoft Lawsuit, UC Regents filed a continuation application stemming from the '906 patent disclosure. Ex. 17 at Cover. Examiner Larry Donaghue handled examination for the PTO. *Id.* The PTO issued an OTDP rejection based on '906 patent claims, UC

Regents responded by filing a terminal disclaimer, and the PTO issued the '985 continuation patent. Ex. 18; Ex. 19; Ex. 17 at Cover.

### C. The *Adobe* Lawsuit

#### 1. Eolas sues Amazon, Google, and others for infringing the '906 and '985 patents; after many settlements, the court sets a validity-only trial.

In 2009, Eolas sued Amazon, Google, and nearly twenty other companies for infringing the '906 and '985 patents in the Eastern District of Texas. Ex. 20. UC Regents also joined the suit as a plaintiff. Ex. 21. The court ordered a separate, invalidity-only trial. Ex. 22. By trial, most defendants had settled. Exs. 23.

#### 2. Amazon and Google convince the court to construe the claims to apply to non-Web systems and leverage that construction for an invalidity verdict.

Just days before trial was set to begin, Amazon and Google alleged the term "browser application" was not limited to Web browsers, but applied to non-Web systems. Ex. 24. Amazon and Google contended that if the "browser application" term was limited to Web browsers, then Eolas would "avoid some of defendants' prior art," because Web-browser limited claims would not be obvious in light of that alleged prior art. *Id.* at 2. The court agreed with Amazon and Google's construction of "browser application" and held the "claims have not limited the browser application to operating only within the Internet or World Wide Web." Ex. 2.

Amazon and Google presented four theories of invalidity at trial, three of which were grounded in obviousness. Leveraging their eve-of-trial claim construction, Amazon and Google argued to the jury that certain limitations (at issue here) were not part of the '906 and '985 patent claims and they were not required to prove these features were obvious. In particular, they argued to the jury that the claims were not limited to the Web. Ex. 3 at 64:21-22 ("There's no requirement that the browser be a web browser."). They also argued that the '906 and '985 patent claims included no security-related limitations. Ex. 4 at 69:25-60:7 ("There's no security issues at all associated with the claims."); Ex. 12 (Feb 8 PM) at 83:7-11 ("The Court's construction of type information says nothing about security, does it, sir?"); Ex. 3 at 65:1-2 ("There's no security requirement that says it has to be highly secure."). The jury found the claims invalid in a general verdict form, the district court

MCKOOL SMITH, P.C.
AUSTIN, TX

entered a final appealable judgment, and the Federal Circuit affirmed without issuing an opinion in a final, non-appealable judgment. Ex. 25; Ex. 26; Ex. 27.

**D. The Second and Third Continuation Patents Issue After OTDP Rejections; Google Sues UC Regents and Eolas**

UC Regents filed two additional continuation applications and Examiner Donaghue again handled the examinations for the PTO. Ex. 28 at Cover; Ex. 29 at Cover. In both examinations, after Examiner Donaghue issued OTDP rejections based on ’906 and ’985 patent claims, UC Regents responded by filing terminal disclaimers. Ex. 30; Ex. 31; Ex. 32; Ex. 33. The PTO then issued the ’293 and ’662 patents. Ex. 28 at Cover; Ex. 29 at Cover.

In 2013, Google sued UC Regents and Eolas in this District seeking a declaratory judgment of non-infringement of the ’293 and ’662 patents. Ex. 34. UC Regents and Eolas counterclaimed for infringement of the ’293 and ’662 patents and then filed a motion to dismiss. Exs. 35-36. The court dismissed the infringement claims with prejudice but noted that it could not opine as to the then-pending ’507 patent application’s claims “because those claims have not yet even been asserted.” Ex. 37 at 2; *see also* Ex. 38.

**E. The Fourth Continuation Patent Issues; Eolas Sues Amazon, Google and Walmart**

**1. The PTO issues the ’507 patent without an OTDP rejection after considering the prior patents and *Adobe* Lawsuit alleged prior art.**

In 2011, UC Regents filed a fourth continuation application. Ex. 39 at Cover. Examiner Donaghue again handled the examination. *Id.* UC Regents requested expedited examination based on PTO regulations for an “application [that] by relation to a prior United States application, has an effective pendency of more than five years,” and the PTO granted the request. Ex. 40; Ex. 41. Despite granting expedited examination, the application went unexamined for over three years and, by May 2014, the PTO predicted it would not issue a first office action until March 2015. Ex. 42.

On January 6, 2015, the PTO finally did something: Examiner Donaghue sought “factual information regarding why [UC Regents] believes that the present claims are distinguished” over the alleged prior art from the *Adobe* Lawsuit and how they “were different from the court case.” Ex. 43

at 1-2; Ex. 44 at 312:17-25. UC Regents obliged, filing a response that demonstrated how the claims differed from both the ’906 and ’985 patent claims and Amazon and Google’s alleged prior art. *See generally* Ex. 43. UC Regents explained distinctions related to the Web, Web browsers, Web browsers configured with interactive-content applications, and a distributed application with two or more remote servers. *Id.* With this information and minor claim editing, the PTO awarded the patent without an OTDP rejection. Ex. 45; Ex. 46; Ex. 47; Ex. 48; Ex. 49. UC Regents later assigned the soon-to-be-issued ’507 patent and its family to Eolas. Ex. 50.

On November 24, 2015, the PTO issued the ’507 patent Ex. 39. But, as this Court has noted, “Because of the [PTO’s] delay in acting on the application, the PTO ordered that the patent would be subject to a total patent-term adjustment of 1,042 days.” Dkt. 566.

**2. Eolas sues Defendants for infringing the ’507 patent and seeks early resolution of the issues now—four years later—before this Court.**

Eolas sued Amazon, Google, and Walmart for infringing the ’507 patent in the Eastern District of Texas’s home forum and the court intimately familiar with the parties and inventions). Dkt. 1; -1138 Case Dkt. 1; -3023 Case Dkt. 1. After receiving Defendants’ responses to the complaint, Eolas asked the court to set early summary judgment deadlines for Defendants’ legal arguments and issues relating to the prior claims and litigations, such as collateral estoppel. Dkt. 70 at 9. Defendants objected to early resolution of these legal issues. *Id.* Amazon later candidly acknowledged that its strategy was “based on which motions the Texas court would have been receptive to.” Dkt. 371 at 16 n.12. Because “Amazon believe[d] this Court may be more receptive to the preclusion and obviousness-type double patenting issues,” Defendants wanted to wait to file such motions until after a potential transfer to this Court. *Id.*

By the time Defendants secured that transfer, in April 2017, these cases were in their late stages. Claim construction was complete. Dkt. 212. Fact discovery was closed. Dkt. 232 at 4. Eolas, Amazon, and Walmart had served expert reports. Dkts. 256 at 4; Dkt. 297 at 4 (-1138 Case Dkt. 54); (Dkt. 327; -3023 Case Dkt. 56). All of the “facts” in their motion’s “Statement of Facts” had long been in their possession. Mot. at 1-7. Still, Defendants did not file their motion upon transfer—they

MCKOOL SMITH, P.C.
AUSTIN, TX

chose instead to spend nearly three years seeking an unwarranted disposition of these cases that would not require the Court to reach the merits of the claims and defenses. Dkt. 405; Dkt. 586. With that years-long diversion concluded and little remaining other than summary judgment and trial, Defendants finally moved, in March 2020, for resolution of these defenses.

