Pages 1 - 85

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jon S. Tigar, Judge

| | |
|---|---|
| EOLAS TECHNOLOGIES INCORPORATED, | ) ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| VS. | )   **NO. CV 17-03022-JST** |
| | ) |
| AMAZON.COM, INC, | ) |
| | ) |
| Defendant. | ) |
| | ) |

Oakland, California
Thursday, August 6, 2020

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff Eolas Technologies Incorporated:
          MCKOOL SMITH, P.C.
          300 W. 6th Street, Suite 1700
          Austin, TX 78701
    **BY: JOHN B. CAMPBELL, JR., ESQUIRE**
       **JOSHUA W. BUDWIN, ESQUIRE**
       **JAMES E. QUIGLEY, ESQUIRE**

For Consol Plaintiff Google LLC:
          QUINN EMANUEL URQUHART & SULLIVAN, LLP
          50 California Street, 22nd Floor
          San Francisco, Ca 94111
    **BY: CHARLES K. VERHOEVEN, ESQUIRE**
       **DAVID A. PERLSON, ESQUIRE**
       **FELIPE CORREDOR, ESQUIRE**
       **CARL G. ANDERSON, ESQUIRE**

Reported By:     Pamela Batalo-Hebel, CSR No. 3593, RMR, FCRR
                 Official Reporter

**APPEARANCES CONTINUED:**

For Defendant Amazon.com Inc.:
              LATHAM & WATKINS LLP
              140 Scott Drive
              Menlo Park, CA 94025
        BY:  **DOUGLAS E. LUMISH, ESQUIRE**
             **RICHARD G. FRANKEL, ESQUIRE**

              LATHAM & WATKINS LLP
              555 Eleventh Street, NW, Suite 1000
              Washington, DC 20004
        BY:  **MELISSA A. SHERRY, ESQUIRE**
             **CHARLES S. DAMERON, ESQUIRE**

              LATHAM & WATKINS LLP
              505 Montgomery Street, Suite 2000
              San Francisco, CA 94111
        BY:  **AMIT MAKKER, ESQUIRE**

              HALTOM & DOAN
              6500 Summerhill Road, Suite 100
              Texarkana, TX 75503
        BY:  **JENNIFER HALTOM DOAN, ESQUIRE**

For Consol Defendant Google LLC:
              QUINN EMANUEL URQUHART & SULLIVAN, LLP
              50 California Street, 22nd Floor
              San Francisco, CA 94111
        BY:  **CHARLES K. VERHOEVEN, ESQUIRE**
             **CARL G. ANDERSON, ESQUIRE**
             **DAVID PERLSON, ESQUIRE**
             **FELIPE CORREDOR, ESQUIRE**

For Consol Defendant Wal-Mart Stores Texas LLC:
              WHITE & CASE
              3000 El Camino Real
              2 Palo Alto Square, Suite 900
              Palo Alto, CA 94306
        BY:  **ERIC E. LANCASTER, ESQUIRE**
             **BIJAL VIJAY VAKIL, ESQUIRE**

              WINSTON & STRAWN LLP
              800 Capitol Street, Suite 2400
              Houston, TX 77002
        BY:  **ROBERT L. GREEN, III, ESQUIRE**

1    **Thursday - August 6, 2020**                                    **2:00 p.m.**

2                        **P R O C E E D I N G S**

3                              **---oOo---**

4        **THE CLERK:**  Your Honor, now calling Civil Matter

5    17-3022, Eolas Technologies Incorporated vs. Amazon.com, Inc.

6        If counsel could please state their appearances for the

7    record, starting with counsel for Plaintiff Eolas.

8        **MR. CAMPBELL:**  Good afternoon, Your Honor.  John

9    Campbell for Eolas.  Also on the line are my colleagues Josh

10   Budwin and James Quigley.

11       **THE COURT:**  Very good.  Welcome.

12       **MR. CAMPBELL:**  Thank you.

13       **MR. LUMISH:**  Good afternoon, Your Honor.  Doug Lumish,

14   Latham & Watkins, for Amazon.  With me from Latham are Melissa

15   Sherry, Rick Frenkel, Amit Makker, and Charles Dameron.  Also

16   from the Haltom & Doan firm is Jennifer Doan, and from the

17   client side.  We have Jeff Dean and Scott Stanford, I believe,

18   on the public line.

19       **THE COURT:**  Very good, welcome.

20       **MR. VERHOEVEN:**  Good morning, Your Honor.  Charles

21   Verhoeven from Quinn Emanuel on behalf of Google, and we also

22   have David Perlson, Carl Anderson, and -- where is he?  He's

23   fallen off the screen -- oh, there he is -- Felipe Corredor.

24   We are ready to proceed, Your Honor.

25       **THE COURT:**  All right.  Welcome.

1    **MR. VAKIL:**  Good afternoon, Your Honor.  This is Bijal

2    Vakil from White & Case on behalf of Wal-Mart.  With me is Eric

3    Lancaster from White & Case and Robert Green from Winston &

4    Strawn, and our client, Anna Lowe, is in the public gallery.

5    **THE COURT:**  Very good.  Welcome.  I think we've

6    covered the waterfront.

7    Who will be arguing for defendants today?

8    **MR. VERHOEVEN:**  This is Charles Verhoeven, Your Honor.

9    I will be arguing the obviousness-type double patenting issue,

10   and my colleague, co-counsel, Doug Lumish will argue, with

11   Your Honor's permission, the preclusion issues.

12   **THE COURT:**  All right.  Very good.  That's fine.

13   Mr. Campbell, will you be arguing on behalf of the

14   plaintiff today?

15   **MR. CAMPBELL:**  Yes, I will, Your Honor.

16   **THE COURT:**  All right.

17   Well, let me let defendants take it away.  What I

18   typically do is take arguments sort of the way I take the

19   briefs, and that is, the party that bears the burden makes an

20   argument and then the party that doesn't have the burden makes

21   an argument and then the party that has the burden has the last

22   say.

23   Sometimes in a motion that has this much complexity --

24   although I don't know how complex it actually is -- and this

25   many moving parts, it makes sense to actually give the other

```
1    side a second bite at the apple.  Something often comes up in
2    the reply argument they feel the need to respond to, so we'll
3    just play that one by ear.
4        Mr. Verhoeven, why don't you take it away.
5        MR. VERHOEVEN:  Thank you, Your Honor.  Just one
6    second.  Here we go.
7        Can everyone see that PowerPoint?
8        THE COURT:  I can.  You're in that sharing mode where
9    I can see a column of slides on the left, so whatever that is,
10   F5 on PowerPoint, you know, where you just see the main slide,
11   you might want to do that.
12       MR. VERHOEVEN:  Okay.
13       THE COURT:  I'm not sure it's F5, but I think you get
14   my meaning.
15       MR. VERHOEVEN:  Well, I'm showing a full screen-share
16   right now.  No one sees that?
17       THE COURT:  I have a full screen-share.  It's just
18   that I think you probably right now only want me to see the
19   slide that says "Defendants Motion for Summary Judgment."
20       MR. VERHOEVEN:  Yes.
21       THE COURT:  I can also see to my left a column that
22   contains, for example, Slide No. 2, "Obviousness-type double
23   patenting."  And maybe --
24       MR. VERHOEVEN:  Well, I'm not sure what's going on.
25       MR. PERLSON:  If you just look right below the "A" in
```

1   the "Wal-Mart," if you go straight below, there's like a little

2   icon that has a little dot with a line coming out of it.  I

3   think if you click on that, you'll be in presentation mode.

4         **MR. VERHOEVEN:**  Okay.

5         **THE COURT REPORTER:**  And I don't know -- excuse me.

6   This is the court reporter.  I don't know who just spoke

7   because of the -- because of the sharing the screen.  It

8   doesn't show all the voices.  So whoever just spoke before

9   Mr. Verhoeven --

10        **THE COURT:**  That was Mr. Perlson, I believe.

11        **THE COURT REPORTER:**  Thank you.

12        **MR. PERLSON:**  This is David Perlson.  Apologies.

13        **MR. VERHOEVEN:**  Okay.  Now, I'm sharing again.  I'm so

14  sorry, folks.  I practiced this and everything.  And now I'm

15  going to hit "slide show."  It's not working.  Oh, boy.

16     Felipe, do you want to just do it, because I don't want

17  to --

18        **MR. CORREDOR:**  Yes.

19        **MR. VERHOEVEN:**  Hold on.  One more try.

20        **THE COURT:**  Mr. Verhoeven, if it puts you at ease at

21  all, we live in the Zoom times now, so we're used to, you

22  know -- it's fine.  Anyway, it all worked out.  Here it is,

23  presented as you were hoping.

24        **MR. VERHOEVEN:**  Yes.  I'm trying to get you on the

25  screen, Your Honor, and then I'll start.

1          Okay.  Ready to go.

2          May I proceed, Your Honor?

3              **THE COURT:**  Please.

4              **MR. VERHOEVEN:**  So I'm going to be presenting today on

5     obviousness-type double patenting, and all my argument will be

6     on behalf of all the defendants.

7          So just to go through -- and, Your Honor, stop me at any

8     time if this is stuff you would rather me not go over, but the

9     standard for obviousness-type double patenting is laid fourth

10    here in the *AbbVie* case, and it involves two steps.

11         "First, the Court 'construes the claims in the earlier

12    patent and the claims in the later patent and determines the

13    differences.' Second, the Court 'determines whether those

14    differences render the claims patentably distinct.'"  "'A later

15    claim that is not patentably distinct from', i.e., 'is obvious

16    over or anticipated by,' an earlier claim is invalid for

17    obviousness-type double patenting."

18         The next slide here, slide 4, citing the *Georgia-Pacific*

19    *Corp. vs. U.S. Gypsum* case -- and this also goes on to explain

20    the purpose of the doctrine:  "Obviousness-type double

21    patenting is a judicially created doctrine grounded in public

22    policy which, prevents the extension of the term of the

23    original patent."  That's very important.  It "prevents the

24    extension of the term of the original patent via the patenting

25    of an obvious variation," which is what we have in this case.

1          **THE COURT:**  Mr. Verhoeven, let me jump in just to

2     respond to an invitation that you extended earlier.

3          **MR. VERHOEVEN:**  Okay.

4          **THE COURT:**  I don't like to tell people -- excuse

5     me -- I don't like to tell lawyers "talk about this, don't talk

6     about that" because it's -- I'm always -- I think it's very

7     possible that they're going to talk about something that I

8     didn't pay enough attention to in the briefs or that I hadn't

9     focused on.

10         I did read the briefs very carefully, and the legal

11    standards seem very clear, and everyone has done a good job of

12    identifying them and repeating them.  The part of your argument

13    and Mr. Lumish's argument that I'm going to be focused on most

14    carefully will not be what the legal standards are but to what

15    extent is the present patent different from the prior patents.

16    That's where the fight is in the case.  It's really a factual

17    fight.

18         **MR. VERHOEVEN:**  Yes, Your Honor.

19         **THE COURT:**  So please give the argument you came to

20    make, but just know that when you get to that point, that's

21    when my ears will be most up.

22         **MR. VERHOEVEN:**  Okay.  Well, in light of that,

23    Your Honor, I'm going to move on to the merits here.

24         In general, Your Honor, the main argument that the

25    plaintiffs are making to distinguish the '507 patent from the

1    parent patents is the explicit recitation of "World Wide Web,"

2    "web pages," and "over the web."  And I'm going to go into that

3    in detail, Your Honor, but I think a few things are notable

4    right off the front.

5        In *Eolas I*, they -- the inventors described their idea in

6    terms of web pages in *Eolas I*.  And in *Eolas/Microsoft* -- and

7    I'm citing Exhibit 31 for the first point, Exhibit 32 for the

8    second -- in *Eolas/Microsoft*, it also described the '906 patent

9    in terms of interactive web pages and sending things over the

10   web.

11       In *Eolas* -- if you look at the papers across the cases,

12   they admit that the inventive idea of the '507 patent is listed

13   as identical to the idea for the parent patents, so in *Eolas I*,

14   quote, "their idea to embed interactive content directly into

15   previously static web pages."  And that's in *Eolas I*.

16       The very conception, Your Honor -- the very conception of

17   this alleged innovation was via the use of web pages.  In this

18   case, they state the same idea.  "Their idea to embed

19   interactive content directly into previously static web pages."

20       If you look at Inventor Doyle's testimony from *Eolas I* at

21   trial, Your Honor, he admitted that the web and web browsers

22   were part of his invention claimed in the '985 and '906

23   patents.  And I'll just quote it for the record.  This is

24   Exhibit 5, transcript cite 92, 15 through 17; 98, 18 through

25   21:

1        "Q. What do you call the invention on the two patents in

2    red here, the '906 and the '985 patents?

3        "A. We call it the interactive web."

4        This is *Eolas I*, Your Honor.

5        "Q. Okay.  And tell us what is a browser?"

6        A "browser" is a term claimed in the parent patents,

7    Your Honor.

8        "Q. What is a browser?

9        "A. A browser as it's used in our invention essentially

10   means a web browser, a distributed hypermedia browser."

11       So in their own words, Your Honor, in the prior cases,

12   they describe their very invention, not the accused products,

13   their invention in terms of the World Wide Web and the use of

14   the web to -- to combine with something else to have some

15   interactivity that they claim is novel in *Eolas I*, which of

16   course the jury found otherwise.

