RESTRICTED – ATTORNEYS' EYES ONLY

1    [Counsel identified on signature page]

2

3

4

5

6

7

8

9                    **UNITED STATES DISTRICT COURT**

10                 **NORTHERN DISTRICT OF CALIFORNIA**

11                        **OAKLAND DIVISION**

12

13   EOLAS TECHNOLOGIES                    Case No. 4:17-cv-03022-JST
     INCORPORATED,
                                           Related to Case Nos. 4:17-cv-01138-JST,
14              Plaintiff,                 4:17-cv-03023-JST, and 4:15-cv-05446-JST

15        v.                               **DEFENDANTS' MOTION FOR**
                                           **SUMMARY JUDGMENT**
16   AMAZON.COM, INC.,

17              Defendant.
                                           **Judge: Hon. Jon. S. Tigar**
18                                         **Hearing Date: June 2, 2022**
                                           **Hearing Time: 2:00 p.m.**
19

20

21

22                        REDACTED

23

24

25

26

27

28

RESTRICTED – ATTORNEYS' EYES ONLY

# NOTICE OF MOTION

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on June 2, 2022, at 2:00 P.M., or as soon thereafter as the matter may be heard by the Honorable Jon. S. Tigar in Courtroom 6, 2nd Floor, United States District Court for the Northern District of California, 1301 Clay Street, Oakland, CA 94612, Defendants Amazon.com, Inc. ("Amazon"), Google LLC ("Google"), and Walmart Inc. ("Walmart") shall and hereby do move the Court for an order granting this Motion for Summary Judgment. This Motion is made pursuant to Federal Rule of Civil Procedure 56. Defendants bring this motion for judgment on multiple, independent grounds.

- First, the asserted claims are ineligible under 35 U.S.C. § 101 because they are functional claims directed to the abstract idea of dividing, across a distributed set of computers, the labor needed to provide interactive applications on the web and fail the test for eligibility at *Alice* step one. Likewise, the claims recite only generic, conventional computers and fail *Alice* step two as well.

- Second, Eolas failed to raise a genuine issue of material fact as to direct infringement, because it cannot demonstrate that each Defendant practices each of the limitations in the asserted claims. The asserted claims all require the use and extensive configuration of a World Wide Web browser, running on a client device, and no single entity practices all elements of the claims.

- Third, Eolas has failed to raise a genuine issue of material fact as to whether the accused products meet certain limitations recited in the claims, including those related to the "interactive-content application," "distributed application," "object," and "automatically invoking" limitations.

This Motion is based upon this Notice of Motion and Motion, Memorandum of Points and Authorities in Support thereof, the Declaration of Bijal V. Vakil and exhibits thereto, all pleadings and papers on file in this action, such other evidence or arguments as may be presented to the Court, and such other matters of which this Court may take judicial notice.

1

## TABLE OF CONTENTS

2
                                                                                    Page

3    I.    INTRODUCTION ......................................................................................... 1

4    II.   STATEMENT OF ISSUES .......................................................................... 2

5    III.  STATEMENT OF FACTS ........................................................................... 2

6          A.    The Asserted '507 Patent .................................................................. 2

7          B.    The Accused Products ....................................................................... 5

8          C.    Procedural History ............................................................................ 5

9    IV.   LEGAL STANDARDS ............................................................................... 5

10   V.    THE ASSERTED '507 PATENT CLAIMS ARE INELIGIBLE UNDER
11         § 101 ........................................................................................................... 6

12         A.    The Asserted Patent Claims Are Directed to the Abstract Idea of
                 Providing Interactive Applications on the Web Using Distributed
13               Computing ......................................................................................... 7

14               1.    The Claims Recite Results-Oriented Functional Language,
                       As In *Aftechmobile* and Other Federal Circuit Decisions .......... 7

15               2.    The Claims' Use of Distributed Computing Is Akin to
16                     Basic Human Teamwork or Project Management ..................... 11

17               3.    The Asserted Claims Are Unlike Claims Found Eligible At
                       Step One ................................................................................... 14

18         B.    The Asserted Patent Claims Add Nothing Inventive ........................... 16

19   VI.   DEFENDANTS DO NOT INFRINGE THE ASSERTED '507 PATENT
20         CLAIMS ..................................................................................................... 21

21         A.    Eolas Fails to Raise a Genuine Issue of Material Fact as to Direct
                 Infringement ........................................................................................ 21

22         B.    Defendants Do Not Infringe the Application Limitations .................... 27

23               1.    Eolas Fails To Raise A Genuine Issue Of Material Fact As
                       To Whether The Accused Products Include An
24                     "Interactive-Content Application" (All claims) ......................... 27

25               2.    Eolas Fails To Raise A Genuine Issue Of Material Fact As
                       To Whether The Accused Products Include A "Distributed
26                     Application" ............................................................................... 32

27

28

RESTRICTED – ATTORNEYS' EYES ONLY

3.   Eolas Fails To Raise A Genuine Issue of Material Fact As To Whether The Accused Products Include A "Distributed Interactive-Content Application" ............................................................... 35

C.   Eolas Fails to Raise a Genuine Issue of Material Fact as to Dr. Martin's "Type 2 Information" Infringement Theory ......................................... 36

D.   Eolas Fails to Raise a Genuine Issue of Material Fact as to "Object" ............................................................................................................... 40

VII.   CONCLUSION ............................................................................................................ 43

1

# **TABLE OF AUTHORITIES**

2

Page(s)

3

**Cases**

4

*Aftechmobile Inc. v. Salesforce.com, Inc.,*
   No. 19-cv-05903-JST, 2020 WL 6129139 (N.D. Cal. Sept. 2, 2020), *aff'd*, 853
   F. App'x 669 (Fed. Cir. 2021) ........................................................................................... *passim*

5

6

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l,*
   573 U.S. 208 (2014).......................................................................................................... *passim*

7

8

*Amdocs (Israel) Ltd. v. Openet Telecom, Inc.,*
   841 F.3d 1288 (Fed. Cir. 2016).............................................................................................15

9

10

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986)...........................................................................................................5, 6

11

12

*Appistry, Inc. v. Amazon.com, Inc.,*
   195 F. Supp. 3d 1176 (W.D. Wash. 2016), *aff'd*, 676 F. App'x 1008 (Fed. Cir.
   2017) .................................................................................................................................12, 20

13

14

*Appistry, Inc. v. Amazon.com Inc.,*
   No. C15-311 MJP, 2015 WL 4210890 (W.D. Wash. July 9, 2015)......................................13

15

16

*Apple, Inc. v. Samsung Elecs. Co., Ltd.,*
   No. 12-CV-00630-LHK, 2014 WL 660857 (N.D. Cal. Feb. 20, 2014)..................................30

17

18

*Apple, Inc. v. Samsung Elecs. Co.,*
   No. 12-CV-00630-LHK, 2014 WL 252045 (N.D. Cal. Jan. 21, 2014) ...........................32, 43

19

*Bascom Glob. Internet Servs., Inc. v. AT&T Mobility, LLC,*
   827 F.3d 1341 (Fed. Cir. 2016).......................................................................................19, 20

20

21

*Biagro W. Sales, Inc. v. Grow More, Inc.,*
   423 F.3d 1296 (Fed. Cir. 2005)..............................................................................................6

22

*Brit. Telecomm. PLC v. IAC/InterActiveCorp,*
   381 F. Supp. 3d 293 (D. Del. 2019) (Bryson, J.)....................................................................19

23

24

*BSG Tech LLC v. Buyseasons, Inc.,*
   899 F.3d 1281 (Fed. Cir. 2018)..........................................................................................9, 14

25

26

*Chamberlain Grp. v. Techtronic Indus. Co.,*
   935 F.3d 1341 (Fed. Cir. 2019).............................................................................................16

27

*ChargePoint, Inc. v. SemaConnect, Inc.,*
   920 F.3d 759 (Fed. Cir. 2019)..............................................................................................16

28

*Coho Licensing LLC v. Glam Media, Inc.*,
    No. C 14-01576 JSW, 2017 WL 6210882 (N.D. Cal. Jan. 23, 2017)...............................12, 13

*Cooperative Ent., Inc. v. Kollective Tech., Inc.*,
    544 F. Supp. 3d 890 (N.D. Cal. 2021) ...................................................................................13

*cxLoyalty, Inc. v. Maritz Holdings, Inc.*,
    986 F.3d 1367 (Fed. Cir. 2021)...............................................................................11, 16, 20

*CyberSource Corp. v. Retail Decisions, Inc.*,
    654 F.3d 1366 (Fed. Cir. 2011)...............................................................................................26

*Device Enhancement LLC v. Amazon.com, Inc.*,
    189 F. Supp. 3d 392 (D. Del. 2016)........................................................................................12

*Digital-Vending Servs. Int'l, LLC v. Univ. of Phoenix, Inc.*,
    672 F.3d 1270 (Fed. Cir. 2012).................................................................................................26

*Dynacore Holdings Corp. v. U.S. Philips Corp.*,
    363 F.3d 1263 (Fed. Cir. 2004).........................................................................30, 32, 35, 36

*Electric Power Group, LLC v. Alstom S.A.*,
    830 F.3d 1350 (Fed. Cir. 2016)...............................................................................................19

*Enfish, LLC v. Microsoft Corp.*,
    822 F.3d 1327 (Fed. Cir. 2016)..................................................................................14, 30, 32

*Enpat, Inc. v. Tenrox Inc.*,
    No. 6:13-cv-948-Orl-31KRS, 2015 WL 541673 (M.D. Fla. Feb. 10, 2015)..........................13

*Eolas Techs., Inc. v. Adobe Sys., Inc.*,
    810 F. Supp. 2d 795 (E.D. Tex. 2011).............................................................................36, 37

*Eolas Techs. Inc. v. Amazon.com, Inc.*,
    521 F. App'x 928 (Fed. Cir. 2013) ...................................................................................18, 31

*Eolas Techs. Inc. v. Microsoft Corp.*,
    399 F.3d 1325 (Fed. Cir. 2005)........................................................................................30, 32

*Free Stream Media Corp. v. Alphonso Inc.*,
    996 F.3d 1355 (Fed. Cir. 2021)........................................................................................10, 18

*Hutchins v. Zoll Med. Corp.*,
    492 F.3d 1377 (Fed. Cir. 2007).................................................................................................6

*i4i Ltd. P'ship v. Microsoft Corp.*,
    598 F.3d 831 (Fed. Cir. 2010)...................................................................................................24

*Intell. Sci. & Tech., Inc. v. Sony Elecs., Inc.*,
    589 F.3d 1179 (Fed. Cir. 2009)...................................................................................6, 29, 35

*Intell. Ventures I LLC v. Capital One Bank (USA), Nat'l Ass'n,*
   792 F.3d 1363 (Fed. Cir. 2015)..................................................................6, 9, 12, 18

*Intell. Ventures I LLC v. Erie Indem. Co.,*
   850 F.3d 1315 (Fed. Cir. 2017)...................................................................................6

*Intell. Ventures I LLC v. Symantec Corp.,*
   838 F.3d 1307 (Fed. Cir. 2016).......................................................................7, 12, 20

*Internet Pats. Corp. v. Active Network, Inc.,*
   790 F.3d 1343 (Fed. Cir. 2015).................................................................................11

*Interval Licensing LLC v. AOL, Inc.,*
   896 F.3d 1335 (Fed. Cir. 2018).................................................................................10

*Jazz Photo Corp. v. Int'l Trade Comm'n,*
   264 F.3d 1094 (Fed. Cir. 2001), *abrogated on other grounds by Impression*
   *Prods., Inc. v. Lexmark Int'l Inc.,* 137 S. Ct. 1523 (2017) ........................................6

*Lyda v. CBS Corp.,*
   838 F.3d 1331 (Fed. Cir. 2016).................................................................................26

*Medgraph, Inc. v. Medtronic, Inc.,*
   843 F.3d 942 (Fed. Cir. 2016).............................................................................21, 24

*Mirror Worlds, LLC v. Apple Inc.,*
   692 F.3d 1351 (Fed. Cir. 2012).................................................................................21

*Move, Inc. v. Real Estate Alliance Ltd.,*
   721 F. App'x 950 (Fed. Cir. 2018) ......................................................................16, 20

*PersonalWeb Techs. LLC v. Google LLC,*
   8 F.4th 1310 (Fed. Cir. 2021) ..............................................................................18, 22

*Pixion, Inc. v. Citrix Sys., Inc.,*
   887 F. Supp. 2d 881 (N.D. Cal. 2012), *aff'd*, 500 F. App'x. 954 (Fed. Cir.
   2013) ....................................................................................................................29, 35

*Rearden LLC v. Walt Disney Co.,*
   293 F. Supp. 3d 963 (N.D. Cal. 2018) ......................................................................21

*RecogniCorp, LLC v. Nintendo Co.,*
   855 F.3d 1322 (Fed. Cir. 2017)..............................................................................7, 11

*SAP Am., Inc. v. InvestPic, LLC,*
   898 F.3d 1161 (Fed. Cir. 2018)......................................................................... *passim*

*Simio, LLC v. FlexSim Software Prods., Inc.,*
   983 F.3d 1353 (Fed. Cir. 2020)..............................................................................13, 18

*Swarm Tech LLC v. Amazon.com Inc.*,
    No. CV-21-00438-PHX-DJH, 2021 WL 4263728 (D. Ariz. Sept. 20, 2021) .........................13

*Teradata US, Inc. v. SAP SE*,
    No. 20-cv-06127-WHO, 2021 WL 6332792 (N.D. Cal. Oct. 5, 2021) ....................................12

*Tokai Corp. v. Easton Enters., Inc.*,
    632 F.3d 1358 (Fed. Cir. 2011)..................................................................................................5

*Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*,
    874 F.3d 1329 (Fed. Cir. 2017)..............................................................................7, 10, 18, 19

*Uniloc 2017 LLC v. Netflix, Inc.*,
    No. 18-2055-GW, 2019 WL 3291581 (C.D. Cal. May 14, 2019)...........................................13

*Universal Secure Registry LLC v. Apple Inc.*
    10 F.4th 1342 (Fed. Cir. 2021) ..........................................................................................9, 11

*VeriPath, Inc. v. Didomi*,
    842 F. App'x 640 (Fed. Cir. 2021) ..........................................................................................12

**Statutes**

35 U.S.C. § 101...................................................................................................... *passim*

**Other Authorities**

Federal Rules of Civil Procedure Rule 56(a)..................................................................................5

Merriam-Webster, https://www.merriam-webster.com/dictionary/breakup (last
    visited Feb. 14, 2022)..............................................................................................................33

National Institute of Standards and Technology, Host,
    https://csrc.nist.gov/glossary/term/host (last visited Nov. 11, 2021)......................................34

RESTRICTED – ATTORNEYS' EYES ONLY

# NOTES ON CITATIONS

1.    Unless stated otherwise, all cites to the docket herein refer to the lead case in these actions (No. 4:17-cv-03022-JST).

2.    Citations to "*Eolas I*" refer to Eolas Technologies Inc. v. Adobe Systems Inc., No. 6:09-cv-00446-LED (E.D. Tex.).

3.    Citations to "Texas Court" refer to the U.S. District Court for the Eastern District of Texas, where these cases were first filed before their transfer to this Court.

4.    Citations to the "'507 patent" refer to U.S. Patent No. 9,195,507, attached as Exhibit 1.

5.    All emphasis added unless noted otherwise.

RESTRICTED – ATTORNEYS' EYES ONLY

## I.   INTRODUCTION

Defendants respectfully request that this Court grant summary judgment in Defendants' favor because the asserted claims are not eligible for patent protection.  Additionally, the asserted claims are not infringed.

