UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EOLAS TECHNOLOGIES INCORPORATED,<br><br>Plaintiff,<br><br>v.<br><br>AMAZON.COM INC.,<br><br>Defendant. | Lead Case No. 17-cv-03022-JST<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT UNDER 35 U.S.C. § 101; DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT AS MOOT; DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AS MOOT; DENYING MOTIONS TO EXCLUDE OR STRIKE EXPERT TESTIMONY AS MOOT**<br><br>Re: ECF Nos. 829, 832, 686, 689, 696, 698, 699, 703, 706, 708, 710, 714 |
| EOLAS TECHNOLOGIES INCORPORATED,<br><br>Plaintiff,<br><br>v.<br><br>GOOGLE LLC,<br><br>Defendant. | |
| EOLAS TECHNOLOGIES INCORPORATED,<br><br>Plaintiff,<br><br>v.<br><br>WALMART INC.,<br><br>Defendant. | |
| GOOGLE LLC,<br><br>Plaintiff,<br><br>v.<br><br>EOLAS TECHNOLOGIES INCORPORATED,<br><br>Defendant. | |

United States District Court
Northern District of California

Before the Court are several motions: (1) Defendants' motion for summary judgment on the grounds that the asserted claims are invalid under 35 U.S.C. § 101 or are not infringed, ECF No. 832; (2) Plaintiffs' motion for summary judgment as to certain of Defendants' affirmative defenses, ECF No. 829; and (3) several motions to exclude or strike certain expert testimony, ECF Nos. 686, 689, 696, 698, 699, 703, 706, 708, 710, and 714.

For the reasons discussed below, the Court will grant Defendants' motion for summary judgment that the asserted claims are invalid under 35 U.S.C. § 101 and will deny the rest of the pending motions as moot.[1]

## I.    BACKGROUND

### A.    Procedural History

On November 24, 2015, Plaintiff Eolas filed three actions in the Eastern District of Texas alleging infringement of U.S. Patent No. 9,195,507 ("the '507 patent") by Defendants Amazon.com, Inc. ("Amazon"), Google LLC ("Google"), and Wal-Mart Inc. ("Walmart") (collectively, "Defendants"). *See Eolas Techs. Inc. v. Amazon.com, Inc.*, No. 6:15-cv-1038 (E.D. Tex.); *Eolas Techs. Inc. v. Google Inc.*, No. 6:15-cv-1039 (E.D. Tex.); *Eolas Techs. Inc. v. Wal-Mart Stores, Inc.*, No. 6:15-cv-1038 (E.D. Tex.).  Eolas alleges that various products of each Defendant directly infringe the asserted claims of the '507 patent.  *See* ECF No. 830-5 at 14. Defendants contend, and Eolas does not dispute, that the only asserted claims of the '507 patent that remain at issue at this stage of the litigation are the following: Claims 32, 37, 39, 19, 24, 26, and 45.

On February 8, 2016, the three actions were consolidated for pretrial purposes.  *See* ECF No. 22.  In 2017, the three actions were transferred to the Northern District of California.  ECF Nos. 251, 326, 329.  A fourth case was filed in the Northern District of California on November 25, 2015 (*Google LLC v. Eolas Technologies Incorporated*, Case No. 15-cv-05446) and this fourth case was consolidated for pretrial purposes with the other three actions on March 10, 2020.  *See* ECF No. 582.  The lead case is *Eolas Technologies Incorporated v. Amazon.com, Inc.*, Case No.

---

[1] Pursuant to Civil Local Rule 7-1(b), the Court concludes that these motions are appropriate for determination without oral argument.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   17-cv-3022.  *Id.*

2       On May 31, 2016, while first three actions were still pending in the Eastern District of

3   Texas, Eolas filed an early summary judgment motion of "no invalidity" under 35 U.S.C. § 101.

4   *See* ECF No. 112.  The District Court for the Eastern District of Texas ("Texas district court")

5   denied the motion without prejudice.[2]  ECF No. 208.  On December 8, 2016, the Texas district

6   court construed certain disputed terms in the '507 patent.  *See* ECF No. 212.

7       Once the consolidated actions were assigned to the undersigned, Defendants moved for

8   reconsideration of the construction of one of the disputed terms ("interactive-content application"),

9   ECF No. 619, which this Court denied, ECF No. 628.

10      On March 25, 2020, Defendants moved for summary judgment on obviousness-type

11  double patenting, double patenting, and various preclusion doctrines.  ECF No. 592.  On April 27,

12  2021, the Court denied Defendants' motion on the basis that Defendants had not met their burden

13  to show that the asserted claims are invalid under any of the doctrines that Defendants had

14  invoked.  ECF No. 655.

15      **B.    The '507 patent**

16      The '507 patent is titled "Distributed Hypermedia Method and System for Automatically

17  Invoking External Application Providing Interaction and Display of Embedded Objects Within a

18  Hypermedia Document," and it was issued on November 24, 2015.  *See* '507 patent, ECF No.

19  832-2.  According to the specification, the claimed methods and systems "allow[] a user at a client

20  computer connected to a network to locate, retrieve and manipulate objects in an interactive

21  way[.]"  *Id.* at 6:57-59.

22      The specification of the '507 patent describes the context of the claimed invention as

23  follows.  The internet provides an "open distributed hypermedia system" that allows computers

24

25  ─────────────────────

26  [2] The order resolving this motion was sealed and not filed on the docket.  The docket entry that
    was entered when the order was emailed to the parties is ECF No. 208.  Neither side has filed a

27  copy of this order in connection with their summary judgment-related briefs.  Eolas represents,
    and Defendants do not dispute, that the Texas district court denied this motion without prejudice,

28  "including on the grounds that the court had not yet decided claim construction."  *See* ECF No.
    840-3 at 21 (citing "Dkt. 208").

connected to the internet to display and retrieve objects located at remote computers by clicking on links. *Id.* at 2:4-16. When a user clicks on a link, a request that includes the address of the object is sent by the user's computer via the internet, which is ultimately received by the server computer where the object is located. *Id.* at 5:1-21. The server processes the request, locates the object, and transfers a copy back to the user via the internet. *Id.* When the user's computer receives the object, it is displayed to that user. *Id.*

The specification states that a shortcoming of "the present open distributed hypermedia system on the Internet" is that, while it "allows users to locate and retrieve data objects," it "allows users very little, if any, interaction with these data objects." *Id.* at 6:25-34. The specification further explains that the viewing of and interaction with large objects in real time is particularly useful in a variety of contexts, including in the fields of medicine and meteorology, but such activities require employing "visualization techniques and real time computer graphics methods," which are "bandwidth-intensive and compute-intensive [sic] and often require multiprocessor arrays and other specialized graphics hardware to carry them out in real time." *Id.* at 5:62-68 to 6:1-13. The specification states that users of client computers cannot effectively perform these bandwidth-intensive and computing-intensive tasks as a result of "the relatively low bandwidth of the Internet (as compared to today's large data objects) and the relatively small amount of processing power available at client computers[.]" *Id.* at 6:22-24.

According to the specification, "it is desirable to have a system that allows the accessing, display and manipulation of large amounts of data, especially image data, over the Internet to a small, and relatively cheap, client computer." *Id.* at 6:18-21. The specification provides that the claimed invention meets this need because it "allows a user at a client computer connected to a network to locate, retrieve and manipulate objects in an interactive way," *id.* at 6:45-59. The claimed invention, according to the specification, enables users of client computers connected a network to interact with objects (including large objects) displayed on a web browser through communications sent over a "distributed" network environment, wherein such interaction is achieved by enabling the user of the client computer to interact via network communications with an application located on a remote computer. *Id.* at 6:45-67. This allows the user of the client

4

United States District Court
Northern District of California

1  computer "to use a vast amount of computing power beyond that which is contained in the user's

2  computer," namely the computing power of remote computers.  *Id.* at 6:65-67.  Notably, the

3  specification does not state that the claimed invention improves the computing capacity of client

4  computers or improves the availability of bandwidth on the internet.

5  The specification discusses examples of how the claimed invention circumvents the

6  problems of client computers' limited computing power and bandwidth constraints; these

7  examples involve having remote computers perform resource-intensive computations required to

8  enable interactivity in the client computer browser and then limiting the amount of data they send

9  back to the client computer (such as by sending back only the results of their computations).  *See,*

10  *e.g.*, *id.* at 7:1-35.  For instance, the specification states that several remote computers can process

11  three-dimensional images "in a distributed manner" to enable a user of a client computer to view

12  and interact with the images.  *Id.*  The specification implies that this distributed processing of the

13  images circumvents the computation limitations of client computers because the resource-

14  intensive "calculations" required for manipulating the three-dimensional images "may be

15  performed by remote distributed computer systems" instead of by the client computer individually.

16  *Id.*  This arrangement also reduces "the need for a high band-width data connection" because the

17  distributed remote computers can, after performing the necessary computations, transmit to the

18  client computer only the data that is necessary to "update the image" on the client computer.  *Id.* at

19  7:15-23; *see also id.* at 10:60-64 ("It will be readily seen that application server 220 can

20  advantageously use server computer 204's computing resources to perform the viewing

21  transformation much more quickly than could application client 210 executing on client computer

22  200.  Further, by only transmitting the updated frame buffer containing a new view for the embryo

23  image, the amount of data sent over network 206 is reduced."); *id.* at 11: 33-38 ("computer

24  systems located remotely on the network can be used to provide the computing power that may be

25  required for certain tasks and to reduce the data bandwidth required by only transmitting results of

26  the computations").