## IV. LEGAL STANDARD

Summary judgment is warranted if there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). "[T]he district court must view the evidence in a light most favorable to the nonmovant and draw all reasonable inferences in its favor and must resolve all doubt over factual issues in favor of the party opposing summary judgment." *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1116 (Fed. Cir. 1985) (*en banc*) (internal citations omitted).

Patents are presumed valid, and invalidity must be shown by clear and convincing evidence. *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 95, 108 (2011). As Judge Rich explained, when a court is presented with evidence not before the PTO, that evidence may carry more weight:

> "When new evidence touching validity of the patent not considered by the PTO is relied on, the tribunal considering it is not faced with having to disagree with the PTO or with deferring to its judgment or with taking its expertise into account. The evidence may, therefore, carry more weight and go further toward sustaining the attacker's unchanging burden."

*Id.* at 110-11 (quoting *Am. Hoist & Derrick v. Sowa & Sons*, 725 F.2d 1350 (Fed. Cir. 1984)). Here, the PTO considered the same evidence before this Court. As such, while the "heightened standard of [clear and convincing] proof applie[s] where the evidence before the court was 'different' from that considered by the PTO, it applie[s] even more clearly where the evidence was identical." *Id.* at 108-09 (citing *Radio Corp. of Am. v. Radio Eng. Labs., Inc.*, 293 U.S. 1 (1934)).

## V. ARGUMENT

### A. The Asserted Claims Are New and Nonobvious Compared to the Prior Claims

The Asserted Claims are distinct from—and nonobvious in light of—prior claims in their family. Defendants focus on '985 patent claim 42 and '293 patent claim 11. *E.g.*, Mot. at 12. A comparison of those claims to the Asserted Claims illustrates the differences. Ex. 1 ¶ 95.

MCKOOL SMITH, P.C.
AUSTIN, TX

McKool Smith, P.C.
Austin, TX

**1. The prior claims are directed to less secure, less scalable, non-Web-limited embodiments.**

The ’985 and ’293 claims are directed to serving information in distributed hypermedia (non-Web-limited) environments. Ex. 17 at 21:60-64; Ex. 29 at 18:20-23. Each relates to:

- serving information to browser applications;
- browser applications able to:
  - display hypermedia documents; and
  - identify, locate, and execute an executable application (’985 patent) or program code (’293 patent) using an embed text format at a first location such than an object is displayed at the first location within the hypermedia document;
- application or code that is part of a distributed application with at least one remote server (’985 patent) or two remote servers that send information to, and receive information from, the browser application (’293 patent); and
- users able to interact with an object within the displayed hypermedia document.

Ex. 17 at 21:60-22:28; Ex. 29 at 18:20-47. The “browser applications” in the ’985 and ’293 claims are not limited to “operating only within the Internet or World Wide Web.” Ex. 2 at 5-6. Each of the ’985 and ’293 patents also includes dependent claims directed to the served information including HTML text format tags. Ex. 17 at 22:29-32; Ex. 29 at 18:48-51. As Amazon and Google agree, these “claims refer to text formats not the file type”—*i.e.*, a hypermedia document need not be an HTML document. Ex. 51.

**2. The Asserted Claims are directed to specific Web embodiments and provide previously unclaimed advantages of security and scalability.**

The Asserted Claims, unlike the prior claims, are focused on: (1) interactive Web applications; (2) secure interactivity on the Web; and (3) the distribution and coordination of interactive applications over the Web. Both independent claims 19 and 32 of the ’507 patent are directed to serving information over the Web and contain new aspects, including:

- Web servers, Web pages, and Web browsers;
- interactive-content applications that must be selected and automatically invoked based on information from Web servers resulting in secure Web-based interactivity; and
- two or more distributed application server computers that enable interaction with the interactive-content application from a client computer over the Web.

Ex. 39 at 21:58-22:38, 23:25-24:2; Ex. 1 ¶¶ 25-58. Dependent claims 24, 26, 37, and 39 also claim:

- one or more coordination computers to coordinate performing at least one task; and
- breaking up the at least one task such that the two or more distributed application computers work together to perform the task.

Ex.39 at 21:22:61-23:3, 24:24-32; Ex. 1 ¶¶ 59-62.

Independent claim 45 contains each of the previously-mentioned attributes of the other Asserted Claims. Ex. 39 at 24:56-25:37; Ex. 1 ¶¶ 25-62. The claim further requires that a coordination computer send commands to coordinate activity of the other computers to perform viewing transformations to enable interaction. Ex. 39 at 25:7-11; Ex. 1 ¶¶ 63-66.

The differences between the Asserted Claims and the prior patent claims are not just words on paper; they recite new limitations that: (1) are specific to the Web; (2) provide previously unknown security in that context; and (3) provide previously unknown scalability in that context. These differences, considered individually and in combination—as they must be considered—make the Asserted Claims patentably distinct over the prior claims. The below table shows claim 45 of the '507 patent with the different limitations highlighted:

| **'507 Patent Claim 45** |
|---|
| 45. A method performed by one or more computers for coordinating distributed processing to enable dissemination of interactive content to a client computer, the method comprising: |
| a. coordinating by the one or more computers processing of at least part of a distributed application to perform at least one task, |
| b. coordinating by the one or more computers communications sent to and received from at least a portion of the distributed application located on two or more separate computers connected to the World Wide Web distributed hypermedia network to enable the separate computers to work together to perform the at least one task, wherein at least part of the distributed application has been implemented to be part of a distributed interactive-content application configured to enable a user to interact with at least part of an object, displayed within a World Wide Web page by the client computer, and |
| c. generating and sending by the one or more computers commands over a network to coordinate activity of the separate computers working together to perform viewing transformations to enable the interaction with at least part of the object, wherein: |
| a. the two or more separate computers are remote from the client computer containing a World Wide Web browser configured to cause the display of the World Wide Web page, |
| b. the World Wide Web browser has been configured with a plurality of different interactive-content applications, each said interactive-content application being configured to enable a user to interact, within one or more World Wide Web pages, with at least part of one or more objects while at least part of each of said one or more objects is displayed to the user within at least one |

| of said one or more World Wide Web pages, |
| --- |
| c. the World Wide Web browser has been enabled, by information that has been transferred onto the World Wide Web distributed hypermedia network, to detect at least part of the object and to display the world Wide Web Page, |
| d. the World Wide Web browser has been configured to select an interactive-content application, based upon the information, from among the different interactive-content applications, and automatically invoke the selected interactive-content application, |
| e. the automatically invoked interactive-content application has been configured to operate as part of the distributed interactive-content application.[1] |

*See* Ex. 1 ¶¶ 25-66 (discussing above differences in the Asserted Claims), 95 (showing charts).

**a) Web-related limitations are new, different, and nonobvious.**

Unlike the prior claims, the Asserted Claims focus on the Web and Web-specific problems. Ex. 1 ¶¶ 25-40; Ex. 52 ¶¶ 16-24. Gone are the elements related to generic (non-Web) servers, documents, and browser applications. Ex. 1 ¶ 27. In are Web servers, Web pages, Web browsers, and limitations for securely—and at scale—solving Web problems. Ex. 1 ¶ 25.