17       Let's go to the actual claim language comparison,

18   Your Honor, if that's okay.  I'm going to use this figure,

19   Figure 6, just as a handy sort of side illustration as I go

20   through the claims.  I'll note, Your Honor, that Figure 6 is

21   identical in the '985, '293, and '57 *[sic]* patents so it

22   applies to both the parent and the '507 patents.

23       So there's a lot of different words that -- our

24   contention, Your Honor, is that the plaintiff here went and

25   tried to get a continuation to extend the term, and they, in

1  doing so, intentionally tried to rearrange the wording and make

2  it look like it was different, but all it is is different words

3  to claim the same thing.  So what I'm going to go through,

4  Your Honor, real quick here -- and stop me if you want

5  anything, but these aren't -- these are disputed points.  I

6  just want to run through --

7  　　　　**THE COURT:**  Mr. Verhoeven, let me interrupt you for

8  just a second.

9  　　Do plaintiffs also -- let me just ask them.  Do they also

10  plan to use a PowerPoint presentation?

11  　　　　**MR. CAMPBELL:**  We do, Your Honor, yes.

12  　　　　**THE COURT:**  Well, maybe I could -- maybe the parties

13  could just stipulate that following this, that each of them,

14  with a CC to the other, could send my courtroom deputy copies

15  of these PowerPoint presentations, and that will allow me to

16  pay closer attention and take fewer notes.

17  　　Would that be all right, Mr. Campbell?

18  　　　　**MR. CAMPBELL:**  Yes, of course, Your Honor.

19  　　　　**THE COURT:**  Mr. Verhoeven, does that work for you

20  also?

21  　　　　**MR. VERHOEVEN:**  Yes, Your Honor.

22  　　　　**THE COURT:**  Okay.  Very good.  Let's plan on doing

23  that.

24  　　Mr. Verhoeven, back to you.

25  　　　　**MR. VERHOEVEN:**  So I'm going to run through the claims

1    in functional terms, and really that's what the test is.  When

2    they're comparing the claims, they're looking at the substance,

3    not how the words are arranged.

4        So first, the '985 patent, the parent patent, claims "A

5    method of serving digital information in a computer network

6    environment."

7        '507, "A method for disseminating interactive content via

8    the World Wide Web distributed hypermedia network on the

9    Internet."

10       Functionally, besides the World Wide Web express uses in

11   '507, they're just describing serving information over a

12   network.

13       Next slide.

14       Both the '985, claim 40, and the '507, claim 32, also

15   recite the function of sending and receiving messages over a

16   network.  So if you look at the '985 patent, claim 40,

17   "communicating via the network server," and '507, using

18   different words, "receiving, by the server" and "transferring,

19   by the server."  Same functional concept.

20       Browsing being configured with the browser is being

21   configured with multiple applications.  This is true in both of

22   the patents; in '507, "configuration with the plurality of

23   different interactive content applications," and the '985,

24   claim 40, "identifying and locating an executable application."

25       Next slide.

1       Displaying an object in a web.  '985 patent, claim 40,

2  "the object is being displayed within a display area created at

3  the first location within the portion of the hypermedia

4  document being displayed."  Claim 32 of '507, "said one or more

5  objects is displayed to the user within at least one of said

6  one or more World Wide Web pages."

7       Next function of the claim, detecting an object and

8  displaying a web page.  Claim 40 -- claim -- '507 says, "detect

9  at least part of an object," and to cause a display of the page

10  to the user.  '985, claim 40, "responding to text formats," and

11  "displaying, on said client workstation, at least a portion of

12  the document within the browser-controlled window."  Different

13  words, same thing.

14       Next function is selecting an application based on

15  information.  The '507, claim 32, states exactly that.  Claim

16  40 of '985, "identifying and locating an executable application

17  associated with the object."

18       Both of those are selecting an application based on

19  information.  Just used different words.

20       The next function, automatically invoking an application.

21  The '507, claim 32, "automatically invoke the selected

22  interactive content application," for the '507.  And for claim

23  40, "automatically invoking the executable application."  Same

24  thing, slightly different wording.

25       They also recite displaying an object.  '507, "while at

1    least part of the object is displayed to the user within the

2    web."   Claim 40, "while the object is being displayed within

3    the display area."

4         Then finally, Your Honor, they -- they also both invoke

5    the function of the invoked application being part of a

6    distributed application, which is another element to the

7    claims, and they both say that -- I'm not going to read it into

8    the record.  You can see it for yourself.

9         So in our view, the patents are the same.  They use

10   different words.  They're functionally claiming the same thing.

11   I went over that really quickly, Your Honor, in the interests

12   of time because there is only three disputed issues, and I'd

13   like to go to those in more detail.

14        So Eolas proffers three alleged points of novelty.  The

15   interactive web is a point of novelty, they say.  Secure --

16   security on the web is a point of novelty, and distribution and

17   coordination of the applications that provide scalability is

18   the third thing they point to in their briefing, Your Honor.

19        It's notable that Eolas does not allege any other points

20   of distinction that they claim are patentable.  So we have

21   three claims, three arguments.  Let's address each one.

22        First, the interactive web.  There are several points to

23   make on this, Your Honor.  First, the '507 patent expressly

24   claims, quote, "the web," but that has already been claimed as

25   a species of the previously-claimed distribution hypermedia

1   network.  And this gets esoteric, and it's somewhat unique to

2   obviousness-type double patenting, Your Honor, but we have

3   these genus species things that we talk about, and the genus is

4   broad and the species is more narrow, and the law is that --

5           **THE COURT:**  Mr. Verhoeven, one of the pleasures of

6   this motion is that notwithstanding our reasonably heavy patent

7   docket here in the Northern District, I've not had one of these

8   come up before, so I very much enjoyed working on this motion,

9   actually.

10          **MR. VERHOEVEN:**  Yeah.

11      So a "disclosure of a small genus may anticipate the

12  species of that genus even if the species themselves are not

13  recited."  And the question is would someone -- would a person

14  of ordinary skill know that species included in the genus, and

15  we'll go into that, but obviously in this case, yes.  The

16  answer is yes.

17      I have a couple of examples, Your Honor.  I don't know if

18  you want me to go through the case law, but tell me if you

19  don't.

20      The first is a chemistry example from the Eli Lilly case

21  versus Barr Labs, and I'll just run through the quote here.

22      "Moreover, we find Lilly's argument to be disingenuous

23  because it seeks to use the broad coverage of claim 1 of the

24  '985 *[sic]* patent as both a sword and a shield.  Throughout the

25  term of the '98 *[sic]* patent, by virtue of claim 1's broad

language, Lilly possessed the right to exclude other parties
from administering any of the thousands of claimed compounds,
including but not limited to" the species -- alleged species in
that case, and I'm going to butcher it -- "fluoxetine
hydrochloride, to treat depression."  The case continues,
"Thus, for example, if another party attempted to use" this
hydrochloride to treat depression, Lilly could have sued them
under the '985 [sic] patent for infringement.

"With the '98 [sic] patent now expired" -- I'm going down
to the end of the quote -- "Lilly cannot hide behind its
once-advantageous broad coverage and argue that selecting" this
particular hydrochloride "from the class of compounds defined
by claim 1 the '985" -- "'895 patent would not have been
obvious."

So I like Venn diagrams, Your Honor.  I've got a few of
them in here.  The claim 1 of the parent said "administering a
compound" -- "administering compound to treat depression" and
didn't identify the specific compound.  It's a broad category.
But people in the art knew that this particular fluoxetine
hydrochloride is something that people administered for
depression.  They knew that.  And the court saying if they
would have used that, you would have -- you could have sued
them -- if they would have used this particular hydrochloride
in the parent case, the parent patents would allege
infringement because of the broader administering the compound

1   to treat depression.

2              THE COURT:  You know, I think I have the analogy.

3              MR. VERHOEVEN:  Yeah.  And that's exactly what we have

4   here, Your Honor.  We have the broad parent patents talking

5   about distributed hypermedia network and the species being the

6   World Wide Web and -- as a particular network.

7              THE COURT:  And you were sued under those patents;

8   correct?  Your client was previously sued under the --

9              MR. VERHOEVEN:  Yes, that's correct.

10              THE COURT:  For infringing products -- allegedly

11   infringing products that --

12              MR. VERHOEVEN:  That used the web.

13              THE COURT:  -- that existed on the web, right.

14              MR. VERHOEVEN:  That's right, Your Honor.

15        And the allegation was made that the broader genus,

16   distributed hypermedia network, included the World Wide Web.

17   And that's where you get the inventor talking about how to use

18   the web and modified it to come up with his invention.  That's

19   why you get in the *Microsoft* and the *Eolas I* cases the

20   description of the very idea of the invention and -- both by

21   the inventor and by Eolas itself -- the web was part of it.

22   They modified -- what did they modify?  They modified a web

23   page.

24        So clearly -- I'll get into this more, but clearly a

25   person of ordinary skill would know reading the

1    specification -- common specification here, Your Honor, that

2    the World Wide Web is an option.

3        Okay.  I'm going to skip this example in the interests of

4    time and show you a picture of what I just said.

5        So the Worldwide -- this is slide 28, and I'm citing the

6    '507 patent and the common specification, column 5, lines 32

7    through 35, but you will see in the specification "an example

8    of an open distributed hypermedia system is the so-called World

9    Wide Web implemented on the Internet and discussed in the

10   papers such as the Berners-Lee reference given above."

11       So here the question is would a person of ordinary skill

12   looking at the parent patent have known that this distributed

13   hypermedia genus would encompass the web.  Well, the

14   specification only identifies the web, so the answer to that is

15   obviously yes.

16       So therefore our first argument is because the web was a

17   well-known subset of a distributed hypermedia network, Eolas'

18   web distinction or argument fails to provide a patentable

19   distinction, something that is new or unique.

20       Second point, Your Honor, if you look at some of the

21   dependent claims -- we have listed two dependent claims here.

22   These are from the parent claims, the '985, claim 42, and the

23   '293, claim 11.  And I'll just use '985 because they say the

24   same thing both:  "The method of claim 41 where: the text

25   formats are HTML tags."

1    Well, an HTML tag is part of the web.  It's a standard

2    that was written by Tim Berners-Lee to create the web.  HTML is

3    a language.  And these clearly refer to HTML web tags.  A

4    person of ordinary skill would know that.

5    In the claim -- excuse me -- in the common specification,

6    Your Honor -- I'm at slide 30 now, column 5, lines 26 through

7    29, quote, "It is a 'hypermedia' system because it is able to

8    handle hypermedia documents as described above via standards

9    such as the HTTP and HTML."  Yes.  Those --

10    **THE COURT:**  Mr. Verhoeven, you're familiar with the

11    portion of defendant's brief that recites places, where in

12    their claim construction briefs and other documents, the

13    plaintiffs earlier took the position that this earlier

14    technology covered the web; correct?

15    **MR. VERHOEVEN:**  Yes.

16    **THE COURT:**  What position do the defendants take at

17    those times regarding that same issue?

18    **MR. VERHOEVEN:**  That's a really good question.  I

19    wasn't in those trials, but I think the trials were focused

20    mostly on invalidity.  Mr. Lumish was in those trials.  He

21    could speak up to that question, if it's okay.

22    **THE COURT:**  Okay.  It's just -- I have to say before

23    we get to this, it's really just a point of curiosity for me.

24    The positions that people take in claim construction briefs and

25    that sort of thing really don't have any life past the claim

1    construction hearing for me typically.  They don't tell me very

2    much, but I was just curious.

3         MR. LUMISH:  Your Honor, this is Doug Lumish speaking.

4    I can address that point now or do it when it's my turn --

5         THE COURT:  Why don't we just wait until it's your

6    turn because it feels like a little bit of a distraction.  It

7    just came to my mind while Mr. Verhoeven was talking.

8         MR. LUMISH:  I will do so.  Thank you.

9         THE COURT:  Thanks.

10        MR. VERHOEVEN:  So just to summarize this slide,

11   Your Honor, slide 30, this common specification expressly

12   describes a hypermedia system which is expressly claimed in the

13   parent patents as being able "to handle hypermedia documents as

14   described above via standards such as the HTTP and HTML

15   hypertext transmission and markup standards."

16        Those two references, HTTP and HTML, are languages created

17   by Tim Berners-Lee when he created the World Wide Web.

18        And here, Your Honor, on slide 32, this is from the trial

19   in *Eolas I*.  Trial transcripts, pages 47, lines 9 through.  Tim

20   Berners-Lee is on the stand:

21        "Q. In what languages is the web written in?

22        "A. Well, I designed a couple of languages just as part of

23   the engineering, HTML and HTTP.

24        "Q. HTML being Hypertext Markup Language?

25        "A. Yeah.  Hypertext Markup Language."

1      So the guy who created the web wrote these programs and

2  created these standards, and they're expressly in the dependent

3  claims of the parent patents.  So that provides further

4  evidence.  You could even look at -- now I'm on slide 33 --

5  at -- Eolas' expert, Dr. Martin, testified in *Eolas I*.  In

6  *Eolas I*, not here.

7      "A. HTML is one of the primary characteristics of a web

8  browser, and for that reason, yes, in my opinion, a browser

9  application as used in the '906 and '985 patents would have to

10  support HTML."

11      **THE COURT:**  Mr. Verhoeven, hold that slide on the

12  screen for just a second, please.

13      **MR. VERHOEVEN:**  While Your Honor is writing, for the

14  record, this is Exhibit 35 to the papers at 33, lines 2 through

15  7.