First, the asserted claims are ineligible under 35 U.S.C. § 101 and the Supreme Court's two-step framework in *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 216-18 (2014).  In prosecution before the Patent Office and during claim construction here, Eolas labored to avoid any constraint on the claims that would limit them to a specific or particular technological solution, repeatedly seeking broad coverage of ***any*** distributed interactive applications on the web, no matter ***how*** they are implemented or achieved.  The asserted claims, as construed, are thus purely functional and directed to the abstract idea of dividing, across a distributed set of computers, the labor needed to provide interactive applications on the web.  Consequently, the claims fail the test for eligibility at *Alice* step one.  Likewise, the components for building the claimed system and achieving its distributed functionality are nothing more than black box recitations of conventional technology with no new hardware, software, or methods even suggested.  The claims thus fail *Alice* step two as well.  For at least these reasons, and as detailed below, the asserted claims of the '507 patent are invalid under 35 U.S.C. § 101.

Second, Eolas has failed to raise a genuine issue of material fact as to direct infringement, because it cannot demonstrate that each Defendant practices each of the limitations in the asserted claims.  The asserted claims all require the use and extensive configuration of a World Wide Web browser, running on a client device.  A finding of infringement requires a single entity that practices all elements of a patent claim.  Eolas has failed to raise a genuine issue of material fact as to whether ***Defendants***, rather than third-parties such as end users, practice all elements of each asserted claim.  Summary judgment of non-infringement on this basis is warranted.

Third, Eolas has failed to raise a genuine issue of material fact as to whether the accused products meet certain other limitations recited in the claims.  For both the "interactive-content application" and "distributed application" limitations, Eolas does not identify what specifically in the accused products satisfies these limitations.  Eolas also ignores the claims' construction in its

RESTRICTED – ATTORNEYS' EYES ONLY

"Type 2 Infringement" theory, which seeks to recapture user clicks that the Texas court already found cannot be the claimed "automatically invoking" of the interactive-content application. Eolas likewise fails to follow the construction for the "object" limitation. For these additional reasons, summary judgment of non-infringement is warranted.

## II.    STATEMENT OF ISSUES

1. Are the seven asserted claims of the '507 patent ineligible under § 101?

2. Should the Court grant summary judgment because Eolas has failed to raise a genuine issue of material fact as to whether each Defendant practices every limitation of each asserted claim?

3. Should the Court grant summary judgment because Eolas has failed to raise a genuine issue of material fact as to whether the accused products include an "interactive-content application"?

4. Should the Court grant summary judgment because Eolas has failed to raise a genuine issue of material fact as to whether the accused products include a "distributed application"?

5. Should the Court grant summary judgment because Eolas has failed to raise a genuine issue of material fact as to whether the accused products include a "distributed interactive-content application"?

6. Should the Court grant summary judgment as to Eolas's "Type 2 Information" infringement theory because Eolas has failed to raise a genuine issue of material fact as to whether the accused products meet the limitation of "automatically invoke"?

7. Should the Court grant summary judgment because Eolas has failed to raise a genuine issue of material fact as to whether the accused products include an "object"?

## III.   STATEMENT OF FACTS

### A.    The Asserted '507 Patent

The '507 patent is directed to providing interactive applications on the web using distributed computing. *See, e.g.*, Ex. 1, '507 patent at Abstract, 1:23-26, 6:34-7:14.

According to the specification, existing web browsers allowed users browsing the web to

RESTRICTED – ATTORNEYS' EYES ONLY

view content such as pictures or text.  *Id.* at 1:63-3:50, Fig. 1 (prior art).  But, according to the patent, a browser could not provide interactive applications (e.g., programs allowing users to manipulate images) because they required more processing than a user's computer could typically handle at that time.  *Id.* at 5:36-6:41.  The patent's purported solution is to distribute the processing across multiple computers on the web.  *Id.* at 6:57-7:14, 7:29-32.  As the specification explains, "tasks" that require a lot of processing may be "performed among two or more computers," "such as [a] server computer [] and additional computers."  *Id.* at 11:10-18.  The computers are "coordinated" to "work together to perform the task."  *Id.* at 11:15-25.

The specification admits that to practice the purported invention requires no specific improvement in computer or network technology.  The computers can be any "type[] or configuration[]"—including "personal computers" and generic "server[s]"—and require only "basic" and "familiar . . . components," such as a "processor," "memory," and "keyboard."  *Id.* at 1:27-41, 8:8-46; *see also id.* at 6:14-18 ("client computers," such as "personal computers," are "common[ly] . . . connected to the Internet"); 11:18-22 (task-completion can be coordinated by "any" of the computers).  The specification recognizes that distributed computing, distributed clients and servers, the Internet, the web (i.e., "the World Wide Web distributed hypermedia network on the Internet"), web pages (which are "hypermedia or hypertext documents") and web browsers (which could display or access images, text, sound, and video in web pages) were all well-known.  *See id.* at 1:27-3:50, 3:59-5:35, 9:43-46, Fig. 1 (prior art), Fig. 2 (prior art).

Nor does the specification require any particular implementation.  To the contrary, it insists that it requires no "specific logic" and is not "limited" to any specific examples in the specification, and notes rather that "modifications and changes may be made," and "various programming languages and techniques can be used to implement the disclosed invention."  *Id.* at 16:56-17:3.

The seven asserted claims are broad indeed.  Despite some technical jargon, they focus on the abstract concept of providing interactive applications on the web using distributed computing, with no specific way to achieve that goal.  Independent claim 32 recites:

> **32.** A method, performed by a server computer connected to the World Wide Web distributed hypermedia network on the Internet, for disseminating interactive content via the World Wide Web distributed hypermedia network on the Internet,

RESTRICTED – ATTORNEYS' EYES ONLY

the method comprising:

A. receiving, by the server computer, a request for information; and,

B. transferring, by the server computer, the information onto the World Wide Web distributed hypermedia network on the Internet, wherein:

(i) a World Wide Web browser on a client computer connected to the World Wide Web distributed hypermedia network has been configured with a plurality of different interactive-content applications, each said interactive-content application being configured to enable a user to interact, within one or more World Wide Web pages, with at least part of one or more objects while at least part of each of said one or more objects is displayed to the user within at least one of said one or more World Wide Web pages, and

(ii) at least part of the information is configured to allow the World Wide Web browser on the client computer to:

a. detect at least part of an object to be displayed in a World Wide Web page, and

b. cause a display of the World Wide Web page to a user,

(iii) the World Wide Web browser has been configured to:

a. select an interactive-content application, based upon the information, from among the different interactive-content applications, and

b. automatically invoke the selected interactive-content application to enable the user to employ the selected interactive-content application to interact within the World Wide Web page with at least part of the object while at least part of the object is displayed to the user within the World Wide Web page, wherein the automatically invoked interactive-content application has been configured to operate as part of a distributed application configured to enable a user to perform the interaction through the use of communications sent to and received from at least a portion of the distributed application located on two or more distributed application computers connected to the World Wide Web distributed hypermedia network on the Internet, the two or more distributed application computers being remote from the client computer.

*Id.*, cl. 32 (indentation altered). The other two independent claims are similarly generic as claim 32. Claim 19 adds only the requirement that there be a generic computer ("server") and requires the same steps of claim 32. Claim 45 is essentially the same as claim 32, but also recites "coordinating" the various computers to "work together to perform the . . . task."[1] Likewise, the four dependent claims merely state that a computer "coordinat[es]" performance of the task (claims 24 and 37) and computers "work together" on the task (claims 26 and 39).

---

[1] Claim 45 varies the language in minor respects to claim 32, e.g., stating that the application "perform[s] viewing transformations," which, as construed, just means "operations performed on data for visual display to a user." Dkt. 212 at 29-31.

RESTRICTED – ATTORNEYS' EYES ONLY

**B.    The Accused Products**

The Google accused products are:  Google AdWords, Google Search, Google Docs, Google Gmail, Google Maps, and YouTube. The Amazon accused products are:  Amazon Cart, Amazon EC2, Amazon Product Viewer, Amazon S3, Amazon Search, Amazon Shoveler, and Amazon Video.  The Walmart accused products are:  Walmart Search, Walmart Cart, Walmart Product Viewer, and Walmart Carousel.

For each of the Defendants, Eolas's infringement expert, Dr. David Martin, served a "Main Report," along with a product-specific appendix for each accused product.  The Main Report is nearly identical for each Defendant, as the infringement theories for each asserted claim against each accused product are substantially similar.  Each product-specific appendix purports to describe Dr. Martin's infringement theory for that particular product, but again the theories expressed across all accused products are largely the same.

**C.    Procedural History**

Eolas filed these actions the same day the '507 patent issued on November 24, 2015 in the Eastern District of Texas.  Early in the case, Eolas moved the Texas court for summary judgment that the claims of the '507 patent were not invalid under § 101.  *See* Dkt. 112.  The Texas court found Eolas "failed to carry its burden" and denied the motion.  Dkt. 208 at 8.

Subsequently, Eolas sought and obtained broad, generic constructions of the claim terms such that, as construed, the claims require no particular technological implementation.  *See generally* Dkts. 168, 174, 179, 212.

After proceeding through claim construction and much of discovery, the Eastern District of Texas transferred these cases to this Court between February and April 2017.

**IV.    LEGAL STANDARDS**

"Summary judgment is as available in patent cases as in other areas of litigation." *Tokai Corp. v. Easton Enters., Inc.*, 632 F.3d 1358, 1366 (Fed. Cir. 2011) (citation omitted).  Rule 56(a) of the Federal Rules of Civil Procedure authorizes summary judgment if there are no genuine issues as to any material fact and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  An issue of fact is material if, under

1    the substantive law of the case, resolution of the factual dispute might affect the case's outcome.

2    *Id.* at 248.  "If the [non-movant's] evidence is merely colorable, or is not significantly probative,

3    summary judgment may be granted."  *Id.* at 249-50 (internal citations omitted).  It is axiomatic

4    that if the accused products fail to satisfy even a single limitation of the claims, they do not infringe.

5    *Hutchins v. Zoll Med. Corp.*, 492 F.3d 1377, 1380 (Fed. Cir. 2007); *Biagro W. Sales, Inc. v. Grow*

6    *More, Inc.*, 423 F.3d 1296, 1301 (Fed. Cir. 2005).  The party asserting patent infringement has the

7    burden of proving infringement, and thus the burden of establishing that each and every limitation

8    in the asserted claim is met.  *Jazz Photo Corp. v. Int'l Trade Comm'n*, 264 F.3d 1094, 1102 (Fed.

9    Cir. 2001), *abrogated on other grounds by Impression Prods., Inc. v. Lexmark Int'l Inc.,* 137 S.

10   Ct. 1523 (2017).  Conclusory expert testimony does not create a genuine issue of material fact.

11   *See, e.g.*, *Intell. Sci. & Tech., Inc. v. Sony Elecs., Inc.*, 589 F.3d 1179, 1184-85 (Fed. Cir. 2009)

12   **V.      THE ASSERTED '507 PATENT CLAIMS ARE INELIGIBLE UNDER § 101**

13          Section 101 of the Patent Act describes subject matter that is eligible for patent protection,

14   but "contains an important implicit exception" for abstract ideas.  *Alice*, 573 U.S. at 216.  The

15   Supreme Court's two-step *Alice* framework governs whether computer-based patent claims are

16   ineligible under § 101.  *Id.* at 217-27.

17          At step one, the Court determines whether the claims are directed to an abstract idea despite

18   their computer features.  *Id.* at 218.  The Court evaluates "the focus of the claimed advance over

19   the prior art to determine if the claim's character as a whole is directed to" an abstract idea.  *Intell.*

20   *Ventures I LLC v. Erie Indem. Co.*, 850 F.3d 1315, 1325 (Fed. Cir. 2017) (quotation omitted).

21   Even if claims are limited to a particular "technological environment, such as the Internet," that

22   does not make the core idea "any less abstract."  *Intell. Ventures I LLC v. Capital One Bank (USA),*

23   *Nat'l Ass'n*, 792 F.3d 1363, 1366-67 (Fed. Cir. 2015) ("*Capital One*").  In making this inquiry, the

24   Court considers "whether the claims focus on the *specific* asserted improvement in computer

25   capabilities or, instead, on a process that qualifies as an 'abstract idea' for which computers are

26   invoked merely as a tool."  *Aftechmobile Inc. v. Salesforce.com, Inc.*, No. 19-cv-05903-JST, 2020

27   WL 6129139, at *1 (N.D. Cal. Sept. 2, 2020) (cleaned up), *aff'd*, 853 F. App'x 669 (Fed. Cir.

28   2021).  Importantly, "'[t]he purely functional nature of [a] claim confirms that it is directed to an

1  abstract idea, not to a concrete embodiment of that idea.'" *Id.* (citation omitted).

2      At step two, the Court determines whether the other claim elements, individually or
3  collectively, add "significantly more" to the abstract idea—something "inventive"—that is
4  "sufficient to 'transform' the claimed abstract idea into a patent-eligible application." *Alice*, 573
5  U.S. at 217-22.    Implementing an abstract idea with "well-understood," "routine," or
6  "conventional" activities—or limiting it to a particular technological environment—contributes
7  nothing inventive. *Id.* at 225-26. Use of an abstract idea itself cannot supply the requisite inventive
8  concept. *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1163 (Fed. Cir. 2018). Nor can claims
9  simply recite "generic functional language to achieve [the] purported solutions" without claiming
10 "'*how* the desired result is achieved.'" *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*,
11 874 F.3d 1329, 1339 (Fed. Cir. 2017) (citation omitted) (emphasis in original). And crucially, any
12 inventive concept must be "in the claims," not in unclaimed "technological details set forth in the
13 patent's specification." *Intell. Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1322 (Fed. Cir.
14 2016) ("*Symantec*").

15     Here, the '507 patent's asserted claims are ineligible under § 101 because they (a) are
16 directed to the abstract idea of providing interactive applications on the web using distributed
17 computing and (b) add only non-inventive elements (such as conventional computers and
18 functions) to that abstract idea.

19    **A.    The Asserted Patent Claims Are Directed to the Abstract Idea of Providing**
20    **Interactive Applications on the Web Using Distributed Computing**

21     The asserted claims focus on the abstract idea of providing interactive applications on the
22 web using distributed computing. That is evident from the claim language and the specification,
23 for three reasons.

24        **1.    The Claims Recite Results-Oriented Functional Language, As In**
             ***Aftechmobile* and Other Federal Circuit Decisions**
25

26     The claim language is recited in highly generic terms, focusing on "an abstract end-result,"
27 not "'a specific means or method' for improving technology." *RecogniCorp, LLC v. Nintendo*
28 *Co.*, 855 F.3d 1322, 1326 (Fed. Cir. 2017) (citation omitted).    Independent claim 32 recites a

RESTRICTED – ATTORNEYS' EYES ONLY

computer method in which (1) a server sends "interactive content" to the user's web browser, (2) the web browser starts an "interactive-content application" to "enable the user" "to interact" with the content, and (3) the interactive-content application's processing is divided up ("distributed") among at least two other computers on the web.  To achieve these results, the claimed method recites generic computers (a "server," "client computer," and other "computers") that are "configured to" perform basic computer functions, such as "receiving," "transferring," "display[ing]," and "communicati[ng]" information.  But the claims provide no details explaining "how" to implement the claimed software functions.  *Aftechmobile*, 2020 WL 6129139, at *6. Moreover, Eolas sought, and received, broad claim constructions that do not focus on or require any specific implementation—an "interactive-content application" is any application that "enable[s] a user to interact with content" and a "distributed application" is any "application that is broken up and performed among two or more computers."  Dkt. 212 at 9, 16.  Therefore, claim 32 is "directed to an abstract concept rather than a technical improvement."  *Aftechmobile*, 2020 WL 6129139, at *6.