27  Importantly, the '507 patent states that "[t]he specification and drawings are . . . to be

28  regarded in an illustrative rather than a restrictive sense, the invention being limited only by the

provided claims." *Id.* at 16:67 to 17:1-3.

## II.      JURISDICTION

The Court has subject matter jurisdiction under 28 U.S.C. § 1331.

## III.      LEGAL STANDARD

Summary judgment is proper when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by" citing to depositions, documents, affidavits, or other materials. Fed. R. Civ. P. 56(c)(1)(a). A party also may show that such materials "do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). A dispute is genuine only if there is sufficient evidence for a reasonable trier of fact to resolve the issue in the nonmovant's favor, and a fact is material only if it might affect the outcome of the case. *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014) (citation omitted). "In considering a motion for summary judgment, the court may not weigh the evidence or make credibility determinations, and is required to draw all inferences in a light most favorable to the non-moving party." *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997).

Where the party moving for summary judgment would bear the burden of proof at trial, that party bears the initial burden of producing evidence that would entitle it to a directed verdict if uncontroverted at trial. *See C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000). Where the party moving for summary judgment would not bear the burden of proof at trial, that party bears the initial burden of either producing evidence that negates an essential element of the non-moving party's claim, or showing that the non-moving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

If the moving party satisfies its initial burden of production, then the non-moving party must produce admissible evidence to show that a genuine issue of material fact exists. *See id.* at 1102-03. The non-moving party must "identify with reasonable particularity the evidence that

precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).  It is not the duty of the district court "to scour the record in search of a genuine issue of triable fact." *Id.*  "A mere scintilla of evidence will not be sufficient to defeat a properly supported motion for summary judgment; rather, the non-moving party must introduce some significant probative evidence tending to support the complaint." *Summers v. Teichert & Son, Inc.*, 127 F.3d 1150, 1152 (9th Cir. 1997) (internal quotation marks and citation omitted).  If the non-moving party fails to make this showing, the moving party is entitled to summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## IV.   DISCUSSION

There are two motions for summary judgment pending.  First, Defendants move for summary judgment as to all remaining asserted claims on the grounds that (1) the asserted claims are invalid under § 101 because they recite ineligible subject matter; and (2) there is no genuine issue of material fact as to whether the accused products practice each element of the asserted claims.

Second, Eolas moves for summary judgment as to several of Defendants' affirmative defenses, namely those based on (1) an alleged material failure by the PTO to comply with 35 U.S.C. § 154(b) in determining the patent term adjustment for the patent-in-suit; (2) obviousness-type double patenting; (3) and other preclusion-related doctrines.

Also pending are several motions to exclude or strike certain expert testimony.

For the reasons set forth below, the Court concludes that the asserted claims are invalid under § 101 and it will grant summary judgment in Defendants' favor as to all claims on that basis.  The Court will deny the remaining motions as moot.

### A.   Patentability under § 101

"Section 101 of the Patent Act defines the subject matter eligible for patent protection" by providing that "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof" may be patented. *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014); 35 U.S.C. § 101.  It is well-established that "abstract ideas are not patentable." *Alice*, 573 U.S. at 216 (internal quotation marks and citation omitted).  However, "an

invention is not rendered ineligible for patent simply because it involves an abstract concept." *Id.* at 217.  Courts must distinguish between patents that claim abstract ideas, on the one hand, and patents "that claim patent-eligible applications of those concepts," on the other hand.  *Id.*

To draw this distinction, courts engage in a two-step analysis.  At step one, courts determine whether the claims at issue are "directed to" an abstract idea.  *Id.*  Claims that are "directed to a specific improvement in computer functionality" or "to a specific implementation of a solution to a problem in the software arts" are not directed to an abstract idea.  *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1338-39 (Fed. Cir. 2016).  "In cases involving software innovations, this inquiry often turns on whether the claims focus on 'the specific asserted improvement in computer capabilities . . . or, instead, on a process that qualifies as an 'abstract idea' for which computers are invoked merely as a tool.'"  *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1303 (Fed. Cir. 2018) (quoting *Enfish*, 822 F.3d at 1335-36).  "The purely functional nature of [a] claim confirms that it is directed to an abstract idea, not to a concrete embodiment of that idea."  *Affinity Labs of Texas, LLC v. Amazon.com Inc.*, 838 F.3d 1266, 1269 (Fed. Cir. 2016) ("*Affinity Labs II*").  Additionally, a claim that could be performed by a human, excising generic computer-implemented steps, is often abstract.  *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1318 (Fed. Cir. 2016).

If the claims are directed to an abstract idea, courts proceed to step two and "consider the elements of each claim both individually and as an ordered combination" to determine "whether [the claim] contains an inventive concept sufficient to transform the claimed abstract idea into a patent-eligible application."  *Alice*, 573 U.S. at 217 (internal quotation marks and citation omitted).  "Stating an abstract idea while adding the words 'apply it' is not enough for patent eligibility.  Nor is limiting the use of an abstract idea to a particular technological environment."  *Id.* at 223 (internal quotation marks and citations omitted).  Instead, this test "is satisfied when the claim limitations involve more than performance of well-understood, routine, and conventional activities previously known to the industry."  *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1367 (Fed. Cir. 2018) (internal quotation marks, alteration, and citation omitted).  Both steps of the *Alice* inquiry are informed by "the claims in light of the written description."  *Amdocs (Israel) Ltd. v.*

*Openet Telecom, Inc.*, 841 F.3d 1288, 1299 (Fed. Cir. 2016).

"Whether a claim recites patent eligible subject matter is a question of law which may contain disputes over underlying facts." *Berkheimer*, 881 F.3d at 1368. But this does not mean that patent eligibility cannot be decided on a motion for summary judgment, as "not every § 101 determination contains genuine disputes over the underlying facts material to the § 101 inquiry." *Id.*

### 1.    *Alice* step one

At step one of the *Alice* framework, courts "look at the focus of the claimed advance over the prior art to determine if the claim's character as a whole is directed to excluded subject matter." *Affinity Labs of Tex., LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1257 (Fed. Cir. 2016) ("*Affinity Labs I*") (internal quotation marks omitted). A claim is directed to a solution to a computer-functionality problem and is, therefore, not directed to an abstract idea, when it has "the specificity required to transform a claim from one claiming only a result to one claiming a way of achieving it." *SAP America, Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1167 (Fed. Cir. 2018). On the other hand, where a claim is written in functional terms without claiming a specific way of achieving the functions, then the claim is directed to an abstract idea. *Affinity Labs II*, 838 F.3d at 1269 ("The purely functional nature of [a] claim confirms that it is directed to an abstract idea, not to a concrete embodiment of that idea."). "*Alice* step one presents a legal question that can be answered based on the intrinsic evidence." *CardioNet, LLC v. InfoBionic, Inc*, 955 F.3d 1358, 1372 (Fed. Cir. 2020), *cert. denied sub nom. InfoBionic, Inc. v. Cardionet, LLC*, 141 S. Ct. 1266 (2021). The claim language is the most important indicator of the focus of the claims. *See Chamberlain Grp*., *Inc. v. Techtronic Indus. Co.*, 935 F.3d 1341, 1346 (Fed. Cir. 2019) ("[W]hile the specification may help illuminate the true focus of a claim, when analyzing patent eligibility, reliance on the specification must always yield to the claim language in identifying that focus.") (citation and internal quotation marks omitted).

Defendants argue that the asserted claims are directed to the abstract idea of providing interactive applications on the web using distributed computing. Eolas, on the other hand, argues that the asserted claims are directed to technological improvements, which vary for each asserted

claim or groups of asserted claims.  In general, Eolas contends that the asserted claims are directed to "specific improvements in areas of security, scalability, and more."  *See* ECF No. 840-3 at 14.

For the reasons set forth below, the Court finds that the asserted claims are directed to the abstract idea of enabling interactivity with remote objects on a client computer browser using distributed computing.  The Court analyzes the asserted claims at step one based on the grouping of claims that Eolas employed in its opposition.

### a.    Claim 32

Claim 32 recites the following method:

> 32. A method, performed by a server computer connected to the World Wide Web distributed hypermedia network on the Internet, for disseminating interactive content via the World Wide Web distributed hypermedia network on the Internet, the method comprising:
>
> > A. receiving, by the server computer, a request for information; and
> >
> > B. transferring, by the server computer, the information onto the World Wide Web distributed hypermedia network on the Internet, wherein:
> >
> > > (i) a World Wide Web browser on a client computer connected to the World Wide Web distributed hypermedia network has been configured with a plurality of different interactive-content applications, each said interactive-content application being configured to enable a user to interact, within one or more World Wide Web pages, with at least part of one or more objects while at least part of each of said one or more objects is displayed to the user within at least one of said one or more World Wide Web pages, and
> > >
> > > (ii) at least part of the information is configured to allow the World Wide Web browser on the client computer to:
> > >
> > > > a. detect at least part of an object to be displayed in a World Wide Web page, and
> > > >
> > > > b. cause a display of the World Wide Web page to a user,
> > >
> > > (iii) the World Wide Web browser has been configured to:
> > >
> > > > A.  select an interactive-content application,

10

based upon the information, from among the different interactive-content applications, and

B. automatically invoke the selected interactive-content application to enable the user to employ the selected interactive-content application to interact within the World Wide Web page with at least part of the object while at least part of the object is displayed to the user within the World Wide Web page, wherein the automatically invoked interactive-content application has been configured to operate as part of a distributed application configured to enable a user to perform the interaction through the use of communications sent to and received from at least a portion of the distributed application located on two or more distributed application computers connected to the World Wide Web distributed hypermedia network on the Internet, the two or more distributed application computers being remote from the client computer.