The necessary historical context highlights the significance of these new limitations. In the early 1990s, the Web was in its infancy—there was no Amazon, no Google, no online Walmart shopping. Ex. 7 ¶ 35. More generally, there were no interactive Web applications like email, maps, videos, or dynamic shopping. The Web was a place of static text, blue-underlined hyperlinks, and the occasional static image. This reality is captured in the screenshot of Microsoft's first 1994-era website shown below. *Id.*

[1] As shown in Dr. Martin's declaration, this final limitation and the analogous ones in Asserted Claims 19 and 32 are not found in the '985 patent claims. Ex. 1 ¶ 95.

Significantly, early Web designers like Marc Andreessen wanted to keep the Web static and devoid of interactivity. Ex. 1 ¶¶ 36-37. As Mr. Andreessen explained, static images were as far as the Web should go—the Web certainly shouldn't have "generic inclusions" such as audio or video:

> ***Inlined images located on other servers are bad enough -- if we start making generic inclusions available, things are going to get hairy.*** IMHO.
>
> Plus, this is hypertext -- most times, generic inclusions shouldn't be per se necessary, or even necessarily useful compared to a hyperlink. Also, I'm not certain that any multimedia data other than images needs to be specifiable as inlined/included. ***Things like audio and MPEG can simply be pointed at from an anchor (as Mosaic does) and forked to external viewers*** or processed internally, whichever the browser prefers -- and with inlined images the whole thing will be iconic anyway.

Ex. 53 (emphases added); Ex. 6 ¶¶ 448-49. Indeed, the limited resources of networks and computers in the early 1990s made using images in Web pages difficult. Ex. 6 ¶¶ 448-49. The preferred route at the time was to use helper applications—applications outside of Web browsers. Ex. 7 ¶ 40. But even then Mr. Andreessen cautioned that the Web browser should not be launching another program: "I still don't like the idea of firing off arbitrary executables on the client side." Ex. 6 ¶ 710; Ex. 54.

This presented the inventors with another problem: how to unleash interactivity with Web designers insisting that far less functionality was a bad idea. Ex. 52 ¶¶ 22-29; Ex. 1 ¶ 38. The inventors were undeterred. They enabled interaction over the Web with large 3D datasets using coordinated, distributed servers they designed and a Web browser they modified to provide security. Ex. 7 ¶¶ 47-53. They documented their invention in a lab notebook by September 1993, had a working embodiment by November 1993, and presented the invention in January 1994. *Id.* ¶¶ 40-63; Ex. 6 ¶¶ 112-26. Once the inventors disclosed their invention, the same critics "expressed admiration for the inventors of the patent, implicitly recognizing that the invention satisfied need that they had previously failed to appreciate." Ex. 6 ¶ 710 (citing Ex. 55 and Ex. 56). Finally, in 1996—three years *after* the inventors had done so, the Web adopted a mechanism to embed interactive objects in Web pages. Ex. 1 ¶ 39.

The significance of the Web-focused limitations, found *only* in the Asserted Claims, is illustrated by Amazon and Google's actions in the *Adobe* Lawsuit. Understanding that it would have been difficult to prove these Web-related elements obvious, Amazon and Google convinced the

court and jury that the prior patent claims contained no Web-related limitations. Section III.C.2, *supra*. This allowed them to contend non-Web art—including MediaView—rendered the prior claims obvious. Ex. 6 ¶ 724. Amazon and Google argued (successfully) that the prior claims were not limited to the Web precisely because they believed that such limitations would not be obvious in light of the prior art.[2]

Indeed, the art in this case that even arguably relates to Web browsers is Mosaic and certain versions of ViolaWWW, LBNL Virtual Frog, Digital Anatomist, Klemets, and Ressler. Ex. 1 ¶ 40. Yet each of these pieces of alleged prior art "points *away* from adapting the '985 or '293 claims to the Web as opposed to using those claims on some other hypermedia system":

- ViolaWWW: "object embedding (testPlot.hmml, plot.v, and vplot)" used proprietary HMML and not the Web's HTML and "this alone shows that the ViolaWWW's capability was not suited for the Web";

- Mosaic: inventors had to modify Mosaic code "because the Web browser would not do what they invented without such modifications" and "the Web leaders' [including Mosaic co-creator Marc Andreessen] resistance to even just displaying more images within Web browsers points away from adapting the '985 and '293 distributed hypermedia network to the Web";

- LBNL Virtual Frog, Digital Anatomist, Klemets, and Ressler: each "eventually ran on the Web, but none used any of the object embedding mechanisms and associated applications that are required in the '985, '293, and '507 claims," but instead used the inapposite CGI scripts, which shows that "it was possible to build interesting systems . . . without the Eolas invention" and "that knowledgeable developers were able to use the pre-Eolas Web technologies."

Ex. 1 ¶ 40.

**b) Security-related limitations are new, different, and nonobvious.**

The Asserted Claims contain another set of limitations not found in the prior claims: the claimed Web browser must be configured with interactive-content applications that it may select and automatically invoke based on information it receives from the Web server. Ex. 1 ¶ 41. These limitations were drafted to address security concerns present in the alleged prior art. Ex. 52 ¶¶ 4-16.

---

[2] Defendants and their expert suggest that Dr. Martin testified that "browser application" from the prior patents must have been a Web browser. *E.g.*, Mot. at 15; Dkt. 586-20 ¶ 151. This is false. As Defendants know, the testimony of Dr. Martin (December 2011) came before Defendants' emergency plea for the court to construe the "browser application" term broader in the *Adobe* Lawsuit.

For example, the ViolaWWW browser would simply run whatever application was requested by a hacker with no questions asked—the user's browser would lose control. *Id.* ¶¶ 13-14. Dr. Doyle testified about these security concerns in the *Adobe* Lawsuit:

> There was a huge problem relating to security ... whereby a malicious hacker could send a program to your computer that could take over your computer, delete personal information, steal personal information, or destroy your computer entirely. ... We created a browser technology that only allowed programs to run that the user had allowed to be installed on the computer and where—where the webpage author couldn't know what program would actually be executed or where that program was located.

Ex. 5 at 101:20-102:10. The alleged prior art recognized (but did not solve) this security concern. Ex. 57 at 519 ("[A tag] is used [to] insert any viola application. This provides *lots* of possibilities. But [it] also poses a security issue. So we use it for demos, but will probably not release it, unless we can figure out: some kind of security mechanism."). Amazon and Google may claim that the '507 claims do not say the word "security," but the Asserted Claims solve the security problem by ensuring that only interactive-content applications with which a Web browser has been configured can be utilized. Ex. 1 ¶¶ 44-48.

Once again, the significance of secure embodiment is illustrated by the fact that Amazon and Google—and their current counsel—repeatedly argued to the jury, in the *Adobe* Lawsuit, that the prior claims included no security protection:

- <u>Examination of Dr. Richard Phillips</u>: "There's no security issues at all associated with the claims." Ex. 4 at 69:25-60:7; and
- <u>Closing argument</u>: "There's no security requirement that says it has to be highly secure." Ex. 3 at 65:1-2.