16      **THE COURT:**  All right.  Go ahead.  Thank you.

17      **MR. VERHOEVEN:**  In his expert report also, Dr. Martin

18  declared that, "The World Wide Web is built upon technologies

19  called HTTP, HTML... The web pages delivered and displayed are

20  written in HTML."

21      So Eolas itself -- there is so much evidence of this, I

22  don't know where to stop.  Slide 35, Exhibit 32 of the papers,

23  is *Eolas/Microsoft's* claim construction brief, so this is the

24  parent patents, and when they're discussing the parent

25  patents -- when he is discussing the parent patents -- excuse

1   me -- when Eolas is discussing the parent patents in its claim

2   construction brief in the *Microsoft* case, they stated, "The web

3   is also characterized by a set of standard data formats," just

4   like it says in the specification, Your Honor, "including

5   Hypertext Markup Language, HTML."

6      So, Your Honor, we believe that we have shown for our

7   papers and argument that the web is claimed as a species of

8   distributed hypermedia network environment in the parent claims

9   based on the way it was characterized, based on the way the

10  inventor testified how he conceived of the invention, based on

11  representations by Eolas, based on the law of genus species,

12  and based on the fact that dependent claims of the parent

13  patents expressly require a web, HTML, in part of the -- as

14  part of the dependent claim.

15     **THE COURT:**  Mr. Verhoeven, why does the PTO allow the

16  patent to issue if that's true?

17     **MR. VERHOEVEN:**  Well --

18     **THE COURT:**  The only reason I ask -- I don't know that

19  I would have asked that question, but, you know, in their

20  opposition to your motion, the plaintiffs are very excited

21  about this point, and they spill a lot of ink on it so I wanted

22  to ask you.

23     **MR. VERHOEVEN:**  Well, my first point is I think

24  they're doing that because they don't have anything else to

25  say.  But, you know, if they're right, then there's -- we don't

1    need the district court in patent cases, do we, because the

2    double patenting -- if the Patent Office doesn't find it, it

3    isn't there, but that's not the law, obviously.  And I will

4    note, Your Honor --

5         **THE COURT:**  I think better of the question, actually.

6         Mark Lemley wrote an article about a dozen years ago --

7    maybe it's 10, I don't know -- on this point that you just

8    made, which is why do patents escalate to the -- why is it a

9    good thing that patents escalate to the district court.

10   Anyway, I won't take any more of your time.  You don't need to

11   answer that question.

12        **MR. VERHOEVEN:**  Okay.  All right.

13        So I'm transitioning here, Your Honor, from the point I

14   was making, that the parent patents actually claimed as a

15   species of distributed hypermedia network environment the web.

16   Although they didn't expressly use the word "web," all the

17   evidence we just went through shows that the inventors used the

18   web to create their invention, and in the lawsuits, they --

19   prior lawsuits against Google and other defendant's, they

20   alleged that the web infringed their distributed hypermedia

21   network environment.  However, even if it isn't claimed, it

22   would have been obvious to use the web as the distributed

23   network.

24        So we think it's claimed, but even if -- even if you

25   disagree, Your Honor, we -- at least we would argue it's

obvious to use the web as the distributed hypermedia network, and here are the reasons.

All of the parent patents and the '507 patents share the exact same specification.  The parent patents and the '507 patents disclose the exact same figures.  The specification -- there is only one, so I call it the "common specification." The common specification discloses only one embodiment, the World Wide Web.  I mean, that's the only example they give in the specification, and their argument wouldn't have been obvious to use the web when they used it themselves as the sole embodiment example of a hypertext media system.

And finally, Your Honor, there's law out there saying even if they didn't claim it like I said they did, incorporation of existing routine Internet technology into existing processes does not create a patentable distinction, and I would cite to the *Soverain Software* case talking about open market.  It says "Open market did not invent the Internet or hypertext or the URL.  Newegg is correct that the use of hypertext to communicate a statement document or transaction detail document was a routine incorporation of internet technology into existing processes.  We conclude that Newegg presented clear and convincing evidence of obviousness of claims," and it goes on.

Here that's all -- even if we're just looking at the parent patents, that's all they did, and that's one of the

1    reasons, probably, why the jury found the patents invalid.

2        You might hear an argument -- now I'm going to transfer to

3    go over to some of the counter-arguments in the briefing really

4    briefly, Your Honor.

5        You might hear an argument that it's inappropriate to look

6    at prior art when you are doing the double patenting analysis,

7    and this is where the doctrine gets kind of tricky and

8    esoteric.  So --

9        **THE COURT:**  Don't you have a footnote in your reply

10   brief that says, "Oh, we only cited one piece of prior art

11   anyway.  Go get over yourselves."  Don't you have a footnote

12   that says something like that?

13       **MR. VERHOEVEN:**  We might.  I don't remember off the

14   top of my head, Your Honor, but the -- the law is you can

15   consider the intrinsic evidence when you're doing double

16   patenting.  You don't consider prior art.  It has prior art to

17   see if it's anticipated or obvious, but as this states in this

18   *AbbVie/Mathilda*, "in a double patenting inquiry,...the

19   disclosure may be used" -- the disclosure of specifications --

20   "may be used...to answer the question whether claims merely

21   define an obvious variation of what is earlier disclosed and

22   claimed."

23       So if you -- if we hear an argument that you can't

24   consider the parent patents because they're prior art, this

25   case makes it very clear that you can consider the parent

1   specification and the '507 patent.  We'd be in a bind if you

2   couldn't consider the parent specification, Your Honor, because

3   it's exactly the same as the '507 patent.

4            **THE COURT:**  Okay.

5            **MR. VERHOEVEN:**  In Eolas' brief -- and this is a big

6   question mark to me.  I don't know why they were doing it, but

7   they repeatedly point to the fact that defendants in the prior

8   cases distinguished the parent patents and said they're not

9   limited to the web as part of their validity analysis,

10   Your Honor.  And they say because that distinction was made,

11   it's clear the web would have been a new and unique addition to

12   the claims, and I just cite one thing here.  I won't read it.

13   But Eolas -- it's a logical fallacy.  Saying a claim is not

14   limited to X does not mean that X would be a new and unique

15   addition to the claim.

16            **THE COURT:**  No.  I get your point.  That point -- you

17   like Venn diagrams, by the way, as I also do.  I understand

18   that the small circle sits in the big circle here.

19            **MR. VERHOEVEN:**  Okay.

20      And just really briefly, Eolas says in its briefs, we

21   don't provide any motion *[sic]* to modify the claims, no

22   motivation to combine.

23      Motivation to combine is not a factor, just like the prior

24   art.  It's not a factor in obviousness-type double patenting,

25   and we cite the *Geneva Pharm* case.  "Obviousness requires an

1   inquiry into a motivation to modify the prior art; nonstatutory
2   double patenting does not."
3       Same thing with secondary considerations in the validity
4   analysis.  They don't apply here.  So Eolas argues at page 22
5   of its brief, "defendants do not...discuss any secondary
6   considerations of non-obviousness."  But the same -- well, I
7   guess we have a different case here.  But the objective
8   indicia, secondary considerations, or whatever you want to call
9   them, are not appropriate for OTDP, and here we cited two
10   cases.  This is the *Geneva* case again.  The judge continues,
11   "Obviousness requires inquiry into objective criteria
12   suggesting non-obviousness."  That's secondary considerations,
13   Your Honor.  Semicolon, "nonstatutory double patenting does
14   not."
15       And so I won't spend time on the next case.  The point is
16   that these -- these swings at us are miffs because these aren't
17   requirements for obviousness-type double patenting.  Secondary
18   considerations is not, nor is a requirement to show a
19   motivation to combine.
20       So that concludes my presentation on the first
21   distinction.  The second two will be much quicker, Your Honor.
22       The second distinction that Eolas argues is patentable is
23   this item 2, secure --
24       **THE COURT:**  Mr. Verhoeven, this is the only motion I
25   have on calendar this afternoon so I hadn't thought to provide

1    time limits, but we're at 2:41.  Mr. Lumish hasn't talked,

2    Mr. Campbell hasn't talked, and you've not had a reply

3    argument, and Mr. Campbell has not had the opportunity to think

4    of whether he wants to ask me for one.  So with all of those

5    things in mind, I have to ask how much longer you think you

6    might be?

7              **MR. VERHOEVEN:**  I could do it in five minutes.

8              **THE COURT:**  Go.

9              **MR. VERHOEVEN:**  Is that too long?

10             **THE COURT:**  No.  It was a question.  I mean, I

11   always -- I'm always torn between just letting the lawyers run

12   the show and giving time limits, but that horse already left

13   the barn.  I didn't give anybody any time limits.  So -- yeah.

14   And I don't want to prejudice your opponent.

15             **MR. VERHOEVEN:**  I understand, Your Honor.  I will move

16   very quickly.

17        So the second of the three prongs that they say is a point

18   of novelty is the security.  And since these are going to be

19   delivered to Your Honor, I'm not going to read them all, but

20   I'll just --

21             **THE COURT:**  On this, I would say you could probably

22   keep your powder dry until reply.

23             **MR. VERHOEVEN:**  Okay.

24             **THE COURT:**  Because what you say in your brief is that

25   stuff is nowhere in the patent.

1          **MR. VERHOEVEN:**  Right.

2          **THE COURT:**  They invented that for purposes of this

3    motion.

4          **MR. VERHOEVEN:**  That's right.

5          **THE COURT:**  So why don't you see if Mr.  Campbell

6    scares you when it's his turn and makes you nervous or makes

7    Mr. Lumish nervous, and if you're nervous, you can handle it in

8    reply.

9          **MR. VERHOEVEN:**  Well, I like the way you put that,

10   Your Honor.

11         **THE COURT:**  You can also be very Steve McQueen about

12   it and just say, "I heard what Mr. Campbell said; I'm not

13   nervous," and just leave it at that, so we'll see what happens.

14         **MR. VERHOEVEN:**  Okay.

15      I'm trying to walk through this to find where the

16   second -- the third distinction is scalability, and "Eolas

17   argues that 'the asserted claims...provide new scalability and

18   resource allocation."  And this is the same argument,

19   Your Honor, so maybe I should skip this one, too.  But they're

20   citing the spec that just says this helps with scaling and

21   resource management.  It's not a claim.  It's a discussion

22   about how the actual claim helps things, and if you look at the

23   claim language, there's nothing about security -- I'm sorry --

24   about scalability, scaling, resource management, capacity or

25   workload.  It's -- the claim language is the claim language,

1  and it just doesn't have those words.

2          **THE COURT:**  Yeah.

3          **MR. VERHOEVEN:**  And so I will -- I will save this for

4  rebuttal, unless Your Honor wants me to cover this particular

5  one as well.  It's the same argument.  It's not claimed.

6          **THE COURT:**  Well, that's interesting.  No.  That's

7  fine.

8      And I will -- when I get your PowerPoints, I'm going to

9  read over them, so if there are any slides that either of you

10  skip in your presentations, I'll read them.  Sort of have my

11  cake and eat it too.

12          **MR. VERHOEVEN:**  Okay.  So just to summarize on these

13  second two points, Your Honor, both of these -- Eolas

14  desperately went back to the spec to try and find something

15  they could claim and say it's a point of distinction, and in

16  both cases, they're pointing to language that is talking about

17  the results of -- of the claimed innovation.  And -- where is

18  that slide?

19      We cite to case law in here, and I can't find it, that

20  pointing to results is fine, but it's not claim language, and

21  you can't interpret the claim language to require the results.

22          **THE COURT:**  Yes.

23          **MR. VERHOEVEN:**  And when Mr. Lumish is talking, I'll

24  find it and let you know, Your Honor.

25      But the gist of our argument on both these two arguments,

1    scalability and security, is there is no claim language

2    requiring it.  If you look at where it exists, it's in the

3    spec, and it's talking about results or benefits of what is

4    claimed but not what is claimed.  And the law is very clear,

5    you cannot -- you cannot interpret a claim to include results

6    that might happen or might not happen that you allege.

7         And so with that, Your Honor, I will reserve the rest of

8    any time I have to rebuttal.

9              **THE COURT:**  Mr. Lumish.

10             **MR. LUMISH:**  Thank you, Your Honor.  And just to

11   orient myself, how much time do I have?

12             **THE COURT:**  Well, let's talk about that.  As I said, I

13   didn't set time limits so whatever number I gave you now would

14   be arbitrary.

15        Mr. Campbell, how long is your argument?  Let me put it

16   this way.  I have two things.  One is an absolute limitation

17   that at 4:00, I have another Zoom meeting I have to be in.  I'm

18   more -- a less firm limitation is that the human mind likes

19   watching Zoom for less than an unlimited amount of time.  It

20   does an increasingly poor job of absorbing information.  Now,

21   I'll compensate that by trying harder when Mr. Campbell is

22   talking, but it's now 2:46, so, Mr. Lumish, I think I should

23   ask you the question, how long do you think you need?

24             **MR. LUMISH:**  Your Honor, if I could have 20 minutes, I

25   can get it done in there.  If I could have 25, I would be

1    extremely grateful, but I can do it all in 15 if I need to as

2    well.

3            THE COURT:  I think, out of fairness to Mr. Campbell,

4    15 is what I should be giving you.

5            MR. LUMISH:  All right.

6        Mr. Verhoeven, will you stop sharing your screen, please?

7            MR. VERHOEVEN:  Oh, yes.  Sorry.

8            MR. LUMISH:  Your Honor, I will jump right then to the

9    merits here and go as quickly as I can to try to point out what

10   I think is the most salient points for why collateral estoppel

11   and the Kessler doctrine should govern and hold that the '507

12   patent is equally invalid as the '985 was in Texas.