As noted above, the two other asserted independent claims are equally generic. Independent claim 19 is the same as claim 32, except couched as a generic "server" (with a generic "processor" and generic "memory device") and performs the same steps—which does not change the analysis under *Alice*.  *See Alice*, 573 U.S. at 226 (computer system claims that "are no different from the method claims in substance" are abstract and ineligible "for substantially the same reasons").  Claim 45 is also essentially the same as claim 32, but it recites "coordinating" the various computers to "work together to perform the . . . task"—which is part of the abstract distributed-computing concept itself.  All other differences in claim 45 are part and parcel of the same abstract idea as claims 32 and 19 and simply add recitations of generic communications. Similarly, the four dependent claims (claims 24, 26, 37, and 39) merely state that computers "coordinat[e]" and "work together" on the task—again, part of the abstract idea.  Similar to claim 32, the other asserted independent and dependent claims "do[] not specify how the functions described in each step" are performed.  *Aftechmobile*, 2020 WL 6129139, at *6.  At most they restate or "minimal[ly] narrow[]" the abstract idea, which "does not affect whether [they are]

RESTRICTED – ATTORNEYS' EYES ONLY

1  directed to an abstract idea." *BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1287 (Fed. Cir.

2  2018). Therefore, the claims are all substantially similar and directed to the same abstract idea.

3      The specification confirms that the claims' central purported advance is providing

4  interactive applications on the web using distributed computing—the abstract idea. *See* '507

5  patent at 6:45-67 (purported invention "allows the user to interact with an application program

6  located at a remote computer" and thereby "use a vast amount of computing power beyond that

7  which is contained in the user's client computer"); *supra* at 2-3; *see also* Dkt. 112 at 1 (Eolas

8  acknowledging that the claims are directed to "systems and methods for serving distributed

9  interactive applications on the [web]"); Dkt. 144 at 1 (same); Ex. 2 (Dr. Martin's Rebuttal Report

10 on Validity) at ¶ 774 (Eolas's expert stating

11                                          Ex. 3 at ¶ 868 (same). The specification also confirms

12 that the claims merely use, rather than improve, conventional computer and network technology.

13 *Supra* at 2-3, 8; *see, e.g., Universal Secure Registry LLC v. Apple Inc.* 10 F.4th 1342, 1354-55

14 (Fed. Cir. 2021) (looking to a patent's specification to confirm the claimed biometric information

15 and its use was "conventional").

16

17

18                    Ex. 4, Doyle Dep. Tr. at 33-36, 187-90, 214-23, 281, 293-98, 358-59, 362-64,

19 389-90; Dkt. 609-14 ¶ 3 ("I am ultimately responsible for the claim language in the Eolas

20 patents."). The sheer scope that Eolas seeks to capture confirms that its claims are far too generic

21 to satisfy § 101. *See, e.g., Capital One*, 792 F.3d at 1369 (claims' "breadth" confirms abstraction).

22      The claims here are even more abstract than those this Court found abstract and ineligible

23 in *Aftechmobile* (which the Federal Circuit affirmed). 2020 WL 6129139, at *2-9. In that case,

24 the asserted claims recited—in detailed terms—computer programs and methods for "creating a

25 mobile application for a user device" by assembling multiple pre-coded components. *Id.* at *3-5.

26 The Court nonetheless found they were "directed to the abstract idea of enabling the creation of

27 mobile applications without coding by combining pre-coded software components." *Id.* at *5. The

28 Court explained that the claims require only "generic computer and software components" and

RESTRICTED – ATTORNEYS' EYES ONLY

1  "do[] not specify how to generate the functions required to perform the claim[s]" or "how to write"
2  the necessary software, including "interactive elements configured to enable interactions with said
3  data." *Id.* at \*3-4, \*6. The Federal Circuit agreed: "[t]he recitation of desired functions without
4  corresponding recitations on how to achieve or implement those functions leaves the claims devoid
5  of anything but the abstract idea." 853 F. App'x at 669.

6       So too here. Here, the claims' central software concept (*dividing* an application's
7  processing) is just as abstract as the one in *Aftechmobile* (*combining* application processing
8  blocks). And, just like in that case, the claims here recite purely functional language—generic
9  computer components "configured to" perform functions, like the generic "computer program
10  code" in *Aftechmobile*—to achieve the desired results. Therefore, the same result should follow
11  here.

12       Facing similar claims in other cases, the Federal Circuit has consistently found such claims
13  abstract (and ineligible). In each of these cases, the Federal Circuit found the requirements of
14  § 101 unmet where the claim merely recited functional language dividing processes over a number
15  of computer components without claiming how to achieve those functions. For example, in
16  *Interval Licensing LLC v. AOL, Inc.*, 896 F.3d 1335 (Fed. Cir. 2018), the claims recited numerous
17  computer steps for coordinating the display of content to a user, including an "attention manager"
18  component for arranging the content. *Id.* at 1339-40, 1344-45. Similar to the claims at issue here,
19  the claims in *Interval Licensing* included no details on "how the attention manager perform[ed]
20  the function[s]" or "*how* to engineer or program the display"; the claims "simply demand[ed] the
21  production of a desired result . . . without any limitation on how to produce that result." *Id.* at
22  1345 (emphasis in original). In *Two-Way Media*, the claims purportedly provided "an improved
23  scalable architecture for delivering real-time information" over a network, with an "[e]mbedded
24  . . . control mechanism that provides for the management and administration of users." 874 F.3d
25  at 1333-34. Although the claims recited detailed (more detail than is included in the claims here)
26  steps for "'converting,' 'routing,' 'controlling,' [and] 'monitoring'" packetized streaming content,
27  they did "not sufficiently describe how to achieve these results in a non-abstract way." *Id.* at 1337.
28  The Federal Circuit has ruled similarly in numerous other cases as well. *See, e.g.*, *Free Stream*

RESTRICTED – ATTORNEYS' EYES ONLY

*Media Corp. v. Alphonso Inc.*, 996 F.3d 1355 (Fed. Cir. 2021) (claims reciting a "television," various servers, and a "mobile device" that could "process an embedded object, constrain an executable environment in a security sandbox, and execute a sandboxed application in the executable environment" did not "identify 'how' [its] functional result is achieved"); *cxLoyalty, Inc. v. Maritz Holdings, Inc.*, 986 F.3d 1367, 1372-73, 1379 (Fed. Cir. 2021) (claim with "API" between "vendor system" and "GUI" to "complete purchase transactions" over the internet was abstract).

Even when not dividing processes among components, the Federal Circuit has consistently found computer-based claims that fail to explain how to implement claimed functions to achieve claimed results to be abstract (and ineligible). For example, in *Internet Pats. Corp. v. Active Network, Inc.*, 790 F.3d 1343 (Fed. Cir. 2015), the claims were directed to the abstract idea of "retaining information in the navigation of online forms" using web browsers because the claim did not describe "how the result was accomplished." *Id.* at 1348; *see also, e.g., Universal Secure Registry LLC,* 10 F.4th at 1350-52 (claims reciting an "electronic ID device" using multifactor encryption-based authentication provided no "specific technical solution"); *RecogniCorp*, 855 F.3d at 1326 ("generalized steps [for encoding and decoding information] to be performed on a computer using conventional computer activity" were abstract).

Likewise, here, the claims are directed to an abstract idea because they simply use the recited computers in a conventional way and fail to specify how to provide interactive web content or how to distribute the processing among multiple computers.

### 2. The Claims' Use of Distributed Computing Is Akin to Basic Human Teamwork or Project Management

The claims' use of distributed computing is akin to a concept that is old as humanity: many hands make light work. For example, military commanders or business managers (1) interact with a superior to receive instructions (like the "interactive-content application" here), (2) distribute tasks among multiple subordinates (like the "distributed" computers that are "coordinated" to "work together to perform [a] task" here, '507 patent at 11:3-25), and (3) report back with any updates or results (like displaying the results here). The claims' reflection of longstanding or

RESTRICTED – ATTORNEYS' EYES ONLY

1  fundamental human concepts is another indication of abstraction. *See Symantec*, 838 F.3d at 1314

2  ("'fundamental … practice[s] long prevalent' are abstract ideas" (quoting *Alice*, 573 U.S. at 219));

3  *Appistry, Inc. v. Amazon.com, Inc.*, 195 F. Supp. 3d 1176, 1178-80 (W.D. Wash. 2016) (claims

4  directed to "the abstract idea of distributed processing akin to the military's command and control

5  system"), *aff'd*, 676 F. App'x 1008 (Fed. Cir. 2017). Even if it is purportedly new or beneficial,

6  employing such a concept in the "particular technological environment" of the web does not make

7  it "any less abstract." *Symantec*, 838 F.3d at 1319 (quotation omitted); *see, e.g.*, *id.* at 1313-14

8  (claims for "filtering e-mails that have unwanted content" were akin to human activities and

9  abstract despite "the particular technological environment of the Internet" (quotation omitted));

10  *Capital One*, 792 F.3d at 1369-70 (claims for providing customized web pages were akin to human

11  activities and abstract).

12      Indeed, courts have routinely found that claims for distributed computing, including

13  coordination to break up tasks across multiple computers, are directed to abstract ideas and

14  ineligible. For example, in *Appistry*, the claims including "task handlers" on multiple networked

15  computers were directed to "the abstract idea of distributed processing akin to the military's

16  command and control system." 195 F. Supp. 3d at 1178-80. In *Device Enhancement LLC v.*

17  *Amazon.com, Inc.*, 189 F. Supp. 3d 392, 403-04, 404 n.15 (D. Del. 2016), the ineligible claims for

18  "[u]sing distributed architecture to enable remote adaptation of applications beyond the

19  capabilities of an individual device" were directed to an abstract idea. And in *Coho Licensing LLC*

20  *v. Glam Media, Inc.*, No. C 14-01576 JSW, 2017 WL 6210882 (N.D. Cal. Jan. 23, 2017), the

21  claims for "allocating," "sub-allocating," and "dividing" a "task portion" into a "subtask portion"

22  were directed to the abstract idea of "dividing and subdividing tasks for distributed processing."

23  *Id.* at *4-5, *aff'd*, 710 F. App'x 892 (Fed. Cir. 2018); *see also SAP*, 898 F.3d at 1165, 1167-68,

24  1170 (ineligible claims with "'parallel processing' computing architecture").[2]

25  _____

26  [2] *See also, e.g.*, *VeriPath, Inc. v. Didomi*, 842 F. App'x 640, 641-43 (Fed. Cir. 2021) (ineligible
    claim for a "distributed system" with multiple network-connected devices to collect user
27  information and determine permissions); *Teradata US, Inc. v. SAP SE*, No. 20-cv-06127-WHO,
    2021 WL 6332792, at *9 (N.D. Cal. Oct. 5, 2021) (ineligible claims for improved efficiency of

28

RESTRICTED – ATTORNEYS' EYES ONLY

1    The claims here have far fewer specific limitations related to the distributed tasks than the

2    claims found abstract in these cases.  For example, there is no recitation of actually "dividing" and

3    "allocating" a task with "divisible executable instruction sets" among computers as in *Coho*

4    *Licensing*.  2017 WL 6210882, at *5.  Instead, Eolas's claims simply recite that the "interactive-

5    content application has been configured to operate as part of a distributed application," and that

6    the "distributed application computers" are "coordinat[ed]" to "work together."

7    And here, as in those cases, simply breaking up a task into smaller tasks "is a relatively

8    simple and abstract idea," *Coho Licensing*, 2017 WL 6210882, at *5, and one that requires no

9    "improved computer or network," just "off-the-shelf computer technology," *SAP*, 898 F.3d at

10   1168.  And here, as in those cases, the claims and specification merely rely on distributed

11   computers for their conventional use: enhanced processing speed through division of labor.  *See*

12   '507 patent at 4:35-37, 5:36-52, 6:34-37, 6:65-7:6, 11:3-22; *cf. Simio, LLC v. FlexSim Software*

13   *Prods., Inc.*, 983 F.3d 1353, 1361 (Fed. Cir. 2020) (improved processing speed of a task does not

14   render claim patent eligible).

15   Nor could Eolas suggest otherwise:  its witnesses confirm that the distributed computing

16   of the patent was well-known.

17                                                                      Ex. 6, Dr. Martin

18   Dep. Tr. at 488; *see also* Dkt. 179-3 (stating that "the idea of distributed applications" "was known

19   to persons of ordinary skill in the art" and citing papers back to 1984).  Likewise, named inventor

20   Mr. Martin confirmed that the coordinated distributed processing techniques used in the '507

21   patent "were relatively well understood in the common practice at the time."  Ex. 27, Martin Jan.

22

23   "distributed" "parallel execution of database tasks"); *Cooperative Ent., Inc. v. Kollective Tech.,
     Inc.*, 544 F. Supp. 3d 890 (N.D. Cal. 2021) (ineligible claims using multiple computer peers for
     "distribut[ed] storage" and "processing"); *Swarm Tech LLC v. Amazon.com Inc.*, No. CV-21-

24   00438-PHX-DJH, 2021 WL 4263728, at *1-3 (D. Ariz. Sept. 20, 2021) (ineligible "multiprocessor
     system with the speed of parallel processing"); *Uniloc 2017 LLC v. Netflix, Inc.*, No. 18-2055-

25   GW, 2019 WL 3291581, at *5 (C.D. Cal. May 14, 2019) (using computers to process tasks
     "concurrently rather than serially . . . is an abstract concept"); *Appistry, Inc. v. Amazon.com Inc.*,

26   No. C15-311 MJP, 2015 WL 4210890, at *2 (W.D. Wash. July 9, 2015) (ineligible claims for
     "process[ing] information and/or complet[ing] a task by breaking down the job into small pieces,

27   each handled by a different actor"); *Enpat, Inc. v. Tenrox Inc.*, No. 6:13-cv-948-Orl-31KRS, 2015
     WL 541673 at *1-2, *5 (M.D. Fla. Feb. 10, 2015) (ineligible claims for "coordinated management

28   of a project" on a server).

RESTRICTED – ATTORNEYS' EYES ONLY

1  12, 2017 Dep. Tr. at 55:7-15; *see also id.* at 46-56.  He also confirmed that nothing in the claims

2  tells the public how to use multiple coordinated distributed remote servers to off-load local

3  processing.  *See* Ex. 27, Martin Dep. Tr. at 233-34.  Such detail is lacking because they used "a

4  pretty common standard mechanism for doing parallel processing, which [they] did not invent,"

5  "it would be readily apparent how to divide up a problem and run it across multiple parallel

6  computers," and "it's not something that [they] would have to instruct somebody on how to do."

7  *Id.*  Moreover, inventor Mr. Martin confirmed that Eolas

8  nor having a remote computer do

9  expensive computations and return results, and did not modify the hardware in any way to achieve

10  the coordinated distributed parallel processing.  Ex. 27, Martin Dep. Tr. at 54, 63, 65-67, 145-46.