The focus of Claim 32 is enabling interactivity with remote objects on a client computer browser using distributed computing. The enabling of the interactivity is achieved by an "interactive-content application" (which, as construed, means "application that enables a user to interact with content," ECF No. 212 at 13), invoked by the client computer's browser, that operates as part of a "distributed application" (which, as construed, means "an application that is broken up and performed among two or more computers," *id.* at 16) located at least in part on remote computers. The claim language provides that the web browser selects and automatically invokes the "interactive-content application" from among a plurality of interactive-content applications based on the information it receives. The claim requires that the "interactive-content application" be "configured" to enable the user of the client computer to interact with the object within a web page and to operate as part of a "distributed application" located at least in part on two or more remote computers connected to the internet. The claim further requires that the "distributed application," in turn, be "configured" to enable the user of the client computer to perform the interaction through communications sent to and received from at least a portion of the distributed application located on two or more remote computers.

United States District Court
Northern District of California

The claim language does not specify *how* to "configure" the interactive-content application and the distributed application to render them capable of enabling the interactivity on the client computer browser.  Claim 32 requires that the distributed application, and the interactive-content application selected by the browser, be "configured" so as to allow the client computer browser and remote computers to communicate in order to make the interactivity on the client computer browser possible.  Claim 32 does not contain limitations regarding *how* the client computer and the remote computers *should* communicate to ensure that the problems discussed in the specification, namely computing limitations of client computers and bandwidth constraints, are overcome in the manner described in the specification, which is by having the remote computers perform computations that are resource-intensive and sending back to the client computer only a limited amount of data, such as only the results of such computations.  The claim language of Claim 32 does not require that the computing work or data required to enable the interactivity on the client computer browser be distributed in *any* particular way among the remote computers relative to the client computer, much less in a way that would circumvent the problems discussed in the specification regarding the limited computing power of client computers and bandwidth constraints.

Claim 32, therefore, requires only *results* (that interactivity on the client computer browser be enabled via distributed computing), without specifying *how* to achieve them.[3]  Where, as here, a claim's terms "as properly construed simply demand[] the production of a desired result . . . without any limitation on how to produce that result," the claim "in effect encompasses all solutions" and, therefore, "encompasses a patent-ineligible abstract concept rather than an arguably technical improvement[.]"  *See Interval Licensing LLC v. AOL, Inc.*, 896 F.3d 1335, 1345 (Fed. Cir. 2018) (holding that the asserted claim is directed to an abstract concept rather than a technical improvement because the "attention manager" that purportedly provided the technical

---

[3] Eolas contends that "the construction for the term 'distributed application' describes exactly how the interactive application is configured to use distributed processing—the 'distributed application' is an 'application that is broken up and performed among two or more computers.'" ECF No. 840-3 at 33.  The Court disagrees for the reasons discussed above.

improvement, "as properly construed," "simply demand[ed] the production of a desired result . . . without any limitation on how to produce that result"); *see also Apple, Inc. v. Ameranth, Inc.*, 842 F.3d 1229, 1240-41 (Fed. Cir. 2016) (holding that the asserted claims are directed to an abstract idea because they "claim systems including menus with particular features" and "do not claim a particular way of programming or designing the software to create menus that have these features, but instead merely claim the resulting systems"); *Affinity Labs I*, 838 F.3d at 1269 ("At that level of generality, the claims do no more than describe a desired function or outcome, without providing any limiting detail that confines the claim to a particular solution to an identified problem.  The purely functional nature of the claim confirms that it is directed to an abstract idea, not to a concrete embodiment of that idea."); *Aftechmobile Inc. v. Salesforce.com, Inc.*, No. 19-cv-05903-JST, 2020 WL 6129139, at *6 (N.D. Cal. Sept. 2, 2020) (holding that asserted claims were directed to an abstract concept because they failed to specify "how to achieve" the functions that are the inventive concept stated in the specification), *aff'd*, 853 F. App'x 669 (Fed. Cir. 2021).

That Claim 32 requires generic computer components (e.g., "server," "client computer," "remote computers") or the internet does not alter the analysis at step one, because such limitations merely provide a generic environment in which to carry out the abstract idea.  *See, e.g.*, *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 612 (Fed. Cir. 2016) (noting that an asserted claim is directed to an abstract idea where the additional recited components "merely provide a generic environment in which to carry out the abstract idea"); *Alice*, 573 U.S. at 222 ("[T]he prohibition against patenting abstract ideas cannot be circumvented by attempting to limit the use of [the idea] to a particular technological environment.") (citation and internal quotation marks omitted) (alteration in original).

In light of these authorities, the Court finds that Claim 32 is directed to the abstract concept of enabling interactivity with remote objects on a client computer browser using distributed computing.

The specification supports the Court's interpretation of Claim 32 as being directed to that abstract concept.  The specification distinguishes between the prior art and the claimed invention by noting that the prior art allowed users of client computers to locate and retrieve data objects

from other computers on the internet while allowing users "very little, if any, interaction with these data objects" as a result of bandwidth constraints and computer processing limitations in client computers. *Id.* at 6:25-34. The claimed invention, by contrast, allows users of client computers to interact with remote objects on the internet, even large objects, *notwithstanding* the computing limitations of client computers or bandwidth constraints. '507 patent at 15:65-68 ("The present invention allows a user to have interactive control over application objects such as three dimensional image objects and video objects."). As noted, the specification does not state that the claimed invention improves the computing capacity of client computers or improves the availability of bandwidth on the internet. The specification implies the possibility that the computing capacity of client computers and bandwidth constraints remain unchanged despite the claimed invention.

The mechanism that the specification describes for enabling client computers' interactivity with remote objects is *distributing the computing* required for the interactivity among remote computers relative to the client computer. *See, e.g.*, *id.* at 7:1-35 (discussing "parallel distributed processing" of tasks among remote computers to enable a user of a client computer browser to view and interact with large images, where the images are "processed in a distributed manner by several computers" and where the "calculations may be performed by remote distributed computer systems"). The examples in the specification for how to distribute the computing in a way that circumvents client computers' limitations and bandwidth constraints involve arrangements where remote computers perform resource-intensive computations and send back to the client computer only a relatively small amount of data, such as the results of the computations. *See id.* at 11:26-38 (describing "example" of application of claimed invention wherein remote computers perform calculations for a spreadsheet program and only the calculations' results are sent to the client computer for display, noting that, "[i]n this way, computer systems located remotely on the network can be used to provide the computing power that may be required for certain tasks and to reduce the data bandwidth required by only transmitting results of the computations"); *id.* at 7:15-23 (discussing distributed processing where remote computers perform tasks such as volume rendering or three-dimensional image transformation to enable interactions with large images on a

14

1    client computer and then transmit to the client computer only the data that is necessary to "update

2    the image" on the client computer).

3         These descriptions in the specification, because they are not captured in Claim 32 (or any

4    of the asserted claims), are insufficient to take Claim 32 (or any of the asserted claims) outside of

5    the realm of abstraction. *See Koninklijke KPN N.V. v. Gemalto M2M GmbH*, 942 F.3d 1143, 1150

6    (Fed. Cir. 2019) (holding that, for a claim to be directed to a technological improvement as

7    opposed to an abstract idea, "*the claims* must recite a specific means or method that solves a

8    problem in an existing technological process") (emphasis added); *see also Yu v. Apple Inc.*, 1 F.

9    4th 1040, 1044-45 (Fed. Cir. 2021) (holding that the "mismatch between specification" details

10   "and the breadth" of the claim "underscores that the focus of the claimed advance is the abstract

11   idea"); *Accenture Glob. Servs., GmbH v. Guidewire Software, Inc*., 728 F.3d 1336, 1345 (Fed. Cir.

12   2013) ("[T]he complexity of the implementing software or the level of detail in the specification

13   does not transform a claim reciting only an abstract concept into a patent-eligible system or

14   method.").

15        The breadth of the claim language in Claim 32, which is not restricted to any specific way

16   of enabling the interactivity on the client computer browser using distributed computing, raises

17   preemption issues.  Preemption is the "concern that drives" the principle of excluding abstract

18   ideas from patent-eligible subject matter.  *See Alice*, 573 U.S. at 216.  Here, the claim language

19   does not limit the claimed method to covering a technological solution to the problems discussed

20   in the specification, because the claim language does not require that the computing work required

21   to enable interactivity on the client computer browser be distributed in any particular way.  Indeed,

22   Claim 32 does not require, for example, that more computing work be done on the remote

23   computers relative to the client computer, or that the most resource-intensive tasks be performed

24   by the remote computers instead of the client computer, even though those types of arrangements

25   would serve as workarounds to the client computer's limitations according to the specification.