If these security-related limitations were obvious, unimportant, or in the alleged prior art, Amazon and Google would not have emphasized to the jury that those limitations were missing from the prior claims. And indeed, these previously unknown security advantages were "[o]ne of the surprising and unexpected consequences of the '507 patent claims." Ex. 52 ¶ 15. As Dr. Martin explains, there was no requirement for the "browser application" in the prior patent claims to be "configured with" "executable applications." Ex. 1 ¶¶ 41, 48, 52-55. A person of skill would understand that requiring a Web browser to approve and invoke a configured interactive-content application at a location in a

Web page of its choosing is a nonobvious variant of prior solutions allowing a document author to require a specific application to run at a specific place in a document. Ex. 1 ¶¶ 50-51. Adding this requirement to the Asserted Claims renders them patentably distinct over the prior claims.

A further advantage of this feature in the Asserted Claims is that it permits Web authors to "write-once-publish-many." Ex. 52 ¶ 36. That is, a Web author need only write one piece of Web code and Web browsers are configured with a safe interactive-content application to run to present the interactive content to the user. *Id.* Web authors need not account for the millions—or billions—of different user computer configurations. *Id.* This is unlike Amazon's and Google's alleged prior art from the *Adobe* Lawsuit, which required knowledge of the user's computer for programs like ViolaWWW and MediaView. Ex. 1 ¶¶ 48-49; Ex. 52 ¶ 13.

**c) Scalability-related limitations are new, different, and nonobvious.**

The coordination, task, and viewing transformation limitations of the Asserted Claims are nowhere to be found in the prior claims. Ex. 1 ¶¶ 59-66. While the prior claims simply required a server that was part of a distributed application, the Asserted Claims require a distributed application computer for coordinating the performance of a task. *Id.* ¶¶ 59-60. Consider '293 patent claim 11: it requires two remote servers, but not any coordination. *Id.* ¶ 60. "But, in the alternate architecture," such as the Asserted Claims, "an interactive-content application communicating with a coordination server that in turn communicates with further servers to compute server-chosen portions of the interactive display would have roles for 'coordination computers' and computers that 'work together to perform the task.'" *Id.* ¶ 62. This helps with scaling and resource management—especially where end users have resource-limited computers—as "[the] coordination computer can consider the capacity and current workload of the server computers to decide which and how many to enlist in performing the task." *Id.* As Dr. Martin explains, "[t]hese differences are meaningful" to a person of skill in the art. *Id.* ¶ 60

Asserted Claim 45's viewing transformations are another "specific type of application activity that is not present in the '985 and '293 patent claim[s]." *Id.* ¶ 63. An example is illustrative: under the '293 or '985 patents, an "an interactive-content application could present an interactive

MCKOOL SMITH, P.C.
AUSTIN, TX

graph showing diagnoses of disease over time using two or more remote servers, but the visual aspects of the graph (*e.g.*, bar chart versus line graph, linear versus logarithmic scale) could be controlled locally." *Id.* ¶ 64. But this "would not satisfy [the Asserted Claim] 45 requirement for coordinated remote viewing transformation." *Id.* Under the Asserted Claims, the server is required to handle the visual aspects of the graph in a distributed environment with at least two servers and a client computer.

If these limitations were obvious, Defendants' experts—Dr. Turnbull now or Dr. Mowry or Dr. Keller previously—could point to at least one Web-based example. Ex. *Id.* ¶ 76; Ex. 6 ¶ 734. Instead, each uses hindsight to apply non-Web examples to the Web—ignoring that later Web solutions "like those involved in Digital Anatomist and LBNL Virtual Frog implemented entirely different CGI based solutions after the '507 patent" priority date. *Id.* The coordination, task, and viewing transformation limitations provided a nonobvious advance over the prior art, making possible a previously unknown scalability that proved critical in the Web context.

**d) In combination, these distinctions render the Asserted Claims nonobvious in view of the prior claims.**

More important than the individual distinctions discussed above is consideration of the claim limitations as a whole, including the combination of each of these limitations and the limitations found in both the prior claims and the Asserted Claims. While each of the new limitations discussed above provided a significant distinction over the prior claims, the obviousness analyses does not consider the limitations in isolation as Defendants have done. Mot. at 14-20, 23-26. Instead, the analyses require all limitations to be considered as a claimed combination. *UCB, Inc. v. Accord Healthcare, Inc.*, 890 F.3d 1313, 1323 (Fed. Cir. 2018); *Bourns, Inc. v. United States*, 537 F.2d 486, 493 (Ct. Cl. 1976); *SimpleAir, Inc. v. Google LLC*, 884 F.3d 1160, 1170 (Fed. Cir. 2018). Neither Defendants nor their experts consider or address the combination of the new limitations in the Asserted Claims—which resulted in a new solution to address Web-specific problems with previously unknown security *and* scalability advantages. That constitutes a comprehensive lack of proof that, on its own, is fatal to Defendants' OTDP arguments. Eolas and its experts, on the other

hand, submit uncontroverted evidence and testimony confirming that the combination of these new elements was nonobvious, and that this combination renders the Asserted Claims patentably distinct over the prior claims. Ex. 1 ¶¶ 70-77; *see generally* Ex. 6, Ex. 52;

Indeed, these changes in the Asserted Claims are "not obvious relative to any of the '985 or '293 claims" and "correspond to significant changes in scope." Ex. 1 ¶ 71. For instance, as Dr. Martin explains for the combination of non-scalability differences in Asserted Claims 19 and 32:

> If the . . . combination of differences were obvious, one might expect to see them realized in the state of the art in some proximity to the time of the invention. However, as I explain in my rebuttal report, the '507 combination . . . does not appear in *any* piece of art asserted by Defendants—let alone the additional requirements of the '507 claims such as "distributed application located on two or more distributed application computers" and others. As stated previously, it took some three years for a mechanism for embedding an interactive object to appear on the Web, following Eolas's 1993 conception and reduction to practice.

Ex. 1 ¶ 73. The differences do not end there; the scalability changes in Asserted Claim 45 and the dependent Asserted Claims add even more:

> Reading only the cited claims of the '985 and '293 patents does not suggest to a person of ordinary skill to engineer server systems to include a VIS-like coordination computer that communicates with VRServer-like computers to work together to perform the viewing transformations [as shown in '507 patent Figure 10] that allow a Web browser user to rotate an visual embryo in real-time, all at a period of Web development when practitioners were concerned that loading reasonably sized *static images* on a one-time basis was too slow and network-intensive.

*Id.* ¶ 74. "The idea that the coordinated viewing transformation limitations are not only themselves obvious in light of the cited '985 and '293 claims, but that those limitations *in addition to* all of the other differences . . . are also obvious is that much less plausible." *Id.* ¶ 75. A person of skill in the art would not have been motivated to make all of these changes. *Id.* ¶ 77.

**3. The PTO confirmed that the Asserted Claims are nonobvious over the prior claims.**

The opinions of Eolas, Dr. Doyle, and Dr. Martin regarding the substantial differences between the Asserted Claims and prior claims do not stand alone. The PTO held the same opinion. And it did so in light of its extensive experience in examining '507 patent family, including issuing other OTDP rejections when appropriate.

**a) The PTO has extensive experience examining the '507 patent's family, including consideration of *Adobe* Lawsuit art.**

The history of the '507 patent family's examination at the PTO began more than two decades ago with the application that became the '906 patent. Ex. 8 at Cover. The PTO's examination of family members was continuous through issuance of the '507 patent. Ex. 39 at Cover.