13       And so I'll start here if I can, which is with the legal

14   standard but not because you don't know it but because the

15   parties actually agreed on it.

16       So what you have on your screen here is slide 2.  This is

17   the opposition brief from Eolas.  So this is what they wrote to

18   the Court.  And they cite the *Ohio Willow Wood* case, which I

19   would argue is the most important case for Your Honor to

20   understand for collateral estoppel in this dispute, and they

21   note that collateral estoppel is not limited to identical

22   patents, which we completely agree with.  And the test is

23   what's highlighted down towards the bottom of this excerpt,

24   which is that "if the differences between the unadjudicated

25   patent claims and the adjudicated patent claims do not

1    materially alter the question of invalidity, then collateral

2    estoppel applies."

3        So a lot of the same evidence that you heard goes to the

4    same question here for collateral estoppel but under a

5    different standard, under a different test, and one I think

6    that cannot be met by Eolas.  They cannot show that there is a

7    materially different question of invalidity, and we will show

8    you that there is in fact no difference between the question.

9        So the parties agree that the patents don't have to be

10   identical, and Eolas makes these three very fine distinctions

11   between the three claims.  And when you look at the *Ohio Willow*

12   *Wood Company* case -- and you asked about things that weren't in

13   the briefs -- I want to focus next on that case and what its

14   claims were because you'll see it sets the benchmark for what's

15   not good enough.

16       Collateral estoppel was found in *Ohio Willow Wood*, and it

17   shows you that its claims were not good enough, and the fine

18   distinctions that Eolas tries to draw are not even close to the

19   substantive changes that you saw in *Ohio Willow Wood*.  So let

20   me show you that, if I may.

21       This is slide 3, and on the left what we have is the

22   original claim or the '182 patent claim from the *Ohio Willow*

23   *Wood* case, and coincidentally like this case, it was found

24   invalid in a case in East Texas.  So the one on the left is the

25   adjudicated claim.  The claim on the right is the unadjudicated

1    claim, the one that was presented to the district court in Ohio

2    and asked to have collateral estoppel applied to it and that

3    the Federal Circuit then ruled upon.

4        And what you will see in the highlighting are things in

5    the right in the unadjudicated claim that are simply not found

6    on the claim on the left.  And some of the them, the Federal

7    Circuit says, are just the same thing in different words, but

8    others they say are actually substantive differences.

9        So let me put on a pen here.  If you can see my little

10    laser pen.  Starting with the yellow text, it talks about this

11    covering.  What the patent is about is a covering that you put

12    over an amputated limb to make a prosthetic more comfortable.

13    That's the fundamental invention.  And the adjudicated patent

14    just called it a cushion liner for enclosing an amputation

15    stump.

16        On the right, we see the unadjudicated claim was more

17    narrow, more specific.  It required a tube-sock-shaped

18    covering.  You see that in the first line there and then about

19    six lines down in the middle of the claim.  So it had to have a

20    particular shape.  There is no shape on the left.  It just has

21    to be a cushion liner for enclosing an amputation stump.

22        The amputation stump itself, that's referred to in both

23    claims, but in the unadjudicated claim, the

24    collateral-estoppel-based claim, it's referred to only as an

25    amputation stump being a residual limb.

1          Now, I don't think there is a meaningful difference

2     between those two things, and I think the Federal Circuit says

3     this is an example of just claiming the same thing with

4     different words, and that's not good enough to get out from

5     collateral estoppel.

6               **THE COURT:**  Yes.

7               **MR. LUMISH:**  When you get to the bottom, this is where

8     I think the action really is, Your Honor, because these are --

9     and I think the Federal Circuit says it plainly -- substantive

10    changes or differences between the two claims, and there are

11    far greater differences in the *Ohio Willow Wood* case claims

12    than the three distinctions that Eolas tries to draw today.

13         So first is you have -- well, sort of together in purple

14    and in orange, you have a foamed or non-foamed block copolymer

15    as a coating on this covering.  It's this tube-sock-shaped

16    covering.  If you look over on the left side, you won't see any

17    of that.  It's not foam.  It's not non-foam.  There is no

18    constraint that it has to be one or the other or that it's open

19    to both, and it talks only about any polymeric cushioning gel

20    being enough.

21         Now, a block copolymer, that's not any polymer.  A block

22    copolymer is a very specific thing.  Blocks are a collection of

23    monomers, you know, molecules that have differences from block

24    to block to their adjacent blocks.  They collect some monomers

25    in one block, others in a different one, and they're different

1    from each other.  So the one block has differences from its

2    adjacent block.  A polymer is just any long chain of molecules.

3         So this is absolutely a narrowing in the claim language,

4    and *Ohio Willow Wood* argued that it was a substantive change in

5    their claims, and the Federal Circuit says it is, but it's

6    still not enough.  So we have to have a block copolymer on the

7    right, not just any polymeric gel.  It has to be foamed or

8    non-foamed, and in blue, it has to be a mineral oil.  It has to

9    have a mineral oil gel composition.

10        So this, I think, is the critical part that isn't in our

11   briefs per se -- the case certainly is -- that we would ask you

12   to focus on because when you compare the two sets of claims and

13   the differences that *Ohio Willow Wood* has, you'll see that

14   saying World Wide Web for a distributed network or safety and

15   scalability when they're already in the claims doesn't come

16   even close to rising to this level, and this level in the Ohio

17   claims was not good enough to avoid collateral estoppel.

18   Federal Circuit -- the district court first and then the

19   Federal Circuit applied collateral estoppel to the claims on

20   the right.

21        In pink is another difference, which is that this gel

22   composition has to reside only on the interior surface.  There

23   is no such requirement on the left.

24        So we have sort of reshuffling of the words in yellow and

25   green, and we have substantive changes to the claims in purple,

1   orange, blue, and pink, and none of this was enough to avoid

2   collateral estoppel in that claim -- in that case, I should

3   say.

4       Let me now apply it to this case.  So the first difference

5   Mr. Verhoeven covered in detail.  I won't repeat most of what

6   he said, but the first difference is the World Wide Web, and,

7   again, we see that that limitation is in the claims of the

8   '985, so here on the screen -- and you'll see several slides

9   like this, Your Honor -- I have the adjudicated claim on the

10  left, like the *Ohio Willow Wood* original claim.  It was

11  invalidated in Texas, just like that case.  On the right we

12  have the comparative claim from the '507 patent, your claim 32.

13  And again we have a distributed hypermedia network, and the

14  only example in the patent is the web, and so we know that the

15  genus species argument here also applies, and this is not a

16  meaningful distinction or I would argue it's not a distinction

17  at all between the two claims, and it's certainly not one as

18  substantive as we saw in *Ohio Willow Wood*.

19      The HTML point comes here into play here, too.  We have

20  the HTML tags that modifies the embed text formats in claim 40.

21  And so we point you to claim 42 in our papers as the right

22  comparator for '985, and it is.  That it absolutely -- I concur

23  with everything Mr. Verhoeven said.  That is a World Wide Web

24  standard language, and it is an express reference to the web in

25  the claims of the '985.

1    The specification here is the cite that Mr. Verhoeven

2    didn't show you from the '507 and the '985.  In the '507

3    patent -- I'm on slide 6 here, column 1, line 56 through 61

4    refers to HTML as an Internet standard, and it cites to the

5    Berners-Lee paper, the seminal paper on the World Wide Web, for

6    support for it.  So we know when Eolas talks about HTML like it

7    does in claim 42, it's talking about World Wide Web text, World

8    Wide Web languages.

9    The prior art in the Texas case, the *Eolas I* case,

10   included the embed tag that we talked about in our tutorial

11   from Dr. Raggett.  He was a -- he is now a professor but was

12   working hand in hand with Dr. Berners-Lee on developing the web

13   for the next web but before Eolas' work began.  He had come up

14   with this embed tag for the type attribute that would allow you

15   to embed any kind of device -- any kind of app you wanted,

16   including video.

17   And we see that the patent here, the '507 patent, takes

18   that same HTML tag format, brings it into a table, and then

19   claims it in claim 42.  It is claiming the embed text format of

20   the HTML embed.

21   So the modification to the patent itself was simply to add

22   the web tag HTML embed.  So no distinction at all there.

23   Back to the *Soverain* case.  Mr. Verhoeven cited it for

24   obviousness-type double patenting, but it also applies equally

25   to issue preclusion, and for the same point, which is the same

1    argument was made in that case as is made to Your Honor today:

2    Well, no, the new claims, the unadjudicated claims talk about

3    the Internet, and the old claims didn't.  And the *Soverain*

4    case, the Federal Circuit says that is simply not good enough.

5    That while it's true that the claim -- the unadjudicated claim

6    39 recites a hypertext statement in accordance with claim 15

7    wherein the network is an Internet, that's just the routine

8    incorporation of the Internet technology in claim 39, and it

9    doesn't change the invalidity analysis.  That's the question

10   again we're facing from *Ohio Willow Wood*:  Has this changed the

11   question of validity by adding "World Wide Web"?  *Soverain*

12   *Software* tells us it actually doesn't, and that's for issue

13   preclusion as well as obviousness-type double patenting.

14        Your Honor asked about the position we took under -- in

15   the Texas case, and I have got a couple slides to show you

16   that.  Because I agree with you it's a distraction.  I think it

17   has absolutely nothing to do with the argument today, but I

18   know my colleague at the bar, Mr. Campbell, is going to, quote,

19   fundamentally disagree with.  And the accusation is that me

20   personally, I think, and Ms. Doan are talking out of both sides

21   of our mouth today.

22        **THE COURT:**  Well, hold on, hold on, hold on.

23        First of all, it's a distraction, so you actually don't

24   have to talk about it if you don't want to.

25        Secondly, I feel that, just as I said earlier, that for

1   the plaintiffs, what happened at the PTO is a big part of their

2   presentation.  Your brief spends a lot of time talking about

3   positions that the plaintiffs took regarding claim

4   construction.  So I don't know, you know -- I don't know that

5   I -- I don't know that I care that much.

6          MR. LUMISH:  All right.  I'll do it quickly, Your

7   Honor.  We do talk about what they said because the point being

8   that their patent has always been perceived by both sides as

9   one that was a World Wide Web patent.  And here you can see the

10  argument we in fact make.

11      So I've got at the top of the screen Eolas' brief.  And

12  what they argued to the Court is that Amazon and Google, quote,

13  "argued to the jury that the claims were not limited to the

14  web."  That is not at all what happened.  And even their own

15  quotation, which I have underscored in red here, doesn't say

16  that.

17      So they cite to the trial transcript at page 64, and they

18  quote -- and this is the best one they could muster -- "There's

19  no requirement that the browser be a web browser."  We

20  absolutely made that argument, and it's true that claim 40,

21  which only recites a browser and doesn't say HTML -- our

22  position was that claim itself is not limited to the web.  But

23  when it came to claim 42, which says HTML, we always said that

24  it required web-based -- or was web based and required

25  web-based prior art.

1        The reason this dispute came up, just so you know, was

2   because Eolas wanted to knock out a reference called

3   "MediaView."  MediaView was a -- had a browser.  It was a

4   document viewer and network system, but it wasn't a web-based

5   system.

6        And so let me turn you to another one of their exhibits.

7   This is Eolas' Exhibit 24.  This is our claim construction

8   brief in the underlying *Eolas I* case.  And you'll see that we

9   in fact took the opposite position to what they just argued.

10  We didn't say that none of the claims cover web or HTML.  We

11  expressly noted that claim 42, which is our comparative claim

12  today, limits the text formats to HTML, but because the other

13  claims, like 40, didn't, claim differentiation would weigh

14  heavily against the argument that the web browser in 40 had to

15  be only a web browser and couldn't also be a broader document

16  browser.  So our position has been the same all along.  40 and

17  its web browser isn't limited to a -- pardon me -- and its

18  browser isn't limited to a web browser but would include one.

19  Claim 42, which refers to HTML, is absolutely a web-based

20  claim.

21       And we actually -- because of that, we argued to the jury

22  that MediaView itself had to be combined with HTML and

23  web-based art.  We said and -- this is our expert testifying in

24  the trial on cross-examination where he says that his opinion

25  with respect to MediaView is one of obviousness because it

1    doesn't satisfy the HTML issues.  This is slide 12, page 85,

2    lines 6 through 19 of the trial transcript.

3         And so because of that, Dr. Phillips, our expert, combined

4    it with web references, and here is one example of that, slide

5    13, trial transcript at page 78, where he combines it with the

6    CERN browser.  CERN browser is Dr. --

7              **THE COURT:**  Mr. Lumish --

8              **MR. LUMISH:**  Yes, sir?

9              **THE COURT:**  -- you're operating in your last few

10   seconds before I turn it over to Mr. Campbell.

11             **MR. LUMISH:**  All right, Your Honor.  Let me go to the

12   end then on -- I'll skip all the things you asked Mr. Verhoeven

13   to skip.  And I just wanted to end on the law for this point.

14   And then I won't have time for Kessler, I guess --

15             **THE COURT:**  No.  I just -- I mean, we are past 3:00.

16   Mr. Campbell hasn't talked yet.

17             **MR. LUMISH:**  Understood.