11  **3.     The Asserted Claims Are Unlike Claims Found Eligible At Step One**

12

13          The asserted claims are nothing like the type of "specific improvement[s] to the way

14  computers operate" or network functionality that the Federal Circuit has found eligible at *Alice*

15  step one.  *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1336 (Fed. Cir. 2016).  For example, in

16  *Enfish*, the claims recited a specific improvement in database technology—a "self-referential" data

17  structure.  *Id.* at 1336-37.  The court found that "the self-referential table recited in the claims on

18  appeal is a specific type of data structure designed to improve the way a computer stores and

19  retrieves data in memory."  *Id.* at 1339.  By contrast, here, the claims provide no specific type of

20  data structure or programming, or any specific technological improvement, to provide interactive

21  applications on the web across a distributed set of computers in an improved way.  And unlike

22  *Enfish*, where the benefits taught in the patent flowed from the self-referential table recited in the

23  claims themselves, here, any benefit does not lead to any improvements in the functioning of any

24  claimed computer or networking.  Rather, "they are benefits that flow from performing an abstract

25  idea in conjunction with a well-known" distributed architecture.  *BSG*, 899 F.3d at 1288.  There is

26  nothing in the claims that improves the functioning of the recited "client computer," "distributed

27  application computers," or "coordination computers" themselves.  This is evident from the fact

28  that the specification admits (and the witness testimony confirms) that the claims require only

RESTRICTED – ATTORNEYS' EYES ONLY

1  conventional computers (such as a "personal computer" with any generic "memory," "display,"

2  "keyboard," and so on) and conventional computer networks (such as the Internet). '507 patent at

3  1:27-41, 8:8-44; *supra* at 3; *see also* Ex. 4, Doyle Dep. Tr. at 402 (

4  ).

5  The claims here are also unlike those in *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841

6  F.3d 1288 (Fed. Cir. 2016).  In *Amdocs*, the claims recited a particular improved "distributed

7  architecture" in which "distributed" had a very specific meaning: "that network usage records are

8  processed close to their sources before being transmitted to a centralized manager." *Id.* at 1300.[3]

9  Here, by contrast, the "distributed application computers" are merely "remote from the client

10  computer"—no particular or specific improved architecture is required. '507 patent at 23:65-24:2.

11  The specification explains this is "[t]ypical[]," and Eolas concedes that this core aspect of the

12  purported invention was well-known and conventional. '507 patent at 3:59-4:57; *supra* at 13-14.

13  Moreover, for all the same reasons as in the previous section, the results-oriented functional

14  claim language fails to identify how to configure the interactive application to use distributed

15  processing—it just states that it is done. *Supra* at 7-11; *see also* Dkt. 212 at 16 (construing

16  "distributed application" to be any "application that is broken up and performed among two or

17  more computers").  Absent such detail, the claims "are directed to an abstract concept rather than

18  a technical improvement." *Aftechmobile*, 2020 WL 6129139, at *6-8; *see also Aftechmobile*, 853

19  F. App'x at 669-70 ("The recitation of desired functions without corresponding recitations on how

20  to achieve or implement those functions leaves the claims devoid of anything but the abstract idea

21  . . . and adequately distinguishes the claims from those found not directed to patent ineligible

22  abstract ideas . . . .").

23  While these actions were pending in the Eastern District of Texas, Eolas tried—and

24  failed—to eliminate the § 101 defense. *See* Dkt. 112; Dkt. 208.  In his rebuttal reports, Eolas's

25  expert, Dr. Martin, parroted the same arguments from Eolas's failed early summary judgment

26

27  [3] The Federal Circuit also noted that "[t]he enhancing limitation" into which the "distributed architecture" was construed depended on more than just the distributed architecture. *Amdocs*, 841

28  F.3d at 1300-01.

RESTRICTED – ATTORNEYS' EYES ONLY

1  motion. *See* Ex. 2; Ex. 3. Dr. Martin simply identified claim elements (like "World Wide Web"

2  and "interactive-content applications") and asserted, in conclusory fashion, that these amount to

3  "specific details" and "improvements in computer capabilities and functionality." Ex. 2 at ¶¶ 775,

4  777; Ex. 3 at ¶¶ 869, 871. But courts "do not accord weight to conclusory expert testimony."

5  *cxLoyalty*, 986 F.3d at 1378.

6        Moreover, Dr. Martin never identified anything in the claims that explained how to achieve

7  their results. Thus, his opinions do not remedy what is lacking in the claims. *See, e.g.*, *Move, Inc.*

8  *v. Real Estate Alliance Ltd.*, 721 F. App'x 950, 956 (Fed. Cir. 2018) (ineligible claims focus on

9  "abstract idea" rather than "any technological advancement" despite expert testimony to the

10 contrary). He carefully picks his words when referring to anything from the specification as related

11 to "a particular embodiment," "a specific embodiment," or "exemplary embodiments." Ex. 2 at

12 ¶¶ 778, 780; Ex. 3 at ¶¶ 872, 874. But as demonstrated above, Eolas did everything it could to

13 ensure the asserted claims were not tied to any particular way of achieving their aspirational results.

14 *See supra* at 3-5.

15       At *Alice* step one, the asserted claims are directed to the abstract idea of providing

16 interactive applications on the web using distributed computing.

17       **B.**    **The Asserted Patent Claims Add Nothing Inventive**

18       At *Alice* step two, the Court must determine whether the claims add something

19 "significant" "apart from" the abstract idea—an inventive concept that "transform[s] the abstract

20 idea . . . into a patent-eligible application." *Chamberlain Grp. v. Techtronic Indus. Co.*, 935 F.3d

21 1341, 1348-49 (Fed. Cir. 2019); *see ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 774

22 (Fed. Cir. 2019) (must add "significantly more" than the "use of [the abstract idea] itself"). Eolas's

23 asserted claims do not.

24       Eolas's claims recite only generic computing components (server computer, client

25 computer, web browser, distributed application computers, and coordination computers) and

26 generic computing functions (receiving, transferring, detecting, displaying, selecting, invoking,

27 and coordinating). *See* '507 patent at cls. 19, 24, 26, 32, 37, 39, 45; *supra* at 3, 8. Eolas admits

28 that these computers are not improved computers, and their functions are routine and conventional.

RESTRICTED – ATTORNEYS' EYES ONLY

1  *Supra* at 13-15.  For example, named inventor Dr. Doyle admitted

2

3  Ex. 4, Doyle Dep. Tr. Vol. 1 at 21:2-8.  Named

4  inventor Mr. Martin confirmed that

5  and Dr. Doyle confirmed that

6

7  Ex. 27, Martin Dep. Tr. at 127:4-13; Ex. 4, Doyle Dep. Tr. at 371-73.  Further,

8  Dr. Doyle confirmed that

9  Ex. 4, Doyle Dep. Tr. at 402:5-11.  And as noted above, the

10  coordinated distributed processing of the '507 patent was well-known and common at the time.

11  *See supra* at 13-14.

12  Likewise, the conventional functionality of web browsers like Mosaic provided much of

13  what was required for the purported invention.  Named inventor Mr. Martin confirmed that

14

15  Ex. 27, Martin Dep. Tr. at 61:19-25.

16

17  (e.g., a viewer

18  application).  Ex. 5, Martin MSFT 7/14/03 AM Tr. at 741                                    ); '507

19  patent at 3:11-50 (conventional web browsers could "invoke[] a viewer program" to display

20  various file formats and data objects, such as various image formats, sound files, or video).  Named

21  inventor Mr. Martin also confirmed that

22  Ex. 27, Martin Dep. Tr. at 223;

23  '507 patent at 3:51-54 (background section admitting that "existing approaches" were able to

24  "embed[] interactive program objects in documents"), 6:26-33 (background section admitting that

25  the World Wide Web already allowed at least some interaction with large data objects, for example

26

27

28

1    through "viewers or other forms of external software").[4]

2         Thus, the claimed components and functions are the same "basic functions of a computer"

3 and "purely functional and generic" computer and network components that courts have found

4 merely automate the abstract idea in a "particular technological environment"—which is

5 insufficient to add an inventive concept. *Alice*, 573 U.S. at 225-26; *see, e.g.*, *Two-Way Media*, 874

6 F.3d at 1339 (multiple network components and protocols for sending and receiving packetized

7 data are non-inventive); *PersonalWeb Techs. LLC v. Google LLC*, 8 F.4th 1310, 1319 (Fed. Cir.

8 2021) ("merely adding computer functionality to increase the speed or efficiency of the process"

9 or "mak[ing] more efficient traditional … methods" is non-inventive (quotations omitted)); *SAP*,

10 898 F.3d at 1170 (use of "'parallel processing' computing architecture" is "generic," not

11 inventive); *Capital One*, 792 F.3d at 1369-70 ("merely adding computer functionality to increase

12 the speed or efficiency of the process does not confer patent eligibility on an otherwise abstract

13 idea" at step two, and "interactive interface configured to provide dynamic web" content is a

14 "generic computer element"); *Free Stream Media*, 966 F.3d at 1366 ("[p]rocessing an 'embedded

15 object' . . . or rendering targeted data 'through a sandboxed application of a mobile device'" using

16 "internet-connected device" is non-inventive); *Aftechmobile*, 2020 WL 6129139, at *3-5, *8-9

17 (compiling in a user interface multiple software components from a network is non-inventive).

18         The claimed "interactive-content application" (recited in each independent claim) also adds

19 nothing inventive. *See* '507 patent at cls. 19, 32, 45. It is a purely functional, aspirational, black

20 box tasked with performing the abstract idea of providing interactive applications on the web using

21 distributed computing. It requires no particular, let alone inventive, configuration or

22 programming. In other words, the "interactive-content application" merely reflects "the abstract

23 idea itself, which 'cannot supply the inventive concept.'" *Simio*, 983 F.3d at 1363-64 (quoting

24 *BSG*, 899 F.3d at 1290); *see also Capital One*, 792 F.3d at 1370-71 (reciting "'software' 'brain'"

25 for performing abstract idea is non-inventive); Ex. 4, Doyle Dep. Tr. at 15

26

---

27 [4] This is corroborated by the fact that a jury found numerous claims of parent patents to the '507
28 patent invalid, which a district court confirmed and the Federal Circuit affirmed. *See* Ex. 28; *Eolas Techs. Inc. v. Amazon.com, Inc.*, 521 F. App'x 928 (Fed. Cir. 2013).

RESTRICTED – ATTORNEYS' EYES ONLY

3  Dkt. 168-1 at ¶¶ 37 (Eolas's expert stating that "the idea of interactive-content applications . . .
4  was known to persons of ordinary skill in the art"). Nor do the dependent claims add anything
5  inventive: they merely state that computers coordinate and work together on the task. *See* '507
6  patent at cls. 24, 26, 37, 39; *supra* at 4, 8-9. That, again, reflects the abstract idea. Thus, the claims
7  neither recite nor require any specific improvement in technology to perform that abstract idea.

8      Even when viewed "as an ordered combination," the claims "'ad[d] nothing . . . that is not
9  already present when the steps are considered separately.'" *Alice*, 573 U.S. at 225 (citation
10 omitted). Indeed, the claims' arrangement is like those in *Electric Power Group, LLC v. Alstom*
11 *S.A.*, 830 F.3d 1350, 1355 (Fed. Cir. 2016), which likewise did not "require any nonconventional
12 computer, network, or display components" and had no "non-generic arrangement." And like the
13 claims here, those in *Electric Power* "merely call[ed] for performance of the claimed . . . functions"
14 without explaining "*how* the desired result is achieved." *Id.* Similarly, the claims in *British*
15 *Telecommunications* recited "remote" "data visualisation software" that "must allow for 'selecting
16 and controlling presentation of the data,'" as well as "downloadable onto a browser." *Brit.*
17 *Telecomm. PLC v. IAC/InterActiveCorp*, 381 F. Supp. 3d 293, 314, 317 (D. Del. 2019) (Bryson,
18 J.) But "such software functionality was already well known." *Id.* at 317. The claims provided
19 no "inventive programming, and no inventive data monitoring tool" and no "inventive
20 component." *Id.* The court found the claims, thus, "fail[ed] to limit the data visualization software
21 tool to a 'specific, discrete implementation' featuring a technological improvement." *Id.* (citation
22 omitted). So too here. The asserted claims provide no specific or discrete implementation, and
23 instead merely claim functions and results. At bottom, the claims use only functional language
24 without sufficiently describing how to achieve the results, confirming that they add nothing
25 inventive. *Supra* at 3-4, 7-11. *Two-Way Media*, 874 F.3d at 1338-39 ("inventive concept" must
26 be in "the *claim*" not just "in the specification"); *Aftechmobile*, 2020 WL 6129139, at *8-9.

27      This case is unlike cases where "specific implementation" or "specific improvement" in
28 computer technology is provided that supplies an inventive concept. *Bascom Glob. Internet Servs.,*

RESTRICTED – ATTORNEYS' EYES ONLY

1   *Inc. v. AT&T Mobility, LLC*, 827 F.3d 1341, 1348-49 (Fed. Cir. 2016). For example, in *Bascom*,

2   the claims were saved at *Alice* step two because the court found the claims recited a "non-generic

3   arrangement" by placing "a filtering tool at a *specific* location" that provided "a technical

4   improvement over prior art ways of filtering such content." *Id.* at 1350. By contrast, the claims'

5   arrangement here merely recites conventional computer-implemented steps and network

6   architecture, which add nothing inventive. The "distributed application computers" are merely

7   "remote from the client computer"—no particular or innovative architecture is required. Thus, "it

8   is clear, from the claims themselves and the specification, that these limitations require no

9   improved computer resources [that the applicant] claims to have invented, just already available

10  computers, with their already available basic functions, to use as tools in executing the claimed

11  process." *SAP*, 898 F.3d at 1169-70.

12          At step two, Eolas's expert, Dr. Martin again asserts in conclusory fashion that "the patent

13  is directed to inventive concepts," but never identifies anything in the claims that provides

14  something more than the abstract idea itself. Ex. 2 at ¶¶ 780-83; Ex. 3 at ¶¶ 874-77. But it is an

15  error to rely on "technological details set forth in the patent's specification and not set forth in the

16  claims to find an inventive concept" unless those details are conceded to limit the claims

17  themselves—which Dr. Martin denies.   *Symantec*, 838 F.3d at 1322. And while he asserts that

18  the World Wide Web, browsers, and related technologies were not common, he provides no facts

19  to back up his conclusory statement, which is contradicted by the named inventors' testimony cited

20  above and the patent's specification itself. Regardless, courts "do not accord weight to conclusory

21  expert testimony." *cxLoyalty*, 986 F.3d at 1378; *Move*, 721 F. App'x at 957 (disregarding expert's

22  conclusory statements of what was not routine nor conventional because expert "provide[d] no

23  citations to support this assertion").

24          Eolas's claims are ineligible as a matter of law just like the ineligible mobile-app-creation

25  claims in *Aftechmobile*, the ineligible parallel processing claims in cases such as *Appistry* and *SAP*,

26  and the ineligible claims in the numerous other cases discussed.

27

28

RESTRICTED – ATTORNEYS' EYES ONLY

1  **VI.    DEFENDANTS DO NOT INFRINGE THE ASSERTED '507 PATENT CLAIMS**

2  **A.    Eolas Fails to Raise a Genuine Issue of Material Fact as to Direct**

3  **Infringement**

4  There is no dispute that Eolas only asserts direct infringement of the asserted claims of the

5  '507 patent.  "Direct infringement under § 271(a) occurs where all steps of a claimed method are

6  performed by or attributable to a single entity."  *Rearden LLC v. Walt Disney Co.*, 293 F. Supp.