26   Claim 32, therefore, covers implementations that would *not* solve the problems discussed in the

27   specification and, as such, its scope goes beyond a specific solution to a technological problem.

28   The overbroad preemptive potential of Claim 32 further supports a finding that Claim 32 is

directed to an abstract idea.  *See Symantec*, 838 F.3d at 1321 (holding that "preemption may signal patent ineligible subject matter").

Claim 32 is analogous the one held to be ineligible under § 101 in *Device Enhancement LLC. v. Amazon.com, Inc.*, 189 F. Supp. 3d 392, 403 (D. Del. 2016), which Defendants cited in their opening brief.  There, the claim at issue recited a method that the patentee argued was directed to "a solution to the computer-specific problem of delivering multimedia content to a variety of devices with limited resources and different capabilities."  *Id.*  The claim required that tasks between a "client-side application" on the terminal device and a "remote application" on the server be "dynamically split[]" according to "predetermined computational resources and inherent capabilities."  *Id.*  The claim further required communications over a network between the server and the terminal device to exchange data, deliver the content, and exchange messages.  *Id.*

The court held that the claimed method was directed to the idea of "using distributed architecture to increase the capabilities of individual devices by using remote resources," because it

> generally provides for the installation of a generic client-side application on the terminal device and the installation of a corresponding remote application on the server (which handles most of the graphical processing).  The server exchanges data with the terminal device.  *Tasks are split between the client-side application and the remote application, albeit without further guidance from the patent.*  The processed content is then transmitted and the client-side application renders the content and responds to messages.

*Id.* at 404-05 (emphasis added).

Notwithstanding the patentee's argument that the claim at issue was directed to solving a "computer-specific problem," the court held that the claim was ineligible under § 101 because it "preempts virtually all possible ways of performing" the idea of "using distributed architecture to increase the capabilities of individual devices by using remote resources," as "the patented method uses computerized devices (of any type) in conventional ways (installation of applications, data exchange, and data processing) without delineating any particular way of putting the ideas into practice."  *Id.* at 405.  The court further held that "the very steps of the method comprise nothing more specific than the underlying idea itself[.]"  *Id.*

16

1    Claim 32 here is similar to the claim in *Device Enhancement*, as it requires the use of

2   distributed computing to enable interactivity with remote objects on client computer browsers.  As

3   with the claim in *Device Enhancement*, the claim here requires applications on the client computer

4   and remote computers, whose configurations are not specified in the patent, as well as

5   communications between the computers via a network.  As with the claim in *Device Enhancement*,

6   the claim here does not specify "any particular way" of dividing the computing work between the

7   client computer and remote computers to achieve the purported solution of the patent.  As with the

8   claim in *Device Enhancement*, the preemptive potential of Claim 32 is overbroad, for the reasons

9   discussed above.  *Device Enhancement*, therefore, supports the Court's finding that Claim 32 is

10   directed to an abstract idea.

11    Defendants have pointed to other cases in which courts reached similar conclusions when

12   faced with claims that required computers on a network to work together to accomplish computing

13   tasks.  For example, in *Appistry, Inc. v. Amazon.com, Inc.*, the claims covered systems and

14   methods for processing information via networked computers in a distributed manner.  95 F. Supp.

15   3d 1176, 1178 (W.D. Wash. 2016), *aff'd sub nom. Appistry, LLC v. Amazon.com, Inc.*, 676 F.

16   App'x 1008 (Fed. Cir. 2017).   The claims required using "a request handler, a plurality of process

17   handlers, and a plurality of task handlers" to perform the distributed processing.  *Id.*  The patentee

18   argued that the claimed method was directed to a technological improvement, namely "a more

19   efficiently and reliably distributed configuration of multiple computers . . . resulting in better

20   performance." *Id.* at 1180.  The court disagreed, holding that the claims were directed to "the

21   abstract idea of distributed processing akin to the military's command and control system," as they

22   required merely "distributing tasks through a hierarchical structure." *Id.* at 1179-80.  In *Coho*

23   *Licensing LLC v. Glam Media, Inc.*, No. C 14-01576 JSW, 2017 WL 6210882 (N.D. Cal. Jan. 23,

24   2017) *aff'd*, 710 F. App'x 892 (Fed. Cir. 2018), the court reached a similar conclusion when

25   analyzing the patent-eligibility of claims that required "allocating," "sub-allocating," and

26   "dividing" tasks among multiple computers, finding that the claims were directed to the abstract

27   concept of "dividing and subdividing tasks for distributed processing."

28    Eolas' only response to *Device Enhancement*, *Appistry*, and *Coho Licensing* is that "none

United States District Court
Northern District of California

of those cases controls the outcome in this case, which involves its own particular claims, specification and invention." ECF No. 840-3 at 35. While the cases are not controlling, the Court finds them to be apt and instructive. It also finds, in the absence of any meaningful argument to the contrary, that they lend support to the Court's conclusion that Claim 32 is directed to an abstract idea. *See Amdocs*, 841 F.3d at 1294 (noting that, in light of the absence of a "single, succinct usable definition or test" with respect to what an abstract idea "encompasses" under § 101, courts can and do "examine earlier cases in which a similar or parallel descriptive nature can be seen" when determining patent-eligibility).

Eolas' arguments that Claim 32 is not directed to an abstract idea are unpersuasive. Eolas contends that Claim 32 is directed to improvements in computer technology, namely "securely providing interactive content over the World Wide Web to client computers having limited computing capabilities." ECF No. 840-3 at 25-26. Eolas contends that the invention overcame "problems that existed in October 1994 with the World Wide Web open distributed hypermedia system, including: (1) limitations in the computing power of end users' computers ('507 Patent at 5:50-52); and (2) security, i.e., preventing the end user's computer from losing control and simply running whatever application was requested by a hacker." *Id.*

To be eligible at step one, "the claims must recite a specific means or method that solves a problem in an existing technological process." *Koninklijke*, 942 F.3d at 1150 (emphasis added). In other words, the asserted improvement must be recited in the claims *and* it must be recited with sufficient specificity such that it is not abstract. That is not the case here.

As to the first problem of limited computing power in client computers, Eolas argues that the claimed invention "overcame" it "through distributed applications, where portions of the application are run on the client computer and one or more server computers." ECF No. 840-3 at 27. Eolas contends that this solution is reflected in the language of Claim 32, because that claim requires

> that the interactive-content application (selected by the "World Wide Web browser" "based upon the [transmitted] information") "has been configured to operate as part of a distributed application configured to enable a user to perform the interaction through the use of *communications sent to and received from at least a portion*

> *of the distributed application located on two or more distributed application computers* connected to the World Wide Web.

ECF No. 840-3 at 26 (citing '507 patent at 23:61-67) (emphasis in the original).  Eolas also contends that the specification "confirms that these distributed application aspects of claim 32 provide a technological solution to the technological problem," ECF No. 840-3 at 26, because "the specification identifies the technological problem when attempting to view large data objects over the Internet caused by the technological limitations of the Web browsers, viewers, and end user computers in use at the time."  *Id.* (citing '507 patent at 5:36-52).  Eolas argues that Figures 6 and 10 of the '507 patent "illustrate" the distributed application aspects of Claim 32 that are the purported solution.

Eolas is correct that the specification discusses the limitations of client computers' processing power as a hindrance in the context of interacting with remote objects, as well as distributed computing as being a workaround to that problem because it permits resource-intensive tasks required to enable interactivity on the client computer to be performed by more powerful remote computers on the network.  However, as discussed above, Claim 32 does not claim any particular way of distributing the computing necessary to enable the interactivity on the client computer browser.  Claim 32 also says nothing how much data should be sent to the client computer and when.  The limitations of Claim 32 to which Eolas points merely require that the "interactive-content application" and "distributed application" be configured in a way that enables communications between the client computer and remote computers so as to enable the interactivity on the client computer browser.  Requiring that these communications be enabled is not the same thing as requiring that computing work be offloaded from the client computer in a manner that would circumvent its limitations.  Eolas has not shown that enabling communications between the client computer and the remote computers alone, without any requirements for how to distribute the computing work among the computers, would overcome the computing limitations of the client computer.

/ / /

/ / /

United States District Court
Northern District of California

Eolas points to Figures 6[4] and 10[5] for the proposition that they teach how to perform the distributed computing that circumvents the computing limitations in client computers. The Court is not persuaded. These figures describe in general terms how the client computer and remote computers could be structured to enable interactivity on the client computer, but they do not teach specifically how to distribute the computing work required to enable interactivity on the client computer, or how to coordinate such computing work, in a manner that would circumvent the client computer's computing limitations. Further, none of the specification's descriptions of these figures are incorporated into the claims. The specification makes clear that the scope of the claims must not be interpreted as being restricted by the figures and drawings described in the specification; it states that "[t]he specification and drawings are . . . to be regarded in an illustrative rather than a restrictive sense, the invention being limited only by the provided claims." *Id.* at 16:67 to 17:1-3. Accordingly, the descriptions of these figures are incapable of saving Claim 32 from patent-ineligibility at step one.