Examiner Donaghue himself handled examination of the '507 patent family beginning during the examination of the first continuation application that became the '985 patent. Ex. 58. Examiner Donaghue continued to handle the remaining continuation patents. Ex. 17 at Cover; Ex. 28 at Cover; Ex. 29 at Cover; Ex. 39 at Cover. During examination of these patents, UC Regents presented Examiner Donaghue with the same art as in the *Adobe* Lawsuit—Viola, MediaView, HTML+, and more. Ex. 43; Ex. 45; Ex. 39 at Ref. Cited; Ex. 28 at Ref. Cited; Ex. 29 at Ref. Cited; Ex. 8 at Ref. Cited. Examiner Donaghue allowed each of those patents. *Id.*

**b) Examiner Donaghue knew how to reject continuation patents on OTDP grounds when appropriate.**

The '507 patent application was not the first time the PTO was presented with potential OTDP issues. During examination of the first continuation application leading to the '985 patent, an examiner rejected the application's claims on OTDP grounds in light of the '906 patent claims. Ex. 18. UC Regents responded by filing a terminal disclaimer. Ex. 19. Examiner Donaghue later rejected the claims of the second and third continuation applications leading to the '293 and '662 patents on OTDP grounds in light of the '906 and '985 patent claims. Ex. 30; Ex. 32. UC Regents responded by filing terminal disclaimers. Ex. 31; Ex. 33.

**c) The PTO asked how the '507 patent's claims were different, UC Regents explained the differences, and the PTO allowed the claims.**

During prosecution of the application leading to the '507 patent, the PTO considered the same issue that is now before this Court. The PTO sought "factual information regarding why [UC Regents] believes that the present claims are distinguished" over the *Adobe* Lawsuit art and how these claims "were different than the court case." Ex. 43 at 1-2; Ex. 44 at 312:17-25. At that point, the '507 patent application's claims included all relevant limitations from the Asserted Claims in at

least then-pending claims 22, 26, and 31, which became independent claims 19, 32, and 45, respectively. *Compare* Ex. 39 at 21:58-22:38, 22:61-23:3, 23:25-24:2; 24:24-32, 24:56-25:37 *with* Ex. 43; Ex. 1 ¶¶ 79-80; Ex. 59. UC Regents responded to the PTO's request, focusing on application claim 14 which contains the same relevant limitations as Asserted Claims 19 and 32, and providing a similar explanation as Eolas provides here. *Compare* Ex. 39 at 21:58-22:38, 23:25-24:2; *with* Ex. 43.

Without making an OTDP rejection—as it did with the prior continuation patents—the PTO allowed the '507 patent application claims. Ex. 45. Examiner Donaghue's reasons echo those in this brief. *Id.*; Ex. 59 (mapping application claims to issued claims). After minor claim editing, the '507 patent issued. Ex. 39.

**B. OTDP Does Not Apply Here: Considered as a Whole, the Asserted Claims are Distinct from and Nonobvious Over the Prior Claims**

**1. OTDP does not apply here.**

An OTDP analysis involves two steps: (1) determine claim differences; and (2) determine whether the differences render the claims as a whole patentably distinct compared to the earlier-issued claims. *UCB*, 890 F.3d at 1323 (quoting *Abbvie Inc. v. Mathilda & Terence Kennedy Inst. of Rheumatology Tr.*, 764 F.3d 1366, 1374 (Fed. Cir. 2014)). "The second part of this analysis is analogous to the obviousness inquiry under 35 U.S.C. § 103 in the sense that if an earlier claim renders obvious or anticipates a later claim, the later claim is not patentably distinct and is thus invalid for obviousness-type double patenting." *Id.* (citing *Abbvie*, 764 F.3d at 1378-79). In other words, "the question before [this court] is whether a person of ordinary skill in the art, starting with," *e.g.*, '985 claim 42 or '293 claim 11, "would have been motivated to" make all of the changes discussed in Section V.A, *supra*, "with a reasonable expectation of success." *Id.* at 1324; *see also Otsuka Pharm. Co., Ltd. v. Sun Pharm. Indus., Ltd.*, 678 F.3d 1280, 1296-98 (Fed. Cir. 2012) (noting the analysis requires a motivation to modify earlier claims with prior art teachings).[3] Secondary considerations of nonobviousness like teaching away and unpredictable results are also relevant.

[3] Defendants may suggest that prior cases like *Geneva Pharms., Inc. v. GlaxoSmithKline PLC*, 349 F.3d 1373 (Fed. Cir. 2003) hold that motivation to combine is not an element of OTDP. The Federal Circuit in *Otsuka* explained that suggestion misapplies *Geneva Pharms. Id.*

*UCB*, 890 F.3d 1327-28 (noting evidence of teaching away but holding that the issue need not be reached for purposes of appeal); *Otsuka*, 678 F.3d at 1298-99 (noting results of invention were unpredictable but need not be examined for purposes of appeal).

The focus of the analysis is on the claim "considered as a whole." *Id.* (quoting *Eli Lilly*, 689 F.3d at 1377). The analysis requires comparing one claim to another and not mixing and matching them. *Magna Elecs., Inc. v. TRW Auto. Holdings Corp.*, 2016 WL 4239187, at *2-4 (W.D. Mich. Jan. 8 2016). The burden is on the challenger to prove all elements of OTDP by clear and convincing evidence. *Procter & Gamble Co. v. Teva Pharms. USA, Inc.*, 566 F.3d 989, 999 (Fed. Cir. 2009).

The Asserted Claims contain several material differences individually before even considering the claims as a whole. Sections V.A.2.a)-c), *supra*. For instance, the Asserted Claims focus on solving Web-specific problems. Section V.A.2.a), *supra*. The Asserted Claims also focus on secure and scalable embodiments. Sections V.A.2.b)-c), *supra*. These limitations are not in the prior claims. Section V.A.2, *supra*.

These differences—considered individually and especially considering the claim as a whole—render the Asserted Claims patentably distinct from the prior claims. Section V.A.2, *supra*. They are not merely "different words to describe the same invention." Mot. at 13. This distinctiveness is illustrated through the analyses of Drs. Martin and Doyle, which was discussed in Section V.A.2, *supra*. Secondary considerations, like contemporary Web architects teaching away from the Asserted Claims' Web-specific solutions and others failing to include security mechanisms, support nonobviousness. Sections V.A.2.a)- b), *supra*. The distinctiveness is confirmed through Amazon and Google's positions during the *Adobe* Trial convincing both the court and jury that the prior claims: (1) were not limited to the Web; and (2) included no security. Section III.C.2, *supra* (discussing *Adobe* Lawsuit trial and arguments from Amazon and Google). Conclusory statements from Defendants' expert cannot change the result, particularly where the Asserted Claims here are simply different. *Medtronic, Inv. v. AGA Med. Corp.*, 2009 WL 1163976, at *4-6 (N.D. Cal. Apr. 28, 2009) (Chesney, J.); Section V.A.2, *supra*.

MCKOOL SMITH, P.C.
AUSTIN, TX

The presumption of validity is at its apex here, where the PTO had the art from the *Adobe* Lawsuit and an opportunity to make OTDP rejections like those it had made for prior continuation applications. *Microsoft*, 564 U.S. at 108-09 ("[the] heightened standard of proof . . . . applie[s] even more clearly where the evidence [in front of the PTO] was identical"). For instance, ViolaWWW, MediaView, Mosaic, and HTML+ were before the PTO. Ex. 39 at Ref. Cited. And Examiner Donaghue asked Eolas about the *Adobe* Lawsuit and the prior '906 and '985 patent claims. Ex. 43. Without an OTDP rejection—as he had issued for prior continuation applications—Examiner Donaghue allowed the '507 patent claims. Ex. 45. The PTO already considered and rejected Defendants' OTDP argument (and their alleged prior art).