18        I'm just trying to get to the slide quickly, Your Honor.

19   I will just go to -- I will end on *Ohio Willow Wood*,

20   Your Honor.

21        So we have the scalability argument and the security

22   argument.  We see in the evidence that those things are

23   described equally in the '985 as they are in the '507, and even

24   if that's not agreed, if there's some additional wording, I

25   think you have to go back to this analysis, which is are any of

those things substantive changes that are even more different

than the changes that were made in the *Ohio Willow Wood* case,

and we think clearly the answer to that is no, and so the same

results should occur here.   Claims are invalid in Texas in that

case and in this case.   They should be found invalid here.

             **THE COURT:**   Thank you, Mr. Lumish.

             **MR. LUMISH:**   Thank you, Your Honor.

             **THE COURT:**   Mr. Campbell.

             **MR. CAMPBELL:**   Yes, Your Honor.   Thank you,

Your Honor.

      Mr. Lumish, if you could stop -- there we go.

             **THE COURT:**   Mr. Campbell, I will say Mr. Lumish does a

pretty catchy job with that *Ohio Willow Wood* case, so at some

point in your presentation, you should tell me what you think

your best collateral estoppel case is for your side.

             **MR. CAMPBELL:**   Sure, Your Honor.   And I will be happy

to start there.

      Can I just verify you can see my slide on your screen?

             **THE COURT:**   I can see everything quite clearly, and

it's not necessary that you start there.   You can work it in

wherever it's convenient.

             **MR. CAMPBELL:**   No.   I want to make sure I address the

Court's question, so I'm happy to, if that's a question the

Court has, to start there.

      I think it's very interesting that Mr. Lumish focuses on

1    *Ohio Willow Wood* because I think when the Court reads *Ohio*

2    *Willow Wood*, you'll find that it's not -- it's not the way it

3    was suggested here.

4         *Ohio Willow Wood* -- and I'll read from it -- the Federal

5    Circuit says under *Ohio Willow Wood* -- and the collateral

6    estoppel section is not that long.  It's maybe a page.  But the

7    Federal Circuit says, "OWW, Ohio Willow Wood, seeks reversal on

8    appeal by arguing that the mere existence of different claim

9    language in the adjudicated claims of the '182 patent and the

10   unadjudicated claims of the '237 patent is sufficient to

11   overcome collateral estoppel.  We disagree."

12        No argument there.  Just different language doesn't get

13   you there.  And so that's the proposition that *Ohio Willow Wood*

14   stands for.

15        And then the Court goes on to show the claims, as

16   Mr. Lumish did, and in a paragraph say that, "Since *Ohio Willow*

17   *Wood* failed to explain how the block copolymer limitation

18   changes the invalidity analysis, *Ohio Willow Wood* has not met

19   its burden of opposing summary judgment based on this

20   distinction."

21        So what we have with *Ohio Willow Wood* is just a difference

22   in claim language doesn't get you there.  No disagreement.  Of

23   course that's the case.  But you've got to look at the

24   differences and whether they affect the invalidity analysis.

25   *Ohio Willow Wood* made no arguments or at least failed to

explain, as the Federal Circuit says, how that affects the invalidity analysis.  That is not what we have here.

And I think if the Court reads particularly Dr. Martin's declaration that is Exhibit 1 where he walks through all the differences and how those differences impact the analysis here, we'll see that that -- that standard is not what we're looking for here -- is not what's going on here.  In fact, what's going on here is we have a lot of differences.

**THE COURT:**  Mr. Campbell, I appreciate that.  My question was what's a good case -- what's a good case for you, and maybe you'll get to that later.

**MR. CAMPBELL:**  Well --

**THE COURT:**  Maybe you think *Willow Wood* is a good case for you, but it came out the other way, maybe for different reasons.  I heard what you said, but I'm just saying --

**MR. CAMPBELL:**  I think -- sorry.

**THE COURT:**  Yeah.  No.  But if you think there's a different case that's good for you, it would be good to know that.  That's all.

**MR. CAMPBELL:**  No.  I think *Ohio Willow Wood* -- I'll think about it and have my colleagues look for if there is a better case that I should point the Court to, but I think *Ohio Willow Wood* is a very good case for us in that it says what you do is you look at the limitations and look at how do those different -- those different -- that different language -- how

does it affect the invalidity analysis, and then when you take

our brief and you take the evidence, Dr. Martin's declaration

in Exhibit 1 and particularly compare that to Dr. Turnbull's,

you see that *Ohio Willow Wood* supports that collateral estoppel

can't apply in this case because the analysis is changed based

on the limitations.  So I think *Ohio Willow Wood* is a very good

case for us.

           **THE COURT:**  Very good.

           **MR. CAMPBELL:**  Okay.  So in my time -- and I can jump

off from there, and I'll do a little overview here, but I'll

jump right into it -- I want to talk about the inventors' work

leading to the '507 patent, those differences, and then

obviousness-type double patenting, and collateral estoppel and

Kessler.

      And there's a reason, particularly as we just talked about

with the differences, why I want to talk just very briefly

about the inventors' work at UCSF, and that's because the

timing matters.  And my opposing counsel didn't talk about this

at all, and, in fact, some of the statements were just classic

Federal Circuit hindsight.  You know, *why would -- why would*

*this -- well, of course this was obvious.  The inventors did*

*it.*  Well, that is -- that is just the paradigm of hindsight to

say that.

      We have to look at the time, and it's -- it's hard now

because we're in 2020, but we have to go back to 1993 and say

1   was -- was the differences in this claim, the material

2   differences in this claim, obvious based on the prior claims.

3   And they're absolutely not.

4        At this time, Dr. Doyle, David Martin, an inventor, who is

5   different than David Martin, our expert -- two different

6   people, unrelated -- and Cheong Ang worked at the Center for

7   Knowledge Management at UCSF, and their tasks in 1993 was to

8   develop new technologies to disseminate the results of human

9   embryo biomedical research.  And the problem was that user

10  computers, even today, but particularly in 1993, and some

11  servers were unable to process and store the required data.

12  The networks were not programmed for interactivity.  And

13  Dr. Doyle's declaration, which is not long but is very

14  enlightening in terms of the problems they were dealing with of

15  the massive amounts of data and what they were tasked to do, is

16  very interesting, and that's at Exhibit 52 to our brief.

17       But what they wanted to do was to try to allow users to

18  harness powerful remote computers, and even if one server

19  couldn't do it, do it with multiple computers.  And so they

20  created a program, and it was a modification of Mosaic, so that

21  non-technical, at least non-computer technical researchers --

22  obviously very technical in their field -- could access and

23  interact with these 3D images that were stored and processed on

24  multiple servers.

25       And so from that in 1994 is when they filed their first

1    patent.  And in 1995 is when Dr. Doyle formed Eolas, and the

2    University of California granted the exclusive license under

3    their mission to -- and their policies to encourage inventors

4    to -- entrepreneurial efforts to take patents out into the

5    world.

6        So for this patent, it was filed in 2011, but that's not

7    the time, as the case law tells us, to look at these claims.

8    The time to look at it is 1993 and 1994.

9        We had expedited examination requested and granted.  The

10   examiner, which we're going to talk about, Mr. Donaghue, was

11   actually the examiner on all the continuation applications, so

12   this issue was not new to him.  The first office action was in

13   May 2015.  It issued in November.

14       So as I mentioned -- and the Court asked about this -- and

15   of course the Court fulfills a critically important role and --

16   and sometimes patents get through the Patent Office and the

17   court finds them invalid for obviousness-type double patenting.

18   I think the prosecution history here, though, is important

19   because it shows this is not a case where the Patent Office

20   didn't think about it, wasn't diligent in applying it, didn't

21   consider it.  In fact, what we have is in the '985 patent,

22   there was an obviousness-type double patenting rejection and a

23   terminal disclaimer over the '906.  Same thing in the '662

24   patent.  Same thing in the '293 patent.

25       In this patent, the examiner, the examiner Donaghue who

1    was on all these continuations, called the prosecuting attorney

2    and said, "Tell me how this is different than the art that

3    invalidated the prior claims in the prior case.  How is this

4    going to be different than those claims?"  And that's when

5    Eolas submitted what's at Exhibit 43, an explanation of how

6    these claims are different and focused on much of what we're

7    talking about today.

8         And after receiving that and some other examiner

9    amendments to work out some language and -- and get to the

10   final claims, the examiner allowed this patent, with no

11   obviousness-type double patenting rejection.

12             THE COURT:  What weight do I give this?

13             MR. CAMPBELL:  I'm sorry?

14             THE COURT:  I'm sure you treat this in your briefs,

15   but I'm not remembering it at this moment.  What weight do I

16   give this?  Let's say I were writing an order and it came out

17   your way, and I recited this history as you have, and I said,

18   "Because of this of history, which shows careful consideration

19   by the PTO, I am allowed to give that X weight."  What would I

20   say for X and what would I cite as authority?

21             MR. CAMPBELL:  Well, I don't think you would say

22   anything for X beyond what is already in obviousness-type

23   double patenting, which is the burden is on the defendants by

24   clear and convincing evidence.

25             THE COURT:  But you start with that.  But that would

1  be true even if you didn't say anything about the --

2          **MR. CAMPBELL:**  That's right.  That's right.  Which is

3  why I say I don't think you can do anything with X.  That's the

4  burden.  That's what you start with.  And so while maybe X

5  isn't quantifiable in the sense that clear and convincing

6  evidence is quantifiable -- I don't know that it is --

7          **THE COURT:**  I read your brief carefully on this point,

8  as I tried to indicate to Mr. Verhoeven, so I think I got it.

9          **MR. CAMPBELL:**  Okay.

10         **THE COURT:**  Mr. Donaghue, if it is a "mister" -- it

11  might be Ms. --

12         **MR. CAMPBELL:**  It's mister.

13         **THE COURT:**  Mr. Donaghue gave this, and he knew the

14  whole history and all that.  I got that.

15         **MR. CAMPBELL:**  Yeah.  And Judge Rich says that when

16  the evidence is not before the Patent Office, that's something

17  for the court to consider, and when the evidence is, that's

18  something for the court to consider.

19      Now, Judge Rich doesn't put it -- put X into words or

20  percentages, but it's something for -- it's something for the

21  Court to consider.  And I think Judge Rich is right there.

22         **THE COURT:**  Okay.  That's helpful.  That's a good

23  answer to my question.

24         **MR. CAMPBELL:**  And so that -- we're at the current

25  litigation.  I'll skip over this quickly, but, you know, Eolas

1    sought early resolution on these legal issues four years ago.

2    We're glad we're finally -- we're finally getting to these.

3         So I've got this up for claim 45.  In Dr. Martin's

4    declaration at pages 39 through 46, he provides similar ones

5    for all the asserted claims.  It highlights the language that

6    is different.

7         As we've already talked with, *Ohio Willow Wood*, just

8    different language doesn't get you there, but you need

9    different language.  You've got to have different language to

10   start with.  If you don't have different language, you're

11   certainly not going to get there.  And then you can look at how

12   the differences matter.

13        One thing that I think is critical -- and defendant's

14   don't do and Dr. Turnbull doesn't do at all -- is you really

15   can't isolate these differences and take them one by one.

16   That's not, as the Court -- that's not how a patent claim

17   works.

18        The differences in the claims can't be considered in

19   isolation.  They must be considered as a whole.  Just like in a

20   103 analysis, so, too, under obviousness-type double patenting

21   you have to consider as a whole a prior patent claim against a

22   claim in the existing patent and determine whether it is

23   invalid under clear and convincing evidence for

24   obviousness-type double patenting.  And there is simply no

25   evidence in the record, other than Dr. Martin's uncontroverted

1   evidence, that as a whole, there are certainly meaningful

2   differences.

3       So those -- the combination of those differences is -- was

4   briefly -- well, extensively alluded to in terms of, number

5   one, the web is the network and then touched on briefly,

6   although there's not a whole lot for me to respond to, security

7   and scalability are the differences as a whole that we need to

8   look at.

9       And --

10      **THE COURT:**  Well, I think that -- I think -- there is

11  not a lot to respond to because I asked your opponents to keep

12  their powder dry so that you could address this fulsomely and

13  they could decide whether they needed to respond --

14      **MR. CAMPBELL:**  Okay.  Well --

15      **THE COURT:**  And their brief is emphatic that, as

16  Mr. Verhoeven said I think summarily -- that the questions of

17  scalability and security simply are not in the prior -- they're

18  not in the patent language.

19      **MR. CAMPBELL:**  Well, the -- that word -- and we tried

20  to help and label the -- the combined language is "security" --

21  isn't -- although we did explain to even the PTO that that

22  language provides a security mechanism, we can change it from

23  "security" to "configured with interactive applications."  It

24  doesn't -- the label is not what matters.  Okay?  The

25  description that the inventors gave in trials and our briefs

1    isn't what matters.  What matters is the claim language.

2        So we can take away the "security" label and focus on the

3    claim language.  It's different -- meaningfully different claim

4    language that is not obvious in light of the prior claims.

5        Scalability relates to the distribution, the coordination,

6    the viewing transforms.  It's a whole group of differences in

7    the claims, and we can look at that claim language as well.

8    The label is -- is unimportant other than to allow us to all

9    talk -- know what we're talking about.

10        And we're going to talk about not only is there no

11   evidence on -- considering the claims as a whole, there is no

12   evidence on motivation and no evidence on secondary

13   considerations, which are absolutely part of the

14   obviousness-type double patenting analysis.

15        So let's start with that first difference, which is the

16   web-related limitations, and, again, we're in 1993.  Okay?