7  3d 963, 972 (N.D. Cal. 2018) (quoting *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 797 F.3d

8  1020, 1022 (Fed. Cir. 2015)) (internal citations omitted);  *Medgraph, Inc. v. Medtronic, Inc.*, 843

9  F.3d 942, 948 (Fed. Cir. 2016); *Mirror Worlds, LLC v. Apple Inc.*, 692 F.3d 1351, 1358 (Fed. Cir.

10  2012) ("To infringe a method claim, all steps of the claimed method must be performed.")  Thus,

11  Eolas must be able to demonstrate that each Defendant practices each of the limitations in the

12  asserted claims to prove its allegations of direct infringement.  Because Eolas cannot do so,

13  summary judgment is appropriate.

14  Eolas attributes certain aspects of the asserted claims done by a server computer to

15  Defendants.  *See, e.g.*, Ex. 7, G03 AdWords ¶ 22 ("Google uses an accused server computer every

16  time a user accesses the Accused Product . . . .");  *see also* Ex. 8, G05 Docs ¶ 20; Ex. 9, G07 Mail

17  ¶ 20; Ex. 10, G08 Maps ¶ 20; Ex. 11, G12 Search ¶ 25; Ex. 12, G13 YouTube ¶ 20.[5]  But most of

18  the limitations in the claims go beyond actions by a server.  Take claim 32 as an example. The

19  portions highlighted in yellow reflect claim limitations that occur on a client computer and relate

20  to configurations of a World Wide Web browser, an interactive-content application, or the actions

21  of a user:

22      32.  A method, performed by a server computer connected to the World Wide
    Web distributed hypermedia network on the Internet, for disseminating interactive

23      content via the World Wide Web distributed hypermedia network on the Internet,
    the method comprising:

24

25  [5] *See also* Ex. 13, A01 Cart ¶ 21; Ex. 14, A03 EC2 ¶ 20; Ex. 15, A07 Product Viewer ¶ 19; Ex. 16,

26  A09 S3 ¶ 20; Ex. 17, A10 Search ¶ 21; Ex. 18, A11 Shoveler ¶ 23; Ex. 19, A12 Video ¶ 19; Ex.
20 W01 Cart ¶ 19; 21 W04 Product Viewer ¶ 20; Ex. 22 W05 Search ¶ 21; Ex. 23 W06 Carousel

27  ¶ 20). Defendants use citations to Eolas's infringement theory as to the Google accused products
throughout this Motion as exemplary to ease the burden on the Court of multiple filings of the

28  same motion by each Defendant.  Defendants have included the relevant appendices as exhibits to
this Motion and cited the Amazon and Walmart product appendices in footnotes throughout.

RESTRICTED – ATTORNEYS' EYES ONLY

A. receiving, by the server computer, a request for information; and

B. transferring, by the server computer, the information onto the World Wide Web distributed hypermedia network on the Internet, wherein:

(ii) at least part of the information is configured to allow

at least a portion of the distributed application located on two or more distributed application computers connected to the World Wide Web distributed hypermedia network on the Internet, the two or more distributed application computers being remote from the client computer.

Eolas and its expert Dr. Martin provide no explanation or justification whatsoever for accusing *Google, Amazon, or Walmart* of meeting these limitations.

Eolas's unsupported assertions do not meet the standard required to allege infringement. For example, some limitations require a World Wide Web browser on a client device. Dr. Martin opines that Google Chrome, Microsoft Internet Explorer, Firefox, Apple Safari, and Microsoft Edge satisfy this limitation.[6] Eolas's theory is the same regardless of which web browser an end

---

[6] *See, e.g.*, Ex. 7, G03 AdWords ¶¶ 43-48; Ex. 8, G05 Docs ¶¶ 41-46; Ex. 9, G07 Mail ¶¶ 42-47; Ex. 10, G08 Maps ¶¶ 43-48; Ex. 11, G12 Search ¶¶ 49-54; Ex. 12, G13 YouTube ¶¶ 45-50; Ex.

RESTRICTED – ATTORNEYS' EYES ONLY

1   user uses or where it came from.[7]  *Id.*  Specifically, Dr. Martin's foundational predicate is that

2   infringement is met because of the use of JavaScript by these web browsers on a client device.

3   *See, e.g.*, Ex. 7, G03 AdWords ¶¶ 12-17; Ex. 8, G05 Docs ¶¶ 11-14; Ex. 9, G07 Mail ¶¶ 11-14;

4   Ex. 10, G08 Maps ¶¶ 11-15; Ex. 11, G12 Search ¶¶ 15-19; Ex. 12, G13 YouTube ¶¶ 11-14.[8]

5   Computer users decide whether their browsers enable JavaScript or not.  Dr. Martin's

6   Reports concede the same; the *user* chooses to "configur[e] the web browser to enable (versus

7   disable) website JavaScript," and includes a screen capture showing how the user controls this.

8

9   | JavaScript |
    | :-- |
    | ⦿ Allow all sites to run JavaScript (recommended) |
    | ◯ Do not allow any site to run JavaScript |
    | Manage exceptions... |

10

11

12

13

14  Ex. 26, Martin Google Main Infringement Report ¶ 128(a); Ex. 25, Martin Amazon and Walmart

15  Main Infringement Report ¶ 125(a).  Amazon, Google, and Walmart do not do this. And at his

16  deposition, Dr. Martin conceded the same:

17      Q. And, Dr. Martin, in your report, it's true that you do not provide any allegations
        that Walmart itself can turn on or off JavaScript on a user's web browser; correct?

18

19      A. I don't recall a part of my report where I would take up that question as to
        whether Walmart has direct control over end user JavaScript enabling or disabling
        settings.

20

21

22  13, A01 Cart ¶¶ 44-49; Ex. 14, A03 EC2 ¶¶ 42-46; Ex. 15, A07 Product Viewer ¶¶ 41-45; Ex. 16,
    A09 S3 ¶ ¶ 42-46; Ex. 17, A10 Search ¶¶ 44-48; Ex. 18, A11 Shoveler ¶ ¶ 46-50; Ex. 19, A12

23  Video ¶¶ 41-45; Ex. 20, Walmart Cart ¶¶ 42-46; Ex. 21, Walmart Product Viewer ¶¶ 42-46; Ex.
    22 Search ¶¶ 45-49; Ex. 23 Carousel ¶¶ 37-41.

24  [7] Amazon and Walmart do not make or sell any web browser identified by Dr. Martin.  Separate
    and apart from the Google accused products, Search, AdWords, Docs, Mail, Maps, and YouTube,

25  Google does make available the Chrome browser.  But Eolas and Dr. Martin do not identify this
    as relevant to their infringement allegations. But as noted below, merely providing software would

26  not be direct infringement regardless.

27  [8] *See also, e.g.*, Ex. 13, A01 Cart ¶¶ 11-16; Ex. 14, A03 EC2 ¶¶ 9-14; Ex. 15, A07 Product Viewer
    ¶¶ 10-14; Ex. 16, A09 S3 ¶¶ 10-15; Ex. 17, A10 Search ¶¶ 11-16; Ex. 18, A11 Shoveler ¶¶ 11-18;

28  Ex. 19, A12 Video ¶¶ 10-14; Ex. 20, Walmart Cart ¶¶ 10-16; Ex. 21, Walmart Product Viewer ¶¶
    11-17; Ex. 22 Search ¶¶ 11-16; Ex. 23 Carousel ¶¶ 12-17.

RESTRICTED – ATTORNEYS' EYES ONLY

1   Ex. 28, Martin Dep. Tr. (Vol. 2) 339:10-17; *see also id*. at 81:6-82:15 (same for Amazon); *id.* at

2   81:23-82-3 (same for Google).  Thus, the use of web browsers on end-user devices cannot be an

3   act of direct infringement by the Defendants.  *Medgraph*, 843 F.3d at 947-49 (affirming summary

4   judgment of no infringement of method claim where accused infringer did not perform required

5   step).

6        In addition to the configuration and actions required of the web browser, the interactive-

7   content application also has its configuration in the asserted claims.  Again using claim 32 as an

8   example, it requires the "automatically invoked interactive-content application has been

9   configured to operate as part of a distributed application."  Dr. Martin contends that the accused

10  interactive content applications are on the client device, not with the Defendants.  *See, e.g.*, Ex. 28

11  Martin Dep. Tr. (Vol. 3) 402:14-19 ("Yes.  The Google AdWords application is an interactive

12  content application that runs on a client computer.); *see also e.g.*, Ex. 7, G03 AdWords ¶¶ 47-53;

13  Ex. 8, G05 Docs ¶¶ 45-51; Ex. 9, G07 Mail ¶¶ 46-52; Ex. 10, G08 Maps ¶¶ 47-53; Ex. 11, G12

14  Search ¶¶ 53-59; Ex. 12, G13 YouTube ¶¶ 49-56.[9]  Yet, Eolas again fails to show direct

15  infringement by Defendants; rather the focus is on third parties, including end users.

16       Eolas may seek to sidestep its direct infringement problem with the interactive-content

17  application limitation by arguing that Defendants provide JavaScript assets that are part of the

18  alleged interactive-content application, *e.g.*, ACT90 discussed within, *infra* at 28-29.  However,

19  this makes no sense.  As Dr. Martin concedes, these JavaScript assets are not themselves the

20  accused interactive-content application.  *Id.*  The unidentified "dependent resources" are part of it

21  as well.  *Id.*  As they are not identified at all, Eolas and Dr. Martin do not—and cannot—contend

22  these "dependent resources" are provided by Defendants.  Nor would that solve Eolas's problem

23  even if they were.  Simply providing software is not an act of direct infringement of a method

24  claim.  *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 850 (Fed. Cir. 2010) ("Because the claims

25  asserted by i4i are method claims, Microsoft's sale of Word, without more, did not infringe the

26

27  [9] *See also, e.g.*, Ex. 13, A01 Cart ¶¶ 50-56; Ex. 14, A03 EC2 ¶¶ 47-53; Ex. 15, A07 Product Viewer ¶¶ 46-52; Ex. 16, A09 S3 ¶¶ 47-53; Ex. 17, A10 Search ¶¶ 49-55; Ex. 18, A11 Shoveler ¶¶ 51-57;

28  Ex. 19, A12 Video ¶¶ 46-52; Ex. 20, Walmart Cart ¶¶ 48-54; Ex. 21, Walmart Product Viewer ¶¶ 48-54; Ex. 22 Search ¶¶ 51-57; Ex. 23 Carousel ¶¶ 42-48.

RESTRICTED – ATTORNEYS' EYES ONLY

1  '449 patent.").

2         Eolas may argue that it can show direct infringement because the only actions required by

3  the claims involve actions by a server, not actions by any World Wide Web browser or actually

4  invoking of an "interactive-content application."  Yet, Dr. Martin asserts that "Claims 19 and 32

5  recite" a browser that "has been configured with a plurality of different interactive-content

6  applications," and that "[c]onfiguring JavaScript code execution" is a "technique[] used to

7  configure World Wide Web browsers with a plurality of different interactive-content

8  applications." Ex. 26, Martin Google Main Infringement Report ¶¶ 125-126, 128; Ex. 25, Martin

9  Amazon and Walmart Main Infringement Report ¶¶ 124-125; *see also* claim 45(b) (requiring the

10  same configuration.  Indeed, Dr. Martin conceded that, in order to infringe claim 32, there must be

11  a World Wide Web browser that meets the various limitations and configurations required by the

12  claim:

13         Q. For there to be infringement, does there need to be a web browser that is
           configured in the manner described in claim 32?
14
           A. Again, my report analyzes the circumstance where it's clear that there is a web
15         browser configured in that way.  But as to your question, the way I read claim 32
           sitting here is, it does appear to me that the server computer transferring the
16         information towards the client on *the World Wide Web Browser has this wherein
           clause stated in a way that requires the web browser to be configured to
17         automatically invoke the selected and directive content application.  And that web
           browser has received the information,* having been transferred by the server
18         computer.

19         And so as I sit here, I believe the answer is that yes, *infringement of claim 32
           through those series of constraints requires a World Wide Web Browser that
20         invokes an interactive-content application*.

21

22  Ex. 28, Martin Dep. Tr. (Vol. 3) 408:5-25; *see also id*. at 409:1-25.  Eolas also argued that part of

23  the reason the asserted claims of the '507 patent are different from claims in previous members of

24  the patent family was because the '507 patent's claims include "interactive-content applications

25  *that must be selected and automatically invoked* based on information from Web servers." (Dkt.

26  606 at 10-11.)  In other words, Eolas argued that such selection and automatic invoking must be

27  carried out.

28         Finally, Eolas also contends the web browser and interactive content application are

1    supposedly "new aspects" of these claims.  Dkt. 606 at 10-11 (independent claims 19, 32, and 45

2    "contain new aspects, including: Web servers, Web pages, and *Web browsers; [and] interactive-*

3    *content applications that must be selected and automatically invoked* based on information from

4    Web servers resulting in secure Web-based interactivity").  It is difficult to understand how these

5    claims could be read to eliminate the need for the Defendants to meet, whether directly or

6    indirectly, the client side limitations of the claims that Eolas itself claims is a critical part of what

7    it invented.    *See* Eolas's Opposition to Defendants' Motion for Summary Judgment on

8    Obviousness-Type Double Patenting and Preclusion, Dkt. 606 at 10-11 (independent claims 19,

9    32, and 45 "contain new aspects, including: Web servers, Web pages, and *Web browsers*"); 15-16

10   ("A person of skill would understand that *requiring a Web browser to* approve and invoke a

11   configured interactive-content application at a location in a Web page of its choosing *is a*

12   *nonobvious variant of prior solutions* allowing a document author to require a specific application

13   to run at a specific place in a document.").