---

[4] Figure 6 is "an embodiment of the present invention," '507 patent at 11:3-24, that illustrates computers connected via network, wherein remote computers that are not the client computer or the server contain an "Application (Distributed)" that allows tasks to be performed among two or more such computers and the coordination of the distributed processing can be performed at any of the computers. While the specification's description of Figure 6 states that, in a "preferred embodiment," "distributed processing is coordinated by a program called 'VIS' represented by application client 210 in FIG. 6," *id.* at 11:23-24, nothing in the '507 patent describes how to write or configure "VIS" or indicates how "VIS" would coordinate the processing. The specification states that "VIS" is "software presently under development" created "as part of the Doyle Group's distributed hypermedia object embedding approach" described in an external publication. *See id.* at 10:5-14. Nothing in Figure 6 describes how to distribute the computing work or processing required to enable interactivity on the client computer browser, or how to coordinate such processing, in a way that would ensure that the computing limitations of the client computer are circumvented.

[5] Figure 10 illustrates generally how communications between the browser on the client computer and various "processes" whose configurations are not described in the patent can structured to enable the presentation of images on a client computer browser. '507 patent at 16:37-54. Eolas points to Figure 10 for the proposition that this figure shows how a user's browser "presents three-dimensional image data with the help of remote 'VRServers' and coordination by 'VIS.'" ECF No. 840-3 at 27. Nothing in this figure describes how to configure or write or otherwise achieve the purported functions of the "processes" "VIS" and "VRServer." The specification states that "VIS" and "VRServer" are software under development whose details are described in an external publication. *See id.* 10:5-14; 10:28-29. Accordingly, the references to "VRServers" and "VIS" in Figure 10 do not teach how to distribute the processing required to enable interactivity on the client computer, or how to coordinate such processing, in a manner that would ensure that the computing limitations of the client computer are circumvented.

United States District Court
Northern District of California

As to the second problem that Eolas contends was solved by the claimed invention, namely that of "security" by "preventing the end user's computer from losing control and simply running whatever application was requested by a hacker," ECF No. 840-3 at 25-26, Eolas contends that Claim 32 describes how to solve it.  Eolas points to the limitations in Claim 32 that require that "*only* interactive-content applications with which a Web browser has previously been configured can be utilized" as embodying the purported solution to the security problem; the limitations to which Eolas points require that the web browser on the client computer be "*configured with a plurality of different interactive-content applications*" and that the web browser select an interactive-content application from "among the different interactive-content applications" with which it was configured.  *Id.* at 28 (emphasis in the original).

However, the Court finds no indication in the intrinsic evidence that the claimed invention was intended to solve *any* security vulnerabilities.  The "analysis at *Alice* step one involves examining the patent claims in view of the plain claim language, statements in the written description, and the prosecution history,[6] if relevant."  *CardioNet*, 955 F.3d at 1374.  Here, Eolas points to no portion of the claims or the specification where the notion of preventing hackers from gaining control over a client computer is discussed.  Neither Claim 32 nor any of the other asserted claims contain limitations restricting the types of applications that can be selected by the browser to applications that are secure or that otherwise would not render the client computer susceptible to hacking.  The claim language merely requires that the browser be "configured with a plurality of different interactive-content applications" from which the browser will select one such application; the claim language does not restrict the applications that the browser can select to only those applications that are secure or that otherwise would not allow a hacker to hack the client computer.  The specification likewise does not discuss hacking vulnerabilities or any other security issues.  Indeed, the words "security" or "secure" are not mentioned in the '507 patent.

---

[6] Because Eolas points to no portion of the prosecution history that would support a finding that the asserted claims were intended to provide a solution to security vulnerabilities in client computers, *see* ECF No. 840-3 at 28-30 (portion of Eolas' opposition discussing purported solution to security vulnerabilities), the Court finds that the prosecution history is not relevant to the determination of this issue.

United States District Court
Northern District of California

1       Eolas points to Figure 8A in the specification to argue that this Figure "illustrates" Claim

2   32's purported solution of "securing the browser against running dangerous applications."  ECF

3   No. 840-3 at 28.  The Court disagrees.  Figure 8A depicts a browser that checks the "type

4   attribute" of an object to be displayed on the client computer to determine whether the object is an

5   "application object" ("e.g., a three dimensional image object"), in which case the browser will

6   launch a "predetermined application," or whether the object is a "video object," in which case the

7   browser will launch a "video player application."  '507 patent at 15:15-18; 45-50.  Nothing in the

8   specification's description of Figure 8A suggests that the browser's checking of the "type

9   attribute" is intended to, or would result in, restricting the types of applications that could be

10  selected by the browser to only applications that are secure or that would not render the client

11  computer susceptible to hacking.  Instead, the specification suggests that the checking of the "type

12  attribute" is intended to ensure that the application selected matches the type of the object to be

13  displayed (e.g., video vs. three-dimensional image, etc.).  *See id.* at 13:30-33 (stating that TYPE

14  values are "useful . . . where the browser client needs to determine which application to launch

15  based on the data format").  Accordingly, the Court cannot conclude, based on Figure 8A, that the

16  claimed invention was intended to solve hacking vulnerabilities.[7]

17      The absence of any indication in the claim language and the specification that the asserted

18  claims were intended to solve security vulnerabilities distinguishes this case from those that Eolas

19  cites in its opposition.  In each case upon which Eolas relies, *see* ECF No. 840-3 at 28-30, the

20  technological solution to which the claims at issue were directed *was discussed in the*

21  *specification*, as well as recited in the claims in non-abstract terms and with the requisite degree of

22

23

---

24  [7] Even if it were the case that Figure 8A's description of a web browser launching a
    "predetermined application" were consistent with an improvement to the security of a client
25  computer, that still would not render Claim 32 (or any of the other asserted claims) patent-eligible
    at step one, because embodiments were excluded from the asserted claims at claim construction.
26  *See* ECF No. 212 at 21 ("Although the specification refers to launching a 'predetermined
    application' (id. at 15:17–18), this predetermination is a specific feature of a particular disclosed
27  embodiment that should not be imported into the claims.").  As discussed above, to be patent-
    eligible at step one, *the asserted claims* must recite the technological improvement with
28  specificity.

1  specificity.[8]  Eolas cites no case in which a court has held that a claim was directed to a solution to

2  a problem that was not discussed in the specification, and the Court declines to do so here.

3  Further, relying on a solution to a problem that was not disclosed in the patent would essentially

4  reward Eolas' failure to disclose that purported solution in the patent, which would be inconsistent

5  with the underlying goal of the patent system, which is to award patent rights only to those who

6  create and publicly disclose "useful advances in technology."  *See Pfaff v. Wells Elecs., Inc.*, 525

7  U.S. 55, 63 (1998) ("[T]he patent system represents a carefully crafted bargain that encourages

8  both the creation and the public disclosure of new and useful advances in technology, in return for

9  an exclusive monopoly for a limited period of time.").

10      Eolas also points to extrinsic evidence that was generated in the course of litigation to

11  argue that Claim 32 is directed to solve the problem of hacking vulnerabilities.  Specifically, Eolas

12  points to an April 2020 declaration of Dr. David M. Martin, Jr., Eolas' expert, which Eolas filed in

13  support of its opposition to Defendants' summary judgment motion on obviousness-type double

14  patenting.  *See* Martin Decl. ¶¶ 44-48, ECF No. 609-1.  It also points to an April 2020 declaration

15  of Michael Doyle, Ph.D., a co-inventor of the '507 patent, which Eolas filed in support of its

16  opposition to Defendants' summary judgment motion on obviousness-type double patenting,

17

---

18  [8] *See Koninklijke*, 942 F.3d at 1151 (holding that asserted claims were not directed to abstract
    concept because "they recite a sufficiently specific implementation (i.e., modifying the

19  permutation applied to the original data 'in time') of an existing tool (i.e., check data generating
    device) that improves the functioning of the overall technological process of detecting systematic

20  errors in data transmissions," where "the specification makes clear that modifying the permutation
    in time provides the technological benefit of preventing non-detection of repetitive errors");

21  *Finjan*, 879 F.3d at 1304 (holding that claims were directed to a non-abstract improvement in
    computer functionality because they recited "specific steps" for generating a "behavior-based"

22  security profile to be used in virus scanning, where the "'behavior-based' approach to virus
    scanning was pioneered by Finjan [the patentee] and is disclosed in the '844 patent's

23  specification"); *SRI Int'l, Inc. v. Cisco Sys., Inc.*, 930 F.3d 1295, 1303 (Fed. Cir. 2019) (holding
    that "claims are directed to using a specific technique—using a plurality of network monitors that

24  each analyze specific types of data on the network and integrating reports from the monitors—to
    solve [the] technological problem" of "identifying hackers or potential intruders into the network,"

25  where the specification "explains that the claimed invention is directed to solving" networks'
    vulnerabilities to hacker attacks); *Ancora Techs., Inc. v. HTC Am., Inc.*, 908 F.3d 1343, 1348,

26  1345 (Fed. Cir. 2018), *as amended* (Nov. 20, 2018) (holding that asserted claims were directed to
    "a non-abstract computer-functionality improvement" to methods to prevent hacking of license-

27  authorization software that involved specifically requiring the use of a modifiable part of the BIOS
    memory to store information, where the specification stated that "[u]sing BIOS memory, rather

28  than other memory in the computer, improves computer security").