Critically, Defendants do not perform a proper OTDP analysis. Defendants do not evaluate the claims as a whole, provide any motivation to modify the prior claims to make the combined Asserted Claims, or discuss any secondary considerations of nonobviousness. For instance, Defendants suggest that this Court "need consider only those portions of the claims where a dispute exists" and then focus on the different limitations individually. Mot. at 14-20. They thus admit that they do not perform their analysis on the claim "considered as a whole," as required by the governing legal framework. *UCB*, 890 F.3d at 1323. Nor do Defendants explain why a person of skill would have been motivated to make the changes they and their expert suggest would be made to the prior claims, or why secondary considerations of nonobviousness do not apply. *See generally* Mot. (omitting mention of motivation to combine or secondary considerations). Yet such analyses are also required. *UCB*, 890 F.3d 1327-28; *Otsuka*, 678 F.3d at 1296-99. These failures of proof are fatal to Defendants' OTDP defense and their motion as a whole as they rely on their faulty OTDP analysis for both their collateral estoppel and *Kessler* doctrine defenses.[4]

**2. Defendants' OTDP arguments are unavailing.**

Even the OTDP arguments Defendants make are unavailing. ***First***, Defendants discuss at length Eolas's prior descriptions of its inventions and the '507 patent specification's disclosure. Mot.

[4] Defendants' expert's highlighted claim charts are no help. Ex. 1 ¶ 88. As Dr. Martin explains, the wording for each color/bucket varies significantly, groupings are incoherent and include different terms, and there is no explanation for the different arrangements across the claims. *Id.*

McKOOL SMITH, P.C.
AUSTIN, TX

at 10-12. Yet Eolas's prior descriptions of its inventions in pleadings—seeking to provide helpful summaries for the courts—is not the issue. The test for OTDP looks to the *claim* differences and whether those differences, considering the claim *as a whole*, are patentably distinct. *UCB*, 890 F.3d at 1323. As to the '507 patent's specification, Defendants are again misguided. Eolas agrees with Defendants that the Asserted Claims are supported by the specification. The specification, however, does not impact the OTDP analysis. *Regents of Univ. of Cal. v. Monsanto Co.*, 2005 WL 1513093, at *2 (N.D. Cal. June 27, 2005) (Hamilton, J.) ("the court cannot rely on the earlier patent's specification as prior art in evaluating double patenting"). Indeed, given that patent claims must be supported by the specification, all continuation patent claims would be unpatentable if the OTDP inquiry compared the continuation claims to the specification. Clearly, that is not the case.[5]

Second, Defendants' OTDP cases are inapposite. Mot. at 14-20 Each involves only minor differences in one or two limitations unlike the extensive differences here. For instance, in *Georgia-Pacific Corp. v. U.S. Gypsum Co.*, the claims were nearly identical other than: (1) the later claim removing one limitation (which simply removes the need to prove that limitation is in the prior art); and (2) replacing "comprising" with "consisting" for the exact same subset of materials. 195 F.3d 1322, 1326-28 (Fed. Cir. 1999). And *Abbvie* involved a single somewhat narrower species in a method of treatment. 764 F. 3d at 1374-81. Neither case is like this one, which, as discussed *supra*, involves claims with numerous, material, and nonobvious differences. Section V.A, *supra*. Nor is there a prohibition—as Defendants imply (Mot. at 15, 16, 17)—on later claiming a species of an already-patented genus (which is not the case here, anyway). Indeed, "[i]t is not surprising or controversial that either the same or a different inventor will improve upon and attempt to patent a novel, useful, and nonobvious variation of a compound claimed by an earlier patent." *Brigham & Women's Hosp. Inc. v. Teva Pharms. USA, Inc.*, 761 F. Supp. 210, 224 (D. Del. 2011).

[5] Defendants make much of continuation patent applications and suggest that there is something nefarious about the practice. Mot. at 6 n.3, 9. There is nothing nefarious about continuation applications. If there were, Congress would not permit them. Continuation practice is common. Amazon's counsel, for instance, tells clients and potential clients that "the filing of one or more continuing pending applications during the enforceable term of a patent still gives the patent owner more strategic flexibility, both defensively and offensively." Ex. 60.

MCKOOL SMITH, P.C.
AUSTIN, TX

*Third*, Defendants are wrong about the distinctions between the Asserted Claims and the prior claims. Mot. at 12-20. This was discussed earlier, but further discussion may be helpful.

**As to the claimed Web-specific solutions**, both Drs. Martin and Doyle explain why the distinctions render the claims patentably distinct: contemporaries used different solutions and experts at the time taught away from using the Web for interactive content. Section V.A.2.a), *supra*; Ex. 1 ¶¶ 25-40; Ex. 52 ¶¶ 17-24. Indeed, Amazon and Google admit that the move to the Web matters—why else would they have argued so strenuously on the eve of trial in the *Adobe* Lawsuit that the "browser application" need not be a Web browser? As Dr. Martin explains, Defendants wrongly rely on "HTML" in the prior claims to close the gap: non-Web browsers parse and display HTML. Ex. 1 ¶¶ 34-35, 82.

**As to the security solutions**, both Drs. Martin and Doyle again explain why the distinction renders the claims patentably distinct: the security and "write-once-publish-many" aspects of the claims moved beyond what was known at the time. Section V.A.2.b), *supra*; Ex. 1 ¶¶ 41-58; Ex. 52 ¶¶ 4-24. Again, both Amazon and Google admit this difference matters—why else would they spend so much time arguing the prior claims were not secure in the *Adobe* Lawsuit? As Dr. Martin explains, the prior patent claims did not include this secure configuration requirement, and the alleged prior art from the *Adobe* Lawsuit had security issues that permitted third-party document authors to run nefarious scripts on user computers. Ex. 1 ¶¶ 41-48, 84.

**As to scalability solutions**, Dr. Martin explains why the distinctions render the claims patentably distinct: communications amongst computers or servers is not the same as management of them to work together. Ex. 1 ¶¶ 60-61. This management permits the coordination computer to determine capacity and workload, and then enlist necessary resources to perform a task, including remotely assisting in handling viewing transformations for a user. *Id.* ¶¶ 62; Section V.A.2.c), *supra*. Defendants do not seriously dispute this—nor can they. Instead, Defendants rely on prior inventor and other testimony. Mot. at 18-19. But the cited testimony is not specific to managing Web servers, but instead relates to different technologies. Nor do Defendants provide a reason that a person of skill would consider this embodiment obvious. If the distinctions were so well known, Defendants

MCKOOL SMITH, P.C.
AUSTIN, TX

would be able to point to at least one alleged prior art reference and articulate a motivation to combine it with the reference claims. Ex. 1 ¶ 76.