17   We're in 1993.  These claims require web servers, web browsers,

18   web pages.  Okay?  The prior claims required a distributed

19   hypermedia network.  And those differences are material because

20   of the technology in 1993, and those differences are shown in

21   the defendant's own arguments as showing those differences were

22   material in their prior discussions to the Court about the

23   claims.

24            THE COURT:  Well, here's something that Mr. Verhoeven

25   said that I had not -- I don't know why I didn't focus on this

1    after reading the briefs.  Could you go back a slide?

2              **MR. CAMPBELL:**  Sure.  Is it not -- let's see.  There

3    we go.

4              **THE COURT:**  Okay.

5        So prior claims are not limited to the web.  It's sort of

6    like the prior claims are about jungle cats, and the new claims

7    are about panthers.  Well, panthers are covered by the prior

8    claims, so why is this middle point here helpful to you?

9              **MR. CAMPBELL:**  Well, first of all, let me respond to

10   that on a legal ground, legal point, and then a factual point.

11       As the Northern District of California stated in the

12   *Medtronic vs. AGA Medical Corp.* case, the commonplace situation

13   where a broader claim embraces or encompasses the subject

14   matter defined by a narrower claim, however, is not per se

15   double patenting.  So just because we have that situation

16   doesn't make it double patenting.

17       So then that gets to the factual point --

18             **THE COURT:**  Well, it's not per se double patenting.

19             **MR. CAMPBELL:**  Right.

20             **THE COURT:**  But my question is why is this middle

21   point helpful to you?

22             **MR. CAMPBELL:**  Getting there.

23       So that gets to the factual point; right?  Place yourself

24   in 1993.  Okay?  And Dr. Martin talks about this extensively,

25   particularly in paragraphs 37 to 38.  But a distributed

1   hypermedia network might be an internal network that you have

2   that you've built up that has particular speed, particular

3   processing power, the ability to do things.  Okay?

4        In 1993, the web didn't have that; right?  Your Honor

5   maybe remembers, you know, much -- I certainly do, even way

6   after 1993, watching images come over line by line.  Right?

7   Because the speeds were so slow on a 144 modem.  Okay?

8        To think the web at that time was going to support

9   interactive applications doing the data sizes and processing

10  that was required for this human embryo project was -- was very

11  different, was a -- very different than saying do it in a

12  distributed hypermedia network.

13          THE COURT:  Your opponents point to the HTML and HTTP

14  references in the prior patent which would seem to contemplate

15  that the patent would be practiced with regard to the web.

16  And --

17          MR. CAMPBELL:  Yes.  So -- sorry.

18          THE COURT:  What about that?

19          MR. CAMPBELL:  Okay.  So two points on that.

20       First, the -- you can't use the spec.  Of course the

21  claims are supported by the spec, but as again the Northern

22  District of California said in *Regency of University of*

23  *California vs Monsanto,* the Court cannot rely on the earlier

24  patent's specification as prior art in evaluating double

25  patenting.

1      So, yes, the specification discloses using the web as a

2   distributed hypermedia network.  It supports the claims.  If it

3   didn't, we would have a significant 112 problem.  Okay?

4      HTML is certainly used on the web, and if I try to do the

5   analogy like Your Honor just did, I'll probably mess it up, but

6   just because the web uses HTML does not make all things that

7   use HTML the web.  And, in fact, as Dr. Martin points out in

8   his declaration -- and the history of HTML was not quite

9   characterized accurately -- HTML is a variation of SGML.  It's

10   the Standardized General Markup Language.

11      You can have plenty of non-web browsers that can read and

12   understand and open something based on HTML.  Just because you

13   use HTML, non-web browsers -- Dr. Martin talks about a system

14   that uses HTML that no one of ordinary skill in the art would

15   consider the web -- doesn't make it the Web.

16      So when you try to use the spec to say the claims are

17   invalid, well, if you're able to do that, every continuation

18   patent would be either invalid for obviousness-type double

19   patenting or invalid for lack of 112 support.  That doesn't

20   work.  And you can't use HTML --

21           **THE COURT:**  Mr. Campbell, I have not heard any

22   complaint from our court reporter, but nonetheless, if you

23   could --

24           **MR. CAMPBELL:**  I'm going too fast.

25           **THE COURT:**  -- slow down just a tad, that would be

1    good.  You will be happy with your transcript if you do that.

2         MR. CAMPBELL:  I apologize, Your Honor.  I'm wanting

3    to make sure I cover everything since there was a lot in the

4    prior art.

5         THE COURT:  I'm ready whenever you are.  Go ahead.

6         MR. CAMPBELL:  So, Your Honor -- let me make sure I

7    slow down.

8         The web, as we talked about, was in its infancy in 1993,

9    1994.  Your Honor may be familiar with the *Today Show* video.

10   Dr. Doyle was going to show it six weeks ago at the technology

11   tutorial where the cohosts were asking, much after this, "What

12   is the internet?  What does the @ sign mean?"  It's not like it

13   was today.

14        And what the web designers at that time envisioned was

15   that you would have external helper applications for images and

16   video, things that the inventors were inventing and trying to

17   come up with today to do through the web.  They rejected

18   supporting anything more than static text and static images.

19   So at that time, this -- the web posed unique challenges.

20        Another example, just to reset ourselves into the time

21   frame, is Microsoft.  We all recognize now World Wide Web

22   leader, came out with Internet Explorer.  This is their web

23   page in 1994.  Basic static blue text -- static image, blue

24   underlined links, nothing that would suggest you could do what

25   the inventors were trying to do at that time.

1    And then the Netscape -- one of the creators of Netscape,

2    Mr. Andreessen, in '93 was saying that having inline images

3    located on servers are bad enough.  If we start making generic

4    inclusions, which Dr. Martin explains is, you know, interactive

5    type -- other type content available, things are going to get

6    harried.  He says things you like audio and MPEG can simply be

7    pointed to from an anchor, a link, as Mosaic does and forked to

8    external viewers.  So they had no interest in doing the type of

9    thing that the inventors were doing, because it wasn't obvious,

10   and that shows.  It wasn't obvious to do it at that time.

11        Secondary considerations are important.  Here, again, this

12   shows praise for doing this on the World Wide Web.  It wasn't

13   obvious at the time.

14        **THE COURT:**  Mr. Campbell --

15        **MR. CAMPBELL:**  Yes, sir?

16        **THE COURT:**  This question may reveal a great deal of

17   ignorance on my part, but isn't the question -- but is the

18   question whether that technology was obvious at that time or

19   whether -- I can never keep the numbers straight in my head --

20   or whether the invention disclosed in the most recent patent is

21   obvious in light of your prior patents?

22        **MR. CAMPBELL:**  It's both.  It's -- and not the

23   patents.  Is the current claims obvious in light of the prior

24   claims in 1993 as of the priority date?  When you look at *UCB*

25   that we cite in our briefs --

1          **THE COURT:**  I see what you're saying.  Okay.  Very

2     good.

3          **MR. CAMPBELL:**  You still have to have a time frame,

4     and *UCB* and *Otsuka* say it's as of the priority date.

5          **THE COURT:**  Right.  Okay.  I got that.

6          **MR. CAMPBELL:**  Okay.  So Mr. Andreessen was working at

7     NCSA, the National Center for Supercomputing Applications.

8     Later the associate director worked with Dr. Doyle because

9     after seeing the project that they were working on to

10    disseminate these embryos, they wanted to collaborate with them

11    to work on -- to work with this invention.  So, you know, it

12    shows again it wasn't obvious at the time to the people

13    creating the Netscape browser.

14         And then a lot of the inventors' art teaches away from the

15    claimed invention.  The Viola art, which is talked about, used

16    different technology.  It was unsuitable for the web because

17    what they were trying to do -- what Viola was trying to do

18    wouldn't work on the web.

19         Mosaic -- the inventors modified Mosaic to make this work.

20    And then the art they point to in their brief, LBNL and Digital

21    Anatomist, those were virtual dissecting programs, but they

22    were CGI solutions.  They refreshed a whole page so, again,

23    pointed away from having the web do interactive content.

24         And, again, this is where -- and this was talked about a

25    little bit with opposing counsel, but the defendants were not

1    pointing to the way they characterize inventions in the prior

2    case or other things but the way they characterized the claims.

3    And on the eve of the last trial, they wanted a claim

4    construction that a browser application is not limited to a web

5    browser application because they were concerned that then their

6    non-web browser art wouldn't render the claims obvious if it

7    was limited to web browsers.

8         So applying that here, you can't now say non-web browser

9    claims, non-web browser art, does render it obvious.  It's the

10   exact opposite situation that they contended before, and Judge

11   Davis agreed with them on the eve of trial and said that the

12   browser application was not limited to the web but was broader

13   than that.

14        And then of course the defendants leveraged that in the

15   trial and focused on the fact that there's no requirement that

16   the browser be a web browser.  That's different.  Those are

17   different things, not just different language.  Different

18   things.  That's what they told the jury before.

19        Okay.  So I can move to the second point.  Again, the

20   label we use is "security-related limitations" but, you know,

21   let's recognize that's a label that is for the claim language

22   that you see here on the screen, which this or something very

23   close to it is in all of the asserted claims, independent

24   claims 19, 32, and 45 -- is that you have to have a web server

25   in communication with a World Wide Web browser on a client

1  computer connected to the World Wide Web distributed hypermedia

2  network that has been configured with a plurality of different

3  interactive content applications.  That is different than the

4  prior claims and different than the prior art.

5       And that -- well, before I jump to the next slide, that --

6  when you want to focus on the language -- again, Dr. Martin

7  talks about it in his declaration at paragraphs 47 to 48 and

8  explains how that's different because -- and Dr. Doyle spends a

9  lot of time in Exhibit 52 talking about this.  We call it

10 "security."  It doesn't matter.  You can use the language.  But

11 this gives the user control because the user now has control as

12 to whether they're going to allow their web browser to be

13 configured with a particular interactive content application or

14 not.

15      And Dr. Martin in his declaration shows an example of that

16 where you can go into your web browser today and say, "I'm

17 going to disable Flash.  For some reason, I don't trust Flash.

18 I don't trust Adobe," for whatever reason you might have.  "But

19 I'm going to allow JavaScript.  I'm good with that."  Right?

20      Well, now if a web server tries to send you Flash, your

21 browser is not going to handle it.  You've taken control of

22 that, and you've got the security of knowing you -- that won't

23 run because you said, "No, I don't want that.  I don't trust

24 that."  JavaScript comes across.  It can now select the

25 application for JavaScript, and it can run.  You trusted that.

1  You're good with that.

2  Again, we can go back to the prior litigation and focusing

3  on what people said about the claims and what the prior art

4  teaches.  That was an issue, and that was an issue with some of

5  the prior art, and it was noted that that prior art -- even the

6  inventor of that prior art said it has lots of possibilities,

7  but there's a security issue.  "We can use it for demos, but we

8  won't release it unless we figure out some kind of security

9  mechanism."

10  And Dr. Doyle, in Exhibit 52, explains that's a difference

11  of the prior art that was used to invalidate the prior claims

12  and these claims.  And that the security vulnerability is

13  prevented by making the web browser -- and the user has control

14  of that web browser -- the final arbiter of what interactive

15  content application is launched rather than the web page.

16  **THE COURT:**  Is there anything in -- is there anything

17  in the specification -- I don't know that it would be an

18  embodiment, but is there anything that says the reason -- in

19  the patent itself -- the reason somebody would select or not

20  select an interactive content application is to be more secure?

21  **MR. CAMPBELL:**  It doesn't say that in the

22  specification.  We did talk about that in the prosecution

23  history when -- with the examiner of how these claims were

24  different, and that's at Docket 609-11 at page 61.  It's part

25  of Exhibit 43.  That was discussed as to why this claimed

1    embodiment provides this advantage over other claimed

2    embodiments.

3        **THE COURT:** Could you give me that page number again,

4    Mr. Campbell?

5        **MR. CAMPBELL:** Certainly. It's Docket 609-11, and

6    it's page 61 of that -- of the docket.

7        **THE COURT:** Very good.

8        **MR. CAMPBELL:** So at the top, page 61. So it is part

9    of the intrinsic record.

10       And so as Dr. Doyle explains, in these claims, in the '507

11   patent claims, "The browser is configured with a plurality of

12   interactive content applications before the information is

13   received from the web server that is used then to cause the

14   selection and subsequent launch of the appropriate interactive

15   content application. This enables protection of the user by

16   ensuring only safe and trusted interactive content applications

17   can be called for by web pages."

18       Again, focusing on what the defendants said about the

19   claims in the prior case, because that's what we're comparing,

20   claims, they asked their expert, "Is there any security

21   limitation in any of the asserted claims?" "No, there is no

22   security issues at all with the associated claims."

23       So we could take away the label, but their experts say no

24   security issues at all with the associated claims. Clearly

25   requiring the web browser to be configured with and the user

1    control to control what applications are -- the web browser is

2    configured with is a security limitation.  That's what it is.

3    We can talk about it as the "configured with" limitation.

4        And then they leverage that in the -- in their closing.

5    They say there is no security requirement that has to be highly

6    secure.  There is nothing that says it can't use Mr. Wei's

7    HMML.  So they're saying it's like the prior art in that it's

8    got a security problem.  These claims, the uncontroverted

9    expert declarations from Dr. Martin and Dr. Doyle, refute that

10   that would -- that Mr. Wei's HMML -- these claims don't have

11   that problem.