14          Additionally, although claim 19 recites a server computer, the computer is defined by the

15   functions that the computer performs.  *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366,

16   1373 (Fed. Cir. 2011) (citing *In re Beauregard*, 53 F.3d 1583 (Fed. Cir. 1995)).  The Federal

17   Circuit held that "[s]uch functionally-defined claims should be treated as method claims to avoid

18   'exalt[ing] form over substance.'"  *Digital-Vending Servs. Int'l, LLC v. Univ. of Phoenix, Inc.*, 672

19   F.3d 1270, 1276 n.1 (Fed. Cir. 2012) (quoting *CyberSource Corp.*, 654 F.3d at 1374); *see also*

20   *Lyda v. CBS Corp.*, 838 F.3d 1331, 1335, 1339 (Fed. Cir. 2016) (finding that "system claims"

21   reciting "the same method steps as [method] claim 1" "should be treated as method claims"

22   because they "require the performance of particular method steps").  Even if not treated as a

23   method claim, again, Eolas and Dr. Martin have argued and/or conceded that the "World Wide

24   Web browser" on a client computer and "interactive content applications" on a client computer are

25   supposedly inventive, required limitations in the claims.  *See, e.g.*, Ex. 7, G03 AdWords ¶¶ 43-48;

26   Ex. 8, G05 Docs ¶¶ 41-46; Ex. 9, G07 Mail ¶¶ 42-47; Ex. 10, G08 Maps ¶¶ 43-48; Ex. 11, G12

27

28

RESTRICTED – ATTORNEYS' EYES ONLY

1 Search ¶¶ 49-54; Ex. 12, G13 YouTube ¶¶ 45-50.[10]

2        Finally, Dr. Martin's reliance on testing is insufficient evidentiary support of any

3 infringement of these claims. As detailed in Defendants' *Daubert* Motion, this opinion is offered

4 without explaining how Defendants' testing infringes each limitation of any of the asserted claims

5 in Dr. Martin's limitation-by-limitation analysis. *See* Dkt. 704-4 at 21-23. Thus, Eolas fails to

6 raise a genuine issue of any material fact as to direct infringement by Defendants from their testing

7 of the accused products as well. However, at a minimum, if the Court finds that Eolas raises a

8 genuine issue of material fact as to testing by Defendants, summary judgment would still be

9 appropriate as to any theory of infringement involving end user/third party use of the Accused

10 Products as discussed above, as explained *infra*.

11       **B.**     **Defendants Do Not Infringe the Application Limitations**

12        The asserted claims recite an interactive-content application (all claims), distributed

13 application (all claims), and/or a distributed interactive content application (claim 45). Eolas fails

14 to raise a genuine issue of fact that the accused products meet these limitations. Rather, Eolas

15 repeatedly either fails to identify what specifically it is accusing for these limitations and/or ignores

16 the constructions for these terms.[11]

17       **1.**     **Eolas Fails To Raise A Genuine Issue Of Material Fact As To**
**Whether The Accused Products Include An "Interactive-Content**
18                **Application" (All claims)**

19        An interactive-content application has been construed to mean an "application that enables

20 a user to interact with content." Dkt. 212 at 34 (hereinafter *"Markman* Order"). As to this

21 limitation, Eolas, through its expert Dr. David Martin, points to certain "features" and

22 "functionality" in the accused products. For example, as to Google Search, Dr. Martin states:

23

---

24 [10] *See also, e.g.*, Ex. 13, A01 Cart ¶ ¶ 44-49; Ex. 14, A03 EC2 ¶ ¶ 42-46; Ex. 15, A07 Product
Viewer ¶ ¶ 41-45; Ex. 16, A09 S3 ¶ ¶ 42-46; Ex. 17, A10 Search ¶ ¶ 44-48; Ex. 18, A11 Shoveler
25 ¶ ¶ 46-50; Ex. 19, A12 Video ¶ ¶ 41-45; Ex. 20, Walmart Cart ¶ ¶ 44-49; Ex. 21, Walmart Product
Viewer ¶ ¶ 44-49; Ex. 22 Search ¶ ¶ 47-52; Ex. 23 Carousel ¶ ¶ 38-43.

26 [11] The non-infringement bases on which Defendants seek summary judgment overlap with issues
raised in their Martin *Daubert* Motion. (Dkt. 704-4.) Given the procedural posture of the case
27 and Eolas's complaints that certain of these arguments were more appropriate for summary
judgment (Dkt. 750-4 at 1), Defendants have included these in this summary judgment motion as
28 well.

RESTRICTED – ATTORNEYS' EYES ONLY

> Google provides *functionality* allowing a user to perform interactive searches on
> its website. As the user types into a search box, Google provides suggested search
> completions, displaying them to the user automatically. Google also provides the
> *feature* of updating the larger search results page according to the user's typing
> before the user presses enter. Google also allows the user to apply filters in order
> to target their searches more precisely. Together, I refer to these search *features*
> as the *"Search" functionality.*

Ex. 11, G12 Search ¶ 2.[12]  Dr. Martin then points to JavaScript assets and what he calls "dependent

resources" that he asserts are together an "application." Again using Google Search as an example,

Dr. Martin states "[t]he software comprising ACT90 and *dependent resources* on the client

computer *is referred to as the "Google Search Application*" in this report." *Id.* ¶¶ 17, 19. "Google

Search *Application*," however, is a moniker that Eolas coined for this case. Ex. 28, Martin Dep.

Tr. (Vol. 3) 396:12–19.) Dr. Martin presents no evidence that Google, its users, or anyone refers

to this ambiguous, *ad hoc* grouping of assets and resources as a "Google Search *Application*." He

comes up with a similar naming convention for each of the Defendants' accused products, referring

to one or more JavaScript assets and "dependent resources" and contending that these assets and

resources are collectively the claimed "application." Ex. 7, G03 AdWords ¶ 16 (e.g., "[t]he

software comprising [javascript assets] EC6B and dependent resources on the client computer"),

¶ 47a (e.g., "[t]hese interactive-content applications are built from JavaScript code and dependent

resources . . ."); Ex. 8, G05 Docs ¶¶ 14, 45a; Ex. 9, G07 Mail ¶¶ 14, 46a; Ex. 10, G08 Maps ¶¶ 14,

47a; Ex. 11, G12 Search ¶¶ 19, 53a; Ex. 12, G13 YouTube ¶¶ 14, 49a.[13]  It is these supposed

"applications" that Eolas contends is the "interactive-content application" recited in the asserted

claims.[14]  (*E.g.*, Ex. 11, G12 Search ¶ 53a.)

---

[12] *See also* Ex. 7, G03 AdWords ¶ 2; Ex. 8, G05 Docs ¶ 2; Ex. 9, G07 Mail ¶ 2; Ex. 10, G08 Maps ¶ 2; Ex. 12, G13 YouTube ¶ 2; Ex. 13, A01 Cart ¶ 2; Ex. 14, A03 EC2 ¶ 1; Ex. 15, A07 Product Viewer ¶ 2; Ex. 16, A09 S3 ¶ 1; Ex. 17, A10 Search ¶ 2; Ex. 18, A11 Shoveler ¶ 2; Ex. 19, A12 Video ¶ 2; Ex. 20, W01 Cart ¶ 2, Ex. 21, W04 Product Viewer ¶ 2, Ex. 22 W05 Search ¶ 2, Ex. 23, W06 Carousel ¶ 2.

[13] *See also* Ex. 13, A01 Cart ¶¶ 15, 50a; Ex. 14, A03 EC2 ¶¶ 13, 47a; Ex. 15, A07 Product Viewer ¶¶ 13, 46a; Ex. 16, A09 S3 ¶¶ 14, 47a; Ex. 17, A10 Search ¶¶ 15, 49a; Ex. 18, A11 Shoveler ¶¶ 17, 51a; Ex. 19, A12 Video ¶¶ 13, 46a; Ex. 20, W01 Cart ¶ 13, Ex. 21, W04 Product Viewer ¶ 14, Ex. 22 W05 Search ¶ 15, Ex. 23, W06 Carousel ¶ 15.

[14] In response to Defendants' *Daubert* motion, Eolas sought to excuse its failure to identify the metes and bounds of any specific application by arguing that the "ACT90" JavaScript example

1   As an initial matter, while Dr. Martin uses the label "application," he fails to identify what

2   specifically within the accused products is responsible for these features and functions that he

3   states constitutes the alleged "interactive-content application." In particular, Eolas and Dr. Martin

4   never identify just what are the "dependent resources" that are part of Dr. Martin's alleged

5   "interactive-content application." Rather, Dr. Martin asserts it was "not necessary" to identify

6   them:

7       Q. Can you list those for me, those *dependent resources*?

8       A. In order to do that exhaustively, I would have to -- I would have to go through
        EC6B and attempt to identify every such reference to one of those resources that it
9       either knows is already present or arranges to obtain, so I *can't do that sitting here*.

10      Q. And that's not something that you did in your report; right?

11      A. No, I *did not do that in my report*. That is *not necessary* for the analysis of my
        report.

12

13  Ex. 28, Martin Dep. Tr. (Vol. 3) 398:3–14; 420:18–25 ("So for my analysis, *it wasn't necessary*

14  to separately identify everything that would be *among those dependent resources*. So no, *I didn't*

15  *make an attempt to separately catalog other JavaScript* that that may be one of those."); *see also*

16  *id.* at 399:6–18. Because Eolas has failed to identify the specific elements in each accused product

17  that meet the "interactive-content application" limitation, Eolas fails to raise a genuine issue of

18  material fact as to whether this limitation is met by the accused products. *Intell. Sci.*, 589 F.3d at

19  1184-85 (affirming summary judgment of non-infringement where the plaintiff's expert did not

20  "pinpoint" where certain elements were found in the accused devices); *Pixion, Inc. v. Citrix Sys.,*

21  *Inc.*, 887 F. Supp. 2d 881, 888–90 (N.D. Cal. 2012), *aff'd*, 500 F. App'x. 954 (Fed. Cir. 2013)

22  (granting summary judgment of non-infringement because plaintiff's expert failed to demonstrate

23  "precisely how" the accused technology met certain claim limitations); *Dynacore Holdings Corp.*

24  *v. U.S. Philips Corp.*, 363 F.3d 1263, 1278 (Fed. Cir. 2004) (affirming summary judgment of non-

25

26  from Dr. Martin's report supposedly identifies the alleged "interactive-content application." Dkt.
    750-4 at 8-9. But, as noted above, that is not what Dr. Martin said, as his accused interactive-
    content "applications" explicitly include the unidentified "dependent resources." Eolas also
27  argued that the "dependent resources" Dr. Martin refers to constitute "non-core" functionality
    (Dkt. *Id.* at 11), which Dr. Martin also did not say in his report and is contrary to his opinion that
28  these dependent resources are part of the "interactive-content application."

RESTRICTED – ATTORNEYS' EYES ONLY

1  infringement, explaining "[i]t is well settled that an expert's unsupported conclusion on the

2  ultimate issue of infringement is insufficient to raise a genuine issue of material fact" and that the

3  expert's opinions were unsupported because they were "reached using words in ways that

4  contradict their plain meaning").

5          Not only does Eolas fail to identify what the alleged "interactive-content application"

6  actually is in the accused products, it also does not and cannot demonstrate that whatever it is

7  pointing to is in fact an "application," as the claims require.  There is no separate construction of

8  "application" that applies here.  So Eolas must use what a person of skill in the art would

9  understand as that term's ordinary and customary meaning.  *Apple, Inc. v. Samsung Elecs. Co.,*

10  *Ltd.*, No. 12-CV-00630-LHK, 2014 WL 660857, at *3 (N.D. Cal. Feb. 20, 2014).  In the *Microsoft*

11  case, the Federal Circuit stated that the plain and ordinary meaning of "application" in the '507

12  patent's ancestor patent at least requires a "computer program."  *Eolas Techs. Inc. v. Microsoft*

13  *Corp.*, 399 F.3d 1325, 1336 (Fed. Cir. 2005).  Specifically, in reviewing the trial court's decision,

14  the Federal Circuit found "the trial court correctly perceived that ***'application' means 'a computer***

15  ***program***, that is not the operating system or a utility, that is designed to allow an end-user to

16  perform some specific task.'"  *Id*.  In its *Daubert* Opposition, Eolas sought to sidestep what the

17  Federal Circuit found regarding "application" by pointing to the Texas court's parenthetical and

18  noting that the Federal Circuit construed the separate term "executable application" as "any

19  computer program code, that is not the operating system or utility, that is launched to enable an

20  end user to directly interact with data."  Dkt. 750-4 at 6 (quoting *Eolas Techs.*, 399 F.3d at 1336-

21  38).  Based on this statement, Eolas asserted that "the plain meaning of 'application'—in the

22  context of the '507 Patent and in light of the prior Federal Circuit ruling on a related patent—is

23  *any* software or program that performs a specific task or work for a user, that is not the operating

24  system or utility."[15]  Dkt. 750-4 at 6.  This overreaches.  The Federal Circuit found that, unlike

25  _____

26  [15] For his part, Dr. Martin never actually explains the meaning of the term "application" he applied
   and readily admitted he did not actually offer an opinion in his report "***as to what the full and***

27  ***proper scope of application would be***" under its "plain and ordinary meaning."  Ex. 6, Martin Dep.
   Tr. (Vol. 3) 444:6–8.  He just points to some amorphous "test" that mirrors the supposed plain

28

RESTRICTED – ATTORNEYS' EYES ONLY

"application," the term "executable application" (a term not at issue in this litigation) "does not have a customary meaning in the computer science field." *Eolas Techs.*, 339 F.3d at 1336. The Federal Circuit did ***not*** state that the plain and ordinary meaning of the separate term "application" could be a "***software or*** program" or "any computer program ***code***," as opposed to "computer ***program***," as Eolas incorrectly suggests.

This distinction is fatal to Eolas's infringement allegations. For each accused product, Dr. Martin never says, nor could he accurately, that the JavaScript assets and dependent resources he points to as the claimed "interactive-content application" are together a "computer program."[16] Indeed, under Dr. Martin's arbitrary groupings of "functionality" and "features" as "applications" discussed above, he includes aspects of separate systems as a single application. For example, Dr. Martin opines that



*See, e.g.*, Ex. 17, A10 Search ¶¶ 13-15

; Ex. 24, Galassi Dep. Tr. 14:22-15:6

Eolas's contention that Dr. Martin's interpretation of "application" is "consistent with relevant dictionary definitions that define 'application' as 'a program for performing' a specific task for a user" (Dkt. 750-4 at 6, n.4) fails for the same reason. These definitions also require that an "application" be a "program." Dr. Martin does not point to any "programs" in the accused products as the alleged interactive-content application. The dictionary definitions discussed in the Federal Circuit's *Microsoft* opinion are similar. *Eolas Techs.*, 399 F.3d at 1336-37.

---

meaning Eolas asserts. *Id.*, 443:10-18 ("I'm confident that computer program code that has this property of performing work for a user and is not an operating system or a utility is an instance of the plain and ordinary meaning of the term 'application'"); *see also id.*, 443:19–444:2; 445:15–24. Thus, nothing that Dr. Martin says regarding what an "application" is or is not could raise a genuine issue of material fact.

[16] Eolas may argue that the JavaScript assets it points to as ***part*** of each alleged "interactive-content application" are themselves "JavaScript programs." While that too is incorrect, that is not the subject of Defendants' Motion. Rather, Defendants' argument here is that the disparate, unidentified things Eolas strings together for each product as an "interactive-content application" are not together an *application*.

RESTRICTED – ATTORNEYS' EYES ONLY

1       Eolas in *Daubert* sought to point blame for this fatal flaw in its theory on Defendants for

2 not seeking construction of "application."  Dkt. 750-4 at 5.  But Defendants are simply applying

3 the plain and ordinary meaning of "application."   In any event, during claim construction,

4 Defendants asserted that "interactive-content application" (like the other "application" terms) was

5 indefinite because the limitation "is recited in purely functional terms—it is defined exclusively

6 by what the interactive-content application *does* and not by what it *is*."  Dkt. 174 at 6 (hereinafter

7 "Defendants' CC Br.").  Defendants also argued that the lack of definition of "application" in

8 Eolas's proposed construction was problematic because Eolas's infringement contentions pointed

9 to a seemingly unbounded myriad of different systems, programs, scripts, and other software as

10 the supposed "interactive-content *application*" wholly untethered from the specification.  *Id.* at 11

11 (citing '507 patent, 13:26-32, 11:22-25, 11:42-46; Dkt. 155 at 3-4); *see also* Dkt. 619 at 10.  Eolas

12 contended that the term "application" itself provided sufficient structure, and the Texas court

13 ultimately agreed.  *Markman* Order at 7 (reciting Plaintiff's position), *id.* at 11.  Eolas should not

14 now be able to abandon the plain meaning of "application" in favor of a meaning that has no

15 structure or any metes and bounds at all, just as Defendants previewed would be an issue years

16 ago.  As Eolas has not identified an "interactive-content application" in the accused products,

17 summary judgment is appropriate.  *Apple, Inc. v. Samsung Elecs. Co.*, No. 12-CV-00630-LHK,

18 2014 WL 252045, at *4-5, *8 (N.D. Cal. Jan. 21, 2014) (granting plaintiff's motion for summary

19 judgment of infringement based on the Court's finding that the defendant's interpretation of the

20 plain and ordinary meaning of "keyboard" was unreasonable); *Dynacore*, 363 F.3d at 1278.