Doyle Decl. ¶¶ 13-14, ECF No. 609-14, and to Mr. Doyle's February 2012 trial testimony in *Eolas Technologies v. Adobe Systems, Inc.*, No. 6:09-cv-00446-LED (E.D. Tex.) ("*Eolas I*"), Doyle Trial Tr. at 101-02, ECF No. 842-4 at 16-17, in which Eolas asserted claims against multiple defendants for infringement of U.S. Patent No. 5,838,906 and U.S. Patent No. 7,599,985; the '507 patent stems from a continuation application of these patents.  The portions of the declarations cited state that claim limitations in the '507 patent requiring that the browser be configured with a plurality of interactive-content applications from which it selects and invokes one such application distinguishes the '507 patent from the prior art, and that prior methods of configuring browsers were insecure.  *See* Martin Decl. ¶¶ 44-48, ECF No. 609-1; Doyle Decl. ¶¶ 13-14, ECF No. 609-14.  The trial testimony cited states that the claimed invention in the '906 and '985 patents was intended in part to prevent hackers from taking control over a computer.  *See* Doyle Trial Tr. at 101-02, ECF No. 842-4 at 16-17.

The Court is not required to consider extrinsic evidence when conducting the step one analysis, because "*Alice* step one presents a legal question that can be answered based on the intrinsic evidence." *CardioNet*, 955 F.3d at 1372 ("The analysis [at step one] does not require a review of the prior art or facts outside of the intrinsic record regarding the state of the art at the time of the invention.").  As discussed above, the claim language and specification do not support a finding that Claim 32 (or any of the asserted claims) are directed to a technological solution to security vulnerabilities in client computers.  That is sufficient for the Court to conclude, under *CardioNet*, that Claim 32 (and the other asserted claims) are not directed to that purported solution.  The extrinsic evidence to which Eolas points, to the extent that it purports to show that the asserted claims are directed to a solution to security vulnerabilities in client computers, is inconsistent with the claim language and specification.  Because Eolas has cited no authority in which a court relied on extrinsic evidence to find that the focus of the asserted claims at step one was a solution to a problem that was not discussed in the patent itself, the Court declines to do so here, particularly given that the extrinsic evidence at issue was generated in the context of litigation.  Crediting the extrinsic evidence in question notwithstanding its mismatch with the claim language and specification would result in prioritizing extrinsic evidence over intrinsic

evidence when conducting the step one analysis, which would be contrary to established Federal Circuit law requiring that the step one inquiry be guided by the intrinsic evidence and, above all, the claim language. *See CardioNet, LLC*, 955 F.3d at 1372; *see also ChargePoint,* 920 F.3d at 769 ("[A]ny reliance on the specification in the § 101 analysis must always yield to the claim language.  Ultimately, '[t]he § 101 inquiry must focus on the language of the Asserted Claims themselves[.]'") (citation omitted).  Eolas' own arguments support the Court's conclusion that it should decline to rely on the extrinsic evidence in question in conducting the step one inquiry.  *See* ECF No. 840-3 at 24 (arguing that "[t]he determination of whether claims are directed to an abstract idea is an issue of law, and courts limit their examination to the claim language, the specification, and the prosecution history.").

In light of the foregoing, the Court finds that Claim 32 is directed to the abstract idea of enabling interactivity with remote objects on a client computer browser using distributed computing.  Claim 32, therefore, is not patent-eligible at step one.

### b.      Claims 37 and 39

Claims 37 and 39 depend from Claim 32.  Claim 37 adds limitations to Claim 32, namely that "at least one or more coordination computers performs coordination of at least part of the distributed application to perform at least one task."  '507 Patent at 24:24-26.  The terms "at least one or more coordination computers performs coordination" were construed as "at least one or more computers manage multiple computers so as to work together."  ECF No. 212 at 28.  Claim 39 adds limitations to Claim 32 and 37, namely that "two or more of the distributed application computers work together to perform the at least one task" that is broken up.  '507 patent at 24:27-32.

Eolas argues Claims 37 and 39 are not directed to an abstract idea and are, instead, directed to solutions to "an additional technological problem," namely "scalability and resource management, especially where end users have resource-limited computers."  ECF No. 840-3 at 30.  Eolas further contends that it is the "'coordination computer' feature required by claims 37 and 39 that describes how the scalability and resource management improvements are achieved, which is also described the specification at 11:9-22 (referring to Figure 6) and 16:37-55 (Figure 10)."  *Id.* at

United States District Court
Northern District of California

31.  Eolas also cites the April 2020 declaration of Dr. David Martin, Eolas' expert, for the proposition that Claims 37 and 39 are directed to solving problems in scalability and resource management.  *See* Martin Decl. ¶¶ 59-66, ECF No. 609-1.

The Court is not persuaded that Claims 37 and 39 are directed to a solution to problems in scalability and resource management.  Eolas points to no portion of the specification that discusses problems in scalability and resource management that the claimed invention was intended to solve. The portions of the specification that Eolas cites, which describe Figures 6 and 10, do not discuss problems with scalability and resource management or solutions to the same.  As discussed above, Figures 6 and 10 describe, in general terms, and without reference to scalability and resource management problems or solutions, how distributed computing *could be* structured to enable interactivity on a client computer browser, but they do not specify how to distribute the computing required to enable such interactivity or how any such distribution should be coordinated.  Even if it were the case that the specification's description of Figures 6 and 10 shed any light on how the "coordination" in claims 37 and 39 could be performed, however, that would not help Eolas, because the specification's description of these figures is not incorporated in the claim language. *See* '507 patent 16:67 to 17:1-3 ("The specification and drawings are . . . to be regarded in an illustrative rather than a restrictive sense, the invention being limited only by the provided claims.").

In addition to citing Figures 6 and 10, Eolas also cites the April 2020 declaration of Dr. David Martin, which Eolas filed in support of its opposition to Defendants' summary judgment motion on obviousness-type double patenting, for the proposition that Claims 37 and 39 are directed to solving problems in scalability and resource management.  *See* Martin Decl. ¶¶ 59-66, ECF No. 609-1.  The portions of Dr. Martin's declaration to which Eolas points state that the claims of the '507 patent are distinguishable from the claims of earlier, related patents because of the '507 patent's inclusion of limitations requiring coordination.  *See id.*  The cited portions of the declaration do not state that the coordination limitations to which Eolas points were intended to solve problems of scalability and resource management, or any other problem.

As discussed above, the Court need not consider extrinsic evidence when conducting the

United States District Court
Northern District of California

United States District Court
Northern District of California

1    step one determination, even if relevant.  *See CardioNet, LLC*, 955 F.3d at 1372.  Here, the cited

2    portions of Dr. Martin's declaration do not appear to be relevant to Eolas' contention that Claims

3    37 and 39 were intended to solve issues of scalability and resource management.  But even if this

4    extrinsic evidence *were* relevant and supported Eolas' contention that Claims 37 and 39 are

5    directed to a solution to scalability and resource management problems, the Court would decline

6    to rely on it to find that the claims at issue are directed to that solution.  Eolas has cited no case in

7    which a court relied on extrinsic evidence to find that the focus of the asserted claims at step one

8    was a solution to a problem that was not discussed in the patent itself.  As discussed above in the

9    context of Claim 32, relying on extrinsic evidence that is at odds with the claim language and

10   specification when determining the focus of the claims would result in prioritizing extrinsic

11   evidence over intrinsic evidence when conducting the step one analysis, which would be contrary

12   to established law.  *See CardioNet, LLC*, 955 F.3d at 1372; *see also Amdocs*, 841 F.3d at 1299.

13          Accordingly, the Court cannot find that Claims 37 and 39 are directed to solutions to

14   scalability and resource management problems.

15          To the extent that Eolas contends that the coordination limitations in Claims 37 and 39

16   embody solutions to the problems that *are* discussed in specification, namely computing

17   limitations in client computers and bandwidth constraints, that argument also fails.  The solution

18   to these problems, as described in the specification, is distributing the computing necessary to

19   enable interactivity on the client computer browser.  As discussed in detail above, the limitations

20   that Claims 37 and 39 share with Claim 32 do not describe how to distribute the computing in any

21   particular way, much less in the way that would ensure that the computing limitations of client

22   computers and bandwidth constraints are circumvented.  The "coordination" limitations that

23   Claims 37 and 39 add to Claim 32 do not supply the missing information.  While they require that

24   at least one computer manage other computers to perform at least one task and that at least two

25   distributed computers work together to perform at least one task, they do not specify how to

26   distribute the computing work required to enable the interactivity in a way that would circumvent

27   the limited computing power of client computers and bandwidth constraints, nor do they specify

28   how that distribution should be coordinated.  As noted, the specification discusses examples where

remote computers relieved the client computer of computational burdens by performing resource-intensive computations and by sending back to the client computer only a limited amount of data, such as the results of such computations.  The limitations in Claims 37 and 39 that "at least one task" be performed by remote computers working together do not require that resource-intensive tasks, or that a significant portion of the tasks, are performed by remote computers as opposed to the client computer.  They also do not specify how much data should be sent back to the client computer and when.  Accordingly, the Court cannot find that the limitations in question are directed to a solution to the problems of computing limitations of client computers and bandwidth constraints as described in the specification.

The Court finds, therefore, that dependent Claims 37 and 39 are directed to the same abstract idea as Claim 32.