### C. Collateral Estoppel Does Not Apply Here: the Asserted Claims are Materially Different than ’985 Patent Claim 42 and Have Never Been Adjudicated

#### 1. Collateral estoppel does not apply here.

Like their OTDP defense, Defendants’ collateral estoppel defense fails. In the context of collateral estoppel, “the Federal Circuit has followed Supreme Court precedent and held that”:

> [C]ollateral estoppel applies with respect to a patent’s validity if (1) the patent was found invalid in a prior case that proceeded to final judgment where all procedural opportunities were available to the patentee; (2) the issues litigated were identical; and (3) the party against whom estoppel is applied had a full and fair opportunity to litigate.

*ArcelorMittal Atlantique et Lorraine v. AK Steel Corp.*, 908 F.3d 1267, 1273 (Fed. Cir. 2018). Under Fifth Circuit law, which applies here, a fourth factor is whether there is a “‘special circumstance that would render preclusion inappropriate or unfair.’” *Soverain Software LLC v. Victor’s Secret Direct Brand Mgmt., LLC*, 778 F.3d 1311, 1315 (Fed. Cir. 2015) (quoting *State Farm Mut. Auto. Ins. Co. v. LogistiCare Solutions, LLC*, 751 F.3d 684, 689 (5th Cir. 2014)).[6]

Collateral estoppel is not limited to identical patents; “it is the identity of the issues that were litigated that determines whether collateral estoppel should apply.” *Ohio Willow Wood Co. v. Alps South, LLC*, 735 F.3d 1333, 1342 (Fed. Cir. 2013) (citing *Bourns*, 537 F.2d at 491; *Westwood Chem., Inc. v. U.S.*, 525 F.2d 1367, 1372 (Ct. Cl. 1975)). “If the differences between the unadjudicated patent claims and adjudicated patent claims do not materially alter the question of invalidity, collateral estoppel applies.” *Id.* (citing *Bourns*, 537 F.2d at 493). Yet, “the differences revealed by such comparisons must be evaluated, not in terms of obviousness under a domino approach, but, rather, in terms of the Graham issues.” *Bourns*, 537 F.2d at 493; *see also Graham v. John Deere Co. of K.C*, 383 U.S. 1, 17-18 (1966) (noting that relevant factors include: (1) determining the scope and content of prior art; (2) determining the differences between the claims

---

[6] Defendants apply Ninth Circuit collateral estoppel law. Mot. at 20-21. Yet as Judge Corley held “[t]hese consolidated actions were transferred here from the Eastern District of Texas pursuant to 28 U.S.C. § 1404(a) . . . .; accordingly, Fifth Circuit law would normally apply.” Dkt. 492 7-8. This Court recently confirmed Judge Corley’s view. Dkt. 566 at 6 n.2.

-25-

Case Nos. 4:17-cv-03022-JST; 4:17-cv-03022-JST; 4:17-cv-03022-JST EOLAS’S RESPONSE TO DEFENDANTS’ MSJ

and prior art; (3) resolving the level of skill in the art; and (4) considerations of nonobviousness, like teaching away and commercial success); *Kimberly-Clark Worldwide, Inc. v. First Quality Baby Prods. LLC*, 135 F. Supp. 3d 850, 857 (E.D. Wis. 2015) ("[T]he obviousness analysis cannot be boiled down to comparing the claims and checking the prior art to see if the new limitations exist."). This is similar to the analysis discussed above for OTDP, and the differences between the claims discussed above show that the *Adobe* Lawsuit issues are not substantially the same as here.

Collateral estoppel does not apply to the unadjudicated Asserted Claims. The '507 patent was never previously asserted. Furthermore, the Asserted Claims are distinct from the '985 patent claims that were previously invalidated by a Texas jury's general verdict. As Dr. Martin shows in both his rebuttal report and his declaration, the difference between the Asserted Claims and the '985 patents claims is significant: the majority of the claim language is different and material. Ex. 6 ¶¶ 719-745; Ex. 1 ¶¶ 25-96. Dr. Doyle has further confirmed that the security and Web solutions of the Asserted Claims are materially different than the subject matter claimed in the '985 patent. *See generally* Ex. 52. As with OTDP, the presumption of validity is at its apex here with respect to collateral estoppel—the PTO had the same art and arguments in hand and rejected Defendants' view of the evidence. *Microsoft*, 564 U.S. at 108-09.

The changes—which Amazon and Google argued vehemently were not in the '985 patent claims—are not "slightly different language to describe substantially the same invention." *Ohio Willow Wood*, 735 F.3d at 1342. Amazon and Google cannot now change their minds about the prior claims and what they were missing—even beyond the dispositive claim differences, this is a special circumstance warranting the exclusion of collateral estoppel. *Soverain*, 778 F.3d at 1315 (quoting *State Farm*, 751 F.3d at 689). Therefore, as discussed in Section V.A, *supra*, the Asserted Claims—considered as a whole and not under Defendants' "domino approach"—are materially different from and nonobvious over the prior claims. Defendants have not—and cannot—meet their burden.

**2. Defendants' collateral estoppel arguments are unavailing.**

Defendants' collateral estoppel arguments fail. *<u>First</u>*, Defendants' cases are inapposite. Each involves an agreement that the claims were substantially the same or involved only minor

MCKOOL SMITH, P.C.
AUSTIN, TX

differences in one or two limitations. For instance, in *Ohio Willow Wood* there was no "dispute that the Asserted Claims of the '237 patent are substantially similar to the invalidated claims of the '182 patent." 735 F.3d at 1342. Such a dispute certainly exists here. In *Bourns*, "[t]here [were] essentially two features included in some of the claims not found in the adjudicated claims," but the defendant cited prior art disclosing these features that the patentee did not dispute. 537 F.2d at 493-94. There are not just two new, minor additions to the Asserted Claims, and the alleged prior art does not render the Asserted Claims—particularly considered as a whole—obvious. Section V.A, *supra.* In *Soverain*, only a single dependent claim—limiting the independent claim's network to the Internet—was at issue. 778 F.3d at 1319-20. But here there are a number of new limitations in a new patent considered by the PTO. And the Web solutions in the Asserted Claims come against a backdrop of others rejecting any kind of interactivity on the Web. Section V.A.2, *supra.* In *Kimberly-Clarke*, the patentee did not argue that the new limitations were nonobvious until an untimely sur reply, and did not show that the claims were narrower. 135 F. Supp. 3d at 856-57. But this case, as discussed in Section V.A, *supra*, involves claims with numerous, material, and nonobvious differences.

<u>*Second*</u>, Defendants' reliance on prior inventor and expert testimony is misplaced. Because the '293 patent claims do not apply to this defense—they have never been adjudicated invalid—Defendants cannot rely on the "distributed application located on two or more remote computers coupled to the distributed hypermedia network environment" limitation in that patent. Defendants thus point to testimony from inventors David C. Martin and Dr. Doyle, and expert Dr. Martin. Mot. at 24-25. Yet the testimony from each is not related to Web problems solved by these claims, but instead relates to different technologies. If the concept of two or more remote computers being used as part of a distributed application on the Web was so well known, Defendants would be able to point to at least one such reference. They cannot—and their silence speaks volumes.