12       Okay.  Scalability-related limitations.  Again, label.

13   The important thing is, of course, the claim language.  The

14   claim language specifically talks about coordination, and we're

15   looking at claims 24, 37, and in particular, 45.

16       The claims also talk about breaking up tasks and

17   performing viewing transformations on the server side as

18   opposed to the client side, which again helps with the

19   scalability.

20       All of that is unlike the prior art and unlike the prior

21   claims.

22           THE COURT:  If I were to ask you a similar question

23   about scalability that I just asked about security, what would

24   you say?

25           MR. CAMPBELL:  That is in the spec -- that is in the

specification.  And I will -- I will find -- let's see.  Did I

put it in the notes here?  Yes, I did.

    Well, yeah.  That's right.  Okay.  So in column 11, lines

23 to 25 is one example.  I believe there is another, but this

is one right at the tip of my fingertips.  It says, "In a

preferred embodiment, distributed processing is coordinated by

a program called VIS represented by application client 210 in

Figure 6."  So there is a discussion of the coordination

program VIS in the specification, and that's what we see here.

I used Figure 10 because it's labeled VIS there, but we see VIS

as the coordination computer coordinating with, below it, the

VR servers that have -- that are the servers actually

performing the tasks, and VIS can distribute that processing to

coordinate that.

    **THE COURT:**  I suspect that if you and I had a lengthy

conversation, we would conclude that we had different

definitions of "scalability," but I don't know that we want to

use up your time having that conversation now.

    **MR. CAMPBELL:**  Okay.  I'd be happy to address that if

Your Honor --

    **THE COURT:**  Well, I'm just wondering what is it about

this patent -- about the invention claimed by this patent that

makes it easier for people to do things in larger -- across a

larger number of units of things doing that thing than would

have been the case without that patent?  I didn't say that very

artfully, but that's -- that -- that's sort of roughly my idea

of scalability.

So if someone says, "Well, we have this" -- for example,

"we have this program for project planning, and it's great, but

it really only works for teams of 20 or fewer, that's it, and

it only -- so that's it."  Someone says, "Well, that's really

too bad because I have an organization of 500 people, and we're

not" -- you know, "we're not building accounting software for

mom and pops, we're building airplanes, so I need something

that applies that process but to much greater numbers, across

many more units."

That is probably not a great example, but hopefully it

conveys something of my idea of what scalability is.

MR. CAMPBELL:  So let me try to address it, and if I'm

off track to Your Honor's question, please interrupt me.

But I think where we might differ in scalability is we're

talking about the server side, not the client side.

THE COURT:  Okay.

MR. CAMPBELL:  So rather than using, if I could, the

example you just used, I can use what Dr. Doyle talks about in

his declaration of we've got these massive visual embryo -- 3D

embryo sets, and even one server has trouble processing the

visualization that a user wants.  And so it's going to be very

difficult to get this out there to even a user with -- with a

server because of the -- the massive amount of data that

1    Dr. Doyle talks about in his declaration that is required here.

2         So we have to break those up into different servers, the

3    VR servers here, to be able to do that processing, and VIS is

4    the coordination computer that sits in there and allows you to

5    do that.  And that is -- sorry.

6              **THE COURT:**  Would you like to know what the Merriam

7    Webster definition of "scalability" is?

8              **MR. CAMPBELL:**  Sure.

9              **THE COURT:**  "Capable of being easily expanded or

10   upgraded on demand," and the example they actually give is a

11   scalable computer network, and that definition is so squishy,

12   really, you or I could have a field day with that so I don't

13   think that really probably solves my --

14             **MR. CAMPBELL:**  Well, it's Websters.  It's very

15   general.  Of course, Websters is going to be very general.

16        But I think we can see here in Figure 10 what was being

17   talked about in the specification.  Right?  That's why we

18   labeled it "scalability," but it's the coordination computer

19   VIS coordinating among these VR servers, and that's why we call

20   it "scalability" because now I can scale out the servers so

21   that I have the ability to handle more and more data, more and

22   more processing.  I can do that across a bigger network to

23   serve, you know, whatever -- whatever number -- one client,

24   maybe 500 clients.

25        And as Dr. Martin talks about -- this is in his

1    declaration at paragraph 76 -- this is where, you know -- I

2    think this is one -- this is one of the places that -- that --

3    where Dr. Martin shows -- Dr. Turnbull, you know, about nine

4    times in his declaration says, "Well, if there is language" --

5    "if it's not covering exactly the same thing, it's inherently,"

6    and kind of "inherently" is kind of a magic word you can look

7    for because it shows up nine times.  He tries to say, "Well,

8    it's the same type of thing."

9        And as Dr. Martin points out, he disagrees with that every

10   time he uses the "inherently," that those are the same thing.

11   And if they were the same thing, you would see -- and in the

12   art -- even if it wasn't prior art, at least some time around

13   there you would see this if it was obvious.  And yet

14   Dr. Turnbull -- the defendants used to have Dr. Mowry,

15   Dr. Keller -- they've -- none of them have been able to point

16   to any non-web examples or projects that use the -- that had

17   the scalability the '507 patent teaches because that is -- that

18   was not an obvious variation at the time.

19       Okay.  So we've talked about the three buckets of

20   differences.  And then as -- as the Court knows, there's a

21   two-step analysis.  Identify those -- determine those

22   differences, which we now have.  They're much more than just

23   different claim language.  And then determine whether the

24   differences render the claims as a whole patentably distinct

25   compared to the earlier-issued claims.  And given that there is

these three very different aspects of the current claims that are not in the prior claims, when you look as a whole, they cannot be obvious -- they cannot be invalid for obviousness-type double patenting, which is why the examiner very in tune to this asked about this, was explained this, and didn't issue an obviousness-type double patenting rejection, which would have been -- which would have just required, as in the other patents, a terminal disclaimer.

The burden is on the challenger to prove all the elements of obviousness-type double patenting by clear and convincing evidence.  There is plenty of case law that says conclusory statements like just saying, "well, it's inherently there" or "one of skill" -- "it would have been obvious to one of skill" doesn't meet that clear and convincing evidence burden, and that is just lacking here.

Again, you can't mix and match claims either so you have to do a whole claim to a whole claim, and there is plenty of discussion about that in the case law as well.

I already talked about this, about considering the claims as a whole, so I'll jump over that slide and go here to where this was talked about a little bit, but the law is the opposite.  The defendant's don't perform an obviousness-type double patenting -- a proper obviousness-type double patenting examination.

We talked about the claims as a whole.  Let's talk about

1    the motivation to modify and the secondary considerations.

2         This is the "considered as a whole."  I've talked about

3    this, so I'll skip over that.  This is the examiner's analysis,

4    so I'll skip over that.  And let me get to here.

5         And this was talked about, the *Geneva Pharmaceuticals*

6    case, and this is in the defendant's brief that, "Eolas'

7    attempt to resort to secondary fact-intensive considerations of

8    obviousness is misplaced."  And the *Geneva Pharmaceutical* case

9    is cited and talked about before with the, quote, "obviousness

10   requires inquiry into motivation to modify prior art.

11   Non-statutory double patenting does not."  Okay?

12        If you go to the Federal Circuit's opinion in *Otskua* years

13   after *Geneva Pharmaceuticals* -- and we pointed this out in our

14   response brief.  It wasn't new.  Reading *Geneva Pharmaceuticals*

15   to say obviousness-type double patenting doesn't require a look

16   into the motivation and doesn't require a look into secondary

17   considerations mischaracterizes those cases.  And what the trap

18   is that some practitioners fall into is it's often talked about

19   as obviousness-type double patenting.  The Federal Circuit in

20   *Geneva* was talking more -- talked in terms of non-statutory

21   double patenting.

22        Non-statutory double patenting, when I label it that way,

23   can encompass both anticipatory non-statutory double patenting

24   and obviousness-type double patenting.  So in *Otsuka* what the

25   Federal Circuit said is that contrary to the defendant's

1   arguments there, same as here, neither *Geneva* -- and some

2   people cite *Procter & Gamble* -- stands for the proposition that

3   in considering whether one compound is an obvious variant over

4   another for purposes of non-statutory double patenting,

5   analyzing the compound of the prior claim for a reason or

6   motivation to modify is irrelevant.  They say that's wrong.

7   "Rather, an analysis of non-statutory obviousness-type double

8   patenting like an analysis under Section 103 entails

9   determining, among other things, whether one of skill in the

10  art would have had reason or motivation to modify the earlier

11  claimed compound to make the compound of the asserted claim

12  with a reasonable expectation of success."  And the quote

13  here -- but when you read *Otsuka*, what *Otsuka* -- the Federal

14  Circuit says is the mistake is *Geneva* was focused on

15  anticipatory non-statutory double patenting.  And of course as

16  we all know, in an anticipation analysis, you don't look at a

17  motivation to modify.  You don't look at secondary

18  considerations.  That's an obviousness inquiry.  But in an

19  obviousness-type non-statutory double patenting, you still look

20  for those just like in Section 103.

21       So *Otsuka* has said that reading of *Geneva Pharmaceuticals*

22  or *Procter & Gamble* is wrong.  And because of that, there is no

23  evidence in the record of any sort of motivation to modify the

24  prior claims to make these changes, to make these claims, and

25  there is no evidence of the secondary considerations in the

1    evidence -- in the record.

2        And the secondary considerations here also support

3    non-obvious.  We talked about how browser designers like Marc

4    Andreesen rejected interactivity on the Web.  We talked about

5    other people failing, such as Pei Wei and the ViolaWWW security

6    flaw.  We talked about the praise where the NCSA Mosaic team

7    wanted to collaborate with Dr. Doyle's team given what they saw

8    about the virtual embryo project.

9        And just as further evidence that secondary considerations

10   need to be looked at, in *Otsuka* the Court found that the claims

11   were not invalid for non-obviousness-type double patenting, but

12   they said that the -- that that meant that they don't need to

13   examine the evidence of secondary considerations of

14   non-obviousness.  Obviously if secondary considerations of

15   non-obviousness didn't apply, they would have said, "That's not

16   part of the test.  We don't have to look at that."  But they

17   said, "We don't have to examine it because we're finding the

18   patents are not invalid."

19       There is a similar quote in the *UCB* case that we cite that

20   they do not need to reach the district courts' findings

21   regarding secondary considerations.  So these are very relevant

22   and required aspects of the test that there is no evidence,

23   other than Dr. Martin and Dr. Doyle's declarations talking

24   about.

25       So if there is no questions on obviousness-type double

1    patenting, I'll turn to collateral estoppel.

2              THE COURT:  Go ahead.

3              MR. CAMPBELL:  So collateral estoppel -- just so --

4    I'm told that -- well, we cited to *Bourns*.  The Court was

5    looking for another collateral estoppel case.  *Bourns* is a good

6    collateral estoppel case, which, again, it -- it's interesting

7    collateral estoppel.  The '507 claims of course were not

8    adjudicated before here.  The test is whether they are

9    materially different than the prior claims.

10         Collateral estoppel is -- when obviousness-type double

11   patenting fails, collateral estoppel fails, too.  The

12   differences because of why obviousness-type double patenting

13   fail are the same differences of why collateral estoppel fails.

14             THE COURT:  Yes.  I agree with that.  I agree with

15   that.

16             MR. CAMPBELL:  And that's what *Bourns* says.  And the

17   difference is they are just like obviousness-type double

18   patenting.  *Bourns* says the differences revealed by comparisons

19   must be evaluated not in terms of obviousness under a domino

20   approach, but rather in terms of the *Graham* issues, 103.  So,

21   again, as a whole.  It's going to be very, very much the same.

22         Here collateral estoppel under Fifth Circuit law, if you

23   apply Fifth Circuit law, you have special circumstances you

24   need to look at.  I think the special circumstances here is the

25   defendant's characterizations of the prior claims.  Again, not

1    the characterizations of the invention but the

2    characterizations of the prior claims and what they did not

3    include and what now clearly they do include.

4         So *Ohio Willow Wood*, you know -- if the differences

5    between the unadjudicated claims and the adjudicated claims do

6    not materially alter the question of invalidity, collateral

7    estoppel applies.  Here the differences materially alter the

8    claim, just like obviousness-type double patenting.  Those

9    differences, again, not under a domino approach, not under a

10   "let's take this off one by one," but as a whole, do those --

11   are there differences there?  That's what is referred to there

12   as the *Graham* factors.

13        And so, again, we have the web is the network in 1993.

14   Very different.  Not obvious to do this on the web.  What we

15   labeled "security" but really goes to the "configured with"

16   language, that the browser has to be configured with these

17   interactive applications and then one of those applications, if

18   it's configured with, can be selected, that's a material

19   difference.

20        And here, don't even use the word "scalability."

21   "Distribution," "coordination," the "viewing transforms" -- we

22   didn't even really talk about that -- being done on the server

23   side, that is another difference.

24        And, again, here if you go to Exhibit 1, Dr. Martin's

25   uncontroverted testimony in looking at this as a whole is that

these claims are not the same as the prior claims, and what he says is "the combined changes correspond to significant changes in claim scope."

So, again, those special circumstances, the defendants before said prior claims, don't have to be a web browser.  Just any browser.  Well, now clearly they do.  There can be no question that there has to be a web browser.

Defendants said no security issues at all with the -- with the prior claims.  Well, now, given the "configured with" language, Dr. Martin and Dr. Doyle's declaration teach you -- and there is no controversy, there is no dispute, there is no contrary evidence to this -- that "configured with" language provides the user with control and security, unlike that was talked about in the prior art claims.