21                **2.**     **Eolas Fails To Raise A Genuine Issue Of Material Fact As To**
                            **Whether The Accused Products Include A "Distributed Application"**

22

23       Eolas also fails to show whether the accused products include a "distributed application,"

24 which was construed—at Eolas's urging—as "an application that is ***broken up*** and performed

25 among two or more computers." *Markman* Order at 34.  Something is broken up when it "ceases

26 to exist as a unified whole."  *Break up*, Merriam-Webster, https://www.merriam-

27 webster.com/dictionary/breakup (last visited Feb. 14, 2022) (break up: "intransitive verb **1a:** to

28 cease to exist as a unified whole : DISPERSE// their partnership *broke up*... transitive verb **1:** to

RESTRICTED – ATTORNEYS' EYES ONLY

1   break into pieces"). But after obtaining its desired construction, Eolas has failed to prove that any

2   of Defendants' accused products have an application that is actually "broken up." For example,

3   as to Google Adwords, Dr. Martin just summarily states as follows:

> The remote computer is a distributed application computer, because it is a computer
> that is running part of an application that is ***broken up*** and performed among two
> or more computers. The distributed application used to perform AdWords
> operations and provide user interaction with the object spans both the client and
> server computers, but is ***broken up***. User interface functions are performed on the
> client computer by the interactive-content application. Communications take place
> between the client computer and the remote server computers. The remote server
> computers acquire, process, and transmit updated object content back to the client
> computer.

9   Ex. 7, G03 AdWords ¶ 85. Dr. Martin makes nearly identical statements for each accused product,

10   substituting other generic "operations" for each Accused Product. *See* Ex. 8, G05 Docs ¶ 84; Ex.

11   9, G07 Mail ¶ 85; Ex. 10, G08 Maps ¶ 87; Ex. 11, G12 Search ¶ 93; Ex. 12, G13 YouTube ¶ 89;

12   Ex. 13, A01 Cart ¶ 92; Ex. 14, A03 EC2 ¶ 87; Ex. 15, A07 Product Viewer ¶ 85; Ex. 16, A09 S3

13   ¶ 88; Ex. 17, A10 Search ¶ 93; Ex. 18, A11 Shoveler ¶ 90; Ex. 19, A12 Video ¶ 85; Ex. 20, W01

14   Cart ¶ 85, Ex. 21, W04 Cart ¶ 85, Ex. 22, W05 Search ¶ 92, Ex. 23 W06 Carousel ¶ 66  Dr. Martin

15   does not show how the distributed application has been "broken up" in any way. Rather, Dr.

16   Martin asserted at his deposition that he was not required to establish that the "distributed

17   application" was an application that was previously together and then "broken up":

> Q. But for the purpose of the distributed application in your analysis, you didn't
> assume that something had to be together before and then apart in order to meet the
> broken apart limitation?
>
> A. I agree. I ***didn't make an assumption*** in order to meet this court's construction
> that an application that is broken up and performed among two or more computers
> actually means that there has to have been at a previous point in time a version of
> that application. That was not broken up and/or was not performed through two or
> more computers and only through evolution in that application resulted in one that
> later became broken and you performed among two or more computers.

24   Ex. 28, Martin Dep. Tr. (Vol. 3) 437:3–17; *see also id.*, 434:11–21.

25   Instead, Dr. Martin merely points to ***traditional client-server interactions*** as somehow

26   being sufficient to be a "distributed application." *See, e.g.*, Ex. 7 G03 AdWords ¶ 85 ("the

27   interactive-content application communicates with a remote computer using HTTP requests over

28   the World Wide Web . . . . The remote computer is a distributed application computer, because it

RESTRICTED – ATTORNEYS' EYES ONLY

1   is a computer that is running part of an application that is broken up and performed among two or

2   more computers").  By Dr. Martin's logic, any email program capable of sending an email to

3   another email program on a different computer would somehow form a "distributed application"

4   with that other program.  This theory would result in a near-infinite number of "distributed [email]

5   applications," with each application comprising various sets of email programs that may read a

6   given email message.  Dr. Martin's approach would allow any arbitrary set of computers, both on

7   and not on the World Wide Web, to be considered part of a distributed application if there are any

8   communications between any portion of them.  This level of generality is untethered to the '507

9   patent, which does not describe clients and servers as unitary distributed applications, nor does the

10  Court's construction allow for it.

11          In addition to failing to show the Court's construction is met, Eolas again fails to identify

12  what the alleged "distributed application" actually is in the accused products.  Through Dr. Martin,

13  Eolas alleges that the "distributed application" runs on a myriad of "hosts" across Defendants'

14  respective networks.  A host is generally a computer, server, or other device linked to a network.

15  *See,        e.g.*,        National        Institute        of        Standards        and        Technology,        Host,

16  https://csrc.nist.gov/glossary/term/host (last visited Nov. 11, 2021).   For example, regarding

17  Google Search, Dr. Martin recites a litany of "hosts" in Google's network which he contends the

18  distributed application "at least" "runs on."[17] Ex. 11, G12 Search ¶ 94; *see also* Ex. 8, G05 Docs

19  ¶ 85; Ex. 9, G07 Mail ¶ 86; Ex. 10, G08 Maps ¶ 88; Ex. 12, G13 YouTube ¶ 90; Ex. 7, G03

20  AdWords ¶ 88.)  Dr. Martin then refers to the functionality of these hosts.  *See, e.g.*, Ex. 11, G12

21  Search ¶¶ 96-101.  During his deposition, Dr. Martin could not identify whether the distributed

22  application constitutes "part of" or "all of" these long lists of "hosts."   In fact, as with the

23  "interactive-content application" (*supra* Section VI.A.1), he again said it did not matter:

24          Q.        Is the distributed application part of or all of those hosts?

25          A.        I believe it can be analyzed ***either way***.

26

27  [17] *See also* Ex. 13, A01 Cart ¶ 93; Ex. 14, A03 EC2 ¶ 88; Ex. 15, A07 Product Viewer ¶ 86; Ex.
    16, A09 S3 ¶ 89; Ex. 17, A10 Search ¶ 94; Ex. 18, A11 Shoveler ¶ 91; Ex. 19, A12 Video ¶ 86;
28  Ex. 20, W01 Cart ¶ 86 , Ex. 21, W04 Product Viewer ¶ 86, Ex. 22 W05 Search ¶ 93, Ex. 23, W06
    Carousel ¶ 87.

1   Ex. 28, Martin Dep. Tr. (Vol. 3) 439:3–5.

2       Previously, Eolas contended in its *Daubert* opposition that Dr. Martin's opinions pass

3 muster because he points to "various 'host' 'computers and servers'" that "receive the user's search

4 query, process it, and provide a response to the user . . . ." Dkt. 750-4 at 12. But this argument

5 only highlights the problem. As a matter of law, Eolas cannot point to "features" and

6 "functionality" of the supposed "distributed application" without ever identifying what it actually

7 is in the accused products.[18] *Intell. Sci.*, 589 F.3d at 1185; *Pixion*, 887 F. Supp. 2d at 888–90;

8 *Dynacore*, 363 F.3d at 1278.

9           3.   **Eolas Fails To Raise A Genuine Issue of Material Fact As To Whether**
10                **The Accused Products Include A "Distributed Interactive-Content Application"**

11       The Texas court construed "distributed interactive-content application" of claim 45 to

12 mean "an interactive-content application that is broken up and performed among two or more

13 computers." *Markman* Order at 34. This is similar to the construction of a "distributed

14 application" as "an application that is broken up and performed among two or more computers,"

15 but further adds that it must be an "interactive-content application." Claim 45 further requires that

16 "the distributed application *has been implemented to be part of* a distributed interactive-content

17 application." Accordingly, claim 45 requires a "distributed interactive-content application" that is

18 broken up and performed among two or more computers and that likewise comprises a "distributed

19 application" that is itself "broken up and performed among two or more computers."

20       Dr. Martin initially opines that the entities satisfying "distributed *interactive-content*

21 application" in claim 45 are "the entities satisfying 'distributed application' in prior claims."[19] Ex.

22 7, G03 AdWords ¶ 197; Ex. 9, G07 Mail ¶ 192; Ex. 10, G08 Maps ¶ 192; Ex. 11, G12 Search ¶

23

---

24 [18] As detailed in Defendants' *Daubert* Motion, the way in which Dr. Martin applies the claims to these unidentified "distributed applications" is nonsensical. (Dkt. 704-4 at 13-14.)

25 [19] *See also* Ex. 13, A01 Cart ¶ 200; Ex. 14, A03 EC2 ¶ 188; Ex. 15, A07 Product Viewer ¶ 190;
26 Ex. 17, A10 Search ¶ 206; Ex. 18, A11 Shoveler ¶ 202. Dr. Martin did not accuse A09 S3 and A12 Video of infringing claim 45. As to Walmart, *see* Ex. 21, W04 Product Viewer ¶ 194, Ex. 22
27 W05 Search ¶ 199, Ex. 23, W06 Carousel ¶ 152. Dr. Martin did not accuse W01 Cart of infringing claim 45.

28

RESTRICTED – ATTORNEYS' EYES ONLY

1    201; Ex. 12, G13 YouTube ¶ 195.  Dr. Martin later states that "Google's distributed interactive-

2    content application includes the server portion of the distributed application identified in claim 19

3    and the interactive-content application identified in claim 19."  Ex. 7, G03 AdWords ¶ 208; Ex. 9,

4    G07 Mail ¶ 203; Ex. 10, G08 Maps ¶ 206; Ex. 11, G12 Search ¶ 212; Ex. 12, G13 YouTube ¶

5    206.[20]  And then Dr. Martin simply concludes:

6
> This distributed interactive-content application is broken up and performed among
7    > two or more computers. This distributed interactive-content application enables the
> user to interact with content in which the content includes at least part of an object
8    > displayed within a World Wide Web page by the client computer.

9    *Id.*  He again provides no actual bases that whatever he is pointing to as the distributed interactive-

10   content application is "broken up."  And while unclear, presumably Dr. Martin is relying on his

11   prior opinions regarding "interactive-content application" for his conclusory opinion that this

12   aspect of the limitation is met, which also would fail for the same reasons discussed above.

13   *Dynacore*, 363 F.3d at 1278.  Summary judgment is appropriate.

14           **C.     Eolas Fails to Raise a Genuine Issue of Material Fact as to Dr. Martin's**

15                   **"Type 2 Information" Infringement Theory**

16           All asserted claims require a web browser configured to "automatically invoke an

17   interactive-content application," but as to one of its theories, Eolas cannot prove infringement.

18   Consistent with the construction from *Eolas I*, the Texas court construed the term "automatically

19   invoke" as "launch without user activation."  *See Markman* Order at 18–19 (discussing *Eolas*

20   *Techs., Inc. v. Adobe Sys., Inc.*, 810 F. Supp. 2d 795, 803–04 (E.D. Tex. 2011)).  The Texas court

21   reviewed the *Eolas I* claim construction, and noted that the *Eolas I* Judge had before him "the same

22   language at issue in the '507 Patent," construed "a patent that shares the same specification as the

23   '507 Patent," and that he "reasoned that the prosecution history of a patent related to the '507

24   Patent supported the construction." *Id.*  Consequently, the Texas court did not "depart[] from the

25   *Eolas I* construction." *Id.* at 19.

26

27   [20] *See also* Ex. 13, A01 Cart ¶ 211; Ex. 14, A03 EC2 ¶ 199; Ex. A07], A07 Product Viewer ¶
     201; Ex. 17, A10 Search ¶ 217; Ex. 18, A11 Shoveler ¶ 213; Ex. 21, W04 Product Viewer ¶ 205,
28   Ex. 22 W05 Search ¶ 210, Ex. 23, W06 Carousel ¶ 161. Dr. Martin did not accuse W01 Cart of
     infringing claim 45..

RESTRICTED – ATTORNEYS' EYES ONLY

1   In construing "automatically invoke," the *Eolas I* court made clear that a user's mouse
2   click—a quintessential form of user activation—was outside the scope of the claims. 810 F. Supp.
3   2d at 803–04. The *Eolas I* court found that the "automatically invoke" language was added to the
4   claims to overcome the Mosaic prior art, and that "the applicant characterized the Mosaic browser
5   as launching viewer applications in a separate window in response to a user's interactive command
6   (i.e., 'clicking' on a URL link)." *Id.* Rejecting Eolas's proposed construction of "automatically
7   calling or activating" the application, the *Eolas I* court found that the application had to be
8   "launched without user activation"—meaning, without a user's mouse click.[21] *Id.*

9   Before claim construction, Eolas and Dr. Martin were applying that same rejected
10  construction to the '507 patent in this case, which included a user's mouse clicks as automatic
11  invocation. Recognizing that Eolas was attempting an end-run around to the *Eolas I* construction,
12  Defendants specifically noted to the Texas court that Eolas's position was that a user clicking to
13  invoke the accused functionality was within the scope of the '507 patent's claims. Defendants'
14  CC Br., 17–18. And Defendants specifically noted that Dr. Martin's opinion was that applications
15  "automatically called or activated" were within the claims' scope, despite that exact language
16  being rejected by the *Eolas I* court. *Id.* In response, Eolas stated that its infringement contentions
17  only showed that the accused applications were interactive, and that Eolas would not proceed
18  contrary to the *Eolas I* construction. Dkt. 179 at 6. Relying on this statement, the Texas court
19  adopted the *Eolas I* construction, finding no need to clarify what was already clear from the *Eolas
20  I* claim construction order: "automatically invoke" does not include something started by a user's
21  interactive mouse click. *Markman* Order at 19.

22  But Eolas's infringement theories remain inconsistent with the construction—meaning
23  Eolas's infringement theory still relies on a user's mouse click. Dr. Martin analyzes "two different
24  types of information" that he opines "correspond to two different ways that the claim's limitations
25  are independently satisfied" by the accused products. *See, e.g.,.* Ex. 7, G03 AdWords ¶ 19. The
26  second of these types—which he refers to as "type 2 information"—is the result of a user's mouse

27

---

28  [21] For further discussion on the numerous occasions that Eolas has clearly stated that
"automatically invoke" does not include a user's mouse click, *see* Dkt. 174 at 15–17.

RESTRICTED – ATTORNEYS' EYES ONLY

1  click on a webpage. In deposition, Dr. Martin explained that "type 2 information" "is a
2  communication *that is the result of some of the interactive use of the cart*." Ex. 28, Martin Oct.
3  13, 2021 Dep. Tr. at 184:18–20. And further, that "type 2 information" is "information that is
4  more immediately responsive *to the interaction that* the computer—*that the user has just recently*
5  *done*. So maybe *they've clicked on add to cart*, and so this is a communication that is appropriate
6  to *responding to that activity*." *Id.* at 184:9–17. In other words, a user's click on the webpage
7  causes the "type 2 information" request to be sent and the subsequent invocation of the accused
8  application. But because a user's mouse click is excluded from the construction of "automatically
9  invoke," Dr. Martin's "type 2 information" opinions directly contradict that construction. Indeed,
10 Eolas's infringement theory is identical to the applicants' description of Mosaic, which Eolas
11 distinguished as *not* automatically invoking. *See, e.g.*, Dkt. 174-4 at 12 (explaining that with
12 Mosaic, the request is sent "by the user interactively selecting the [URL] anchor," and after
13 retrieval, the helper application "is launched"). This is exactly what was excluded from the *Eolas*
14 *I* construction adopted in this case. 810 F. Supp. 2d at 803–04.