### c.      Claims 19, 24, and 26

Eolas argues that Claims 32, 37, and 37 are representative of Claims 19, 24, and 26, because there is no material difference between the claims other than the fact that the latter set of claims are system claims, whereas the former set of claims are method claims.  *See* ECF No. 840-3 at 21.  Eolas contends that, in light of their material similarity, claims 19, 24, and 26 are not directed to an abstract idea for the same reasons that claims 32, 37, and 39 are not directed to an abstract idea.  *Id.*

The Court agrees with Eolas that Claims 32, 37, and 39 are representative of claims 19, 24, and 26.  The Court concludes that, because Claims 32, 37, and 39 are representative of Claims 19, 24, and 26, the latter are directed to the same abstract idea as Claims 32, 37, and 39, for the reasons discussed in detail above.  *See Alice*, 573 U.S. at 226 (holding that system claims that "are no different from the method claims in substance" are abstract and ineligible "for substantially the same reasons" as the method claims).

### d.      Claim 45

Eolas argues, and the Court agrees, that Claim 45 recites a method that is substantially similar to the method described in Claims 32 and 39.  *See* ECF No. 840-3 at 31.

Eolas argues that Claim 45 is not directed to an abstract idea because, in addition to the

United States District Court
Northern District of California

elements it shares with Claims 32 and 39, Claim 45 also recites limitations not found in Claims 32 and 39, which require that one or more computers generate and send commands to coordinate activity of the separate computers working together to perform "viewing transformations" to enable the interaction with at least part of the object on the client computer browser. *See* ECF No. 840-3 at 31 (citing '507 patent at 25:7-11). The term "viewing transformations" was construed as "operations performed on data for visual display to a user." ECF No. 212 at 31. Eolas contends that the "viewing transformations" limitations in Claim 45 compel a finding that the claim is not directed to an abstract idea, because such limitations "help provide the 3D view" in the embodiments shown in Figures 9 and 10 of the '507 patent, and because the "human mind is not equipped" to perform the viewing transformations described in the claim. ECF No. 840-3 at 31.

It is undisputed that Claim 45 is materially similar to Claims 32 and 39, which the Court has found to be directed to an abstract concept. In light of the material similarity between the claims, Claim 45 would likewise be directed to the same abstract concept as Claims 32 and 39, unless Claim 45 recites an element that it does not share with Claims 32 and 39 that indicates that its focus is a specific, non-abstract technological improvement.

Here, the only aspect of Claim 45 that Eolas contends is materially distinct from those of Claims 32 and 39 are the "viewing transformation" limitations. Eolas has not shown that such limitations convert Claim 45 from one directed to an abstract idea to one directed to a non-abstract technological solution. Eolas has not explained why the "viewing transformation" limitations distinguish Claim 45 from the other asserted claims in terms of the claimed method's ability to solve a technological problem. Further, Eolas' reference to Figures 9[9] and 10[10], which are embodiments of the claimed invention, is unavailing. At Eolas' request, the term "viewing transformations" was construed to exclude embodiments described in the specification. *See* ECF No. 212 at 29-31. Accordingly, any details in these figures as to what "viewing transformations"

---

[9] Figure 9 illustrates how images sent to a browser can be displayed in the browser after the browser has communicated with remote computers, and how a browser can include control buttons that a user can use to interact with images. *See* '507 patent at 16:17-36.

[10] Figure 10 is discussed in detail above.

could entail are not a part of the § 101 analysis.  *ChargePoint*, 920 F.3d at 769 (holding that, when conducting the § 101 inquiry, "the specification cannot be used to import details from the specification if those details are not claimed").

The Court finds that the "viewing transformation" limitations in question do not materially distinguish Claim 45 from Claims 32 and 39 in a manner that would transform Claim 45 into a patent-eligible claim at step one.  As noted, these limitations require that separate computers working together perform, based on commands sent by the coordinating computers, *"viewing transformations"* (as construed, "operations performed on data for visual display to a user") to enable interaction with objects on the client computer browser.  These limitations do not solve the abstractness problem of Claims 32 and 39 because the limitations do not amount to a requirement that the computing work and data for enabling interactivity on the client computer browser will be distributed in a manner that would solve the problems discussed in the specification.  That these limitations require that remote computers jointly perform unspecified "operations" on data for visual display does not mean that the computing work that must be performed and the data that must be transferred to enable interactivity on a client computer browser will be allocated in a manner that will circumvent the computing limitations of client computers and bandwidth constraints.  Thus, the limitations in question do not save Claim 45 from abstraction.  The Court finds that Claim 45, like Claims 32 and 39, is directed to the abstract idea of enabling interactivity with remote objects on a client computer browser using distributed computing.

### 2.    *Alice* step two

Because the Court has found that all of the asserted claims are directed to an abstract idea at step one of the *Alice* inquiry, the Court now proceeds to step two.

At *Alice* step two, courts look for an "inventive concept" and "consider the elements of each claim both individually and as an ordered combination to determine whether the additional elements transform the nature of the claim into a patent eligible application.  The second step of the *Alice* test is satisfied when the claim limitations involve more than performance of well-understood, routine, [and] conventional activities previously known to the industry."  *Berkheimer*, 881 F.3d at 1367 (internal citations and quotation marks omitted) (alterations in the original).

"[S]imply appending conventional steps, specified at a high level of generality, to laws of nature, natural phenomena, and abstract ideas cannot make those laws, phenomena, and ideas patentable." *Mayo*, 566 U.S. at 82. "To save a patent at step two, an inventive concept must be evident in the claims." *RecogniCorp, LLC v. Nintendo Co*., 855 F.3d 1322, 1327 (Fed. Cir. 2017) (citation omitted). "Whether a combination of claim limitations supplies an inventive concept that renders a claim 'significantly more' than an abstract idea to which it is directed is a question of law." *BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1290 (Fed. Cir. 2018). "Underlying factual determinations may inform this legal determination." *Id.* (citing *Berkheimer*, 881 F.3d at 1368). "When there is no genuine issue of material fact regarding whether the claim element or claimed combination is well-understood, routine, conventional to a skilled artisan in the relevant field, this issue can be decided on summary judgment as a matter of law." *Berkheimer*, 881 F.3d at 1368.

Here, Eolas argues that the asserted claims satisfy the requirements for patent-eligibility at step two because the asserted claims contain the following limitations, which Eolas contends constitute "unconventional technical solutions to technical problems": (1) the claims require "transmitting information over the Web, wherein the information enables a Web browser to: (a) select, based upon the information, an interactive-content application from among a plurality of different interactive-content applications ('507 Patent at 23:51-53); and (b) automatically invoke the selected interactive-content application to enable the user to employ the selected interactive-content application to interact within a Web page wherein the automatically invoked interactive-content application has been configured to operate as part of a distributed application located on two or more remote distributed application computers connected to the Web"; (2) the claims require the use of an interactive-content application that resides in part on the "client side"[11]; and (3) the claims require that the "systems and methods" claimed therein "be performed on the World Wide Web[.]" ECF No. 840-3 at 38-39.

---

[11] The presence of the "interactive-content application" on the client computer is, according to the claim language, achieved via the limitations requiring that the browser on the client computer select and invoke one such application. *See, e.g.*, '507 patent at 23:35-44. Thus, the presence of the interactive-content application on the client computer is already captured by the other claim limitations to which Eolas points.

United States District Court
Northern District of California

The Court finds that the claim limitations to which Eolas points as supplying the requisite inventive concept for patent-eligibility at step two, whether individually or as an ordered combination, embody the abstract idea to which the asserted claims are directed, which is enabling interactivity with remote objects in client computer browsers using distributed computing.  Indeed, the limitations to which Eolas points are the ones the Court analyzed in detail at step one and found to be directed to an abstract idea, and not a specific technological solution.  The limitations in question, therefore, cannot supply the requisite inventive concept at step two.  *See BSG Tech*, 899 F.3d at 1290 ("It has been clear since *Alice* that a claimed invention's use of the ineligible concept to which it is directed cannot supply the inventive concept that renders the invention 'significantly more' than that ineligible concept."); *Simio, LLC v. FlexSim Software Prod., Inc.*, 983 F.3d 1353, 1363 (Fed. Cir. 2020) (same).  Because of their abstract nature, the limitations in question cannot render the asserted claims patent-eligible at step two even if the Court assumes that the limitations are unconventional or innovative.[12]  This is because "a claim for a *new* abstract idea is still an abstract idea."  *Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1151 (Fed. Cir. 2016) (emphasis in the original); *see also Finjan*, 879 F.3d at 1305 ("[A] result, even an innovative result, is not itself patentable.") (collecting cases).

The remaining aspects of the asserted claims do not recite anything that would permit a finding that the asserted claims amount to "significantly more than a patent on the abstract idea itself."  *Simio*, 983 F.3d at 1363 (citation and internal quotation marks omitted).  It is undisputed that they require the use of components (e.g., client computers, servers, remote computers) and basic functions (e.g., computers communicating over networks or the internet, data processing and transfer) that are generic and basic.  The specification indicates that the components and computer

---

[12] Defendants have shown that David C. Martin, one of the co-inventors of the '507 patent, testified at his deposition that he does not claim that he and the other co-inventors of the '507 patent invented distributed computing in general, ECF No. 830-34 at 19; distributed applications in general, *id.* at 21; or parallel processing in general, *id.* at 9.  Eolas has not rebutted this evidence, nor has it pointed to any evidence showing that the asserted claims require distributed computing that differs from the general distributed computing that was known at the time of the claimed invention (and if so, how it differs).  Even had Eolas shown, which it has not, that the asserted claims require distributed computing that was unconventional at the time of the claimed invention, that still would not save the asserted claims from invalidity under § 101 because the claims do not recite in non-abstract terms how to perform it.