### D. The *Kessler* Doctrine Does Not Apply Here: the Asserted Claims are Not Essentially the Same as Any Prior Claims

The *Kessler* doctrine "fills the gap between" issue and claim preclusion. *Brain Life, LLC v. Elekta Inc.*, 746 F.3d 1045, 1055-56 (Fed. Cir. 2014). For instance, while "claim preclusion does not

MCKOOL SMITH, P.C.
AUSTIN, TX

bar a party from asserting infringement based on activity occurring after the judgment in the earlier suit," the *Kessler* doctrine may. *SimpleAir*, 884 F.3d at 1170. Just like claim preclusion, the *Kessler* doctrine examines whether the claims—not individual limitations—and products are "essentially the same" as previously-adjudicated claims and products, respectively. *Id.* at 1168-70. The party asserting preclusion has the burden to show the products are essentially the same. *Foster v. Hallco Mfg. Co., Inc.*, 947 F.2d 469, 479-80 (Fed. Cir. 1991); *Acumed LLC v. Stryker Corp.*, 525 F.3d 1319, 1324 (Fed. Cir. 2008 ) (citing *Foster*, 947 F.2d at 480); *SKC Kolon PI, Inc. v. Kaneka Corp.*, 2017 WL 3476995, at *3 (C.D. Cal. Mar. 13, 2017).

Like their other defenses, Amazon and Google's *Kessler* doctrine defense fails: the Asserted Claims are not essentially the same as the prior '293 patent claims (for Google) or the prior '985 patent claims (for Amazon and Google). As discussed in Section V.A, *supra*, the Asserted Claims include numerous, distinctive differences over the prior claims. As with OTDP and collateral estoppel, the presumption of validity applies even more forcefully here where the PTO had the same art and arguments in hand and rejected Defendants' view of the claims and evidence. *Microsoft*, 564 U.S. at 108-09. Defendants have not—and cannot—meet their burden.

Even as to the accused products, Amazon and Google's defense fails: there has been no showing that "essentially the same" products are at issue here as in the prior litigations. Despite their burden, Defendants make no effort to prove this point. Instead, they provide cherry-picked (and incomplete) lists of accused services, mention JavaScript and "JavaScript technology," and assume their "essentially the same" conclusion. Defendants have made no showing that all of the products accused in this case were accused in previous cases—or that the current accused products with similar names as previously-accused products are essentially the same given that the prior products are from years ago. Defendants' paltry effort here is insufficient to meet their burden. *Advanced Cardiovascular Sys., Inc. v. SciMed Life Sys., Inc.*, 989 F. Supp. 1237, 1243-44 (N.D. Cal. 1997) ("ACS does not carry its burden under *Foster* . . . . To support this assertion, ACS asserts that the catheters all have relatively long guidewire lumens designed to provide increased pushability and

prevent kinking and other malfunctions. . . . This one reference to a similarity between the products does not satisfy ACS's burden to demonstrate that the products are essentially the same.").

Defendants also wrongly suggest that the *Kessler* doctrine bars the claims here because "the exact words of the asserted '507 patent claims" could have been included in prior claims. Mot. at 28-29 (quoting *Medinol Ltd. v. Cordis Corp.*, 15 F. Supp. 3d 389, 404 (S.D.N.Y. 2014)). Notwithstanding Defendants' citation to the *Medinol* case—which relates to laches and not the *Kessler* doctrine—no such rule exists. And if one did, patentees would be *per se* precluded from asserting any continuation patents if any earlier family member had one or more claims adjudged non-infringing or invalid. Given that the claims must be supported by the specification, it will always be true that "the exact words" of a continuation patent claim could have been included in a prior patent. Indeed, the Federal Circuit has already held that "the essentially-the-same-test of *Foster* does not apply where a claim could have been litigated in a prior action." *Acumed*, 525 F.3d at 1326. Rather, whether later-asserted patents "present the same cause of action as previously litigated depends on the scope of their claims, not on their dates of issuance." *SimpleAir*, 884 F.3d at 1169. As discussed above with respect to OTDP, the scope of the Asserted Claims differences materially from the prior claims.

**E. The *Adobe* Lawsuit's General Jury Verdict Prevents Assuming Any Reference is Prior Art**

Throughout their motion, Defendants rely on alleged prior art to meet their heavy burden. Mot. at 20 n.5, 21-23, 25. This reliance is misplaced for two reasons. ***First***, the analysis for each defense relates to comparing claims to claims and not to prior art. *UCB*, 890 F.3d at 1323; *Bourns*, 537 F.2d at 493; *SimpleAir*, 884 F.3d at 1170. ***Second***, no alleged prior art has ever been adjudicated as such. As to the art from the *Adobe* Lawsuit—ViolaWWW, MediaView, Mosaic, and HTML+—no finding has ever been made that any of the alleged prior art—including any particular version—is actually prior to the invention. This was an issue in the *Adobe* Lawsuit, but the verdict was a general one and did not articulate which references or which grounds were invalidating—and the Eastern District court merely held that there was substantial evidence precluding the court from overruling

McKool Smith, P.C.
Austin, TX

the jury's verdict. Dkt. 588-10 at 11, 13. This is an insufficient basis for the Court to assume any of those references is prior art—or that the jury based its verdict on anything in particular. *United Access Techs., LLC v. Centurytel Broadband Services LLC*, 778 F.3d 1327, 1334-35 (Fed. Cir. 2015) ("The defendants' argument that a ruling as to the sufficiency of the evidence on multiple grounds provides a basis for invoking collateral estoppel on each of those grounds is squarely contrary to the reasoning of one of the Supreme Court's leading decisions on collateral estoppel." (citing *Ashe v. Swenson*, 397 U.S. 436 (1970))). And any non-*Adobe* Lawsuit art is even more problematic: no argument exists that it has ever been held to be prior art.

## VI.    CONCLUSION

Defendants fail to meet their burden to prove any of their legal defenses. Defendants admittedly delayed filing their motion in hopes of securing a "more receptive" court through transfer but their motion is not support by the facts or the law in this court or any other court. Defendants bear the burden—by clear and convincing evidence—to prove that the Asserted Claims, when considered as a whole and not as individual elements in isolation, are "not patentably distinct" from the prior claims to establish OTDP. They fall short of their burden. When the Asserted Claims are viewed as a whole, it is clear that they are dispositively different from the prior claims. Because the Asserted Claims are different from the prior claims, the Asserted Claims are not invalid for obviousness-type double patenting and do not violate principals of collateral estoppel or the *Kessler* doctrine. Defendants' motion should be denied.

DATED: April 28, 2020

MCKOOL SMITH P.C.

*/s/ John B. Campbell*
Mike McKool, (admitted Pro Hac Vice)
**McKool Smith, P.C.**
300 Crescent Court, Suite 1500
Dallas, TX 75201
Telephone: (214) 978-4000
Facsimile: (214) 978-4044
mmckool@mckoolsmith.com

John B. Campbell (admitted pro hac vice)
Josh W. Budwin (admitted pro hac vice)
James E. Quigley (admitted pro hac vice)
**McKool Smith, P.C.**
300 W. 6th Street, Suite 1700
Austin, Texas 78701
Telephone: (512) 692-8700
Facsimile: (512) 692-8744
jcampbell@McKoolSmith.com
jquigley@McKoolSmith.com

Alan P. Block (State Bar No. 143783)
**McKool Smith Hennigan, P.C.**
300 S. Grand Avenue, Suite 2900
Los Angeles, California 90071
Telephone (213) 694-1200
Facsimile (213) 694-1234
ablock@mckoolsmith.com

Attorneys for Plaintiff
Eolas Technologies Incorporated