Just briefly, because the Court particularly asked about the cases, *Ohio Willow Wood*, again, it's only a page.  The appeal there was just the different language was enough.  The Federal Circuit said, "No, and you haven't told me why the different languages is not substantially similar, so you lose."  Okay.  Well, that's fair.  The language here is different.

*Bourns*, there was two arguably new features, but then the defendants pointed to prior art with those features, and the patentee admitted they were in the prior art.  We don't have that here.  In fact, as Your Honor pointed out, I think the defendants say, "Oh, you don't have to look at the prior art.

1   You can just look at the prior claims."  Well, okay.  Then, I

2   mean, we don't think it's in the prior art, but since you can't

3   look at the prior art, the differences there then control the

4   analysis.  We don't even have to worry about *Bourns* and looking

5   in the prior art.

6       And *Soverain*, it was just a single dependent claim that

7   said put it on the Internet.  No explanation of why that was

8   important.  Here in '93 -- looking at it from a 1993

9   perspective, we know that's different.

10      And so we can't focus on inventor and expert testimony,

11  but we've got to focus on the claims and how are they

12  materially different.  And if they -- the concepts were known,

13  the defendants would point to prior art that shows web-related

14  technology, interactive technology, which they can't in '93.

15  They would show a browser configured with these applications,

16  which they can't.  They would show the VIS coordination

17  computer, the coordination and the viewing transformations, and

18  they haven't been able to do that.

19      Kessler doctrine, this was -- I'm not sure if it was

20  touched on or not, but just like -- just like collateral

21  estoppel, the Kessler doctrine exams whether the claims --

22  again, not individual limitations -- and products are

23  essentially the same as the previously-adjudicated claims and

24  products.  Again, the Kessler doctrine is going to rise -- is

25  going to fall -- it's not going to rise -- it's going to fall

1   just like the obviousness-type double patenting doctrine.  Once

2   you see the differences and appreciate the differences between

3   the claims, the Kessler doctrine doesn't apply because the

4   claims are not essentially the same.

5       The party asserting the Kessler doctrine has the burden

6   here.  We went through the differences.  The web is the

7   network.  Again, in 1993, very different.  Not obvious.  The

8   "configured with," the browser configured with.  Again, not

9   obvious.  Different.  The distribution and coordination.

10      So it's the same three limitations because I think the

11  test, once you apply it to the obviousness-type double

12  patenting include the claims are different, that makes

13  collateral estoppel and Kessler doctrine easy to deal with.

14      Dr. Martin's testimony again, at least as to the

15  combination, is -- is uncontroverted.  And the secondary

16  considerations also support the lack of similarity.  We talked

17  about those, the teaching away from people like Mr. Andreessen,

18  the failure of people like Mr. Wei, and the praise from people

19  like Mr. Hardin.

20      Just briefly to touch on the products, I don't think you

21  need to even get here because you deal with it as a matter of

22  the claims, but the defendants really just asked the Court to

23  assume that if they say the products are JavaScript technology,

24  then they're the same.  Of course in the last trial, which

25  was -- is it eight years ago now -- I guess it was four years

1   ago we wanted to deal with this.  Maybe it was eight years ago

2   that the trial was, if I have my timeline right.  Things

3   change, as Your Honor, of course, knows over eight years.

4   There is no showing that the prior versions of products that

5   are the same -- named the same are essentially the same, and

6   just because they use JavaScript and JavaScript technology,

7   even assuming that fact, doesn't make them the same, and

8   that's -- and that's what they would have to show here.

9       So just because there are prior versions of -- and then of

10  course for differently-named products -- and some of those

11  exist here, too -- there's no showing that they're the same.

12  Again, it's kind of just *well, assume that JavaScript and Java*

13  *technology is working on those products, and, well, they're the*

14  *same.*  That's not a sufficient showing to meet your burden that

15  those things are the same.

16      So that's another reason that the Kessler doctrine fails,

17  although I think it fails before you even need to get to the

18  products.  It fails on the claims.

19      I left two minutes.  Is there any questions that the Court

20  has?

21          **THE COURT:**  I don't have any.  I'm going to move my

22  4:00 back a few minutes.

23      Mr. Verhoeven -- first of all, how do you pronounce your

24  last name?  You're on mute.

25          **MR. VERHOEVEN:**  It's "Ver-hoe-ven," the emphasis on

1   the middle syllable.

2            **THE COURT:**  Mr. Verhoeven, you and Mr. Lumish have

3   five minutes to split, and then I will give Mr. Campbell five

4   minutes to split.  It's not much, but it's all I have.

5            **MR. VERHOEVEN:**  Okay.  I am going to share my screen,

6   so you could you please take off -- thank you.  I don't know

7   how to go to slide 51 really fast.

8        Your Honor, in my slide 51 -- I'll keep talking.  Maybe

9   I'll get to it -- I want to address really briefly the security

10  issue.  In slide 51, I have a comparison -- if I can ever get

11  there -- here it is.

12           **MR. CORREDOR:**  If you just type "51," enter, you will

13  get there.

14           **MR. VERHOEVEN:**  Here you go.

15       This is the language, Your Honor, that the plaintiff is

16  pointing to for all of their scalability requirements.  Okay?

17  It's the same thing as claimed in claim 40 of the '985 patent.

18  And none of this language has anything to do with scalability.

19  "Select an internet interactive content application."  Okay.  I

20  made my point.

21       Next point, there is discussion of plaintiff's expert,

22  Dr. Martin, Your Honor, and, you know, obviously experts are

23  hired by the parties and whatnot.  What I found really

24  interesting about Dr. Martin's recent declaration is to quote a

25  complete inconsistency of that declaration with his, in this

1   case, prior infringement report.  In his infringement report,

2   he doesn't say scalability is a requirement.  He doesn't say

3   security is a requirement.  He doesn't say there's a

4   requirement that you have to be able to scale up a big, high

5   number.  He doesn't go on to compare those requirements with

6   any of the accused products.  Why?  Because they're not there.

7   And his latest declaration is just, you know, argument and

8   should be accorded no weight.

9       The next point, slide -- on the scalability, I won't --

10  I'll just say the claim language doesn't say "scalability."

11  I've got two slides showing what they say and what the claim

12  language says, and it doesn't say that.  What they point to for

13  scalability is the coordination elements of the claim.

14          **THE COURT:**  I think you're going to win this point.

15          **MR. VERHOEVEN:**  Okay.  Then I have nothing further.

16          **THE COURT:**  Mr. Lumish.

17          **MR. LUMISH:**  Thank you, Your Honor.

18      The only point I think I have time to make is that the

19  second best case they could come up with for collateral

20  estoppel after *Ohio Willow Wood* -- Charlie, can you stop

21  sharing your screen, please -- was the *Bourns* case.

22          **THE COURT:**  He cited all your cases.  I gave myself

23  the homework of reading those three cases anyway after this

24  hearing, even if nobody mentioned them, so I'll read *Bourns*.

25  Is that the one you were going to pick?

1          **MR. LUMISH:**  It is, Your Honor.  I think -- no.  He

2     picked it.  He said *Bourns* was his best case --

3          **THE COURT:**  That's what I'm saying.

4          **MR. LUMISH:**  -- after *Ohio Willow Wood*.

5          **THE COURT:**  That's what I'm saying.  He cited your

6     cases.

7          **MR. LUMISH:**  Agreed, Your Honor.  What I wanted to

8     stay about it was the court finds in *Ohio Willow Wood* -- it's a

9     1976 court case decision.  They find collateral estoppel

10    applies to kill the unadjudicated claims even though there are

11    differences in those claims.  So they found that the

12    unadjudicated claims had hollow rivets, that they had a cover

13    that the other claims didn't have, and that they were oriented

14    so that the cover was in cooperation with the slider so the

15    slider wouldn't move around and break things.

16         None of that stuff was in the unadjudicated claims, and

17    they still found collateral estoppel applied, and those are

18    more substantive differences than anything Mr. Campbell could

19    show you today.

20         **THE COURT:**  Okay.  That was fast.

21         **MR. VERHOEVEN:**  Well, could I just say one more thing?

22    I'm sorry, Your Honor.

23         **THE COURT:**  Go ahead.

24         **MR. VERHOEVEN:**  There was a point made about the

25    products not being the same with Kessler.  The prior action was

1  an invalidity verdict, and so the preclusion is that they can't

2  walk away from that invalidity verdict.

3          **THE COURT:**  Yes.  I think I have your point.

4          **MR. VERHOEVEN:**  Yes.  Thank you, Your Honor.

5          **THE COURT:**  Okay.

6      Mr. Campbell?

7          **MR. CAMPBELL:**  Yes, Your Honor.

8          **THE COURT:**  You can even say some more things, if you

9  want.

10          **MR. CAMPBELL:**  Great.  I'd love to.

11          **THE COURT:**  As long as you fit it in five minutes.

12          **MR. CAMPBELL:**  Five minutes.

13          **THE COURT:**  It's like a game show where they open the

14  door and you can run around and fill up your basket.

15          **MR. CAMPBELL:**  All right.  I'm not sure what to shop

16  for, but I will respond to -- I will respond to what was just

17  said there.

18      The first thing I would say is that I -- I -- I know the

19  Court will do this.  Just encourage the Court to.  The focus is

20  on the claim language.  Right?  We've never disputed that.

21      The fact that -- I don't -- I don't understand the -- the

22  focus on the label of "security" and "scalability."  Those

23  things -- nobody has disputed those things result from the

24  claim language.  We labeled them --

25          **THE COURT:**  You keep saying that.  You gave them those

1    labels.

2              **MR. CAMPBELL:**  You're right.

3          **THE COURT:**  People are using labels you gave them,

4    aren't they?

5              **MR. CAMPBELL:**  You're right.  We wanted to, rather

6    than --

7          **THE COURT:**  That's why they're doing that, because you

8    did that.  That's all.

9              **MR. CAMPBELL:**  Rather than write a brief where we just

10   repeatedly quoted that claim language, we said what it did.

11   It's much more accessible that way to read a brief, in my view,

12   to say -- call it -- to talk about the language, call it

13   "security" because that's what it provides, and there is no

14   evidence other than Dr. Martin and Dr. Doyle saying that that's

15   what it provides.  Nobody had disputed that before.

16       To call it "scalability" rather than -- I mean, that

17   language is a lot of language.

18       My only point is let's focus on the claim language, and

19   the language that was put up by counsel is only part of it, of

20   where the "security" comes from, but the language, right, that

21   "the browser has been configured with a plurality of different

22   interactive content applications," and Dr. Martin explains at

23   paragraphs 36 -- 37 to 38 how that language is a meaningful and

24   non-obvious difference over the claims.  He explains in great

25   detail, particularly in claims 40 -- in paragraphs 47 to 48 why

1   the language about coordination and distribution is very

2   different than the prior claims.

3       That claim language is what we are relying on as being

4   very different and distinctions over the prior claims, which is

5   exactly what the Patent Office, even though they didn't see a

6   distinction in three prior or four prior continuation

7   applications and wanted to know what the distinction was

8   here -- that's the distinction they saw.

9       I don't -- again, I don't even -- Dr.Martin -- there is no

10  inconsistency.  There is no evidence in the briefs.  I don't

11  know what inconsistency is being talked about.

12      Again, we want to focus on the claims, not the language

13  that we used to try to make the brief more -- more interesting,

14  more readable, to focus on what was understood to come out of

15  those claims.

16      And, you know, on collateral estoppel, *Ohio Willow Wood*

17  and *Bourns* -- look, if you just want to look for a case that --

18          **THE COURT:**  It's --

19          **MR. CAMPBELL:**  -- comes out the way you want to come

20  out in terms of affirm or reverse, okay, those claims --

21          **THE COURT:**  Believe me, it puts me in a privileged

22  position when everybody cites the same cases.

23          **MR. CAMPBELL:**  Those cases don't have the result that

24  we want, but I think when you look at the legal test, which I

25  think is what the Court is more interested in, the legal test

1 described in those cases and the analysis for *is this different*

2 *or are you just relying on differences in language* -- the legal

3 test in those cases leads to the result here that collateral

4 estoppel doesn't apply.  Just because it led to the result in

5 those cases that collateral estoppel doesn't apply, in my view,

6 doesn't make them bad cases for us.  They're still good cases

7 for us.  It's the legal test explained in the correct way and

8 applied to our case leads to the correct result of no

9 collateral estoppel.

10     I may -- I think I used my five minutes.  If I didn't --

11       **THE COURT:**  I will take that as a stipulation.  That's

12 okay.  I'm late for something else.

13       **MR. CAMPBELL:**  Okay.  Very good.  I appreciate your

14 time, Your Honor.

15       **THE COURT:**  Thank you all for your arguments today.

16       **MR. VERHOEVEN:**  Thank you, Your Honor.

17       **THE COURT:**  I feel we've covered the waterfront.

18     If you could email your three PowerPoint presentations to

19 the CRD email address on the Northern District web page for my

20 chambers, that would be great.  And I think that concludes this

21 hearing.  Thank you.

22            (Proceedings adjourned at 4:08 p.m.)

23

24

25

1

2

3                    CERTIFICATE OF REPORTER

4            I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:    Thursday, September 23, 2020

8

9    *Pamela Batalo Hebel*

10   _____
     Pamela Batalo Hebel, CSR No. 3593, RMR, FCRR
11   U.S. Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25