15      Eolas earlier argued in its *Daubert* opposition that in the Mosaic prior art, the information
16 used to invoke the application arrived *before* the user click, and that in contrast, in the Accused
17 Products, the type 2 information arrives *after* the user click. Dkt. 750-4 at 20. But Dr. Martin's
18 video cited by Eolas (Dkt. 750-28)[22] showed that a user clicking in the accused products triggers
19 the receipt of the type 2 information request that causes the invocation of the application. *See* Dkt.
20 750-28; *see also* Ex. 28, 183:18-184:20. This is the same functionality found in Mosaic—a user
21 click leads to a request (for the linked object for Mosaic and for the type 2 information for the
22 accused products), and when information is returned in response to that request, the product
23 launches the appropriate application (the helper application for Mosaic and the alleged application
24 for the accused products) without additional user interaction. *Compare, e.g.*, Dkt. 174-4 at 12
25 (Applicant Eolas distinguishing Mosaic as *not* automatically invoking, explaining during
26 prosecution that with Mosaic, the request is sent "by the user interactively selecting the [URL]
27

28 _____
[22] Eolas stated that it submitted this video in "physical form" to the Court. *See* Dkt. 750-28.

RESTRICTED – ATTORNEYS' EYES ONLY

1    anchor," and after retrieval, the helper application "is launched") *with* Dkt. 750-4 at 8 (describing

2    the JavaScript code for Google Search being activated "when a user begins typing in the search

3    bar"); Ex. 28, 183:18-184:20 ("browser selects the Application Cart Application" based on

4    communication triggered by user clicking on add to cart).

5           Eolas also tried to distinguish the operation of Mosaic from its theories regarding the

6    accused products by arguing that in Mosaic, a user interaction occurs ***between*** receiving the

7    "information" and the computer invoking that information after a user interaction.  Dkt. 750-4 at

8    20.  But the asserted claims do not make this distinction—it is irrelevant whether user interaction

9    occurs between receiving the claimed information and automatically invoking the claimed

10   interactive-content application as long as both occur.  *See, e.g.*, '507 Patent, Claim 19 (containing

11   separate "cause a transfer of the information" and "automatically invoke" limitations).

12          Finally, Eolas argued that the mouse click that is required for the client to receive the type

13   2 information is not relevant because what matters is that no user interaction took place between

14   receiving the type 2 information and invoking the application.  Dkt. 750-4 at 20–21.  But that too

15   is a distinction without a difference.  Eolas has never disputed that the mouse click was required

16   to receive the type 2 information needed to invoke the application in the first place.  Thus, Eolas

17   seems to be saying that the only thing invoked manually is the first specific code/instruction done

18   after the user clicks and all remaining processes are automatic.   But there are numerous

19   instructions/code that are invoked in reaction to any user interaction.  It cannot be the case that

20   user interaction does not invoke these processes simply because code/instructions on a computer

21   are being followed.   That would render this limitation, and the Texas Court's construction,

22   meaningless.  Summary judgment as to the "Type 2 Information" is appropriate.

23

24

25

26

27

28

RESTRICTED – ATTORNEYS' EYES ONLY

1

**D.      Eolas Fails to Raise a Genuine Issue of Material Fact as to "Object"**

2    The claims require one or more objects that are displayed to the user within Web pages that

3    a user can interact with, at least in part.  The parties' agreed construction for "object" is "text,

4    images, sound files, video data, documents and/or other types of information that is presentable to

5    a user of a computer system."  *Markman* Order at 37.  This comes from the '507 patent's

6    specification, which describes how

7    these specific data objects may be

8    accessed and used by a user.  ('507

9    patent at 3:34-50 (adjacent).)  From

10   the   plain   language   of   the

11   construction,  and  consistent  with

12   the specification, an object needs to

13   be  some  specific  entity  of  stored

14   information that is presentable to a

15   user,  as  opposed  to  an  arbitrary

> As discussed above, hypermedia documents allow a user to access different data objects. The objects may be text, images, sound files, video, additional documents, etc. As used in this specification, a data object is information capable of being retrieved and presented to a user of a computer system. Some data objects include executable code combined with data. An example of such a combination is a "self-extracting" data object that includes code to "unpack" or decompress data that has been compressed to make it smaller before transferring. When a browser retrieves an object such as a self-extracting data object the browser may allow the user to "launch" the self-extracting data object to automatically execute the unpacking instructions to expand the data object to its original size. Such a combination of executable code and data is limited in that the user can do no more than invoke the code to perform a singular function such as performing the self-extraction after which time the object is a standard data object.

16   collection,   set,   or   mass   of

17   "information" stored or collected in any manner whatsoever.  Yet, the latter is exactly how Eolas

18   has applied the term for the majority of the accused products.  For example, regarding Google

19   Search, Dr. Martin accuses the *entire universe* of Google's potential search results as somehow

20   being the *single* object. Ex. 11, G12 Search ¶ 65a ("The search content that the user interacts with

21   includes search result data.  This set of possible search result data is the 'object' of this claim.").

22   Dr. Martin confirmed during his deposition that this supposed "object" could comprise

23   "billions and perhaps trillions" of different results:

24   Q. So the *entire corpus* of Google potential search results, all of it is a *single object*?

25   A. That is what the user is interacting with and it comprises text, images, sound file,
     video, data documents and other types of information that is presentable to a user
26   of a computer system....

27   Q. So you would agree that Google Search result corpus could have *billions and
     perhaps trillions* of different possible results?
28

RESTRICTED – ATTORNEYS' EYES ONLY

A. ***Yes, it's very large***. There's large amount of server infrastructure and data systems, and so on, that is used to maintain a very large amount of information and there's a set of applications, including distributed application that has found a way to present that search result data to the user through interaction.

Ex. 28, Martin Dep. Tr. (Vol. 3) 505:2–7, 506:1–10.  But it is nonsensical to deem these trillions of different results as the "object" that is presented to the user.  Not only are they not a single identifiable entity of stored information, but these results are, as even Dr. Martin acknowledges, not all "presentable to the user of a computer system" as required under the parties' agreed construction.  *Id.* at 505:8–12 ([*Question*] "Do you think that the entire corpus of Google Search results is something that could be presented to a user?" [*Answer*] "I think the user only ***ever*** sees a ***small part*** of it….".); *see also, e.g.*, Ex. 17, A10 Search ¶ 61a and Ex. 22, W05 Search ¶ 61a. (identifying the "set of possible search result data" as the object).  For Google Adwords (now Google Ads), Eolas says the object is an amorphous "configuration that the user interacts with" which includes "representations of the user's decisions and settings regarding advertising campaigns, individual ads, and associated keywords," rather than any specific object that is being interacted with.  Ex. 7, G03 AdWords ¶ 59a.)  And for the Walmart and Amazon ecommerce platforms, the purported "object" at issue includes an assemblage of arbitrarily selected information related to Dr. Martin's notion of the "cart."[23]  Ex. 20, W01 Cart ¶ 58a; Ex. 13, A01 Cart ¶ 62a; *see also* Ex. 9, G07 Mail ¶ 58a; Ex. 10, G08 Maps ¶ 59a; Ex. 14, A03 EC2 ¶ 59a; Ex. 15, A07 Product Viewer ¶ 58a; Ex. 16, A09 S3 ¶ 59a; Ex. 17, A10 Search ¶ 61a; Ex. 18, A11 Shoveler ¶ 63a.

Contrary to Eolas's assertions in its *Daubert* briefing, Dr. Martin's application of the "object" to the entire database of potential Google search results is nothing like the 3D dataset of a single embryo the user can interact with in the Visible Embryo Project discussed in the '507 patent specification. Dkt. 750-4 at 15 (citing 8:45-11:37, Figs. 9 and 10).  Eolas argued that in the

[23] For some of Defendants' accused products, such as Google Docs and YouTube, Dr. Martin asserts that the object is a single file or entity.  Ex. 8, G05 Docs ¶ 57a ("The Docs content that the user interacts with includes the content of the underlying word processing document. This Docs document is the 'object' of this claim."); Ex. 12, G13 YouTube ¶ 62a; Ex. 19, A12 Video ¶ 58a. Defendants do not seek summary judgment as to "object" for those accused products.

RESTRICTED – ATTORNEYS' EYES ONLY

1   Visible Embryo Project, "the user may only be interacting with a small portion of the dataset that

2   comprises an object (e.g., the user is not simultaneously interacting with every 3D image in the

3   database)." But the "object" discussed in the specification is not, as Eolas contends, "every 3D

4   image in the database." Rather, the specification refers to the object as the 3D image of a single

5   embryo that is being viewed by a user. *See, e.g.*, '507 patent, 9:52-53 ("data object 216 may be a

6   three dimensional *view* of medical data for, e.g., an embryo"). Even Eolas must acknowledge this

7   difference between the database of images and the displayed images themselves in its own

8   description in the specification.

9        Eolas also argued that, in the specification, "any of the 3D datasets[24] were 'presentable' to

10   a user, just as any Google search result is 'presentable.'" Dkt. 750-4 at 16. Eolas further contended

11   that "the user was only ever 'presented,' and interacting with, with a specific 3D dataset at any one

12   time as outlined in the specification (just as a Google Search user is only ever interacting with a

13   specific subset of search results at any one time)." *Id*. But this argument proves Defendants'

14   point: the "object" in the specification is the image of the embryo that is actually "presented" or

15   displayed to the user, not the entire collection of available embryo images that may never get

16   displayed and which, while sitting in the database, cannot be interacted with by the user.[25] The

17   same is true for Dr. Martin's supposed object in Google Search and the other accused products.

18   Dkt. 704-4 at 16-17 (citing Ex. 28, Martin Dep. Tr. (Vol. 3) 505:8–12 ([*Question*] "Do you think

19   that the entire corpus of Google Search results is something that could be presented to a user?"

20   [*Answer*] "I think the user only *ever* sees a ***small part*** of it. . . .").

21        As Eolas cannot raise a genuine issue of material fact as to the object limitation for Google

22   Search, AdWords, Mail, and Maps, Amazon Cart, EC2, Product Viewer, S3, Search, and Shoveler,

23

24      [24] Eolas uses the term "dataset," but that term that never appears in the specification, which instead

25   refers to, as Eolas elsewhere acknowledges, "images." (Dkt. 750-4 at 15; '507 patent, 3:34-50.)

26      [25] Eolas also contended that "[t]he word 'single' never appears in the claim or agreed construction, so it is unclear where any 'single' requirement comes from or why this provides any basis to strike any of Dr. Martin's opinions." Dkt. 750-4 at 16. This misses the point. Whether two displayed

27   images are a single object or two separate objects is of no moment; the critical point is that it is the displayed images that are the "objects" of the patents, not data sitting in a database that is not

28   presented to the user for interaction by that user.

RESTRICTED – ATTORNEYS' EYES ONLY

1  Walmart Search, Cart, Product Viewer, and Carousel, summary judgment should be granted as to

2  these products. *Apple*, 2014 WL 252045, at *4-5, *8.

3  **VII.    CONCLUSION**

4          The asserted claims are ineligible for patent protection and are also not infringed.

5  Defendants respectfully request that the Court grant their motion for summary judgment.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

RESTRICTED – ATTORNEYS' EYES ONLY

DATED:  February 24, 2022          Respectfully submitted,

By /s/ *Douglas E. Lumish*

DOUGLAS E. LUMISH, Bar No. 183863
doug.lumish@lw.com
RICHARD G. FRENKEL, Bar No. 204133
rick.frenkel@lw.com
JEFFREY G. HOMRIG, Bar No. 215890
jeff.homrig@lw.com
LATHAM & WATKINS LLP
140 Scott Drive
Menlo Park, CA 94025
Telephone: (650) 328-4600
Facsimile:  (650) 463-2600

JOSEPH H. LEE, Bar No. 248046
joseph.lee@lw.com
LATHAM & WATKINS LLP
650 Town Center Drive, 20th Floor
Costa Mesa, CA 92626-1925
Telephone: (714) 540-1235
Facsimile:  (714) 755-8290

AMIT MAKKER, Bar No. 280747
amit.makker@lw.com
BLAKE R. DAVIS, Bar No. 294360
blake.davis@lw.com
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6538
Telephone: (415) 395-8034
Facsimile:  (415) 395-8095

GABRIEL K. BELL (pro hac vice pending)
gabriel.bell@lw.com
MELISSA ARBUS SHERRY (admitted pro hac vice)
melissa.sherry@lw.com
CHARLES S. DAMERON (admitted pro hac vice)
charles.dameron@lw.com
LATHAM & WATKINS LLP
555 Eleventh Street, Suite 1000
Washington, DC 20004-1304
Telephone: (202) 637-2200
Facsimile:  (202) 637-2201

JENNIFER H. DOAN (*pro hac vice*)
jdoan@haltomdoan.com
JOSHUA R. THANE (*pro hac vice*)
jthane@haltomdoan.com
J. RANDY ROESER (*pro hac vice*)
rroeser@haltomdoan.com
HALTOM & DOAN
6500 Summerhill Road, Suite 1000
Texarkana, TX 75503

RESTRICTED – ATTORNEYS' EYES ONLY

Telephone: (903) 255-1000
Facsimile:  (903) 255-0800

GRANT KINSEL, Bar No. 172407
gkinsel@perkinscoie.com
PERKINS COIE, LLP
1203 3rd Street, 39th Floor
Seattle, WA 98112
Telephone: (206)-395-316
Facsimile: (206) 359-9000

*Counsel for Defendant*
*AMAZON.COM, INC.*

By /s/ David A. Perlson

QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Charles K. Verhoeven (CA Bar No. 170151)
  David A. Perlson (CA Bar No. 209502)
  Lindsay M. Cooper (CA Bar No. 287125)
  Felipe Corredor (CA Bar No. 295692)
  Michael Trombetta (CA Bar No. 320149)
  qe-eolas@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone: 415-875-6600
Facsimile: 415-875-6700

QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Deepa Acharya (CA Bar No. 267654)
  qe-eolas@quinnemanuel.com
1300 I Street, NW
Washington, DC 20005
Telephone: 202-538-8107
Fax: 202-538-8100

*Counsel for Defendant*
*GOOGLE LLC*

By /s/ Bijal V. Vakil

Bijal V. Vakil (SBN 192878)
Shamita D. Etienne-Cummings (SBN 202090)
Eric E. Lancaster (SBN 244449)
William Keeley Wray (SBN 338653)
ALLEN & OVERY LLP
550 High Street
Palo Alto, CA  94301
Telephone:  (650) 388-1150
Email: bijal.vakil@allenovery.com
Email: setienne@allenovery.com
Email: eric.lancaster@allenovery.com
Email: william.wray@allenovery.com

RESTRICTED – ATTORNEYS' EYES ONLY

1

*Attorneys for Defendant*
WALMART INC.

2

3

**ATTESTATION**

4

 I, Bijal Vakil, am the ECF user whose user ID and password authorized the filing of this

5

document.  Under Civil L.R. 5-1(h)(3), I attest that all signatories to this document have concurred

6

in this filing.

7

 DATED:  February 24, 2022          */s/ Bijal V. Vakil*
                                                       Bijal V. Vakil

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28