United States District Court
Northern District of California

and network functions recited in the claims are generic.[13]  Eolas has pointed to no evidence or authority suggesting otherwise.  The asserted claims' recitation of generic components and basic functions, therefore, does not save them from ineligibility at step two.  *See, e.g.*, *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014) ("The claims' invocation of computers adds no inventive concept. . . . That a computer receives and sends the information over a network—with no further specification—is not even arguably inventive.  The computers in *Alice* were receiving and sending information over networks connecting the intermediary to the other institutions involved, and the Court found the claimed role of the computers insufficient."); *Affinity Labs I*, 838 F.3d at 1262 (holding that a claim was not patent-eligible at step two where it "simply recites the use of generic features . . . as well as routine functions . . . to implement the underlying [abstract] idea").

Eolas cites the Court's findings in the context of Defendants' summary judgment motion on obviousness-type double patenting ("OTDP") for the proposition that the asserted claims' limitations requiring that the claimed methods and systems be practiced on the World Wide Web render the asserted claims patent-eligible at step two.  *See* ECF No. 840-3 at 38 (citing ECF No. 655 at 10-11).  The citation is not persuasive.  The OTDP analysis requires a comparison of the claims of two related patents for the purpose of determining whether the claims in the latter patent are invalid on the basis that they were obvious in light of the claims in the earlier patent.[14]  In

---

[13] *See., e.g.*, '507 patent at 8:17-13 (discussing "many possible computer types of configurations capable of being used with the present invention"); *id.* at 1:30-51 ("standard protocols" and "uniform" standards for internet and network communications); *id.* at. 16:61-63 ("various programming languages and techniques can be used to implement the disclosed invention"); *id.* at 4:15-20 (discussing data processing and data transfers).

[14] "Non-statutory, or 'obviousness-type,' double patenting is a judicially created doctrine adopted to prevent claims in separate applications or patents that do not recite the 'same' invention, but nonetheless claim inventions so alike that granting both exclusive rights would effectively extend the life of patent protection."  *Perricone v. Medicis Pharm. Corp.*, 432 F.3d 1368, 1373 (Fed. Cir. 2005).  "The obviousness-type double patenting analysis involves two steps: 'First, the court construes the claim[s] in the earlier patent and the claim[s] in the later patent and determines the differences. Second, the court determines whether those differences render the claims patentably distinct.'"  *Abbvie Inc. v. Mathilda and Terence Kennedy Inst. of Rheumatology Trust*, 764 F.3d 1366, 1374 (Fed. Cir. 2014) (citation omitted) (alterations in original) (internal quotation marks omitted).  "The second part of this analysis is analogous to the obviousness inquiry under 35 U.S.C. § 103 in the sense that if an earlier claim renders obvious or anticipates a later claim, the later claim is not patentably distinct and is thus invalid for obviousness-type double patenting."

resolving Defendants' summary judgment motion on OTDP, the Court found that Defendants were not entitled to summary judgment that the '507 asserted claims were invalid on OTDP grounds because Defendants failed to proffer sufficient evidence showing that the '507 asserted claims were not "patentably distinct" from the claims in earlier patents that share the same specification with the '507 patent.  ECF No. 655 at 11.  In making this finding, the Court relied, in relevant part, on limitations in the '507 patent claims requiring that the claimed methods and systems be practiced on the World Wide Web.  *See id.* at 11-12.

Eolas has cited no authority showing that the Court's analysis and findings in the context of OTDP bear on the question of patent-eligibility under § 101.  On the other hand, the Federal Circuit has routinely held, in the context of § 101, that claim language requiring that the claimed invention be performed on the internet merely confines the claimed invention to a particular technological environment, and that this is not enough, as a matter of law, to convert the asserted claims into patent-eligible subject matter at step two.  *See, e.g.*, *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 716 (Fed. Cir. 2014) ("The claims' invocation of the Internet also adds no inventive concept.  As we have held, the use of the Internet is not sufficient to save otherwise abstract claims from ineligibility under § 101."); *Intell. Ventures I LLC v. Cap. One Bank (USA)*, 792 F.3d 1363, 1366 (Fed. Cir. 2015) (holding that "[a]n abstract idea does not become nonabstract by limiting the invention to a particular . . .  technological environment, such as the Internet").  In light of this clear Federal Circuit authority, the Court finds that the "World Wide Web" limitations in the asserted claims merely require a particular technological environment and, as such, they cannot, as a matter of law, save the asserted claims from ineligibility under § 101.

Citing *Bascom Glob. Internet Servs., Inc. v. AT&T Mobility, LLC*, 827 F.3d 1341, 1352 (Fed. Cir. 2016), Eolas contends conclusorily that the limitations to which it points satisfy the requirements of *Alice* step two because they "do not preempt all systems and methods for securely providing interactive content over the World Wide Web to client computers having limited computing capabilities that also provides improved scalability and resource management."  ECF

---

*UCB, Inc. v. Accord Healthcare, Inc.*, 890 F.3d 1313, 1323 (Fed. Cir. 2018) (citation omitted).

No. 840-3 at 38.  *Bascom* is distinguishable.  There, the claimed invention was a method and system for customizing filters of internet content at a remote ISP server.  The district court held that the asserted claims were invalid under § 101 because they were directed to the abstract idea of filtering content.  *Id.* at 1346-47.  The Federal Circuit reversed this holding, finding that Bascom had shown that "an inventive concept can be found in the ordered combination of claim limitations," namely limitations that "claim[] a technology-based solution (*not an abstract-idea-based solution implemented with generic technical components in a conventional way*) to filter content on the Internet that overcomes existing problems with other Internet filtering systems." *Id.* at 1351-52 (emphasis added).  The technology-based solution that rendered the claims patent-eligible at step two was discussed in the specification and captured specifically in the claims; that solution, which distinguished the claimed invention from the prior art according to the specification, involved installing the filter at the ISP server and having the ISP associate individual users with a specific request to access a website so that the filtering of internet content could be customized for each user.  *Id.* at 1343-45.  According to the specification, this solution was unlike other known methods for filtering content because it allowed customization to occur at a remote server, where the filtering could not be thwarted by a computer-literate end-user.  *Id.*  In light of this, the Federal Circuit held that the claims were unlike those that were held to be invalid under § 101 in other cases on the basis that they preempted uses of an abstract idea on generic computer components or technological environments.  *Id.*

Here, unlike in *Bascom*, the limitations to which Eolas point do not embody a "technology-based solution" and instead amount to nothing more than an "abstract-idea based solution implemented with generic technical components in a conventional way."  *See id.* at 1351-52.  In contrast to the technology-based solution discussed in the specification and recited in the claims in *Bascom*, here, the solution discussed in the specification (i.e., distributing the computing required for enabling interactivity on a client computer browser so as to circumvent the limitations of client computers and bandwidth constraints) is not captured in the asserted claims in a non-abstract way, as discussed in detail above.  The asserted claims merely demand that interactivity on the client computer browser be enabled via distributed computing, without specifying a particular way of

doing so that would circumvent the problems discussed in the specification. Where, as here, "a claim directed to an abstract idea contains no restriction on how the result is accomplished" and the "mechanism . . . is not described, although this is stated to be the essential innovation . . . then the claim is not patent-eligible." *Symantec*, 838 F.3d at 1316 (holding that asserted claims were not patent-eligible at step two because of the absence of any "specific or limiting recitation of . . . improved computer technology" in the patent and distinguishing *Bascom* on that basis) (citation and internal quotation marks omitted).

For these reasons, the asserted claims do not satisfy the standard for patent-eligibility at step two and summary judgment that the asserted claims are invalid under § 101 is appropriate. *See BSG Tech*, 899 F.3d at 1291 (affirming summary judgment that claims were invalid under § 101 in relevant part because the "alleged unconventional feature" was a "restate[ment]" and "reformulate[ion]" of the abstract idea found at step one, and there was no genuine dispute that "other, non-abstract features of the claimed invention" were well-understood, routine, and conventional).

The Court, therefore, GRANTS Defendants' motion for summary judgment under § 101 with respect to all seven asserted claims.

### B. Remaining motions

In light of the Court's finding and conclusion that the seven asserted claims are invalid under § 101, the Court need not reach and DENIES AS MOOT Defendants' summary judgment motion as to non-infringement, Plaintiffs' summary judgment motion as to certain of Defendants' affirmative defenses, and the parties' motions to exclude certain expert testimony.

### CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' motion for summary judgment under § 101 and finds and concludes that the asserted claims of the '507 patent (Claims 32, 37, 39, 19, 24, 6, and 45) are invalid under 35 U.S.C. § 101. In light of this ruling, the Court DENIES AS MOOT Defendants' summary judgment motion as to non-infringement; Plaintiffs' motion for summary judgment as to certain of Defendants' affirmative defenses; and the parties' motions to exclude certain expert testimony.

1    The Clerk shall terminate these consolidated actions.

2        **IT IS SO ORDERED.**

3  Dated:  May 16, 2022



4    _____
              JON S. TIGAR
5          United States District Judge

United States District Court
Northern District of California